# In the United States Court of Federal Claims

| | |
|---|---|
| JIM W. CHEUNG,<br>CHRISTOPHER D. KOS,<br>CRAIG P. MILLER,<br>JACOB O. ONEWOKAE,<br>SEAN E. WRIGHT,<br>            Plaintiffs,<br>      v.<br>UNITED STATES,<br>            Defendant. | No. 18-48C<br>Filed: October 29, 2019<br>Redacted Version for Issued for<br>Publication: December 19, 2019[1] |

**O R D E R**

Plaintiffs Jim W. Cheung, Christopher D. Kos, Craig P. Miller, Jacob O. Onewokae, and Sean E. Wright filed a complaint in the United States Court of Federal Claims alleging violations of the Fair Labor Standards Act of 1938 (FLSA), as amended, 29 U.S.C. §§ 201-219 (2012), against the United States Department of Homeland Security, United States Immigration and Customs Enforcement (ICE). The named plaintiffs are based in the Enforcement and Removal Operations (ERO) office, in the St. Paul Field Office, in Ft. Snelling, Minnesota. The named plaintiffs allege failures to pay plaintiffs while on night phone duty on a "standby" basis, rather than on an "on-call" basis, and for failure to pay plaintiffs regular overtime compensation, rather than administratively uncontrollable overtime (AUO) compensation from May 1, 2017 to the present. Plaintiffs seek backpay and liquidated damages for their unpaid compensation, including interest and attorney's fees.

After the defendant filed an answer and the parties submitted a joint stipulation of facts, which included a joint appendix with deposition transcripts from the named plaintiffs and other government officials, plaintiffs filed a motion for partial summary judgment and defendant filed a motion for summary judgment, pursuant to Rule 56 of Rules of the

---

[1] This Order was issued under seal on October 29, 2019. The parties were asked to propose redactions prior to public release of the Order. This Order is issued with the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

United States Court of Federal Claims (RCFC) (2019). RCFC 56 is similar to Rule 56 of the Federal Rules of Civil Procedure in language and effect. Both rules provide that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); Fed. R. Civ. P. 56(a) (2019); see also Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651 (Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); 1st Home Liquidating Trust v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370-71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012); Arranaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011); Boensel v. United States, 99 Fed. Cl. 607, 610 (2011).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Mata v. United States, 114 Fed. Cl. at 744; Arranaga v. United States, 103 Fed. Cl. at 467-68; Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. at 469. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Trust v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469-70; Boensel v. United States, 99 Fed. Cl. at 611; Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717

2

(2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009); Johnson v. United States, 49 Fed. Cl. 648, 651 (2001), aff'd, 52 F. App'x 507 (Fed. Cir. 2002), published at 317 F.3d 1331 (Fed. Cir. 2003). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250-52; Jay v. Sec'y of Dep't of Health and Human Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Leggitte v. United States, 104 Fed. Cl. at 316. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc., 674 F.3d at 1372; Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Rothe Dev. Corp. v. U.S. Dep't of Def., 262 F.3d 1306, 1316 (Fed. Cir. 2001); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

> In appropriate cases, summary judgment
>
> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

Dehne v. United States, 23 Cl. Ct. 606, 614-15 (1991) (quoting Pure Gold, Inc. v. Syntex, (U.S.A.) Inc., 739 F.2d 624, 626 (Fed. Cir. 1984)) (citation omitted), vacated on other grounds, 970 F.2d 890 (Fed. Cir. 1992); see also Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 806 (Fed. Cir. 1999) ("The purpose of summary judgment is not to deprive a litigant of a trial, but to avoid an unnecessary trial when only one outcome can ensue."); Metric Constr. Co., Inc. v. United States, 73 Fed. Cl. 611, 612 (2006).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all

presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 562 U.S. 827 (2010); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345-46 (Fed. Cir. 2000)); Dana R. Hodges Trust v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587-88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; and Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d at 1266-67; Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807. "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009); see also Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48.

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Riley & Ephriam Constr. Co. v. United States, 408 F.3d 1369, 1371 (Fed. Cir. 2005); Crown Operations Int'l Ltd. v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir.), reh'g denied (Fed. Cir. 2002); Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 741 (Fed. Cir.) (quoting Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994), reh'g denied and en banc suggestion declined (Fed. Cir. 1995)), reh'g denied and en banc suggestion declined (Fed. Cir. 1997); Lockwood v. Am. Airlines, Inc., 107 F.3d 1565, 1569 (Fed. Cir. 1997); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; RQ Squared, LLC v. United States, 119 Fed. Cl. 751, 757-58 (2015), subsequent determination, 129 Fed. Cl. 742 (2017), aff'd, 708 F. App'x 685 (Fed. Cir. 2018). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. See Celotex Corp. v. Catrett, 477 U.S. at 322; see also Wavetronix LLC v. EIS Elec. Integrated Sys., 573 F.3d 1343, 1354 (Fed. Cir. 2009); Long Island Sav. Bank, FSB v. United States, 503 F.3d at 1244; Fla. Power & Light Co. v. United States, 375 F.3d 1119, 1124 (Fed. Cir. 2004); Schoell v. Regal Marine Indus., Inc., 247 F.3d 1202, 1207 (Fed. Cir. 2001); Am. Airlines, Inc. v. United States, 204 F.3d 1103, 1108 (Fed. Cir. 2000); Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d at 807; Rasmuson v. United States, 109 Fed. Cl. 267, 271 (2013). However, "a non-movant is required to provide opposing evidence under Rule 56(e) only if the moving party has

provided evidence sufficient, if unopposed, to prevail as a matter of law." Saab Cars USA, Inc. v. United States, 434 F.3d 1359, 1369 (Fed. Cir. 2006).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968-69; Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Massey v. Del Labs., Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010), aff'd, 814 F.3d 1299 (2015); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378 (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); see also DeMarini Sports, Inc. v. Worth, Inc., 239 F.3d 1314, 1322 (Fed. Cir. 2001); Gart v. Logitech, Inc., 254 F.3d 1334, 1338-39 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1114 (2002); Oswalt v. United States, 85 Fed. Cl. 153, 158 (2008); Telenor Satellite Servs., Inc. v. United States, 71 Fed. Cl. 114, 119 (2006).

As indicated above, along with the joint stipulation of facts, the parties submitted a joint appendix, which includes transcripts of depositions of the named plaintiffs, as well as of government officials, and selected other written documentation, which includes the ICE Premium Pay Guide. After extensive review of the record before the court, the question of whether to grant summary judgment or partial summary judgment has developed to be a more challenging issue than anticipated. Careful review of the totality of the record currently before the court reveals significant differences regarding important material facts relevant to reaching a decision. Although summary judgment or partial summary judgment is an important and efficient way to resolve disputes without the time and expenses of trial, it should only be used to resolve cases that are appropriate for summary judgment.

The statutes and regulations at issue in the above captioned case are specific and have precise definitions. The court briefly notes that, for the purposes of context, authorized by Congress in 29 U.S.C. § 204(f) (2012), the United States Office of Personnel Management's (OPM) issued regulations which include a definition of hours of work. The OPM regulations state:

> (a) All time spent by an employee performing an activity for the benefit of an agency and under the control or direction of the agency is "hours of work." Such time includes:
>
> > (1) Time during which an employee is required to be on duty;
> >
> > (2) Time during which an employee is suffered or permitted to work; and
> >
> > (3) Waiting time or idle time which is under the control of an agency and which is for the benefit of an agency.

5 C.F.R. § 551.401(a)(1)-(3) (2019). Suffered or permitted to work is defined by the OPM regulations as:

> *Suffered or permitted work* means any work performed by an employee for the benefit of an agency, whether requested or not, provided the employee's supervisor knows or has reason to believe that the work is being performed and has an opportunity to prevent the work from being performed.

5 C.F.R. § 551.104 (2019) (emphasis in original). OPM also issued regulations governing when an employee is off the employer's premises but must still be responsive to work duties. The OPM regulators define "on-call" status of an employee:

> An employee will be considered off duty and time spent in an on-call status shall not be considered hours of work if:
>
> > (1) The employee is allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius; or
> >
> > (2) The employee is allowed to make arrangements such that any work which may arise during the on-call period will be performed by another person.

5 C.F.R. § 551.431(b)(1), (2) (2019). OPM also issued regulations defining what constitutes standby duty:

6

>   (1) An employee is on duty, and time spent on standby duty is hours of work if, for work-related reasons, the employee is restricted by official order to a designated post of duty and is assigned to be in a state of readiness to perform work with limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her own purposes. A finding that an employee's activities are substantially limited may not be based on the fact that an employee is subject to restrictions necessary to ensure that the employee will be able to perform his or her duties and responsibilities, such as restrictions on alcohol consumption or use of certain medications.
>
>   (2) An employee is not considered restricted for "work-related reasons" if, for example, the employee remains at the post of duty voluntarily, or if the restriction is a natural result of geographic isolation. . . .

5 C.F.R. § 551.431(a)(1), (2). The OPM regulations further indicate, if the employee is "allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius," or "[t]he employee is allowed to make arrangements such that any work which may arise during the on-call period will be performed by another person," then that employee is on-call. 5 C.F.R. § 551.431(b)(1)-(2).

According to statute, regular overtime compensation is paid "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(k) (2012). An employer may pay an employee a different rate for "administratively uncontrollable overtime:"

>   The head of an agency, with the approval of the Office of Personnel Management, may provide that . . . an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for regularly scheduled overtime, night, and Sunday duty, and for holiday duty. Premium pay under this paragraph is an appropriate percentage, not less than 10 percent nor more than 25 percent, of the rate of basic pay for the position, as determined by taking into consideration the frequency and duration of irregular, unscheduled overtime duty required in the position.

5 U.S.C. § 5545(c)(2) (2018). The OPM also issued a regulation providing an example of when hours of duty cannot be controlled administratively:

>   The requirement in [5 C.F.R.] § 550.151 that a position be one in which the hours of duty cannot be controlled administratively is inherent in the nature

7

> of such a position. A typical example of a position which meets this requirement is that of an investigator of criminal activities whose hours of duty are governed by what criminals do and when they do it. He is often required to perform such duties as shadowing suspects, working incognito among those under suspicion, searching for evidence, meeting informers, making arrests, and interviewing persons having knowledge of criminal or alleged criminal activities. His hours on duty and place of work depend on the behavior of the criminals or suspected criminals and cannot be controlled administratively. In such a situation, the hours of duty cannot be controlled by such administrative devices as hiring additional personnel; rescheduling the hours of duty (which can be done when, for example, a type of work occurs primarily at certain times of the day); or granting compensatory time off duty to offset overtime hours required.

5 C.F.R. § 550.153(a) (2019).

As described below, the above captioned case is not appropriate for summary judgment or partial summary judgment given the existing, material, factual differences between the parties. Selected examples of material, factual differences between the parties, although not all inclusive, are discussed below. At trial, the parties will have opportunities to present their respective factual testimony while also giving the court an opportunity to consider the credibility of the witness testimony offered and the relevance, and significance, of the documents admitted into the trial record. In post-trial briefs, the parties will have a chance to explain their respective legal positions with citation to the trial record.

Among plaintiffs' assertions in support of their claims are that plaintiffs should be compensated in accordance with "standby" status because night phone duty responsibilities are the same as duties on a regular shift. Plaintiffs state, "[u]nderscoring this point, an Agency supervisor testified that the primary duties that plaintiffs would perform working a scheduled duty phone shift, during which all time is paid, and an off-hours night phone shift, during which only a portion is paid, are the same." As further examples, plaintiffs offered excerpts from the depositions of four Supervisory Detention Deportation Officers (SDDOs), including the following discussion with the government representative Dustin Halverson, a SDDO:

> [Plaintiffs' counsel:] Would the primary duties that you list here apply to somebody who is on night phone duty?
>
> [Mr. Halverson:] Yeah, it could apply to them.
>
> [Plaintiffs' Counsel:] And would the -- those would be the same primary duties if somebody was on night phone duty, whether they were working [redacted] or working [redacted], correct?
>
> [Mr. Halverson:] Yes.

8

Separately, defendant's counsel asked plaintiff Kos, "[w]hy do you think it [plaintiff Kos' AUO rate] has declined?" to which plaintiff Kos responded: "Due to family life. I have a long commute. My wife runs a business nights and weekends. I've got to be there for the kids, so I -- you've got to give somewhere. I've cut back hours. My docket demands where I could work many, many – I've got 2,000 cases. I mean, I could work around the clock." Defendant refers to this testimony to argue that, "[i]n contrast to night phone coverage, DOs' regular shifts do not involve idle time." In addition, defendant, citing to the deposition transcripts in the joint appendix, identifies the following activities the plaintiffs appear to have performed while on night phone duty, including, for plaintiff Onewokae, playing with his kids, spending time with family and in-laws, getting mail, and running errands to the gas station, for plaintiff Kos, going on a family camping trip, for plaintiff Cheung, going to the "grocery store" and "Target," and, for plaintiff Wright, "[w]atch TV, surf the internet."

In the joint stipulation of facts, the parties stipulated that, in 2017, the ERO in St. Paul "participated in an effort referred to as 'ERO 2.0,' in which the office tested and evaluated various initiatives with the goal of improving its operations." It was further stipulated that, "[t]he ERO 2.0 test involved the creation of additional shifts, for which DOs volunteered and earned scheduled overtime, while working their regular shifts as well." According to the joint stipulations, "[o]vertime for these additional shifts was to be requested and approved in advance and paid as scheduled overtime (not as administratively uncontrollable overtime (AUO))." The parties stipulated that the ERO in St. Paul, however, changed their night phone duty obligation on October 1, 2017 to the current night phone duty obligation, the one at issued in the above captioned case. The plaintiffs and defendant, however, disagree on the level of similarity of ERO 2.0 as compared to the current night phone duty.

Plaintiffs claim in their motion for partial summary judgment that, "[t]here is **no difference whatsoever** between the duty phone tasks that DOs performed during ERO 2.0, when the deportation officers were compensated with regularly scheduled overtime for all time spent monitoring the duty phone, and the duty phone tasks performed by plaintiffs now," in which DOs earn AUO compensation. (emphasis in original). In its response to plaintiffs' motion for partial summary judgment, defendant asserts that, "[d]uring night phone coverage, DOs must respond to calls that come in . . . but otherwise need not perform any work," whereas during ERO 2.0, "DOs came into the office, performing work for the entirety of the shift." The deposition testimony in record, however, reveals conflicting, and less than clear information. For example, Mr. Halverson testified for the government:

> [Mr. Halverson:] It could be, for instance, during the ERO 2.0 test phase. I believe we had people working overtime that were taking those phone calls from the after-hours duty phone. So in that instance, because it was scheduled in advance with the administrative workweek, it would be considered overtime versus AUO.

9

> [Plaintiffs' counsel:] Okay. And were they working outside the field office, or where were they working that occurred when they were working the scheduled overtime?
>
> [Mr. Halverson:] Typically in the office.
>
> [Plaintiffs' counsel:] But not always?
>
> [Mr. Halverson:] Well, not always, no.

The same individual, Mr. Halverson, testified, regarding ERO 2.0, in response to plaintiffs' counsel's question: "Did they [DOs] work the overtime shifts here at the office, or were they on, like, phone duty?" Mr. Halverson responded: "It was at the office."

The parties also dispute the expectation regarding the timing of answering an incoming call while on night phone duty. Defendant states in its reply brief that it "expects them [plaintiffs] to answer the phone when it rings," and proceed appropriately. In a question to Mr. Halverson, however, plaintiffs' counsel asked: "If they receive a call, do they need to answer it immediately from local law enforcement?" Mr. Halverson replied: "Yes. There may be instances when they are unable to, but we instruct them that they are supposed to answer the phone call immediately if available." Yet in his deposition, plaintiff Cheung stated, "I don't necessarily answer the call. I let it go to voice mail."

In addition, the parties dispute the expectations and requirements for plaintiffs to search government databases while on night phone duty. All five named plaintiffs, during their respective depositions, testified that their laptops were set up to assist plaintiffs in their homes while on night phone duty. Plaintiff Onewokae testified, "I go downstairs so I don't wake my kids or my wife and so I can have my laptop set up, ready to respond." Plaintiff Miller testified, in response to defendant's counsel's question, "what's your setup look like in the basement when you do that?" "I fire up my laptop." Plaintiff Kos testified, "I have all -- my gun, computer, everything at home at the ready." Plaintiff Wright testified, "my computer is set up." In response to defendant's counsel's question: "So do you -- do you have your computer, your laptop," plaintiff Cheung testified "I do." Plaintiffs argue in their reply brief that, "in practice, they [plaintiffs] are confined to, either their home, or the office." During oral argument, however, the court had the following exchange with plaintiffs' counsel:

> [The Court:] [T]heoretically they could take their laptop with them and their phone and they could go wherever they wanted.
>
> [Plaintiffs' counsel:] Theoretically, yes.
>
> [The Court:] Okay.
>
> [Plaintiffs' counsel:] Yes. They could.

[The Court:] Let's not confuse the two, because you just said they can't leave the home, but they can.

[Plaintiffs' counsel:] Well, in their -- in their minds, you know, they could, I suppose, go to the public library or something and set up or whatever the hell or heck they do.

[The Court:] Go to a friend's house and watch a movie; they could do all kinds of things. Right?

[Plaintiffs' counsel:] Well, but they better answer the call.

On another subject, defendant argues that the plaintiffs are not required to look up the status of an individual on their own, that they may call "ICE's Law Enforcement Service Center (LESC)," and that plaintiffs are familiar with the LESC. Plaintiff Miller testified, "if I can't get my laptop to work, then I have to rely on the LESC." Plaintiff Kos testified that at times, "I'm waiting on my computer to come up," and the "only reason I'm powering up that computer is to do my duty. So sometimes I'll call the LESC if that takes too long." Plaintiff Cheung testified that "they [LESC] have access to certain databases that I do not. So when I am stumped on a case, unable to locate him [a detained individual] in our systems, I call them [LESC] to see if they [LESC] are able to help." At plaintiff Kos' deposition, however, in response to the question from plaintiffs' counsel, "[i]s there anything that you have to do when you get a call to the night phone that the LESC can't handle?," plaintiff Kos indicated: "When there's a detainer issue or a pickup issue, you've got to produce certain documents -- it can be anywhere from two to three documents -- that the LESC cannot provide."

Plaintiffs and defendant further dispute whether DOs are in states of readiness while on night phone duty, one of the factors identified in 5 C.F.R. § 551.431(a) for determining whether an employee would be paid on a standby basis. Plaintiffs cite to plaintiff Wright, who claimed in his deposition, "the idea that I can go about my life and do things with my family outside of the house while on call, it's just not feasible." In their response to defendant's motion for summary judgment, plaintiffs contend that their "personal lives are placed on hold and that every moment is spent either in a state of readiness to respond to a call or responding to a call." Defendant notes that in the depositions of plaintiffs Miller, Wright, and Kos, they indicate that there is no requirement imposed by the employer or a supervisor to stay at home and perform night phone duty, and that there are no restrictions other than what is required to do the job, which includes not consuming alcohol.[2] As indicated above, for example, some DOs offered deposition testimony that they go on family camping trips, take trips to the in-laws, and run various types of errands.

The parties also disagree on the impact of call frequency during a typical night phone duty shift. Using plaintiffs' AUO logs as support for plaintiffs' claims, plaintiffs

---

[2] Plaintiff Cheung testified: "I would not consume any alcohol in case something would arise, but I -- I don't think there would be any restrictions."

11

argue, "[e]ven a few calls dispersed over the course of a night phone shift will substantially disrupt a DO's ability to sleep." Based on plaintiffs' self-reported AUO Reports, which are included in the joint appendix, defendant calculated that, "over 70 percent of the time (47 of 67 instances) a plaintiff was responsible for covering the night phone . . . he reported active work amounting to no more than a quarter of the scheduled night phone coverage hours," thirty-six percent of the night shifts plaintiffs covered reported zero calls, and just under fifteen percent of the time, "[a]ctive work consumed more than half the scheduled coverage period."

Also important to the court's decision to deny summary judgment or partial summary judgment, at this time, is that in the various deposition transcripts of both the named plaintiffs and the government representatives, were the use of cautious, tentative, and qualifying phrases by deponents, making it difficult for the court to reach a final conclusion for summary or partial summary judgment. The differences identified in the record, and the unclear answers in the various deposition transcripts, lead the court to the conclusion that it will be important for the court to judge the credibility of the witnesses, for both the plaintiffs and for the government when their testimony is offered within the formality of a trial setting. For example, in response to defendant's counsel's question "[h]ave you gone grocery shopping while you were on night phone duty?" Plaintiff Onewokae responded: "Yes. I think so, but I think that's probably before we did pickups." Defendant's counsel followed up with plaintiff Onewokae, and had the following exchange regarding what can be done during a regular day shift:

> [Defendant's counsel:] Just to be clear, are you saying that it is acceptable during your regular shift to watch Netflix?
>
> [Plaintiff Onewokae:] I mean, I guess if they don't have any more assigned work, then that's -- that's possible. Is it -- would they get -- would they get in trouble? Possibly.
>
> [Defendant's counsel:] You're not –
>
> [Plaintiff Onewokae:] I don't know what they're supposed to do on their downtime.
>
> [Defendant's counsel:] I mean, have you ever watched Netflix during your regular shift?
>
> [Plaintiff Onewokae:] No.

Plaintiff Miller, in response to the question from defendant's counsel as to whether he had ever watched television during the hours he was on night phone duty, responded:

> I try to -- normally, on the weekends, if I have a long, 24-hour shift, if I know my partner, for whatever reason, won't be able to cover it, I try to relax and get as much sleep as possible when I can. And if it means watching TV to

12

> relax me, I'll do I just so I can fall asleep, but my main goal is to answer the phone when it rings. And, I mean, I don't get to see my family that whole day, practically, and it sucks.

When asked about whether he is able to sleep while on night phone duty, plaintiff Kos answered: "I attempt to sleep. Sure. It's usually pretty difficult." In response to the question from defendant's counsel: "Has any supervisor ever told you that you're not permitted to engage in any activity while you're on night phone duty that could cause you to miss a call? Plaintiff Kos answered, "I mean, I don't remember specifics, but it's understood." Plaintiff Cheung had the following exchange with defendant's counsel regarding splitting the weekend shift with his partner:

> [Defendant's counsel:] So for the -- for the 12 hours that you are not having the phone forwarded to your cell phone, would you then leave your house periodically?
>
> [Plaintiff Cheung:] I would.
>
> [Defendant's counsel:] And what kinds of places have you gone?
>
> [Plaintiff Cheung:] I would run errands to the grocery store, to Target.
>
> [Defendant's counsel:] Do you spend time with friends and family then?
>
> [Plaintiff Cheung:] I could. Yes. I would. I -- but I don't recall I have.

Plaintiff Cheung also stated, with regard to whether he needs to come into the office for night phone duty that:

> Occasionally I do. I don't have access to a fax machine. Sometimes my laptop does not work properly at my home. I don't have a printer at home -- or I have a printer at home, but I'm not able to download the software onto my government computer to be able to print out documents I may need.

In response to the question from defendant's counsel are you mostly working from home for these calls? Plaintiff Wright answered: "It depends on -- as I said, it depends on the night." In response to defendant's counsel's question, "when you're on night phone duty but not actively responding to a call, are you able to spend time with friends or family?" Plaintiff Wright: answered: "Not really."

The government representatives also were tentative during their testimony such as Dustin Halverson, one of the SDDOs when answering questions about ERO 2.0:

13

> [Plaintiffs' counsel:] were they [DOs] working outside the field office, or where were they working when that occurred when they were working the scheduled overtime?
>
> [Mr. Halverson:] Typically in the office.
>
> [Plaintiffs' counsel:] But not always?
>
> [Mr. Halverson:] Well, not always, no.

Mr. Halverson also stated:

> I can't say for certain if it's been months in advance. I know local management makes every effort to do that months advance. There's oftentimes things that come in up. Negotiations with the union comes to mind, which may prevent us from having months to be able to post that. But in my experience, it's been posted months in advance. I guess in my experience, it's been posted in advance; how long that's been in the past, I don't know.

Patrick Kenney, another SDDO, who is the supervisor of plaintiffs Wright, Cheung, and Kos, testified when discussing the role of the LESC:

> [Plaintiffs' counsel:] During a night phone, after-hours phone shift, how are they accessed so that they can decide whether to issue a detainer?
>
> [Mr. Kenney:] They could call the LESC, who would run the checks for them. So they could just make a phone call and they would -- whatever checks or databases the deportation officer asked the LESC to perform, they would do.
>
> [Plaintiffs' counsel:] Do they have a government computer?
>
> [Mr. Kenney:] Yes.
>
> [Plaintiffs' counsel:] Do all the deportation officers?
>
> [Mr. Kenney:] To my knowledge, they should all have a laptop that they can -- that they're assigned that they can take to and from work.
>
> [Plaintiffs' counsel:] All right. And then are those databases accessible on that laptop?
>
> [Mr. Kenney:] They can be, yes.

14

Sam Olson, the SDDO for plaintiff Miller, had the following exchange at his deposition with plaintiffs' counsel, "do the local agencies honor the detainers?" and Mr. Olson answered: "Some." Plaintiffs' counsel followed up: "Are there some that don't?", and Mr. Olson answered: "Yes, I believe so." In response to plaintiffs' counsel's question, "[a]nd does the officer covering the night form [sic] need to perform a pickup if someone is being released?" Mr. Olson responded: "It depends."

In addition, the RCFC 30(b)(6) witness offered by the government, Brian Wyneken, identified as the special assistant to the local field office director, on a number of occasions, could not fully address the questions asked. With regard to how the night phone is set up technologically, he had the following exchange with plaintiffs' counsel at his deposition:

> [Plaintiffs' counsel:] And it's forwarded to a deportation officer's work cell phone?
>
> [Mr. Wyneken:] I certainly believe so. That's always been my belief or assumption.
>
> [Plaintiffs' counsel:] Do all the deportation officers have work cell phones?
>
> [Mr. Wyneken:] I would say yes. They gave me one. They're certainly giving one to all the deportation officers.

With regard to the field office's expectation of picking up detainees, Mr. Wyneken testified, "if it were the case that the placement of the detainer was intended because we definitely would want to pick this person up, that would be closer to a fair description of it." In response to plaintiffs' counsel's follow-up question, "[y]ou're just not sure?" Mr. Wyneken responded, "I'm just not sure." Mr. Wyneken also responded to plaintiffs' counsel's question, "[i]f they're performing the pickup because someone is being released, the steps would be the same [on night phone duty and a regularly scheduled shift], correct?" by responding: "Based on an incomplete understanding of law enforcement work, it sounds pretty close, but I'm not a DO."

The parties in the case currently before the court also dispute whether liquidated damages should be awarded and whether there is sufficient evidence to support FLSA compliance by agency officials. Plaintiffs contend, besides following "an internal ICE policy called the 'Premium Pay Guide,'" that "[d]efendant has done nothing else to determine its FLSA compliance other than consult the Premium Pay Guide." Defendant, however, argues that "supervisors have had sufficient training to be familiar with the Premium Pay Guide and to recognize that it contains the proper guidance to address FLSA compliance questions." Jennifer Skwira, SDDO, who supervises plaintiff Onewokae, stated in response to plaintiffs' counsel question: "Have you ever had any training in the Fair Labor Standards Act?" "I don't recall." The RCFC 30(b)(6) witness for defendant, Mr. Wyneken, had the following exchange with plaintiffs' counsel:

15

> [Plaintiffs' counsel:] Have you ever had any training in the Fair Labor Standards Act?
>
> [Mr. Wyneken:] I don't remember. But I did not have it while working with ICE ERO.
>
> [Plaintiffs' counsel:] Okay. So you may have had it previously, but you haven't had it with ICE, is that --
>
> [Mr. Wyneken:] Yes.

The plaintiffs' reference to the Premium Pay Guide and the question of Mr. Wyneken's familiarity with the Fair Labor Standards Act raise a separate issue which also, based on the record before the court, are not resolvable on summary judgment or partial summary judgment.

The court is careful to note that civilian pay cases, and cases involving the Fair Labor Standards Act, including cases involving the United States Department of Homeland Security, United States Immigration and Customs Enforcement can be resolved on summary judgment if there are no material facts at issue. The above described samples of deposition testimony are exemplary, not exhaustive, of the numerous relevant, material facts identified as in dispute given the context of the relevant statutory and regulatory framework. In this case, the court requires the opportunity to hear testimony and an opportunity to judge the credibility of the witnesses. Therefore, after careful and extensive review of the record currently before the court, the court is unable to resolve the case on summary judgment, or reach a decision on partial summary judgment. The court **DENIES** the defendant's motion for summary judgment and **DENIES** the plaintiffs' motion for partial summary judgment. By separate Order, the court will schedule a conference with the parties to discuss further proceedings.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**
