# In the United States Court of Federal Claims

**No. 18-48C**
**Filed: August 27, 2021**
**Reissued: December 6, 2021[1]**

| | |
|---|---|
| * * * * * * * * * * * * * * ** | * |
| | * |
| JIM W. CHEUNG, | * |
| CHRISTOPHER D. KOS, | * |
| CRAIG P. MILLER, | * |
| JACOB O. ONEWOKAE, and | * |
| SEAN E. WRIGHT, | * |
| | * |
| Plaintiffs, | * |
| | * |
| v. | * |
| | * |
| UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |
| * * * * * * * * * * * * * * * * | * |

    **David Ricksecker**, McGillivary Steele Elkin LLP, Washington, D.C., for plaintiffs. With him were **Gregory K. McGillivary**, **T. Reid Coploff**, and **Matthew D. Purushotham**, McGillivary Steele Elkin LLP, Washington, D.C..

    **Daniel B. Volk**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Reginald T. Blades, Jr.**, Assistant Director, Commercial Litigation Branch, **Martin F. Hockey, Jr.**, Acting Director, Commercial Litigation Branch, and **Brian Boynton**, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C.

## O P I N I O N

<u>**HORN, J.**</u>

    Plaintiffs Jim W. Cheung, Christopher D. Kos, Craig P. Miller, Jacob O. Onewokae, and Sean E. Wright, "on their own behalf and on behalf of others similarly situated,"

---

[1] This Opinion was issued under seal on August 27, 2021. The parties were given the opportunity to propose possible redactions, but no redactions were proposed. The parties were also given the opportunity to review the spreadsheets attached to this Opinion. The time it took to review and verify the spreadsheets accounts for the delay between when the Opinion was issued under seal and when the Opinion was reissued. The original Opinion is hereby unsealed and reissued without redaction.

employees of the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), filed a complaint in the United States Court of Federal Claims alleging violations of the Fair Labor Standards Act of 1938 (FLSA), as amended, 29 U.S.C. §§ 201-219 (2018) against the United States. The named plaintiffs each work as a Deportation Officer (DO) in ICE's Enforcement and Removal Operations (ERO), St. Paul Field Office, in Ft. Snelling, Minnesota. Plaintiffs had been placed by ICE in on-call status while monitoring the after-hours duty phone and were paid Administratively Uncontrollable Overtime (AUO) compensation for that work. See 5 U.S.C. § 5545(c)(2) (2018); 5 C.F.R. § 551.431(b) (2021). Plaintiffs' complaint alleges two counts: (I) failure to pay FLSA overtime under section 7(k) of the FLSA, 29 U.S.C. § 207(k), and (II) failure to comply with the provisions of Title 5 regarding scheduled overtime. In Count I, plaintiffs also allege that, although plaintiffs are compensated for time spent actively working while monitoring the duty phone, "Defendant is required, under the FLSA, to pay plaintiffs, and those similarly situated, for all time spent in a standby status. 5 C.F.R., § 551.431(a); 29 C.F.R. § 553.221(d)." Plaintiffs contend that

> [d]efendant has violated, and continues to violate the FLSA by failing and refusing to compensate plaintiffs and other similarly situated employees for hours of work when plaintiffs, and those similarly situated, spend monitoring, but not actively responding to, the night phone, as they are so restricted that their time cannot be effectively used for their own purposes.

Plaintiffs allege in Count I: "All of the time that plaintiffs spend monitoring the night phone during the scheduled night phone shifts constitutes compensable hours of work." Plaintiffs also allege in Count I: "Pursuant to 29 U.S.C. § 216(b), plaintiffs are entitled to recover liquidated damages in an amount equal to their back pay damages for the defendant's failure to pay overtime compensation."

In Count II, plaintiffs allege: "Defendant schedules plaintiff deportation officers, and those similarly situated, for shifts spent monitoring and responding to the night phone months in advance of the actual shifts." Plaintiffs also allege in Count II: "The Office of Personnel Management regulations require that work that should have or could have been scheduled in advance to be treated for pay purposes as if it was scheduled in advance of the administrative workweek. 5 C.F.R. § 610.121(b)." Plaintiffs further allege in Count II that "[d]efendant has violated, and continues to violate Title 5 of the U.S. Code by compensating plaintiffs for the time that they spend responding to calls on the night phone as administratively uncontrollable overtime and not regular overtime work."

For both counts, plaintiffs contend that "[p]ursuant to the Back Pay Act, 5 U.S.C. § 5596, plaintiffs are entitled to recover interest on their back pay damages for the defendant's failure to pay them overtime compensation." In addition, they claim that "[p]laintiffs are entitled to recover attorneys' fees and costs under the Back Pay Act, 5 U.S.C. § 5596 as well as other applicable laws and regulations" for these claims.

After the defendant filed an answer to the complaint, the parties filed cross-motions for partial summary judgment on the issue of liability. The court's Order denied the cross-motions for partial summary judgment and concluded: "Careful review of the totality of the record currently before the court reveals significant differences regarding important material facts relevant to reaching a decision." Therefore, the court ordered the case to

2

proceed to trial. Prior to the trial, the parties filed a joint motion for partial bifurcation, which stated, in part, "[t]his proposal would not result in a complete bifurcation of damages. Specifically, the parties agree that the upcoming trial should include a resolution of exactly which days and hours—by date and time—were allegedly not paid correctly." The court granted the parties' joint motion to partially bifurcate the issues for trial, as requested, stating: "Payroll computation shall be deferred until after the upcoming trial, however, the parties shall present evidence identifying the dates and hours in dispute."

During the trial, each of the five plaintiffs testified, as did two ICE supervisors for the Criminal Alien Program (CAP) team. Subsequently, plaintiffs and defendant filed post-trial briefs and plaintiffs filed a reply. The trial closing argument also revealed a disagreement between the parties regarding the appropriate timeframe relevant to the determination of liability. Therefore, the parties were directed to and filed a supplemental filing to address the issue in which the parties stated that they "were unable to reach a joint conclusion as to the appropriate way to answer the Court's question and to identify the date range for liability in this case." The parties each provided their own suggestion as to the appropriate time frame.

Plaintiffs argue that the relevant timeframe should begin May 1, 2017, as plaintiffs identified in the complaint, and that the parties agreed "for the purposes of liability, to limit the trial to the time-period through the end of 2019," but "excluding the period during which the paid ERO 2.0[2] overtime shifts were in place." Plaintiffs assert that the "trial record demonstrates that the ERO 2.0 shifts when the duty phone was staffed with paid officers 24 hours per day occurred from June 5 to July 15, 2017." Plaintiffs acknowledge that "[t]here is, of course, no liability for the time period that the duty phone was staffed *and paid* 24 hours per day because all of the time that the plaintiff Deportation Officers were responsible for the duty phone were compensated." (emphasis in original). Plaintiffs conclude, therefore, that "the appropriate time period for the Court to determine liability in the trial is from May 1 to June 4, 2017 and from July 16, 2017 to December 31, 2019."[3]

Defendant states that "the relevant date range to determine liability remains as indicated by the plaintiffs' complaint: May 1, 2017, through the present." Defendant asserts "through the present" as the relevant timeframe in its portion of the December 1, 2020 status report, despite filing a joint status report with plaintiffs on November 19, 2019 indicating: "The parties will present evidence on damages through December 31, 2019 at trial. In the event that the Court finds in favor of plaintiffs on the issue of liability, the parties will attempt to stipulate on any damages occurring after December 31, 2019." In a December 1, 2020 joint status report, defendant states that the court should examine the ERO 2.0 testing period for liability because the time period is at issue in the complaint.

---

[2] Throughout the trial, and in the parties' post-trial briefings, a period of time is referenced, which was called ERO 2.0. The parties stipulate during that period "the office tested and evaluated various initiatives with the goal of improving its operations" in 2017.

[3] Although the complaint states that the appropriate timeframe should be "since May 1, 2017," the parties agreed to limit the appropriate timeframe to May 1, 2017 until December 31, 2019 for the purpose of discovery and trial. Defendant appears to walk back on that agreement by indicating later that the appropriate timeframe continues to the present.

Defendant, however, argues that, "[r]ather, for those dates when the parties agree that plaintiffs had no responsibility for the night phone, a determination of no liability is appropriate, regardless of whether the Court rules in favor of the plaintiffs or the Government as to other dates." The court's finding of the duration of ERO 2.0 is discussed below. The relevant time frame for determining liability is May 1, 2017 through December 31, 2019 because the parties presented evidence only from May 1, 2017 through December 31, 2019. When reviewing the testimony and exhibits in the record, the court also asked the parties to address the "days and hours–by date and time" findings which the parties had asked the court to address. After reviewing the trial record, including the joint stipulations, the testimony, and admitted exhibits, the court prepared a detailed set of spreadsheets based on the information in the record and identified multiple inconsistencies regarding which the parties were asked to comment with citations to the record. After reviewing the parties' input, the court prepared a detail spreadsheet of the court's post-trial findings on the "days and hours–by date and time" for which the plaintiffs were allegedly not paid correctly. The detailed spreadsheets on the court's findings are attached to this Opinion.

## FINDINGS OF FACT

The five named plaintiffs are employed, and have been employed at least since May 1, 2017, each as DOs at ICE in the ERO in St. Paul, which covers a "five-state area of responsibility," including Minnesota, North Dakota, South Dakota, Nebraska, and Iowa. According to the DO Position Description, the "Major Duties and Responsibilities" of a DO are

> to perform law enforcement duties to investigate, identify, locate, arrest, detain, prosecute, and remove foreign nationals who pose a threat to national security and public safety, as well as those that enter the United States illegally with the intent to undermine the integrity of the nation's immigration laws and border control efforts.

The parties stipulated that "DOs interview witnesses and interrogate suspects, investigate citizenship status, make arrests, transport suspects, and plan, coordinate, and execute deportations, among other duties." The parties stipulated that "[t]he exact nature of a DO's day-to-day responsibilities depends on a variety of factors, including the office in which the DO works and the team to which the DO may be assigned."

Although none of the named plaintiffs were assigned to the CAP team, the plaintiffs support the CAP team by monitoring the duty phone after hours. The responsibilities of the CAP team include answering the "duty phone." The duty phone is also referred to as the "night phone" and the "day phone," depending on the shift covering the duty phone. During the trial, the parties often referred to the duty phone as the night phone. The court will refer to the assignment as monitoring the duty phone because, on weekends and holidays, as discussed below, the overtime duty to monitor the phone was not limited to a time of day. According to the joint stipulations filed by the parties, the CAP team is responsible for screening non-citizens who "have been arrested and booked into various jails and prisons, assess[ing] their immigration status, and tak[ing] appropriate action for those who are in the country unlawfully." (brackets added). The parties stipulated that "ERO St. Paul has operated a 'night phone' system for several years," and the 2009

Standard Operating Procedure (SOP) "originally characterized the after-hours duty coverage as being 'in support of the Criminal Alien Program.'"[4] The 2016 SOP later characterized the duty phone "to reflect a broader scope," including more than just CAP team members to staff the duty phone after-hours, by stating, "an entire sub-office can elect to assume the after-hours duty rotation for more than a 24-hour period." The responsibilities of a DO monitoring the duty phone, according to the "Implementation of After-Hours On-call Duty Rotation and Responsibilities" letter of intent signed by the Field Office Director Scott Baniecke on October 17, 2017 were:

- Picking up detainees is a standard expectation, and will be accomplished as is practicable and in accordance with current enforcement priorities and policies.
- ERO mission needs and protection of public safety are paramount and should be the primary consideration in determining the appropriate law enforcement response. Personal inconvenience to the DO on-call is generally not an acceptable reason to avoid or delay making the timely pick-up of a detainee or to take other appropriate action.
- If a DO determines that a pick-up is not practicable, he/she will notify the SDDO [Supervisory Detention and Deportation Officer (SDDO)], annotate log with the reason, and refer case to an at-large SDDO.
- A caged vehicle will be available for these pick-ups.
- DOs will be assigned after-hour duty rotations based on reverse-seniority.

(emphasis omitted) (brackets added). The 2017 SOP sets out the expectations and requirements for DO employees. The 2017 SOP includes the following statement:

> *Personal inconvenience to the DO on-call is generally not an acceptable reason to avoid or delay making the timely pick-up of a detainee or to take other appropriate action if a DO determines that a pick-up is not practicable, he/she will notify the SDDO, annotate log with the reason, and refer case to an at-large SDDO.*

(emphasis in original).

According to the joint stipulations filed and agreed to by the parties, "[e]ffective October 1, 2017, the Ft. Snelling office implemented new shifts, which kept the office staffed with DOs on regular shifts through Midnight on non-holiday weekdays, rather than 4 P.M." when the office had previously closed. The following is the overtime duty phone schedule outlined to begin on October 1, 2017 in the ERO in St. Paul:

Tuesday: 12:00 A.M. to 7:00 A.M.

Wednesday: 12:00 A.M. to 7:00 A.M.

---

[4] The SOP was revised multiple times during the time period at issue in the above-captioned case. The court refers to both the 2016 and 2017 SOPs in the findings of fact.

Thursday: 12:00 A.M. to 7:00 A.M.

Friday: 12:00 A.M. to 7:00 A.M.

Saturday: 12:00 A.M. to 7:00 A.M.

Saturday 7:00 A.M. to Sunday 7:00 A.M.

Sunday 7:00 A.M. to Monday 7:00 A.M.

Two officers are assigned to monitor the duty phone for each after-hour shift. According to Supervisor Dustin Halverson, the duty phone shifts are assigned "at least three months in advance." Mr. Cheung testified that the duty phone schedule used to be sent "a year out," but that now "they schedule it out for two or three months." Mr. Onewokae testified that "[s]omeone on management usually assigns or schedules us two months out" to monitor the duty phone. Mr. Miller testified that shifts to monitor the duty phone are scheduled "months" in advance. Mr. Kos testified that the duty phone schedule is set "three months in advance," but that "it used to almost be out six months to a year." Mr. Wright testified that the duty phone shifts were scheduled "[p]ossibly" more than one month in advance.

All five named plaintiffs testified at the trial, as did two supervisors, Supervisors Dustin Halverson and Jennifer Skwira, to describe the duty phone program and comment on the program. Each witness offered input on the issues raised in plaintiffs' complaint. The descriptions below of each witness and certain relevant input at trial is summarized and reflected and is applied to the relevant law in the discussion portion of this Opinion.

Supervisor Halverson

Supervisors Halverson and Skwira, who provided supervisory coverage on a weekly basis for the after-hours coverage of the duty phone, were supervisors on the CAP team who testified at the trial. Supervisor Halverson described the duty phone as "the after-hours phone that our local law enforcement partners call typically when they have a foreign-born individual that they have booked into custody, and they will contact us via our duty phone for our officers to determine their alienage and removability." Supervisor Halverson also testified that there "is a physical phone in our office, and typically that phone is then forwarded to whichever on-call officer is assigned to that specific day." Supervisor Halverson testified that the responsibilities of DOs who are monitoring the duty phone as

monitoring any incoming calls from our law enforcement partners via the after-hours duty phone. They're responsible for responding to those telephone calls appropriately, and at times that could mean if they received a call from a law enforcement agency that required -- regarding a release, they would be required to respond to that call and pick up the individual from the local jail. They would be -- they're responsible also for documenting any calls that they receive via the after-hours duty phone in our call logs. And that's all I can think of.

When asked by plaintiffs' counsel "what kind of information do you expect that officer to gather" when the officer answers the duty phone, Supervisor Halverson testified that the

DO would ask for the individual in custody's "name, date of birth, if there's an FBI [Federal Bureau of Investigation] number or any sort of identifying number, an A [sic] number, sometimes a law enforcement partner has that as well. They would ask what that individual is in custody for, what they were arrested for." (brackets added). After gathering that information, Supervisor Halverson testified: "If it was somebody that was amenable to removal or to be put into proceedings, I would expect that they would place a detainer on that individual with the local law enforcement agency." Supervisor Halverson described a detainer as "a request to the law enforcement partner to notify us upon the alien's release."

Supervisor Halverson's testimony indicated that "in the past, when a law enforcement agency honored a detainer, they typically would give us up to 48 hours to pick up that individual," but that "[n]ow, we don't get that 48 hours" and "our deportation officers are typically given a short period of time." When asked by plaintiffs' counsel "[s]o is it an expectation that officers assigned the night phone be responsible for and make pickups like you're describing?" Supervisor Halverson responded, "[y]es." Supervisor Halverson testified that he expected a DO to have "their government vehicle, their firearm, their OC spray, a baton, handcuffs, handcuff key, their cell phone, things like that." When asked by plaintiffs' counsel "do you expect them to be in a state of readiness in order to perform a pickup if necessary?" Supervisor Halverson testified: "Yes. I mean, I don't expect them to be sitting at home wearing all of their gear, but I expect that if they received a call about a release, that they would have their gear available and be able to respond in a reasonable amount of time." When asked by plaintiffs' counsel, "if an officer does not have a take-home government vehicle, what would you expect them to do?" Supervisor Halverson answered:

> We have take-home vehicles -- or excuse me, we have government vehicles available in our office. When somebody is assigned to the duty phone, it's incumbent upon them to inform their supervisor that they don't have a government vehicle to take home and they have the duty phone, so that supervisor can make sure that there is a vehicle available for them that they can choose to take home with them, or they can leave it at the office and if there was a release, they could drive in to the office and pick up the vehicle and drive it to the facility to pick up somebody. But there's always a vehicle available to the officer to either take home or in the office.

Supervisor Halverson also answered that officers cannot use a personal vehicle for a pickup.

Supervisor Skwira

Supervisor Skwira's testimony indicated that the duty phone is "a tool for our law enforcement agencies to notify us or call us if they have someone in custody or someone's being released, but it's a tool so they can connect with us." Regarding the expectation of a DO to perform a pickup and whether the policy had changed recently to require pickups, Supervisor Skwira testified: "No, it's always been an expectation. Even back when I was a DDO, we did pickups in the middle of the night." Regarding the expectations of a DO on duty, plaintiffs' counsel and Supervisor Skwira had the following exchange on cross-examination:

Q. Okay. For the officers that are scheduled to have the night phone either from 12:00 a.m. to 7:00 a.m. on a weekday, or the 24-hour period on the weekend or a holiday, you expect them to be ready to answer the duty phone?

A. I expect them to answer the phone unless there's a reason they can't.

Q. You expect them to be ready to answer the phone?

A. I expect them to answer if they can. If they're -- if they're sleeping and -- I mean, they should -- being ready, I guess I'm getting confused with ready, because you make it sound like they should be sitting at a table with their phone. You know, that's not exactly how it is on the after-hours phone. They could be sleeping, they could be out and about, but if the phone comes in, they need to answer it if they can. If they can't, then it goes to voicemail. They just need to answer it and take action on that in a reasonable time, but they only have to do the phone or do a pickup. They don't have to do ACRIMe[5] or any other duties that are along with someone who is on shift.

Plaintiffs' counsel and Supervisor Skwira had the following exchange on cross-examination regarding the procedure for when a call comes in:

Q. Do you expect them to be able to perform research in order to properly respond to an incoming call on the duty phone?

A. Yes.

Q. And do you expect that research to be done on a laptop and looking at these various databases that they have access to?

A. No, it doesn't have to.

Q. Okay. Can it be through the laptop -- the databases on their laptop?

A. It can, yes.

Q. And would you leave that to the judgment of the officer on duty for the night phone shift that we're talking about to perform that research?

A. Yes.

Q. Can an officer ever have a post of duty when they're working that is not at the office?

---

[5] When asked the meaning of the acronym ACRIMe, Supervisor Halverson testified, "I'm sorry. I don't know what the acronym stands for," nor did Supervisor Skwira testify to the definition of the acronym. It appears the acronym ACRIMe may stand for "Alien Criminal Response Information System," according to ICE's website. DHS/ICE/PIA-020 Alien Criminal Response Information Management System (ACRIMe), U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, https://www.dhs.gov/publication/dhsicepia-020-alien-criminal-response-information-management-system-acrime (last visited Dec. 6, 2021).

A. I don't know.

Q. Well, earlier in your testimony you stated that their post of duty would be the office.

A. Well, yes. I'm sorry. I thought you said other.

Q. Is there any other location where it could be?

A. I don't know, no.

At the trial, each of the named plaintiffs testified. The testimony offered by the five plaintiffs varied, some was somewhat anecdotal, tentative, and inconsistent with other testimony in certain respects. Each plaintiff addressed their individual concerns about what they could or thought they could not do while monitoring the duty phone, what they might have done while not assigned to monitor the duty phone, and how each plaintiff dealt with their duty phone responsibilities.

Mr. Cheung

At the time of trial, Mr. Cheung testified that he was scheduled to work his regular shift Monday through Friday from 7:00 a.m. to 3:00 p.m., and any overtime in addition to that schedule. Since October 2019 and through the time of the trial, Mr. Cheung had been assigned to the "Nondetained/ATD [alternative to deportation] unit" in which Mr. Cheung testified that his role was to "monitor GPS and telephonic check-ins for individuals that have been released from immigration custody." (brackets added). Prior to his assignment on the nondetained and alternative to deportation unit, Mr. Cheung was on the "detention custody team," in which he was "responsible for bringing any detainees into our office so they could continue their immigration hearings and interviews with other officers" as well as transporting individuals to the "field office from their facility" where ICE-detained individuals are held. Mr. Cheung also occasionally worked at the "bond window" during his regular shifts, which is the reception window in which ICE "deal[s] with individuals who come to our office with questions or check-ins." (brackets added).

When asked by plaintiffs' counsel how monitoring the duty phone fits in with his job duties and responsibilities, Mr. Cheung testified at trial that the duty phone is "part of our duties of locating, identifying and arresting individuals that have violated U.S. immigration law." Mr. Cheung testified that the local law enforcement agencies call the duty phone number "to notify us [ICE DOs] that a foreign-born individual has come into their custody and from there we are determining if these are individuals that we would like to arrest and put them in immigration proceedings." (brackets added).

Mr. Cheung testified that when a call comes in "notifying us that there is a pickup, I would start my computer to make sure that this individual is a number that I can arrest. Once I've got that, I let the agency know that I am on my way." Regarding the number of calls plaintiffs received, Mr. Cheung testified that the "[l]ow end would be two or one. One or two calls. High end would be maybe four or five, or more." When law enforcement called the duty phone, Mr. Cheung testified that the agents provided the DOs with the names of the arrested individuals, "the date of birth, FBI number, what they are arrested for, sometimes they give us the alien registration number." Mr. Cheung testified "I always

respond to the calls. I'm assuming if you don't respond to the calls, you would get -- they'll write you up or some type of punishment for not doing your job."

Mr. Cheung had a "government-issued laptop" because "[i]t's a necessity to -- for my duties as when I'm on standby with the night phone. It helps me conduct records checks determining whether the individual -- who the individual is." On the laptop, Mr. Cheung testified that he uses a government-issued laptop to run "the individual's name through their FBI number to see if we ever had contact with them. Also I need the computer to issue detainers that an individual is somebody we would like to arrest." Mr. Cheung also testified that he may contact the ICE resource, Law Enforcement Service Center (LESC), to provide information about individuals who have been captured, and that the LESC has "some databases I do not have, and I like to double check my work. I would call them just to verify if they have the same information." When asked by defendant's counsel whether "there are some databases that you [Mr. Cheung] have access to that LESC does not have access to," Mr. Cheung answered, "I believe so, yes." Mr. Cheung testified that he has to have internet access when monitoring the duty phone because "[t]he majority of the databases are accessed through the Internet. There is [sic] a couple of databases that we can access -- well, it's still through the -- it's in our network, we still have to connect through the Internet for that to happen." When defense counsel asked Mr. Cheung whether he could "turn on your government cell phone and make it into a hotspot to get WiFi access remotely for your laptop," Mr. Cheung testified "I believe so, yes" and "I may have done it once before when I was on the fugitive team."

If ICE has a detainer on an individual, Mr. Cheung testified, "these individuals are being released and that's when we have to respond immediately to those specific pickups." Mr. Cheung testified also that a detainer "is a request to that local law enforcement agency to hold that individual until we can arrive to their facility and place that individual under arrest." The equipment Mr. Cheung has with him when he performs a pickup is his "service weapon, my duty belt, handcuffs, handcuff key, my credentials, my secondary service weapon." Mr. Cheung testified regarding whether he would put his gear on while monitoring the duty phone, "I wouldn't have my service weapon on me with my kids around me." Mr. Cheung testified that, after he determined a pickup would be appropriate, he does the following:

> Once I get off the phone, I go into my bedroom and change into my law enforcement attire. And then I would get in my vehicle, drive to the Fort Snelling Field Office and get into a government caged vehicle and then from there I would drive to that local law enforcement agency.

Mr. Cheung testified that he lives "[a]pproximately 25, 30 minutes" away from the office. When asked how far the detention facilities for ICE are from the ERO St. Paul office, Mr. Cheung testified, "[t]he Freeborn County Jail is approximately two, two and a half hours away. Sherburne County is approximately an hour, hour and a half away. I believe the Carver County Jail is approximately 45 minutes, an hour away. And Kandiyohi, that's quite a while, maybe two and a half -- three hour -- two and a half mile [sic] drive without traffic." Mr. Cheung testified that once he arrives at a detention center, he provides "detention paperwork" "called an I-203," which he believes is "for billing purposes." After dropping

off the individual and paperwork, he would "drive back to the office, drop the vehicle off," and

> go to my desk and prepare information for the next business day to let the CAP team know that I took somebody in custody, notify them that on Monday morning they need to set up a transport for that individual to come into our office so that individual can be processed.

Mr. Cheung testified:

> Due to the current political atmosphere, they [local law enforcement] don't honor our detainers. What they do now is do a courtesy call letting us know this individual is in the process of being released from their custody, and if we are -- wanted to take this individual into custody, we need to arrive at their facility prior to him being released.

(brackets added). Mr. Cheung testified that law enforcement is not honoring detainers, but that it has not always been the case as, "in the past, the facilities would hold onto the individual. If there was a detainer placed by our agency, the facility would hold that individual until the next business day." When defendant's counsel asked Mr. Cheung if there have been "any significant changes or trends in 2020 recently that are different than previous years with respect to call volume," Mr. Cheung responded: "Yes. A lot of the local law enforcement agencies are not calling us on new bookings during the night phone. I don't know about the day phone, but during the night phone. I believe that's why the volume of calls has dropped."

Mr. Cheung offered a number of statements of how assignment of the duty phone has worked, including:

> It restricts me from partaking into [sic] activities I normally do on my day off. So essentially I feel like I am working when I am working during this time. It prevents me from taking my kids to -- taking my kids to the zoo, the science museum, going to the family cabin. It prevents me from partaking in my personal hobbies that I like to do on my days off. It essentially restricts me from me partaking in activities I normally do on my day off.

Mr. Cheung testified regarding monitoring the duty phone on weekends, "[f]or both days, I wouldn't -- I would not leave my home. That's my workstation. I would stay at home until my shift is over." Regarding accommodations to their personal life a DO must make while monitoring the duty phone, Mr. Cheung testified:

> If my wife is out of town, or has prior engagements on the weekend, or weekday, I need to find child care during that time. If a call comes in of a release and that individual has to be picked up, I have to leave my home to pick them up, so a babysitter has to be at my home at those times.

Regarding a DO's ability to sleep while monitoring the duty phone, Mr. Cheung testified, "I wouldn't be able to sleep, I would be interrupted with phone calls and I would not get a good night rest."

When defense counsel asked Mr. Cheung, "[a]re you aware of any written directive or order that says you must remain in any fixed location during your night phone duty," Mr. Cheung responded, "I do not believe so." Mr. Cheung testified to second-hand information that "[t]here was a time when I was told by our union representative that management individual -- an individual -- a management officer stated that we're not allowed to mow our lawns during the night phone."

While monitoring the duty phone, Mr. Cheung also testified that he "browses the Internet," watches television, sleeps, plays with his children, and does "tidy up the house." When the duty phone is forwarded to his partner while monitoring the duty phone, Mr. Cheung stated, "I would run errands, personal errands, yes. But I would still have the phone on, I mean, just in case an emergency would arise, or if an officer -- in this case Officer Holien -- needed assistance."[6] Mr. Cheung also testified he had monitored the duty phone at a location other than his home: "many years before we had to do pickups, I have done it I believe at a friend's house one time. Not for the whole night, but just for a few hours. But at that time, we weren't required to do pickups." Mr. Cheung testified that he has left his house once for ten to fifteen minutes while monitoring the duty phone:

> It was during the beginning of a snow blizzard and I realized I had ran out of milk for the kids so I quickly ran to the store, which is down the street, to pick up milk. With that being said, I wasn't planning to do a pickup that shift, due to the Minnesota State Patrol stated that due to the road conditions, travel is not advised, and I believe a few hours later my supervisor also agreed that we should not be doing transports on that day.

Mr. Onewokae

At the time of trial, Mr. Onewokae was scheduled to work Monday through Friday from 6:00 a.m. to 2:00 p.m., and any overtime generally would be in addition to that schedule.[7] Since October 2019, Mr. Onewokae had been assigned to the detention team of ICE ERO in St. Paul. In this role, Mr. Onewokae testified at trial that his responsibilities were to "work in the detention room a couple of days a week" to fingerprint non-citizens as well as "do jail visits for people that are in our custody just to make sure we're abiding by the national detention standards [and] [r]espond[ing] to detainee requests." (brackets added). Prior to October 2019, Mr. Onewokae was assigned to the "IHP[8] CAP team" in which he would "infer [sic] foreign-borns in jails and also in prison, determine alienage and removability and serve immigration documents," and "[t]ake sworn statements."

---

[6] Officer Holien is not a named plaintiff in the above-captioned case.

[7] As detailed above, the shifts for monitoring the duty phone were from midnight until 7:00 a.m. during the weekdays. Mr. Onewokae was still responsible for monitoring the duty phone while on his regular shift, from 6:00 a.m. until 7:00 a.m.

[8] Mr. Onewokae did not define the meaning of the acronym "IHP." It appears that the acronym IHP may stand for the "Institutional Hearing Program," according to a Fact Sheet from the United States Department of Justice, Executive Office for Immigration Review. U.S. DEP'T OF JUSTICE, FACT SHEET: INSTITUTIONAL HEARING PROGRAM (January 2018).

To set up in order to monitor the duty phone, Mr. Onewokae testified that he has his "work-issued cell-phone and then I have my work-issued laptop and forms, like a call log and my computer turned on." Mr. Onewokae testified that he sets up his laptop and workstation in the basement "[s]o I don't disturb my wife and children." Mr. Onewokae testified he uses the work-issued cell-phone "to receive calls from the jails or from the . . . jails or the local PD [police department] or the Law Enforcement Service Center. I use my laptop to issue detainers, to do records checks." (brackets added). Mr. Onewokae testified that, when a call comes in,

> usually they [local law enforcement] give you a name of someone that they want you to check on to see if they're removable or not, what their status is. You would do your records check, interview the person right away, and then according to what you find with the records check or the interview, then you may need to lodge a detainer.

(brackets added). When Mr. Onewokae was asked by plaintiffs' counsel, "[d]o you know if you could be subject to discipline for missing a call?" Mr. Onewokae responded, "I believe so." Mr. Onewokae described lodging a detainer as sending a detainer to local law enforcement,

> saying, hey, we want this guy after he's finished with the jail, we call the supervisor up and get their okay and we issue an immigration warrant of arrest along with a detainer, and I'd have to email that to the Law Enforcement Support Center and they would fax it to the jail on my behalf.

Regarding the requirement of pickups, Mr. Onewokae and plaintiffs' counsel had the following exchange:

Q. Okay. What is the typical -- what is your typical experience with law enforcement agencies regarding holding detainees for ICE?

A. It varies per county jail. Some counties may give you 20 minutes to a half hour, some may give you an hour, some may gave [sic] you two hours.

Q. Okay. Has that changed over time?

A. Yes.

Q. And how has that changed?

A. Well, previously, the county jails would hold for us for like 72 hours I believe.

Q. Okay.

A. Usually a lot of times it's just as long as it takes for them to book that person out of their custody.

Q. So since it sounds like they now hold them a much shorter time, how has that changed night phone duty?

A. So we're expected to do pickups.

13

Q. Who expects you to do pickups?

A. I think it was the former field office director, so management here.

Q. And what is a pickup?

A. So if someone is getting released on a detainer, or we have a detainer on someone, and the jail is releasing them, then we would pick that individual up from the county jail.

Q. Okay. Sorry, go ahead.

A. Essentially arrest them and then put them into our custody.

Mr. Onewokae testified, "[y]ou've got to be able to respond just as well, you know, so you have to have your laptop on hand, and be ready to do a transport if needed." Mr. Onewokae testified regarding how to perform a pickup of a non-citizen, "I would say best practice would be to get a caged vehicle because it's just you picking up that one person." Mr. Onewokae testified that he lived "[f]ourteen, 15 minutes" away from the office to get a caged vehicle. Mr. Onewokae testified that the locations he had to go to in order to perform pickups "[c]ould be a couple of hours away, could be in the cities here, you know, 30 minutes away from the office, hour and a half, hour." Mr. Onewokae testified, while monitoring the duty phone, that when he picks up an individual from a local jail, "[y]ou have a couple of options. You can either have one of the jails that we house at meet you [the local police and non-citizen], generally that's only one of the jails that we have, they'll meet you and transport him to their jail, or you would drive all the way to that jail." (brackets added). Even if making a pickup would seem impracticable due to the time restraints, Mr. Onewokae testified, "I was told by management, AFOD [Assistant Field Office Director] Tim McGrath, to make an attempt to get the person." (brackets added).

Mr. Onewokae offered statements at trial, including: "generally -- sleep gets interrupted." Mr. Onewokae also testified:

Even if I get called, let's say at 4:00, you know, I wrap up a short call, wrap up at 4:30, and then there's no point in trying to get back to sleep because I'm going to be waking up a half hour or hour later as it is, so half my night's sleep is already gone.

Mr. Onewokae testified, "[y]ou kind of have to schedule around it [monitoring the duty phone]. So whatever day that falls on the weekends, just plan on not doing anything." (brackets added). Mr. Onewokae testified that while monitoring the duty phone, he does not drink, but that he can watch movies on Netflix, sleep, do household chores, and play with his kids "[t]o a certain extent." When Mr. Onewokae testified he can play with his kids, he later clarified that he casually plays with them from home and "[i]t's not like I can't really, you know, walk and take them to the park, or really even drive and take them to the park, because in case I can get a phone call that I need to go right away for whatever I get called for." Mr. Onewokae testified that on May 28, 2018, he went to his in-laws while monitoring the duty phone. While Mr. Onewokae was at his in-laws, he brought his laptop and had connection to the internet "[e]ither through their WiFi or through my mobile phone hotspot." Mr. Onewokae also testified that he had "possibly" brought his laptop into a store

in a backpack while monitoring the duty phone duty before. Mr. Onewokae testified that they cannot do the research necessary to do when answering the duty phone without an internet connection. When defense counsel asked Mr. Onewokae if "the number of calls coming in declined somewhat compared to previous periods" in the last six months of 2019, Mr. Onewokae testified "I believe so" and agreed that the trend continued into 2020. Mr. Onewokae, who had gone to his in-laws' home one time while monitoring the duty phone had the following exchange with defense counsel:

> Q. In your view, was it -- you were complying with ICE's policies when you took your -- or when you went to your in-laws' house while you were on the duty phone, weren't you?
>
> A. I still performed the work. And I put a detainer down and was able to make calls from that post.
>
> Q. So nothing you did violated any of ICE's policies, correct?
>
> A. I was still able to respond, yeah. I don't believe it violated it.

Mr. Miller

At the time of trial, Mr. Miller was scheduled to work Monday through Friday from 6:00 a.m. to 2:00 p.m., and any overtime would be in addition to that schedule. Mr. Miller was assigned to the at-large team and had been since before May 1, 2017 and until the trial.[9] Mr. Miller testified that, at the time of trial, he was assigned to the at-large team. Mr. Miller testified at trial that the "at-large team is responsible for locating subjects that have been ordered removed by an immigration judge or subjects that have a criminal record that has been deemed removable by the agency and we have to track those subjects down and try to arrest them." Because of his duties on the at-large team, Mr. Miller parks a government-issued vehicle at his home, and, rather than going to the office to perform his work at the beginning of his shift like the other plaintiffs, he goes "to a location" or to "the field a lot tracking down our subjects." Mr. Miller also testified that "the only time we would be in the office is if we're processing or need to catch up on some stuff that we couldn't be able to do from the car or the field." Additionally, Mr. Miller testified that, regarding whether he could do regular shift work from his home, "[d]uring COVID we've been able to do the telework, but before that, no."

Mr. Miller testified that he sets up to monitor the duty phone in his

> basement in my house so I'm away from my kids, so I don't disturb them if the phone does go off. I would set up my government-issued phone, my laptop, make sure it's hooked up to the WiFi, test everything out, and make

---

[9] As detailed above, and similar to Mr. Onewokae, the shifts for monitoring the duty phone were from midnight until 7:00 a.m. during the weekdays. Mr. Miller was still responsible for monitoring the duty phone while on his regular shift, from 6:00 a.m. until 7:00 a.m.

sure all the calls were forwarded to my phone properly, and start waiting for the phone calls to begin.

Mr. Miller testified

[i]f we don't have access to our laptop or if the Internet is not working, a lot of our databases aren't working, we would eventually have to call the Law Enforcement Service Center and they are not as reliable and not as well versed in establishing the duties that we need or the background that we would need to see and use because since it's not in front of us, we are relying on a third party to get our records.

Mr. Miller also added that the LESC "have been known to make a lot of mistakes." Mr. Miller further added that the LESC "can't create any of your detainers if one needs to be lodged or if the subject is determined to be a removeable alien," but that the LESC can fax documents, if necessity requires, to a specific location for a DO if a DO monitoring the duty phone does not have a fax machine. Mr. Miller testified that he tries to collect the "Social Security number" and "their state booking number" of the potential non-citizens because "the more information that's provided, the easier it is for us to do our records checks on our computers and relay the proper information back to them." Mr. Miller testified that he would run queries in the databases

that we have available to us to see if the subject is believed to be a foreign-born or has since been nationalized or has become a lawful permanent resident. And then I'll put that in my notes and then I will relay that back to the corresponding agency that called earlier and let them know what our decision would be with that subject.

Mr. Miller testified that a detainer is

an I-247 [a Department of Homeland Security Form] notice that we send to a jail that has a foreign-born alien and it would have the subject's name, FBI number, if you found one, date of birth, and it would have a warrant of arrest[10] and then another sheet that would have in a few various languages saying you've been served a detainer.

(brackets added). Mr. Miller testified, "[a] pickup is when you would actually have to go to the jail in your government-issued vehicle with all your duty gear, badge, credentials, weapon and stuff." Mr. Miller also added he brings, "of course, my driver's license." Pickups cannot be performed in personal vehicles, because, according to Mr. Miller, "[i]t's against the rules and you can get in a lot of trouble, fired, and a whole lot of other things. Insurance reasons, safety reasons." Mr. Miller testified that he performs duty phone interviews, which occur when he "would leave my house, go to the jail for a pickup, wait for them to release the subject, make sure it's the same subject that I'm picking up that I

---

[10] Mr. Miller testified regarding the warrant of arrest to which he was referring, "[t]hey [local law enforcement] don't classify it as a real warrant that's not been signed off by a real judge, and depending on the county, some of them are accepted and some of them are turned away."

have on my paperwork, and then it looks like I had to direct book him into" a detention facility. Mr. Miller testified that "[i]t seems like we get less and less time once they call and want to release them. We used to get a decent amount of time, and now it's like as soon as they hang up they want you there, which is sometimes impossible." Mr. Miller, however, testified, "[a]t the early part of the few years, it was pretty busy, and then since then, due to the political stuff and the COVID, it's slowed down a little bit, but we still have our fair share when we are covering the phone of phone calls coming through."

Mr. Miller also testified, "even though I might not be taking a phone call, I still might have to be called into action to take phone calls or to do pickups, so I'm still relegated to my basement." Mr. Miller testified, "[i]t's horrible because you keep anticipating that a phone call is going to happen, whether it comes in or not, because you want to be alert and ready for the phone call, and at the same time you try to get sleep and it's a constant battle. You always wake up fatigued and tired the next day." Mr. Miller testified that monitoring the duty phone "feels like I'm glued to my phone and being -- if I'm doing my night phone duties like at home, I would be doing them in the basement and I would feel like I was confined there and wouldn't be able to leave." Mr. Miller testified that he would stay "in the basement, waiting for the phone to ring. Just because of the circumstances of phone calls, I wouldn't want anyone to hear our conversation since it is a sensitive nature, I wouldn't want anyone in the public to hear, or hear my conversation just if -- it's just not worth it. So I just stay home and don't do much of anything." Mr. Miller also testified, "I can't just be off shopping or with my friends or with my family. I just stay home and wait for the calls."

Mr. Miller testified that, if his family were to get takeout food, he "would ask my wife to see if she could go grab some food, but I would not be the one going to get the food because I would be staying at my house making sure I'm responding to those phone calls." Mr. Miller testified that "going for takeout is a big no-no" in a government vehicle. Mr. Miller also testified that,

> if my kid tripped and cracked her head open, me being a father and if I got a phone call, I'm going to probably weigh the totality of that circumstance with if my kid is hurting and then take the necessary time to take care of that situation and then call the agency back or someone else to handle it.

Mr. Miller testified that if the weather was extreme, because "we do get a lot of snow" in Minnesota, or if a family emergency "were to arise," then he would communicate the issue to his "first-line supervisor or whoever was the supervisor covering the night phone or duty phone at the time." Mr. Miller testified that "[i]t was my understanding that you had still had to make a successful effort to make and return all phone calls, and if not, it was my understanding that you would probably receive disciplinary action." Mr. Miller testified, "I know they [a DO who missed a phone call] were written up and I know the union was involved, and that's about as much as I know, but they were asked to speak with their supervisor with a union rep." When Mr. Miller was asked by defense counsel, "[a]re you aware of any official order or anything you would consider an official order that expressly says you can't leave your home while you have the night phone?" Mr. Miller answered, "[i]t's implied on how they worded it in the email or how they direct it to everybody during the staff meetings."

17

Mr. Kos

At the time of trial, Mr. Kos was scheduled to work Monday through Friday from 7:30 a.m. to 3:30 p.m., and any overtime would be in addition to that schedule. Mr. Kos, similar to Mr. Cheung, was assigned to the nondetained unit. At trial, he described his duties by stating:

> I'm essentially like a probation officer. I have several thousand people on my docket, which I monitor their cases. They will check in periodically at the building. I will run criminal histories. I will see if they've re-offended and possibly be taking people back into custody. I'll also attempt to obtain travel documents for those who are already a final order, and if I'm able to obtain the travel documents, then we would have SLRFF[11] in order to arrest them.

Mr. Kos had been assigned to the nondetained team for three years. Prior to being assigned to the nondetained team, he was on the detention team, similar to Mr. Onewokae's team, in which Mr. Kos stated that his duties were "coordinating with all our facilities that board our detainees, so you'll coordinate through computer, through telephone, bring in people for court. You also deal with all the new arrests coming in. You keep order and security down in the detention room."

Mr. Kos also offered his view of the impact of phone duty including that he sets up for his shift to monitor the duty phone in either his kitchen or in his basement, and that he has his "phone set up. I'll bring my binder, which has all my interview sheets, any -- if it helps with translations, and I have some sheets in there that help with that. It has many documents in it." Mr. Kos also testified that "I bring my computer, my keyboard, and my mouse, and I hook that all up, along with the telephone, and, you know, that's essentially it." Mr. Kos testified, "I put the phone right by my head, on the table, where I sleep on the couch downstairs when I have the phone."

Mr. Kos testified that when answering the duty phone, he gathers "country of origin, any identifiers," and their name in order "to be able to 100 percent say this person is who we say it is." Mr. Kos testified that the checks he runs are through at least six databases after a call comes into the duty phone. Mr. Kos testified that the LESC could assist his research, but that "[i]t's hit or miss with the LESC. Sometimes you can get a guy who is amazing at running stuff, and then other times you don't even know if the information they gave you is valid. So it runs the gamut." Mr. Kos testified that the call volume "used to be a lot more. Lately, one to two." Mr. Kos also testified, "[s]o with COVID, you know, the likelihood of calls has greatly decreased, but you're still getting calls, yes. On the weekend, I don't know, four to five."

Mr. Kos testified regarding monitoring the duty phone:

> So the duty phone has evolved over time. At one point years ago, you would just get inundated with telephone calls from jails throughout a five-state area, and you'd have to interview several people and do your duties as

---

[11] Mr. Kos did not provide a definition of the acronym "SLRFF" in his testimony.

necessary. If you were going to send a detainer, you would do that work. It has now evolved into where you do pickups and answer the phone.

Mr. Kos and plaintiffs' counsel had the following exchange at trial:

Q. Okay. Prior to this time, do you recall whether or not pickups were part of the expectations for the officer working night phone duty?

A. No, they weren't.

Q. Do you know -- do you have any understanding why this change was made?

A. I'm grasping way back there. Yeah, things have changed. You know, we're a political yo-yo, Immigration. We're a very unpopular division of the Government, not very well liked, and it's a constant yo-yo. I believe what probably precipitated this was our detainers weren't being honored anymore by numerous facilities. So before they would hold on to an individual and Monday morning you could just go over and pick that person up. Well, that all changed.

Mr. Kos testified that a "pickup is when a jail calls and states that this person's ready for release. You've got to be ready and go get that individual." Mr. Kos testified that "when I've been hit with pickups, it's either right in the Twin Cities, 50 miles from my house, or way south of the Cities, and that was the Watonwan [County Jail], which was, you know, four hours plus." (brackets added). Mr. Kos also testified that he also "still do[es] get calls from North Dakota, South Dakota, Nebraska, Iowa. It's rare, but I have had it happen." Mr. Kos testified, regarding whether he has turned on lights and sirens for a pickup, that he has "Never. Never. No. That's something you learn -- I was deputy sheriff. No I'm -- unless it's an emergency, there's no lights, no sirens going on." Whether there has been discipline for failure to respond to a call, Mr. Kos testified, "I don't know for a fact if there's ever been actual, like, time on the beach, figuratively speaking, but, yes, I do know people have been spoken to and tongue-lashed over it, sure." Mr. Kos testified,

I don't recall missing many pickups, ever. I'd say one or two. I do remember calling SDDO Halverson on one occasion and just, "Sorry, I slept through the phone calls." And as soon as I got up, I addressed it and, you know, got right back to him. He basically told me, you know, "Hey, we know you do a good job." So, no, there was no discipline to me. I get along good with my supervisors. There is no discipline on that.

Mr. Kos testified

[t]he best way to explain it [monitoring the duty phone] is if anyone's experienced a snow day, you're not going anywhere. You're confined to your house pretty much. Yeah, okay, did you go out and take out the garbage? Yes, I did. Hey, and I did go check the mailbox. But you're really not doing anything.

Mr. Kos testified, "I mean, obviously, it gives you a little more liberty, but, I mean, you've still got to be ready to respond. I can't run up north." At trial, Mr. Kos explained, "I've

received calls before to go to Watonwan, which is probably four hours from my house. It gives you a little PTSD going. So whether that phone rings or not, I'm not peacefully sleeping." Mr. Kos also testified that despite a call being short, it could interrupt his sleep while monitoring the duty phone: "I take a minimum of 15 minutes per phone call on time, so I could end up, if it was a quick call, getting a half hour of pay, yet you were up half the evening." Mr. Kos testified that he has "anxiety" while monitoring the duty phone: "Generally I don't fall asleep. Sometimes -- and then I figure if it's going to ring, it gets busy 2 to 3. If I can just stay up until then, and then, you know, if I fall asleep, I fall asleep, and hopefully the phone wakes you up."

Mr. Kos testified that he had made a quick trip out to the gas station while monitoring the duty phone, but that would generally "be on a weekend. I mean at midnight, I have no reason to have to run out." Mr. Kos testified that, when not monitoring the duty phone, that he sees his wife's family and attends the sporting events of his three children. Mr. Kos testified that he had once gone camping while monitoring the duty phone:

> I had predetermined that my partner would do any and all pickups if I answered all the telephone calls. So whichever day we did go camping, I recall getting calls, and what I did is basically set up -- hooked up to the WiFi, brought my computer and all of that and telephone, and did it from the cab of our pickup truck.

Mr. Kos also testified that he has monitored the duty phone at a coworker's house before, as well "to help him out" because "he was a former supervisor that had not done CAP or -- CAP phone duties in years," "I have found over time it is easier to just self-isolate yourself and do your duties and be done with it," and "he lives five minutes from the office." Mr. Kos also testified that he had gone to his supervisor's home to watch Minnesota Vikings football games while monitoring the duty phone as well.[12] When Mr. Kos was asked by defense counsel, "[a]re you aware of any written order or directive that requires you to remain in any fixed location during your night phone duty?" Mr. Kos answered, "[n]o. We tried to narrow management down on that and haven't really received a good response."

Mr. Wright

At the time of trial, Mr. Wright was scheduled to work Monday through Friday from 8:00 a.m. to 4:00 p.m., and any overtime would be in addition to that schedule. Mr. Wright testified that, at the time of trial, he was on the "post-order custody review chain within the detained docket." Describing his position, Mr. Wright testified at trial, "individuals who express a fear of -- a reasonable fear or credible fear of returning to their country, we set

---

[12] Mr. Kos also disclosed during his testimony at trial that

> over a hundred times I've had this phone, and I've done it honorably. I have had one indiscretion in which it did involve the Vikes [Minnesota Vikings], and I went to a restaurant/bar, and we viewed the game, we ate, and then I did partake in some alcohol while having the phone.

(brackets added).

them up for an interview with Chicago asylum officers who would then make a determination as to whether the claim is legitimate." Mr. Wright also testified that

> after they've been found whether they have a claim or don't have a claim after immigration judge review, and I'll follow that all the way through up until the case proceedings, and if they're ordered removed, then I process the case to set them up for removal. If they're granted benefit, then I ensure that they are released from our custody.

Mr. Wright also offered his observations on the impact of monitoring the duty phone on his time, including set up. To set up for the duty phone, Mr. Wright testified that he is "either camped out down here in the basement or I recently cleaned and claimed the office upstairs, and I'm just -- I'm waiting around on the couch for the phone to ring, hoping not to wake up the rest of my household -- especially now that we have a dog." Mr. Wright testified he needs "WiFi and internet connection" in order to perform research on his laptop while monitoring the duty phone. Mr. Wright testified that when he answers the duty phone, "I want to know any information they can give me, what charges they're arrested for, anything I can use to help figure out through our systems exactly who this individual is." Mr. Wright also testified that "[s]ometimes I'm able to actually interview the individual and talk to them to determine alienage and whether they have any benefits and where they were born and get that sort of information." Additionally, Mr. Wright testified, "we attempt to determine identity and alienage to see whether that individual has a legal right to be in the United States, whether they're in possession of any benefits that will allow them to remain in the United States."

Mr. Wright testified that he would

> run computer checks through our systems to see if this person has ever been encountered, if they have any benefits, if they have been naturalized. Sometimes I get phone calls for individuals who come in and they tell the jail that they were born in Mexico, and the jail doesn't inquire further, and then they're a U.S. Citizen. I can determine that with their name and date of birth and Social Security number, things of that nature, to discover alienage, whether the person has a benefit and whether we need to go further in the investigation as to their status in the United States.

Mr. Wright testified regarding the volume of calls while monitoring the duty phone in the more recent years, "[t]he call volume has dropped." Mr. Wright and defense counsel had the following exchange:

> Q. Okay. Is it fair to say that the time spent working AUO while monitoring the duty phone has decreased over time?
>
> A. Yes.
>
> Q. Okay. That decline seems to be apparent in -- especially in the second half of 2019, correct?
>
> A. That is correct.

Q. Okay. And has that trend continued into 2020?

A. Yes, it has.

Q. So would you agree that the call volume has gone down?

A. Yes.

Q. Okay. Have the number of pickups gone down as well?

A. From my perspective, yes.

Q. So do you remember the last time you did a pickup?

A. No, I don't, actually.

Q. Okay. Would you say it's been more than six months?

A. Yes.

Q. More than a year, would you say?

A. Possibly.

When Mr. Wright was asked by defense counsel, whether Mr. Wright was disciplined for missing a phone call, Mr. Wright testified, "[n]o, because I immediately responded."

Mr. Wright testified that a pickup is performed when "somebody that we need to pick up because of their status in the United States, the nature of their criminality, and we have to go and pick them up from that facility. Hopefully we can arrive there before the person has been released." In order to perform a pickup, Mr. Wright testified:

I leave my house. I go to the office and I pick up the van keys for one of our transport vans, and I then proceed to the -- to where I need to go to pick that person up and bring them back and take them to where they are going to be spending the -- in custody.

Mr. Wright testified that "it was ruled that we cannot demand facilities hold people for us. So it's just asking them [local law enforcement] to please hold this individual until we can get someone out to pick them up, take them into our custody, and start the removal proceedings." (brackets added). Mr. Wright testified,

[i]t went from calling us for every foreign-born national who came into custody and assisting us to determine that information and holding them for us to now barely getting a call, and if you get a call, it's from either someone saying that they're releasing the person in the next 30 minutes or the person is a U.S. citizen.

When asked by plaintiffs' counsel, "[w]as there a time period where there -- where pickups were not a part of night phone duty?" Mr. Wright responded, "[n]ot that I'm aware of."

As for restrictions on his behavior while monitoring the duty phone, Mr. Wright testified that he has young children who play sports and participate in cheerleading, so his weekends are normally spent attending tournaments, which he indicated he cannot attend while monitoring the duty phone. Mr. Wright testified, "I don't sleep. I am up because I have sleep issues, so I'm afraid I will miss a phone call." Mr. Wright testified that he was able to do some household chores, such as washing the dishes while monitoring the duty phone. Mr. Wright testified, "[t]he fact that you have a government computer which has law enforcement sensitive material, law enforcement sensitive websites, accessing it in public view is a violation of the CI[13] -- of the -- of what we're supposed to be doing." When Mr. Wright was asked by defense counsel, "[h]as a supervisor ever told you you have to remain at home while monitoring the night phone," Mr. Wright answered, "[n]ot that I can recall."

ERO 2.0

According to the joint stipulations provided by the parties, as well as the trial testimony offered by Supervisor Halverson, during ERO 2.0, plaintiffs were "paid as scheduled overtime (not as administratively uncontrollable overtime (AUO))" for the entirety of the shift while monitoring the duty phone. The plaintiffs in the above-captioned case request compensation at the rate of one and one-half their normal compensation, the rate for scheduled overtime, for the entire time spent monitoring the duty phone not just for the time spent actively working while monitoring the duty phone, similar to how the plaintiffs were paid during ERO 2.0. Plaintiffs state that "[t]here is, of course, no liability for the time period that the duty phone was staffed *and paid* 24 hours per day because all of the time that the plaintiff Deportation Officers were responsible for the duty phone were compensated," which was during ERO 2.0. (emphasis in original). Because, according to both parties' and Supervisor Halverson's testimony, plaintiffs were compensated for their entire shifts at one and one-half during ERO 2.0, the court determines that the ERO 2.0 dates are excluded from the analysis because, according to plaintiffs, the amount plaintiffs were paid was in violation of the FLSA.

The exact timeframe of ERO 2.0, however, is at issue between the parties. Plaintiffs argue in their section of a joint status report submitted to the court:

> The trial record demonstrates that the ERO 2.0 shifts when the duty phone was staffed with paid officers 24 hours per day occurred from June 5 to July 15, 2017. *See* JX 10; JX 13 (emails re overtime shifts). The evidence also shows that, after July 15, 2017, the Government began to, again, schedule uncompensated night phone duty shifts. *See* JX 14 (explaining that the 4 p.m. to midnight weekday duty phone shift would go into effect on July 16, 2017); JX 15 (July 14, 2017 email regarding scheduling the remaining open 4 p.m. to midnight duty phone shifts); JX 16 (ERO 2.0 tracking document showing data from 6/5/17 to 7/15/17).

---

[13] Mr. Wright did not define the acronym "CI."

The basis for plaintiffs' contentions in the above-quoted paragraph are Joint Exhibits 10, 13, 14, 15, and 16, which were presented, and admitted, at trial. First, plaintiffs note Joint Exhibit 10, which is an email from Supervisor Skwira sent on May 23, 2017 to all five plaintiffs detailing an "Overtime Opportunity." Supervisor Skwira states in the May 23, 2017 email, "[a]s part of the ERO 2.0 process the idea of different shifts are being explored to cover after-hour calls and pick-ups" and that "[t]he St. Paul Field Office will be testing alternative shifts from Monday, June 5 through Friday, June 16." The shifts Supervisor Skwira outlines are "1500 - 2300 (Monday through Friday, June 5 - 16)," "2300 - 0700 (Saturday, June 10 & Sunday, June 11)," and "0700 - 1500 (Saturday, June 10 & Sunday, June 11)." The second exhibit plaintiffs rely on as support is Joint Exhibit 13, which is an email from Supervisor Halverson sent on July 7, 2017, which states "[t]he St. Paul Field Office will continue to offer overtime for alternative shifts from Saturday, July 8 - Saturday, July 15." The third exhibit plaintiffs use as support is Joint Exhibit 14, which is an email from ICE Assistant Field Office Director Jason Sieving on July 7, 2017 attaching a "Revised White Paper" for information regarding "**Team and duty assignments following the initial ERO 2.0 testing phase**." (capitalization and emphasis in original). In the "White Paper," the "recommended changes" based on "data provided during the ERO 2.0 test phase" were to "occur on July 16, 2017 and go through the end of the fiscal year." This "Revised White Paper" also states, however, that ERO 2.0 "started on April 24, 2017 and ends on July 7, 2017." Although the "Revised White Paper" indicates that ERO 2.0 was recommended to begin on April 24, 2017, there is no other evidence in the record before the court that the overtime plaintiffs were scheduled for during ERO 2.0 occurred prior to June 5, 2017. The fourth exhibit plaintiffs use as support is Joint Exhibit 15, which is a set of emails sent by ICE Assistant Director Sieving on July 13, 2017 and July 14, 2017 revealing that shifts from "1600 - 0000" needed to be filled. Plaintiffs indicate that the shifts beginning at "1600" indicate ERO 2.0 is over. The fifth exhibit is Joint Exhibit 16, which is labeled by the parties as an "OT [overtime] Test Document," (brackets added), although the term "OT Test Document" does not appear to be within Joint Exhibit 16. Joint Exhibit 16 is a fifty-four page document which appears to list when calls came into the duty phone from June 5 until July 15, but the year is not stated within the document.

> Plaintiffs also argue in their portion of the December 1, 2020 joint status report: On August 25, 2017, SDDO Halverson emailed an officer informing the officer of the duties he expected the officer to perform during his night phone shift which started on a Sunday morning. JX 18. Similarly, the union representing the Deportation Officers in the St. Paul Field Office filed a grievance regarding an officer who had been ordered by SDDO Halverson to perform a pickup during a weekend night phone shift on August 27, 2017. JX 23. If the duty phone had been staffed *and paid* 24 hours per day until September 2017, as counsel for Defendant seemed to contend during oral argument, the officer involved in that grievance would not have been assigned night phone duty without compensation.

(emphasis in original). To support plaintiffs' contention that ERO 2.0 was not continuing until August 27, 2017, plaintiffs cite to Joint Exhibits 18 and 23. Joint Exhibit 18 is an email

from Supervisor Halverson to DO William Robinson, who is not a named plaintiff in this case, which indicates Mr. Robinson had "the late shift beginning Sunday morning" on August 27, 2017. Plaintiffs also utilize Joint Exhibit 23, in which the American Federation of Government Employees (AFGE) Local 3928 submitted to Assistant Director Sieving a "Duty Phone Memorandum of Understanding Violation" on behalf of DO Jon Ross, also not a named plaintiff in the case before the court, who was represented by AFGE ICE Chief Steward James Grizzell. In the memorandum, Mr. Grizzell asserted that there was a violation of "the Duty Phone agreement" also occurring on August 27, 2017. The March 14, 2016 agreement to which Mr. Grizzell refers is found in Joint Exhibit 6, in which the agreement states regarding "**AFTER HOURS RESPONSE**:"

> Outside normal business hours, the DO will answer the after-hours phone whenever practicable. Officers will take appropriate action on calls based upon current enforcement priorities and policies including, but not limited to, a return call to the law enforcement agency (LEA) to inform the LEA if any action will be taken. This return call shall be within a reasonable amount of time as determined by the DO and the situation.

(emphasis and capitalization in original). In Joint Exhibit 23, the following was alleged to be in violation of the March 14, 2016 agreement in Joint Exhibit 6:

> 1) On Sunday, August 27, 2017, DO Jon Ross had been assigned the duty phone to answer calls from local law enforcement agencies. He had the duty phone for a 24 hour period during his day off.

> 2) At approximately 11:00 am, DO Ross received a call from the Hennepin County Jail stating that they were going to release a foreign born individual they had previously arrested.

> 3) DO Ross was entertaining guests at his home and was too busy to travel to the jail. He called Supervisory Detention and Deportation Officer (SDDO) Patrick Kenney, to notify him of the release and to inform him that he was too busy to complete the jail pick up.

> 4) SDDO Kenney asked DO Ross if DO William Robinson was available to complete the jail pick up. DO Ross informed SDDO Kenney that DO Robinson was busy moving his son to his new college residence and did not answer the phone.

> 5) SDDO Kenney told DO Ross to contact SDDO Dustin Halverson and notify him of the pending release.

> 6) DO Ross sent a text message to SDDO Halverson to notify him of the release and that he was too busy to respond.

7) SDDO Halverson then ordered DO Ross to leave his guests and complete the jail pick up.

8) Neither SDDO Kenney nor SDDO Halverson offered to do the jail pick up.

Mr. Grizzell asserted in Joint Exhibit 23:

The Union was not given the opportunity to bargain this explicit change in working conditions before it was implemented by management. On March 14, 2016, Management and the Union bargained and made an agreement regarding the duties and obligations of Deportation Officers assigned to the Duty Phone. The agreement clearly does not require any DO to complete a jail pick up during their off duty hours. When SDDO Halverson ordered DO Ross to complete a jail pick up on his day off, he clearly violated the terms of the agreement.

Subsequently to this grievance, a new agreement was entered into on October 17, 2017 which specifically stated: "Picking up detainees is a standard expectation, and will be accomplished as is practicable and in accordance with current enforcement priorities and policies."

The court notes that Joint Exhibit 19 also supports the contention by plaintiffs that ERO 2.0 was over by August 27, 2017 because Joint Exhibit 19 is an email sent on August 27, 2017 to Supervisor Halverson regarding the incident detailed in Joint Exhibit 23. Plaintiffs argue "there is no evidence supporting" the contention that the ERO 2.0 shifts continued into September 2017.

Defendant argues, however, in its portion of the same joint status report: The trial evidence indicates that ERO 2.0 proceeded beyond July 15, 2017, apparently to September 3, 2017. Appendix B to Def. Post-Trial Br. at 5, ECF 75-2, Response to ¶ 16 (citing Trial Tr. 768:14-19). However, plaintiffs make a compelling point, above, that the grievance discussed in JX 23 seems to indicate that the night phone was being used on Sunday, August 27, 2017, suggesting that even if some ERO 2.0 initiatives were continuing, the scheduled overtime shifts may not have continued until September 3, 2017.

Ultimately, this is an issue for plaintiffs. Plaintiffs are trying to convince the Court to rule that they were not compensated correctly on certain days, so they should be identifying exactly which days they think that they were not compensated correctly.

Defendant does not disagree that ERO 2.0 began June 5, 2017, but defendant disagrees on the end date of ERO 2.0. The basis for defendant arguing that ERO 2.0 lasted until September 3, 2017, rather than July 15, 2017, which the plaintiffs allege, is only one

source identified in the transcript. When plaintiffs' counsel was questioning Supervisor Halverson, plaintiffs' counsel asked about Joint Exhibit 21. Plaintiffs' counsel had the following exchange with Supervisor Halverson:

> Q. Generally, do you recognize what this email [Joint Exhibit 21] is?
>
> A. Yes.
>
> Q. Okay. And what is it?
>
> A. It appears to be an email that I sent to my boss that documented -- I'm sorry, I'm just looking at the date.
>
> Q. Sure.
>
> A. I guess I don't know the date, that documents the releases and the pickups that we had from July 17th, 2017, through September 3rd, 2017.
>
> Q. And is that -- sorry. Is that time period what we've been referring to as ERO 2.0 for these overtime shifts?
>
> A. Yeah, I believe it took place during that time, yes.

(brackets added).

The court notes that Joint Exhibit 17 and Joint Exhibit 25 also contain some additional information regarding the duration of ERO 2.0. In Joint Exhibit 17, a July 20, 2017 email from Supervisor Halverson regarding the "Late shift" states in relevant part "[s]ince the establishment of the two late shifts, there have been some questions about what the primary duties will be on those shifts." The date of this email, July 20, 2017, indicates that the shifts had recently changed, although when that change occurred is not clear in the email. In Joint Exhibit 25, a letter to Peter Fehlen, then ICE Vice President of the American Federation of Government Employees Local 3928 from Field Office Director Scott Baniecke, Director Baniecke specifically referred to ERO 2.0 as the "ERO 2.0 'Beta Test Phase' (April to July 2017)" in a September 19, 2017 "MOU [Memorandum of Understanding] for New Shifts in the St. Paul AOR [Area of Responsibility]." Although defendant argues in favor of a September 3, 2017 end date, the evidence does not support a conclusion that the ERO 2.0 test period lasted beyond July 15, 2017, especially based on Supervisor Halverson's unclear recollection at trial. Although July 16, 2017 is referenced in the record, it seems that the reference was to the start date of a change, particularly because of the August 27, 2017 grievance. Based on the strong evidence in the record before the court, the court concludes that ERO 2.0 lasted from June 5, 2017 until July 15, 2017.

As noted above, the parties also asked the court to determine "exactly which days and hours—by date and time" were worked by the plaintiffs in this case from May 1, 2017

until December 31, 2019 during the first trial phase on liability, although much of this information is more informative for determining damages if liability is found for each of the named plaintiffs. The court collected the available evidence from the record and developed spreadsheets, which revealed numerous discrepancies in the records before the court after the trial. One spreadsheet was developed by the court for each named plaintiff with commentary and indications of the discrepancies in order for the parties to offer their respective comments to the court in supplemental briefs. The court understands that by allowing such testimony to be gathered during the first phase of the trial on liability, it might be possible to have the witnesses appear to testify only once, without the need for second trial appearances by each of the named witnesses. Based on the records and submissions by the parties before the court, attached to this Opinion are the final spreadsheets listing the days and hours the court has determined were worked by each plaintiff, as well as how many hours were worked, and on which shift, by each plaintiff while monitoring the duty phone.

## DISCUSSION

<u>Standby or On-Call</u>

As indicated above, the parties requested to bifurcate the issues of damages and liability in the case, and the court granted the request. The court, however, also granted the parties' additional request during the first phase of the case that the court determined "exactly which days and hours—by date and time" for each of the five individual plaintiffs. The liability issues before the court during the first trial phase, therefore, are the type and amount of pay to which each of the plaintiffs are entitled when monitoring the duty phone after hours, and whether the plaintiffs' pay should be paid using a standby or on-call duty basis, as well as whether plaintiffs are entitled to regularly scheduled overtime compensation or AUO compensation. Plaintiffs also claim that they are entitled to liquidated damages as a result of violations of the FLSA. <u>See</u> 29 U.S.C. § 207(k) (2018). Prior to the trial, the parties submitted a joint statement of issues of fact and law, an exhibit list, a witness list, and stipulation of facts for trial. In the joint statement of issues of fact and law, the parties agreed to the numbered issues below regarding standby status:

> 1. Whether Plaintiffs are in standby status while covering the after-hours duty phone ("night phone duty"), such that the entire duration of the assignment constitutes hours of work for purposes of determining overtime compensation under the Fair Labor Standards Act of 1938 (FLSA), codified as amended at 29 U.S.C. §§ 201-219, or whether Plaintiffs are in on-call status, such that only time actively responding to the night phone constitutes hours of work.

> 2. Whether, while on night phone duty, Plaintiffs are "restricted by official order to a designated post of duty and [are] assigned to be in a state of readiness to perform work with limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her own purposes." 5 C.F.R. § 551.431(a)(1) (describing standby status).

(alterations in original). Within the joint statement of issues of fact and law, the parties each provided an individual, not agreed to section within the joint statement of issues of fact and law. Plaintiffs added the following issue regarding monitoring the duty phone: "Whether the restrictions on Plaintiffs during their night phone shifts render them unable to effectively use their time for personal pursuits or whether they are free to use their time effectively for personal pursuits when not actively fielding phone calls or performing pickups." The defendant, in its individual portion of the joint statement of issues of fact and law, indicated it did not agree that the way plaintiffs wrote the issue quoted immediately above is as "precise" as the second joint issue the parties wrote together.

Next, in their joint statement of issues of fact and law, both parties agreed to the definition of on-call status in their submission, including:

> 3. Whether, while on night phone duty, Plaintiffs are "allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius." 5 C.F.R. § 551.431(b)(1) (describing on-call status).

> 4. The extent to which Plaintiffs are "allowed to make arrangements such that any work which may arise during the [night duty phone] period will be performed by another person." 5 C.F.R. § 551.431(b)(2) (describing on-call status).

(brackets in original). Plaintiffs argue that the correct status was on standby, and not on-call, while monitoring the duty phone and that the standby classification would entitle plaintiffs to receive regular overtime compensation, rather than AUO compensation. Defendant, however, argues that plaintiffs' correct status was on-call status while monitoring the duty phone and that AUO compensation is appropriate.

<u>Background of the FLSA</u>

Regarding the rate of overtime to be paid to an employee, the FLSA provides that:

> Except as otherwise provided in this section, no employer shall employ any of his [or her] employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his [or her] employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1) (brackets added). The FLSA also provides that "any employee in law enforcement activities" are subject to higher thresholds than forty hours per week to qualify for overtime pay. <u>See</u> 29 U.S.C. § 207(k). The "regularly scheduled workweek," 5

C.F.R. § 550.103 (2021), for law enforcement officers, is 42.75 hours per week, instead of the "40 hours" in another government employee's workweek. See 29 U.S.C. § 207(k); 5 C.F.R. § 550.111 (2021); 29 C.F.R. § 553.201(a) (2021); 29 C.F.R. § 553.230(c) (2021); see also Dep't of Labor, Fire Protection and Law Enforcement Employees of Public Agencies; Study of Average Number of Hours Worked, 48 Fed. Reg. 40,518 (Sept. 8, 1983).

Congress assigned the authority to regulate the employment of federal employees to the Civil Service Commission and then to United States Office of Personnel Management (OPM), instead of to the United States Department of Labor (DOL), which regulates administration of the FLSA to non-federal employees, to "'*assure consistency* with the meaning, scope, and application established by the rulings, regulations, interpretations, and opinions of the Secretary of Labor *which are applicable in other sectors of the economy.*'" Zumerling v. Devine, 769 F.2d 745, 750 (Fed. Cir. 1985) (quoting H.R. Rep. No. 93–913, at 28 (1974)) (emphasis in Zumerling v. Devine). The regulation cited to by both parties in their June 26, 2020 joint statement of issues of fact and law as being controlling for purposes of determining whether the plaintiffs before this court are in standby or on-call status while monitoring the duty phone, 5 C.F.R. § 551.431, is authorized by the statutes at 5 U.S.C. § 5542(c) and 29 U.S.C. § 204(f). See 5 C.F.R. § 551.431; see, e.g., Miscellaneous Changes in Compensation Regulations, 64 Fed. Reg. 69165, 69180 (Dec. 10, 1999). The statute at 5 U.S.C. § 5542 is titled "Overtime Rates: Computation" and defines the applicable hourly workweek and compensation rates. Plaintiffs in the above-captioned case are subject to section 7(k) of the FLSA[14] because

---

[14] Section 7(k) of the FLSA is codified at 29 U.S.C. § 207(k):

> **(k) Employment by public agency engaged in fire protection or law enforcement activities**
> No public agency shall be deemed to have violated subsection (a) with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correctional institutions) if--
>
> > **(1)** in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or
> >
> > **(2)** in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the same ratio to the number of consecutive

of their role as law enforcement personnel for ICE. Therefore 5 U.S.C. § 5542(c) is relevant to plaintiffs:

> **(c)** Subsection (a) shall not apply to an employee who is subject to the overtime pay provisions of section 7 of the Fair labor [sic] Standards Act of 1938. In the case of an employee who would, were it not for the preceding sentence, be subject to this section, the Office of Personnel Management shall by regulation prescribe what hours shall be deemed to be hours of work and what hours of work shall be deemed to be overtime hours for the purpose of such section 7 so as to ensure that no employee receives less pay by reason of the preceding sentence.

5 U.S.C. § 5542(c) (2018) (brackets added). The FLSA statute at 29 U.S.C. § 204(f) states:

> The Secretary is authorized to enter into an agreement with the Librarian of Congress with respect to individuals employed in the Library of Congress to provide for the carrying out of the Secretary's functions under this chapter with respect to such individuals. Notwithstanding any other provision of this chapter, or any other law, the Director of the Office of Personnel Management is authorized to administer the provisions of this chapter with respect to any individual employed by the United States (other than an individual employed in the Library of Congress, United States Postal Service, Postal Regulatory Commission, or the Tennessee Valley Authority). Nothing in this subsection shall be construed to affect the right of an employee to bring an action for unpaid minimum wages, or unpaid overtime compensation, and liquidated damages under section 216(b) of this title.

29 U.S.C. § 204(f) (2018).

The United States Supreme Court has indicated that the analysis regarding whether an employee is in on-call or on standby duty status are questions of fact. See Skidmore v. Swift & Co., 323 U.S. 134, 136-37, 139 (1944). Additionally, the Supreme Court held that "an employer, if he chooses, may hire a man to do nothing or to do nothing but wait for something to happen." Armour & Co. v. Wanock, 323 U.S. 126, 133 (1944) ("Readiness to serve may be hired, quite as much as service itself, and time spent lying

---

> days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days,

> compensation at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(k) (emphasis in original).

in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer."). According to a decision issued by the United States Claims Court, and affirmed by the Court of Appeals for the Federal Circuit, when plaintiffs "are not restricted to the headquarters offices nor to their residences," and are "free to follow their individual private pursuits, subject only to the requirements to remain sober, to remain within the beepers range, and to maintain a log of referred calls," and are "compensated at premium rates" when a call does require work, the plaintiffs are on-call instead of on standby duty. <u>Allen v. United States</u>, 1 Cl. Ct. 649, 651, <u>aff'd</u>, 723 F.2d 69 (Fed. Cir. 1983).[15] In <u>Havrilla v. United States</u>, a Judge of the United States Court of Federal Claims found that plaintiffs were in standby status because, during plaintiffs' respective lunch breaks, while working for the United States Navy, they were required to be in eyesight of their duty station to hand out weapons or equipment and be prepared to assist if anyone came to the station to check out the weapons or equipment. <u>See</u> <u>Havrilla v. United States</u>, 125 Fed. Cl. 454, 465-66 (2016) ("Because the undisputed facts in this case establish that Plaintiffs' entire 8.5–hour shifts are spent in activities that predominantly benefit the Navy, rather than the Plaintiffs, the Court concludes that the entirety of the shifts constituted compensable work time."). In <u>Akpeneye v. United States</u>, another Court of Federal Claims decision, the Judge of the Court of Federal Claims found that, although the requirement by the Pentagon for employees to remain on campus and in uniform during their lunch break benefitted the employer, "the requirements to stay in uniform and at the workplace do not transform a noncompensable meal period into compensable time." <u>Akpeneye v. United States</u>, 138 Fed. Cl. 512, 529 (2018).

Although the parties seemed to agree in their June 26, 2020 joint statement of issues of fact and law that the FLSA regulation at 5 C.F.R. § 551.431 should apply to the court's analysis of standby and on-call status, the defendant changed its argument after the trial. In its post-trial brief, defendant adds that the Federal Employees Pay Act (FEPA) statute at 5 U.S.C. § 5545(c) (2018), rather than the FLSA statutes and regulations, should be controlling for the court's analysis. Plaintiffs, however, continue to maintain that 5 C.F.R. § 551.431, promulgated under 29 U.S.C. § 204(f) and 5 U.S.C. § 5542(c), is controlling for purposes of this court's analysis. The regulation at 5 C.F.R. § 551.431 states:

> (a)(1) An employee is on duty, and time spent on standby duty is hours of work if, for work-related reasons, the employee is restricted by official order to a designated post of duty and is assigned to be in a state of

---

[15] In an unreported decision, the United States Court of Appeals for the Federal Circuit affirmed the finding of a Judge of the United States Court of Federal Claims that a plaintiff was on-call because the plaintiff carried a "pager or cellular telephone" to "respond to a hospital call to return to perform a procedure," but was "not required to remain at any particular location-such as the hospital or her residence" and Ms. Miller "may move about and engage in any activity consistent with responding to a page or telephone call and returning to the hospital within one hour, if necessary." <u>See</u> <u>Miller v. United States</u>, No. 11-766C, 2015 WL 136647, at *1-*2 (Fed. Cl. Jan. 9, 2015), <u>aff'd</u>, 627 F. App'x 932 (Fed. Cir. 2016).

readiness to perform work with limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her own purposes. A finding that an employee's activities are substantially limited may not be based on the fact that an employee is subject to restrictions necessary to ensure that the employee will be able to perform his or her duties and responsibilities, such as restrictions on alcohol consumption or use of certain medications.

(2) An employee is not considered restricted for "work-related reasons" if, for example, the employee remains at the post of duty voluntarily, or if the restriction is a natural result of geographic isolation or the fact that the employee resides on the agency's premises. For example, in the case of an employee assigned to work in a remote wildland area or on a ship, the fact that the employee has limited mobility when relieved from duty would not be a basis for finding that the employee is restricted for work-related reasons.

(b) An employee will be considered off duty and time spent in an on-call status shall not be considered hours of work if:

(1) The employee is allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius; or

(2) The employee is allowed to make arrangements such that any work which may arise during the on-call period will be performed by another person.

5 C.F.R. § 551.431. The statute at 5 U.S.C. § 5545(c) states:

(c) The head of an agency, with the approval of the Office of Personnel Management, may[16] provide that--

(1) an employee in a position requiring him regularly to remain at, or within the confines of, his [or her] station during longer than ordinary periods of duty, a substantial part of which consists of remaining in a standby status rather than performing work, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for irregular, unscheduled overtime duty in excess of his [or her] regularly

---

[16] The court notes that the deferential language in the initial clause of 5 U.S.C. § 5545(c), and specifically the word "may," is important to the court's final decision because, as discussed below, the standby standards under 5 U.S.C. § 5545(c) appear to apply only if the head of an agency with OPM approval has indicated an employee is eligible for 5 U.S.C. § 5545(c) compensation.

scheduled weekly tour. Premium pay under this paragraph is determined as an appropriate percentage, not in excess of 25 percent, of such part of the rate of basic pay for the position as does not exceed the minimum rate of basic pay for GS-10 (including any applicable locality-based comparability payment under section 5304 or similar provision of law and any applicable special rate of pay under section 5305 or similar provision of law) (or, for a position described in section 5542(a)(3) of this title, of the basic pay of the position), by taking into consideration the number of hours of actual work required in the position, the number of hours required in a standby status at or within the confines of the station, the extent to which the duties of the position are made more onerous by night, Sunday, or holiday work, or by being extended over periods of more than 40 hours a week, and other relevant factors; or

**(2)** an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for regularly scheduled overtime, night, and Sunday duty, and for holiday duty. Premium pay under this paragraph is an appropriate percentage, not less than 10 percent nor more than 25 percent, of the rate of basic pay for the position, as determined by taking into consideration the frequency and duration of irregular, unscheduled overtime duty required in the position.[17]

5 U.S.C. § 5545(c) (emphases in original) (brackets added).

Defendant argues in its supplemental brief that "the FLSA is inextricably linked to Title 5 for Federal employees." Defendant argues that

the calculation of an employee's regular rate—necessary to determine FLSA overtime compensation due—depends on the pay the employee is otherwise due for an hour of work. In the private sector, an employee's normal compensation would ordinarily be determined based on an employment contract, along with any relevant regulations promulgated by the U.S. Department of Labor. For Federal employees, normal compensation is ordinarily determined by Title 5, along with any relevant OPM regulations.

---

[17] The issue of whether plaintiffs should be compensated under the administratively uncontrollable payment structure is also an issue the plaintiffs raised in this case and is addressed later in this Opinion.

Defendant further argues that "the calculation of an employee's regular rate" of pay for determining what any overtime pay should be, "depends on the pay the employee is otherwise due for an hour of work" because 29 U.S.C. § 207(a) states that overtime compensation is "one and one-half times the regular rate" of pay. See 29 U.S.C. § 207(a). Defendant maintains that "[i]t is not possible to calculate an employee's regular rate based on the FLSA provisions codified in Title 29 alone," but that "normal compensation is ordinarily determined by Title 5, along with any relevant OPM regulations." (citing Adams v. United States, 391 F.3d 1212, 1221 (Fed. Cir. 2004), and Abreu v. United States, 948 F.2d 1229, 1233 (Fed. Cir. 1991)). Defendant argues:

> As the Federal Circuit has explained, "Congress created a 'flotsam of incomplete legislation' when it extended the FLSA to cover federal employees already covered by Title 5." *Alamo*, 850 F.3d at 1353. Congress charged OPM with the task of "administer[ing] the FLSA as it related to federal workers and . . . resolv[ing] any conflicts between Title 5 pay entitlements and entitlements under the FLSA." *Lanehart v. Horner*, 818 F.2d 1574, 1577 (Fed. Cir. 1987); 29 U.S.C. § 204(f). Thus, in FLSA cases, the Court's role is often to "ensure that OPM has put together the various pieces of pay entitlement in a way that eliminates gaps and minimizes overlaps." *Abreu*, 948 F.2d at 1236.

(alterations in original). Defendant argues that the court should turn to the regulation at 5 C.F.R. § 551.401, titled "Basic principles," regarding hours of work which are detailed in 5 C.F.R. § 551.401, including for what constitutes hours of work. The regulation at 5 C.F.R. § 551.401 states:

> (a) All time spent by an employee performing an activity for the benefit of an agency and under the control or direction of the agency is ''hours of work.'' Such time includes:
>
> (1) Time during which an employee is required to be on duty;
>
> (2) Time during which an employee is suffered or permitted to work; and
>
> (3) Waiting time or idle time which is under the control of an agency and which is for the benefit of an agency.

5 C.F.R. § 551.401(a) (2021). Defendant also argues that "OPM expounds upon 5 C.F.R. § 551.401(a)(3), with a section specifically addressing the standards for standby versus on-call status. 5 C.F.R. § 551.431." Defendant argues "[t]he standard that OPM has adopted for when an employee is in a compensable standby duty status under its FLSA regulations, 5 C.F.R. § 551.431, is materially identical to the standard it has adopted in its regulations implementing Title 5." Defendant then compares 5 C.F.R. § 551.431 with 5 C.F.R. §§ 550.112(k)-(l). The regulations at 5 C.F.R. §§ 550.112(k)-(l), which are promulgated pursuant to 5 U.S.C. § 5545, state:

(k) *Standby duty.* (1) An employee is on duty, and time spent on standby duty is hours of work if, for work-related reasons, the employee is restricted by official order to a designated post of duty and is assigned to be in a state of readiness to perform work with limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her own purposes. A finding that an employee's activities are substantially limited may not be based on the fact that an employee is subject to restrictions necessary to ensure that the employee will be able to perform his or her duties and responsibilities, such as restrictions on alcohol consumption or use of certain medications.

(2) An employee is not considered restricted for "work-related reasons" if, for example, the employee remains at the post of duty voluntarily, or if the restriction is a natural result of geographic isolation or the fact that the employee resides on the agency's premises. For example, in the case of an employee assigned to work in a remote wildland area or on a ship, the fact that the employee has limited mobility when relieved from duty would not be a basis for finding that the employee is restricted for work-related reasons.

(l) *On-call status.* An employee is off duty, and time spent in an on-call status is not hours of work if—

(1) The employee is allowed to leave a telephone number or carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius; or

(2) The employee is allowed to make arrangements for another person to perform any work that may arise during the on-call period.

5 C.F.R. §§ 550.112(k)-(l) (2021) (emphases in original). Defendant also points to language in the "Review of Comments on Proposed Regulations" for Miscellaneous Changes in Compensation Regulations regarding 5 C.F.R. §§ 550, 551 and which refers to 5 C.F.R. § 551.431(a)(1) and 5 C.F.R. § 550.112(k)(1) as "parallel rule[s]," notably not incorporating the entirety of the regulations at 5 C.F.R. § 551.431 and 5 C.F.R. § 550.112(k)-(l). See Miscellaneous Changes in Compensation Regulations, 64 Fed. Reg. 69,165, 69,167 (Dec. 10, 1999) (brackets added). According to defendant: "[r]egardless of whether an employee is exempt or non-exempt under the FLSA, the OPM regulations apply an identical standard for determining whether an employee is in standby duty status, and the statutory underpinning for that standard is 5 U.S.C. § 5545(c)(1). *Compare* 5 C.F.R. § 551.141-.144 *with* 5 U.S.C. § 5545(c)(1)."

Defendant argues "when a FLSA non-exempt Federal employee works standby hours exceeding the applicable FLSA overtime threshold, the straight time (the 'one' in FLSA's 'one and one-half') is supplied by the employee's pay under Title 5, with the FLSA

providing the 'additional half-time bonus,' *Alamo[ v. United States]*, 850 F.3d [1349,] 1353 [(Fed. Cir. 2017)]." (brackets added). Defendant argues: "In rejecting the *Alamo* plaintiffs' FLSA claims, the Federal Circuit explained that 'by design in Title 5, Congress and OPM intended federal employees working standby hours to receive less pay than those who actively work during their entire regularly scheduled overtime.' 850 F.3d at 1353." (brackets added). Defendant notes:

> The Federal Circuit was quite aware that the *Alamo* plaintiffs brought their claims under the FLSA. 850 F.3d at 1351 ("Appellants . . . appeal the Court of Federal Claims' determination that the government properly compensates them for their regularly scheduled overtime work under the Fair Labor Standards Act."). That did not make Title 5 any less relevant in discerning the intent of Congress with respect to overtime pay for standby duty. *Id.* at 1353 (citing 5 U.S.C. § 5545(c)(1); *see also id.* at 1353 n.3 (explaining in a footnote: "Although the FLSA does not distinguish between standby and actively worked time when defining 'work,' Title 5 draws such a distinction.").

Defendant further argues:

> If the Court were to agree with plaintiffs' position that 5 U.S.C. § 5545(c)(1) is irrelevant and that they may establish entitlement to standby compensation under the FLSA without regard to Title 5, the Court would not only open an unauthorized alternative track to qualifying for standby compensation, but would also grant plaintiffs far more compensation than Congress and OPM intended to pay for standby duty. Rather than "balanc[ing] the regular inconvenience . . . of confinement to a duty station for longer than ordinary work hours [with] the reality that . . . these hours [may be spent] sleeping, reading, eating, playing games on a smartphone, and the like," as Congress intended, *Alamo*, 850 F.3d at 1352, the Court would open the door to a FLSA specific permutation of standby in which a Federal employee recovers the same compensation for an hour of standby as he or she would recover for an hour of active work.

(alterations in original). Defendant, however, states that ultimately "this case simply requires the Court to apply the plain language of 5 C.F.R. § 551.431 to the facts of the case." Regarding which authority, 5 U.S.C. § 5545 or 5 C.F.R. § 551.431, should be used to make a decision in this case, defendant further states in a footnote:

> Both 5 U.S.C. § 5545(c)(1) and 5 C.F.R. § 551.431 are controlling in this case. We do not understand there to be any disagreement as to the controlling nature of the regulation [5 C.F.R. § 551.431]. Plaintiffs' contention that 5 U.S.C. § 5545(c)(1) is not controlling because they are pursuing their claim under the FLSA is without merit because standby status is not specific to the FLSA. As discussed above, there are not—and cannot be—separate standards for whether a FLSA exempt Federal employee is

in standby status versus a FLSA non-exempt Federal employee. If the employee is in standby status under 5 U.S.C. § 5545(c)(1), he or she gets paid accordingly, with FLSA non-exempt employees receiving the additional half-time payment for FLSA overtime hours. Because the regulation captures the statutory criteria and is fully consistent with the statute, the Court could simply apply the plain language of 5 C.F.R. § 551.431, without needing to resort to the underlying statute. Nonetheless, the statute remains a controlling authority as to the standby issue presented by Count I of the complaint.

(brackets added).

In plaintiffs' March 15, 2021 supplemental brief, plaintiffs argue "[w]hether or not the time at issue is compensable under the FLSA is completely unrelated to Title 5 premium pay under Section 5545(c)(1) or (2)." (emphasis omitted). Plaintiffs argue regarding the standby pay and AUO pay in 5 U.S.C. § 5545(c) that

> [b]oth of these payments are premium pays that federal agencies *can elect* to pay to employees if they determine that certain criteria are met. They are not mandatory payments, but federal courts have held that once an agency exercises its discretion to make the payments, it must follow the rules specific to that payment. Moreover, an agency's decision to pay one of these Title 5 premium payments does not obviate the Agency's obligation to comply with the overtime requirements of the Fair Labor Standards Act (FLSA), including the requirement to provide additional FLSA pay for each overtime hour worked.

(emphasis in original). Plaintiffs note that ICE elected to pay plaintiffs with AUO before and after ERO 2.0. Plaintiffs argue that although defendant seeks to have the court analyze this case through the lens of the Title 5 statutory provisions for standby or on-call status, "[t]he reason that Plaintiffs seek FLSA overtime for the hours is that (1) the Defendant does not count or compensate the time as hours of work and (2) the time is compensable under the FLSA." Plaintiffs argue, "[t]he Government, however, attempts to bootstrap Title 5 standby pay regulations into the Courts' [sic] analysis of this FLSA issue, but those regulations are irrelevant because the Government *has not opted* to pay Plaintiffs with Title 5 standby pay." (emphasis in original).

Plaintiffs argue, with respect to federal employees, "OPM's regulations expressly command that FLSA pay is in addition to Title 5 standby pay." (citing 5 C.F.R. § 551.513 (2021)). The regulation at 5 C.F.R. § 551.513 states:

> Overtime pay under this subpart shall be paid in addition to all pay, other than overtime pay, to which the employee is entitled under title 5, United States Code, or any other authority. An employee entitled to overtime pay under this subpart and overtime pay under any authority outside of title 5,

United States Code, shall be paid under whichever authority provides the greater overtime pay entitlement in the workweek.

5 C.F.R. § 551.513. The court notes that the regulation at 5 C.F.R. § 551.513 provides that an employee may receive both AUO compensation, as well as FLSA one and one-half overtime compensation. Plaintiffs state:

> The Government's brief willfully conflates Title 5 standby pay and FLSA overtime. These are not the same thing. FLSA overtime is a *mandatory* payment that must be made for all hours worked above the applicable threshold to FLSA non-exempt employees. Title 5 standby pay is a *discretionary* payment that agencies can elect to make to employees if it determines that certain criteria are met. The mere ability of the Agency to elect to compensate employees with Title 5 standby pay (something it has indisputably not done) does not render the FLSA inapplicable to Plaintiffs.

(emphases in original). Plaintiffs state: "Employees covered by the FLSA must be paid for all hours of work. 29 U.S.C. § 207(a). Federal employees, including Plaintiffs, are covered by the FLSA. 29 U.S.C. § 203(e)(2)(A)." Plaintiffs argue:

> As OPM has explained, payments under 5 U.S.C. § 5545(c) are discretionary payments. Once an agency makes the decision to certify a position to receive premium pay under Section 5545(c), then the employee "shall" receive the premium pay. *Doe v. U.S.*, 463 F.3d 1314, 1325 (2006). *Here, however, the Government has not certified the Plaintiffs' position to receive Title 5 standby pay and, accordingly, Title 5 standby pay is not relevant to Plaintiffs' claims.*

(emphasis in original). Plaintiffs argue that "[t]here is no such discretionary element to FLSA pay. To the contrary, FLSA payments are mandatory and cannot be waived." (citing <u>Barrentine v. Ark.-Best Freight Sys.</u>, 450 U.S. 728 (1981)). Plaintiffs contend, "[b]ecause the time Plaintiffs are responsible for the duty phone are all hours of work under the FLSA, the Government must compensate the Plaintiffs for them." Therefore, plaintiffs argue, in addition to the fact that plaintiffs were never authorized to receive Title 5 standby pay, that

> the Agency could not do so because of the number of hours the employees are on a duty phone rotation. They are on seven-hour duty phone shifts on weekdays and 24-hour duty phone shifts on weekends and holidays. *See* Joint Statement of Fact 17. The rotation means that the Plaintiffs would not meet the minimum number of hours every week for the Government to even consider paying them Title 5 standby pay. *See* 5 C.F.R. § 550.144(a)(3).

The regulation plaintiffs cite, 5 C.F.R. § 550.144(a)(3), states:

> (a) An agency may pay the premium pay on an annual basis referred to in § 550.141 to an employee who meets the requirements of that section, at one of the following percentages of that part of the employee's rate of basic pay which does not exceed the minimum rate of basic pay for GS–10 (including any applicable locality-based comparability payment under 5 U.S.C. 5304 or special rate of pay under 5 U.S.C. 5305 or similar provision of law):
>
> . . .
>
> (3) A position in which the employee has a basic workweek requiring fulltime performance of actual work, and is required, in addition, to remain on standby duty: 14 to 18 hours a week on regular workdays, or extending into a nonworkday in continuation of a period of duty within the basic workweek—15 percent; 19 to 27 hours a week on regular workdays, or extending into a nonworkday in continuation of a period of duty within the basic workweek—20 percent; 28 or more hours a week on regular workdays, or extending into a nonworkday in continuation of a period of duty within the basic workweek—25 percent; 7 to 9 hours on one or more of his [or her] regular weekly nonworkdays—15 percent; 10 to 13 hours on one or more of his [or her] regular weekly nonworkdays—20 percent; 14 or more hours on one or more of his [or her] regular weekly nonworkdays—25 percent.

5. C.F.R. § 550.144(a)(3) (2021) (brackets added). Plaintiffs argue:

> There is no exception from the FLSA that says that the federal government is not required to compensate hours of work if the minimum number of standby pay or AUO hours under Title 5 are not worked. Instead, the FLSA requires the Government to compensate the FLSA non-exempt Plaintiffs for all hours of work. *See* 29 U.S.C. § 207(a).

Regarding the Alamo v. United States decision that defendant used to support its position, plaintiffs argue:

> In *Alamo* [*v. United States*], the plaintiffs contended that the Government improperly calculated their FLSA overtime by counting all regularly scheduled overtime hours as compensated with Title 5 standby pay as the straight-time portion of their FLSA overtime pay. *Id.* [*Alamo v. United States*, 850 F.3d at 1351-52] The Court rejected the *Alamo* plaintiffs' claims and held that the calculation was proper and that, for employees *who receive Title 5 standby pay*, the proper calculation for FLSA overtime for regularly scheduled overtime hours is that the Title 5 premium counts as the straight time payment and the employees must receive an additional half-time payment to comply with the FLSA. *Id. See* 5 C.F.R. § 551.512(b).

(emphasis in original) (brackets added). Plaintiffs argue: "The reason that *Alamo* is inapplicable to Plaintiffs' claims here is very simple: the Government does not pay the Plaintiffs annual premium pay for standby hours under Title 5 nor does it pay any FLSA overtime pay for many of the hours that the Plaintiffs' work." Plaintiffs cite to a decision issued by the Federal Labor Relations Authority (FLRA), <u>U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Office of NOAA Corps Operations, Atlantic Marine Center, Norfolk, Virginia and International Brotherhood of Electrical Workers</u>, 55 FLRA 816 (1998), which was an appeal from an arbitration.[18] Plaintiffs argue that the FLRA decision determined that payment for standby duties is different depending on whether overtime occurred under the FLSA or under Title 5. Plaintiffs argue: "The same is true here. The Government cannot avoid compensating Plaintiffs for all their hours of work under the FLSA by refusing to provide a discretionary Title 5 premium pay. The Government must compensate the Plaintiffs for the duty phone shifts with FLSA overtime." Plaintiffs argue "[t]he provisions of 5 C.F.R. § 551.431 implement standby pay under the FLSA. *See* 5 C.F.R. § 551.101." In a footnote, plaintiffs argue:

> The FLSA, however, must be administered in the federal sector in a manner that is consistent with DOL's implementation of the FLSA in the private sector. *See AFGE v. OPM*, 821 F.2d 761, 769-70 (D.C. Cir. 1987) ("In promulgating regulations, OPM is nevertheless obliged to exercise its administrative authority in a manner that is consistent with the Secretary of Labor's implementation of the FLSA. *When the civil service and FLSA systems conflict, OPM must defer to the FLSA so that any employee entitled to overtime compensation under FLSA receives it under the civil service rules*.") (emphasis supplied) (citing Fair Labor Standards Amendments of 1974, H.R. Rep. 913, 93d Cong., 2d Sess. 28 (1974), U.S. Code Cong. & Admin. News 1974, p. 28.).

(emphasis in original). Plaintiffs further argue:

> if the Government had made the determination that it was going to pay Plaintiffs standby pay under 5 U.S.C. § 5545(c)(1), which it did not, and had actually provided the Plaintiffs that payment, it could then have used the FLSA payment methodology approved by the Court in *Alamo*. See 5 C.F.R. § 551.512(b). Because the Government provided the Plaintiffs with no pay for the time, it still must compensate them with time-and-a-half overtime to comply with the mandates of the FLSA. 5 C.F.R. § 551.512(a).

Plaintiffs state: "OPM regulations make clear that FLSA overtime pay is in addition to Title 5 premium pay. 5 C.F.R. § 551.513. Title 5 overtime and the FLSA are not the same thing."

---

[18] Although plaintiffs cite to the FLRA decision, the FLRA decision is not precedential for United States Court of Federal Claims.

Defendant argues in its supplemental response:

> To the extent plaintiffs are arguing that, although the Government could have elected to pay them standby pay under the authority of 5 U.S.C. § 5545(c)(1), the fact that it has not done so means that, if the Court rules in plaintiffs' favor, they should now recover a windfall of greater compensation than would otherwise have been payable under the formula approved in *Alamo*, that issue is a damages question not currently before the Court at this phase of proceedings. By contrast, if plaintiffs are arguing that they may qualify as being in standby under the FLSA even though they do not—or perhaps even *because* they do not—qualify as a being in standby for purposes of Title 5, such arguments only serve to highlight the key point we make: For Federal employees, there are not separate standards for what qualifies as standby status under Title 5 versus under the FLSA.

(footnote omitted). Defendant argues that there is "one identical standard" across the Title 5, the OPM regulation, and the DOL regulation for defining standby duty. Compare 5 U.S.C. § 5545(c)(1), with 5 C.F.R. § 551.431(a), and 5 C.F.R. § 550.112(k). Defendant nonetheless asserts, which is at odds with defendant's earlier assertion that 5 U.S.C. § 5545(c) should be controlling, that "[t]he parties agree that 5 C.F.R. § 551.431 is controlling," the FLSA standby regulation.

In Alamo v. United States, a decision cited by both parties, the United States Court of Appeals for the Federal Circuit stated

> because Title 5 and the FLSA "do not mesh with the machined precision of the gears in a Swiss watch," we interpret these statutes and regulations in a way that "ensure[s] that OPM has put together the various pieces of pay entitlement in a way that eliminates gaps and minimizes overlaps."

Alamo v. United States, 850 F.3d 1349, 1353 (Fed. Cir. 2017) (alteration in original) (quoting Abreu v. United States, 948 F.2d at 1236). The Federal Circuit had indicated earlier in Doe v. United States:

> The appellants base their argument on the relationship between the FLSA and the Federal Employees Pay Act, 5 U.S.C. §§ 5541–5550a ("FEPA"). Section 5542(a) of FEPA provides that federal agencies must provide overtime pay to their employees for "hours of work officially ordered or approved in excess of 40 hours in an administrative workweek, or ... in excess of 8 hours in a day." Subsections (a)(1)-(5) of section 5542 specify the rates at which an agency's employees are to be paid. Before 1974, overtime compensation for federal employees was governed exclusively by FEPA. Aaron v. United States, 56 Fed. Cl. 98, 100 (2003). In that year, Congress enacted the Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 6(a), 88 Stat. 55, which extended FLSA coverage to federal employees. For federal employees who held positions that were not

42

expressly exempted from the FLSA, agencies ensured compliance with both FEPA and the FLSA by requiring that compensation be computed under both statutes and paying the non-exempt employees the greater amount. See, e.g., Alexander v. United States, 32 F.3d 1571, 1575–76 (Fed. Cir. 1994). In 1990, FEPA was amended by the Federal Employees Pay Comparability Act ("FEPCA"), Pub.L. No. 101–509, § 210, 104 Stat. 1389. Among other changes, FEPCA amended section 5542 by adding subsection (c). Following an amendment in 1992, that section now provides as follows:

> Subsection (a) [which requires that federal employees be paid overtime pay for work in excess of eight hours in a day or 40 hours in a week] shall not apply to an employee who is subject to the overtime pay provisions of section 7 of the Fair Labor Standards Act of 1938. In the case of an employee who would, were it not for the preceding sentence, be subject to this section, the Office of Personnel Management shall by regulation prescribe what hours shall be deemed to be hours of work and what hours of work shall be deemed to be overtime hours for the purpose of such section 7 so as to ensure that no employee receives less pay by reason of the preceding sentence.

The effect of section 5542(c) was to "eliminate[ ] the need to calculate and compare an FLSA nonexempt employee's overtime pay entitlement under two laws in order to pay the greater overtime benefit. Instead, employees who are nonexempt under the FLSA of 1938, as amended, always receive overtime pay under FLSA as provided in part 551 of title 5, Code of Federal Regulations." Aaron, 56 Fed. Cl. at 102 (quoting Pay Administration Under the Fair Labor Standards Act; Overtime Pay Provisions, 57 Fed. Reg. 59,277 (Dec. 15, 1992)).

Doe v. United States, 513 F.3d 1348, 1356-57 (Fed. Cir. 2008) (hereinafter 2008 Doe) (alterations in original). Section 5542(c) remains unchanged since the Federal Circuit's decision in 2008 Doe. See 5 U.S.C. 5542(c). The Federal Circuit in the 2008 Doe decision stated, "section 5542(c) provides that non-exempt employees should be paid overtime compensation under the FLSA rather than under FEPA," 2008 Doe, 513 F.3d at 1357 (citing 5 U.S.C. § 5542(c)). The Federal Circuit in the 2008 Doe decision indicated, "section 5542(c) simply states that subsection (a) does not apply to employees who are covered by the FLSA," noting the narrow application of this provision of the statute. See 2008 Doe, 513 F.3d at 1357. Furthermore, when a final rule was published regarding overtime pay administration under the FLSA, OPM stated in the preliminary "SUPPLEMENTARY INFORMATION" to the regulations addressed in "Pay Administration Under the Fair Labor Standards Act; Overtime Pay Provisions" while discussing the Federal Employees Pay Comparability Act's change to 5 U.S.C. § 5542(c):

> Section 210 of the Federal Employees Pay Comparability Act of 1990 (FEPCA) eliminates the need to calculate and compare an FLSA

nonexempt employee's overtime pay entitlement under two laws in order to pay the greater overtime benefit. Instead, employees who are nonexempt under the Fair Labor Standards Act of 1938, as amended, always receive overtime pay under the FLSA, as provided in part 551 of title 5, Code of Federal Regulations.

Pay Administration Under the Fair Labor Standards Act; Overtime Pay Provisions, 57 Fed. Reg. 59,277 (Dec. 15, 1992) (capitalization in original).

The United States Court of Appeals for the Federal Circuit in an earlier case, but with the same name, Doe v. United States, 463 F.3d 1314 (Fed. Cir. 2006), cert. denied 549 U.S. 1321 (2007) (hereinafter 2006 Doe), addressed the permissive language of 5 U.S.C. § 5545(c). In the 2006 Doe decision, 9,000 United States Department of Justice attorneys brought an action seeking pay for overtime work and holiday work, including a claim for pay under 5 U.S.C. § 5545(c)(2), AUO pay. See id. at 1316, 1322. As noted by this court above, the language of 5 U.S.C. § 5545(c) applies to both standby pay at § 5545(c)(1) and AUO pay at § 5545(c)(2). See 5 U.S.C. § 5545(c) ("The head of an agency, with the approval of the Office of Personnel Management, may provide that . . ."). The plaintiffs in the 2006 Doe decision argued that the provision at the beginning of 5 U.S.C. § 5545(c) made the AUO compensation provision a money-mandating statute for purposes of jurisdiction in the United States Court of Federal Claims. When analyzing jurisdiction, the Federal Circuit stated:

> By using the word "may," the statute gives the "head of an agency" the discretion to allow AUO pay for employees in particular positions, although this discretion is somewhat limited because the agency may only award AUO pay to employees in positions that meet the requirements listed in section 5545(c)(2). Further, once the agency makes a determination that a particular position is entitled to AUO pay, the employee "shall" receive premium pay under the statute. Thus, the statute is money-mandating because once a condition is met, namely that the head of an agency states that a position meets the criteria listed in subsection (c)(2), the statute requires payment to employees with that position. *See Fisher [v. United States]*, 402 F.3d at 1175; *Samish [Indian Nation v. United States]*, 419 F.3d at 1364–65 (citing *Perri [v. United States]*, 340 F.3d at 1342–43).

2006 Doe, 463 F.3d at 1325.

In Alamo, referenced above, another Federal Circuit decision addressing 5 U.S.C. § 5545 of the FEPA, Army paramedics and emergency medical technicians who alleged that their overtime pay was improperly calculated. Plaintiffs in Alamo were paid in accordance with standby pay detailed in 5 U.S.C. § 5545(c)(1) and argued that they were entitled to additional overtime payment under the FLSA. See Alamo v. United States, 850 F.3d at 1352. The Federal Circuit, however, rejected plaintiffs' claim and found plaintiffs were not entitled to additional overtime pay under the FLSA. The Federal Circuit stated that

> giving the EMTs additional straight time payment would create a significant "overlap," as they would receive a full time-and-a-half overtime payment for

the same work that their standby pay already covers. The EMTs have not demonstrated that Congress or OPM intended federal workers to receive such a windfall, particularly where the very nature of standby work means that the employees are not actively working all hours for which they receive pay.

Id. at 1353. The plaintiffs in Alamo, however, unlike the plaintiffs in the above-captioned case, were already authorized to receive the discretionary standby overtime pay authorized by 5 U.S.C. § 5545.

In the case currently before this court, ICE had not opted to pay plaintiffs standby compensation under the discretionary 5 U.S.C. § 5545(c)(1) framework. Because the plaintiffs were not elected by the agency to be paid under the 5 U.S.C. § 5545(c)(1) framework, plaintiffs would be covered by the FLSA because they are non-exempt employees, as stipulated to by the parties: "ICE classifies plaintiffs as non-exempt for purposes of the overtime requirements of the FLSA." The Federal Circuit in the 2008 Doe decision stated, "section 5542(c) provides that non-exempt employees should be paid overtime compensation under the FLSA rather than under FEPA." 2008 Doe, 513 F.3d at 1357 (citing 5 U.S.C. § 5542(c)). Because plaintiffs are both non-exempt from the FLSA and ICE did not choose to pay plaintiffs standby compensation under 5 U.S.C. § 5545(c)(1), a requirement to be eligible for 5 U.S.C. § 5545(c)(1), plaintiffs are not subject to the standby framework under 5 U.S.C. § 5545(c)(1). The FLSA framework for standby compensation is in the regulation at 5 C.F.R. § 551.431. This court finds 5 C.F.R. § 551.431 is the governing framework for determining whether plaintiffs monitoring duty phone were on standby status or on-call status while monitoring the duty phone after hours.

In their post-trial brief, the plaintiffs argue that they were on standby status while monitoring the duty phone, and allege:

The "designated post of duty" can be at the officer's home if that is where they are performing work. Plaintiffs may not practically leave either their home or work location once they establish their workstation for the night duty phone period. They are effectively restricted to a designated post of duty while they are monitoring the night phone and accessing databases on their government laptops unless they are performing a required "pick up."

(internal citations omitted). Plaintiffs further argue they are restricted by official order to a designated post of duty:

Defendant requires DOs monitoring the night phone to answer all calls. Handling these calls requires that DOs perform research using a number of government databases accessible only from their government laptops. Accessing these databases requires an internet connection. In addition, ICE prohibits DOs from using a government vehicle for a non-government purpose or from transporting a family member or friend in a government

vehicle. The combined effect of these requirements is that DOs cannot leave their homes during night phone duty and still comply with ICE policies governing performance of such duty.

(internal citations omitted). Plaintiffs also argue that they are

> effectively confined to their homes or some other fixed location while responsible for the night phone and cannot engage in any personal activities that take them outside their homes nor which would prevent them from immediately accessing their phones and computers, such as shopping, visiting restaurants, mowing their lawns, or playing outdoors with their kids because such activities would take them away from the required access to a government computer and/or government vehicle.

Plaintiffs, except for Mr. Wright who worked from home due to COVID-19 health-related reasons, have not had their home officially considered their post of duty. Moreover, plaintiffs' counsel stated in plaintiffs' post-trial reply that the agency "failed to designate their homes as a 'designated post of duty.'" Plaintiffs argue in their post-trial brief that

> [g]iven the requirement that they be ready to respond to frequent calls and their need to access government databases, unless they are actively executing a pickup, plaintiffs may not leave their workstations -whether that be at home, in the office or some similar location (such as a co-workers house) -because they must maintain a state of readiness to field and respond to calls to the night duty phone, perform research and be prepared to perform pickups.

Plaintiffs argue that "[w]hile responsible for the night phone, plaintiffs must answer all calls, no matter the time of day." Plaintiffs also assert, "[d]uring the time periods that they are assigned to night phone duty, Plaintiffs are required to answer the phone and immediately respond to issues raised by local law enforcement." Plaintiffs point out that

> [s]ince 2017, most of the law enforcement agencies covered by the St. Paul Field Office will not hold the non-citizens until the Ft. Snelling office reopens. Frequently, the local agencies will release the non-citizen within a short time period of notifying the Agency meaning that pickups are extremely time-sensitive for the DOs covering the night phone.

(internal citations omitted). Plaintiffs also state, "SDDO Halverson admitted he expects DOs to be in a state of readiness such that 'if they received a call about a release, that they would have their gear available and be able to respond in a reasonable amount of time.'" Plaintiffs state that, "DOs are subject to counseling or discipline for failing to answer the night phone when called or failing to perform pickups when a non-citizen is being

released by local law enforcement."[19] Plaintiffs quote <u>Armour v. United States</u>, in which the Supreme Court held: "Refraining from other activity is often a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired [by an employer], quite as much as service itself." <u>Armour v. United States</u>, 323 U.S. at 133. Plaintiffs also argue, regarding a case involving employees of the United States Navy, <u>Havrilla v. United States</u>, and discussed above:

> In *Havrilla*, this Court rejected the defendant's argument that interruptions to the plaintiffs' meal periods were *de minimis* because "the time Plaintiffs spend "waiting to be interrupted . . . is itself time spent working." 125 Fed. Cl. at 465. Similarly, in this case, an integral part of Plaintiffs' jobs is to "wait for something to happen," whether it be a call from law enforcement agency or the need to perform a pickup.

Plaintiffs argue in their post-trial brief: "The heavy restrictions placed on plaintiffs' activities during their night phone duty are so prohibitive that they cannot effectively use their time for their own purposes." Plaintiffs argue: "Defendant requires DOs monitoring the night phone to answer all calls. Handling these calls requires that DOs perform research using a number of government databases accessible only from their government laptops. Accessing these databases requires an internet connection." (internal citations omitted). According to plaintiffs, "[e]ven when the plaintiffs are not actively answering calls or performing pickups, they are restricted to waiting by their phones and their laptops for incoming calls." Plaintiffs argue:

> When handling calls to the night phone, the DOs must be able to access several computer databases that they use to determine whether a non-citizen detained by law enforcement is in the country legally and whether the individual is someone whom ICE wishes to detain and remove from the United States.

Plaintiffs also assert that "[d]uring night phone duty, DOs receive calls so frequently that they typically are not able to sleep," although there was repeated testimony that the frequency of the calls had decreased in recent times. Plaintiffs argue: "The frequency of the night phone calls places a greater restriction on plaintiffs' activities during their night phone duty than the restriction placed on fire fighters in *Renfro[ v. City of Emporia]*. 948 F.2d [1529,] 1535 [(10th Cir. 1991)] (3-5 calls on average in 24 hours)." (internal citations omitted) (brackets added). Plaintiffs compare their circumstances to the <u>Renfro v. City of Emporia</u> decision in which the United States Court of Appeals for the Tenth Circuit determined whether the firefighters were severely limited based on the number of calls

---

[19] The court notes, however, plaintiffs did not cite any regulation or policy that a DO would face counseling or discipline for a failure to respond to phone calls or other responsibilities on night phone duty. The trial testimony offered only statements of some of the plaintiffs that they believed that ICE employees could be subject to such discipline. In fact, the trial testimony of Mr. Kos indicated that he had not been disciplined for sleeping through phone calls.

the firefighters received while on duty. See Renfro v. City of Emporia, 948 F.2d at 1531 ("the number of callbacks firefighters received ranged from zero to thirteen per day, but averaged approximately four to five per day"). Plaintiffs in the above-captioned case contend that the DOs are emergency-based because a non-citizen could be released if not attended to as soon as possible. Plaintiffs focus a large portion of their post-trial briefings on the factors identified by the United States Court of Appeals for the Ninth Circuit in Berry v. County of Sonoma, 30 F.3d 1174, 1183 (9th Cir. 1994), to determine whether a plaintiff is in standby or on-call status. Those factors, established by the Ninth Circuit, however, while they can offer guidance, are not binding on this court, although another Judge of the United States Court of Federal Claims has previously utilized these guidelines to reach a determination on standby versus on-call status. See Hickman v. United States, 43 Fed. Cl. 424, 443 (1999). The factors, as outlined in its decision in Berry v. County of Sonoma, and quoted in the Hickman v. United States decision are:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

Hickman v. United States, 43 Fed. Cl. at 443 (quoting Berry v. Cnty. of Sonoma, 30 F.3d at 1183).

Plaintiffs contend that, although they were classified by ICE as on-call while monitoring the duty phone, the proper classification should be on standby status. Plaintiffs argue in their post-trial briefs that the testimony at trial demonstrated that their "work responsibilities during night phone duty make engaging in personal activities during these shifts a practical impossibility. Plaintiffs must vigilantly monitor the night phone and respond to any call received." Plaintiffs allege that their "activities during night phone duty are restricted to those that will not impede them from answering all calls that come in to the duty phone and those that will not impede their ability to perform pickups immediately." In order to monitor the duty phone, plaintiffs argue that they must "sit in their basements or sleep on their couches instead of in their beds so as not to disturb their families and to ensure that they are close to their government phone and government computer." Plaintiffs assert: "When performing night phone duty, DOs must use a government-issued cell phone and a government-issued laptop to handle incoming calls to the night phone and must use a government-issued vehicle to perform pickups." Additionally, plaintiffs argue that, "[a]ll of these restrictions make engaging in any personal activity with family members outside the home during night phone duty impossible. The plaintiffs' time is not their own during the night phone shifts."

Plaintiffs state that they

> cannot engage in numerous everyday activities that would take them away
> from their homes. Their situation during night phone duty is not analogous
> to a medical professional who can leave a pager or cell phone number and
> simply call in. DOs are working the minute they get a call from local law
> enforcement and have immediate work responsibilities during and
> *immediately after* those calls. The Plaintiffs do not receive a call to the night
> phone and then have 30 minutes or an hour to respond.

(emphasis in original).

In response, defendant argues in its post-trial brief that plaintiffs "failed to demonstrate that they are restricted by any official order to a designated post of duty while covering the night phone, and their claim therefore fails at this first step," as required under 5 C.F.R. § 551.431. The regulation at 5 C.F.R. § 551.431(b) states:

> (b) An employee will be considered off duty and time spent in an on-call
> status shall not be considered hours of work if:
>
> (1) The employee is allowed to leave a telephone number or to carry an
> electronic device for the purpose of being contacted, even though the
> employee is required to remain within a reasonable call-back radius; or
>
> (2) The employee is allowed to make arrangements such that any work
> which may arise during the on-call period will be performed by another
> person.

5 C.F.R. § 551.431(b). Defendant notes "plaintiffs argue that they are effectively confined to their homes while covering the night phone," but defendant argues that "plaintiffs' constructive-home-confinement argument cannot succeed," because "[t]he Federal Circuit has already rejected it." (citing Huskey v. Trujillo, 302 F.3d 1307, 1312-13 (Fed. Cir. 2002)). Defendant also argues, "[n]ot only is there an absence of any evidence of the requisite official order, there is ample evidence demonstrating that no such order has ever been issued, and that plaintiffs understand that." Defendant then cites to plaintiffs' answers when questioned at the trial which indicate that all plaintiffs were aware that a supervisor had not told them that they could not leave their homes while monitoring the duty phone. Defendant also argues that plaintiffs' "own testimony rebuts" the "assertion" that DOs cannot leave their homes while monitoring the duty phone and still comply with the ICE requirements for monitoring the duty phone. Defendant further highlights when "plaintiff Onewokae testified that he did not violate any ICE policy when he visited his in-laws' home while covering the night phone;" and when "Plaintiff Kos recounted how he handled a night phone assignment while on a family camping trip." "On another occasion, Plaintiff Kos went to a bar to eat and watch a Minnesota Vikings football game while

covering the night phone," which Mr. Kos did indicate might not have been appropriate.[20] Defendant states that plaintiffs' "own actions prove that they do not even perceive themselves to be under any such order."

In defendant's post-trial brief, defendant argues that whether an employee is in a state of readiness is a direction which comes down from the employer, and it is not a self-imposed state of readiness crafted by the employee (citing Huskey v. Trujillo, 302 F.3d at 1313-14). Defendant also argues that Mr. Kos' "camping trip," "Plaintiff Onewokae's experience visiting his in-laws," "Plaintiff Cheung's shopping trips," and "Plaintiff Kos's visit to the bar," "and trips to the convenience store," "reflect that plaintiffs recognize that there is no requirement that they sit by their laptops." Defendant also argues "[t]he frequency with which plaintiffs have actually engaged in personal activities is immaterial. As an initial matter, the majority of the coverage hours are during overnight hours, when plaintiffs would mostly be sleeping during their idle time, not visiting a zoo."

Defendant claims in its post-trial brief that "about 85 percent overall" of the time plaintiffs have monitored the duty phone, from May 1, 2017 until December 31, 2019, was idle time. Defendant also claims that "about 44.5 percent of the time" of shifts plaintiffs monitored the duty phone did not show a single call. Defendant further argues regarding how to classify the duty phone assignments:

> [A]n employer could hardly operate an on-call system if it could not insist on the employee being able to answer the phone and remaining within the geographic vicinity. Indeed, the regulation makes clear that being reachable by phone and remaining within a reasonable call-back radius are indications of being on-call, not in standby duty status. 5 C.F.R. § 551.431(b)(1).

Defendant argues that "[t]he testimony from both of the supervisor witnesses reflects that they have never attempted to prohibit a plaintiff from engaging in any personal activity during night phone idle time." Defendant argues: "That plaintiffs may feel the on-call periods are disruptive to their personal lives does not mean that they are not being compensated in accordance with law."

Defendant also contends that plaintiffs' reliance on the firefighter case, Renfro v. City of Emporia, 948 F.2d 1529, is inappropriate. Defendant argues that, because "plaintiffs' night phone work does not involve responding to emergencies," that the Renfro factors do not apply, citing Armitage v. City of Emporia, 982 F.2d 430, 432 (10th Cir. 1992).[21] Defendant cites to Mr. Kos' testimony on cross-examination to support its assertion that plaintiffs are not responding to emergencies:

---

[20] Mr. Kos did note that while at the bar he did consume some alcohol and described it as his "one indiscretion."

[21] The court notes that in Armitage v. City of Emporia, an appeal regarding "backpay to city police detectives for lunch periods and time spent on call," in which

Q. Have you ever had an occasion where you've turned on your lights or sirens for a pickup?

A. Never. Never. No. That's something you learn -- I was a deputy sheriff. No, I'm -- unless it's an emergency, there's no lights, no sirens going on. And every vehicle you get into, you've got to hunt for half the stuff in these vehicles. It's not your normal vehicle.

Defendant asserts: "The parties' stipulations, along with extensive trial evidence, establish that plaintiffs carry an electronic device—a Government-issued mobile phone—for the purpose of being contacted while they are covering the night phone." Defendant also contends in a footnote in its post-trial brief, "[j]ust as ICE has not imposed any fixed response time, it also has not imposed any specific geographic radius within which plaintiffs must remain." Defendant also argues, and plaintiffs do not rebut, that "plaintiffs are freely permitted to switch their on-call rotations with other officers."

---

[t]he detectives also rotated standby duty and each detective was on call one week out of six. The standby detective was paid $30 per week, plus overtime for the time actually worked. The standby detective was provided with a pager so he did not have to remain near a phone, although he was required to stay in the vicinity in order to call in within ten minutes of being paged, and report to the station within twenty minutes if necessary. The detectives were called back, on average, less than two times per week of on call duty.

Armitage v. City of Emporia, 982 F.2d at 431. The Tenth Circuit explained that

[i]n the instant case, the detectives were allowed to do as they pleased while on call, as long as they remained sober, could be reached by beeper and were able to report to duty within twenty minutes of responding to the page. They were called in on average less than two times per week, as opposed to the twenty to thirty times per week for the firefighters in *Renfro*. The firefighters were required to report within twenty minutes of a call, in full gear, and subject to discipline if late. *Renfro,* 948 F.2d at 1537. Furthermore, the detectives were called in to investigate crimes which had been committed, as opposed to responding to emergencies in progress. The firefighters were "lying in wait for emergencies [which was] a benefit to the employer and thus compensable under FLSA." *Id.* at 1538 (distinguishing *Norton* and *Boehm,* where the employees were not waiting to respond to emergencies). Although the detectives' services are certainly beneficial to the public, to require compensation under these facts would require that all on call employees be paid for standby time.

Armitage v. City of Emporia, 982 F.2d at 432-33.

After hearing the testimony at the trial and the exhibits and stipulations introduced into the record before the court, the first issue to be decided is whether the plaintiffs in this case were on standby or on-call status. As indicated above, the FLSA regulation at 5 C.F.R. § 551.431 details three factors to be satisfied to classify plaintiffs as being in a standby status while monitoring a duty phone. Plaintiffs must demonstrate that they are: (1) "restricted by official order to a designated post of duty," (2) "assigned to be in a state of readiness to perform work," and (3) there are "limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her own purposes." See 5 C.F.R. § 551.431(a)(1). Regarding the first factor, whether plaintiffs were "restricted by official order to a designated post of duty," the plaintiffs before this court have failed to identify any official documents or directives to establish they were restricted to a designated post of duty when monitoring the duty phone. See 5 C.F.R. § 551.431. When defense counsel asked Mr. Cheung, "[a]re you aware of any written directive or order that says you must remain in any fixed location during your night phone duty?" Mr. Cheung responded, "I do not believe so." When Mr. Miller was asked by defense counsel, "[a]re you aware of any official order or anything you would consider an official order that expressly says you can't leave your home while you have the night phone?" Mr. Miller answered, "[i]t's implied on how they worded it in the email or how they direct it to everybody during the staff meetings." When Mr. Kos was asked by defense counsel, "[a]re you aware of any written order or directive that requires you to remain in any fixed location during your night phone duty?" Mr. Kos answered, "[n]o. We tried to narrow management down on that and haven't really received a good response." When Mr. Wright was asked by defense counsel, "[h]as a supervisor ever told you you have to remain at home while monitoring the night phone?" Mr. Wright answered, "[n]o." Mr. Onewokae, who had gone to his in-laws' home while monitoring the duty phone had the following exchange with defense counsel:

> Q. In your view, was it -- you were complying with ICE's policies when you took your -- or when you went to your in-laws' house while you were on the duty phone, weren't you?
>
> A. I still performed the work. And I put a detainer down and was able to make calls from that post.
>
> Q. So nothing you did violated any of ICE's policies, correct?
>
> A. I was still able to respond, yeah. I don't believe it violated it.

Additionally, most plaintiffs had to go to the Field Office to get a government vehicle to perform a pickup. Plaintiffs assert in their post-trial brief: "When performing night phone duty, DOs must use a government-issued cell phone and a government-issued laptop to handle incoming calls to the night phone and must use a government-issued vehicle to perform pickups." Mr. Cheung testified that, after he determined a pickup would be appropriate, he does the following:

> Once I get off the phone, I go into my bedroom and change into my law enforcement attire. And then I would get in my vehicle, drive to the Fort

Snelling Field Office and get into a government caged vehicle and then from there I would drive to that local law enforcement agency.

Mr. Cheung testified that he lives "[a]pproximately 25, 30 minutes" away from the office. Mr. Onewokae testified regarding how to perform a pickup of a non-citizen, "I would say best practice would be to get a caged vehicle because it's just you picking up that one person." Mr. Onewokae testified that he lived "[f]ourteen, 15 minutes" away from the office to get a caged vehicle. Because of his duties on the at-large team, Mr. Miller parks a government-issued vehicle at his home, and, rather than going to the office to perform his work at the beginning of his shift like the other plaintiffs, he goes "to a location" or to "the field a lot tracking down our subjects." Mr. Miller also testified that "the only time we would be in the office is if we're processing or need to catch up on some stuff that we couldn't be able to do from the car or the field." Mr. Kos testified:

> if a call for a pickup comes in, I do not have a G-ride. I currently just got one two months ago, but it's never left the office. It's still here. So I haven't had a G-ride or a government-issued vehicle, and so I would have to -- if I get my call in Elk River, I have to drive 50 miles just to come in to the office and get a vehicle.

In order to perform a pickup, Mr. Wright testified:

> I leave my house. I go to the office and I pick up the van keys for one of our transport vans, and I then proceed to the -- to where I need to go to pick that person up and bring them back and take them to where they are going to be spending the -- in custody.

The reasons that plaintiffs mostly decided to remain in their homes and some even predominantly in their basements while monitoring the duty phone was plaintiffs' choice. Although Mr. Cheung did not testify that he received an order to stay at a specific workstation while monitoring the duty phone on weekends, he testified that "[f]or both days, I wouldn't -- I would not leave my home. That's my workstation. I would stay at home until my shift is over." Mr. Onewokae testified, "[y]ou kind of have to schedule around it [monitoring the duty phone]. So whatever day that falls on the weekends, just plan on not doing anything." (brackets added). Mr. Miller also testified, "even though I might not be taking a phone call, I still might have to be called into action to take phone calls or to do pickups, so I'm still relegated to my basement." Mr. Kos testified that

> [t]he best way to explain it [monitoring the duty phone] is if anyone's experienced a snow day, you're not going anywhere. You're confined to your house pretty much. Yeah, okay, did you go out and take out the garbage? Yes, I did. Hey, and I did go check the mailbox. But you're really not doing anything.

Mr. Wright testified, "I don't sleep. I am up because I have sleep issues, so I'm afraid I will miss a phone call." Reviewing the testimony at trial, the various plaintiffs, however, appear to have different interpretations of how they should monitor the duty phone. Mr. Kos testified to having gone camping, to a colleagues' home, and to a restaurant bar to watch a Minnesota Vikings game. Mr. Onewokae, as indicated above, testified to having gone

to his in-laws' home, while monitoring the duty phone, but Mr. Cheung testified that he had left his house just once to get milk before a blizzard while monitoring the duty phone. Meanwhile, Supervisor Halverson testified that "when an officer is working the after-hours duty phone, I don't tell them where they have to work from. Typically, they are working from their home is my understanding, but there's not a requirement for them to be working at any one designated location." When defense counsel asked Supervisor Skwira whether she had ever "told a deportation officer that they cannot leave their home during night phone duty" or "told a deportation officer that they cannot engage in some particular activity during night phone duty," Supervisor Skwira responded "[n]o."

Although this court decided above that the statute at 5 U.S.C. § 5545(c)(1) was not the statute by which to determine whether plaintiffs were in standby status and that the FLSA regulation at 5 C.F.R. § 551.431 is also applicable to the above-captioned case, not 5 U.S.C. § 5545(c)(1), because 5 U.S.C. § 5545(c)(1) was used in conjunction with the FLSA regulation in the United States Court of Appeals for the Federal Circuit decision Huskey v. Trujillo, 302 F.3d 1307. In Huskey, the Federal Circuit addressed claims brought under both the FEPA and the FLSA, rather than just as FLSA claims, as in the above-captioned case. See generally Huskey v. Trujillo, 302 F.3d 1307. The FEPA metrics for finding that standby duty had occurred in Huskey derived from 5 U.S.C. § 5545(c)(1), which provided: "[I]n a position requiring him to regularly remain at, or within the confines of, his station during longer than ordinary periods of duty, a substantial part of which consists of remaining in standby status rather than performing work." 5 U.S.C. § 5545(c)(1); see also Huskey v. Trujillo, 302 F.3d at 1311. The OPM regulations promulgated under the FEPA statute, and addressed by the Federal Circuit in Huskey indicate that an employee is on standby, and "at, or within the confines of his station" exists "only during periods when an employee is required to remain at his quarters and is required to hold himself in a state of readiness to answer calls for his services." 5 C.F.R. § 550.143(b)(3) (2021) (brackets added); see also Huskey v. Trujillo, 302 F.3d 1311. The FEPA statute and the regulation at 5 C.F.R. § 550.143(b)(3), however, differ slightly from the FLSA regulation, which applies to the above-captioned case. The FLSA requirements, as stated above are that "the employee is restricted by official order to a designated post of duty and is assigned to be in a state of readiness to perform work with limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her own purposes." 5 C.F.R. § 551.431. The plaintiff in Huskey alleged that nurses were required to be available by phone or pager while away from the hospital if scheduled, and that they were to return the call or answer the pager within five minutes, and to report to the hospital within thirty minutes if the phone or pager required. See Huskey v. Trujillo, 302 F.3d at 1309. The plaintiff in Huskey alleged that the restrictions of being on-call precluded her from going to her cabin, fishing at her favorite venues, skiing, jogging, hunting, staying at home without a babysitter, shop at stores with long lines, host dinner parties, dine out, or attend hockey games because of the "unpredictability of calls and the requirement that she respond rapidly." Id. The Federal Circuit found "salutary and commendable" the Huskey plaintiff's devotion to her job, but that the plaintiff was not entitled to standby overtime pay because her "conscience and professional commitment caused her to return immediately to the hospital upon receiving a call, irrespective of the actual time limits imposed." See id. at 1313.

In the above-captioned case, the plaintiffs have not identified an official directive requiring them to remain "by official order to a designated post of duty." 5 C.F.R. § 551.431(a). Although as responsible law enforcement officers, the plaintiffs each of whom testified that, despite not ordered to remain at home, they indicated that they felt themselves primarily bound to their homes, appear not to have been ordered to remain there by ICE.

Regarding the second factor to qualify for standby status, "assigned to be in a state of readiness to perform work," each plaintiff has testified that they were expected to be ready, with their phone, laptop, and, some testified, with internet access available, but that a hot spot might suffice. See 5 C.F.R. § 551.431(a)(1). Each of the plaintiffs did testify that they needed to be ready to answer the call when monitoring the duty phone. Mr. Onewokae testified, "[y]ou've got to be able to respond just as well, you know, so you have to have your laptop on hand, and be ready to do a transport if needed Similarly, Mr. Kos testified regarding performing a pickup that "[y]ou've got to be ready and go get that individual." Mr. Miller testified, "[i]t's horrible because you keep anticipating that a phone call is going to happen, whether it comes in or not, because you want to be alert and ready for the phone call, and at the same time you try to get sleep and it's a constant battle. You always wake up fatigued and tired the next day." Mr. Cheung testified, "I always respond to the calls. I'm assuming if you don't respond to the calls, you would get -- they'll write you up or some type of punishment for not doing your job." Mr. Wright and defense counsel had the following exchange at trial:

> Q. Are there situations where you have received a call while on the duty phone and you did not pick up the call when it rang?

> A. Yes.

> Q. Okay. In those cases, did you let the call go to voicemail?

> A. It went to voicemail, and I immediately retrieved the voicemail and responded.

> Q. Okay. And were you disciplined for missing the phone call?

> A. No, because I immediately responded.

Plaintiffs, however, testified that they did not have to have their ICE gear on while monitoring the duty phone. For instance, when Mr. Cheung determines that a pickup is appropriate, he testified: "I go into my bedroom and change into my law enforcement attire." Both Mr. Miller and Mr. Onewokae testified that in order to perform a pickup he would have to put his gear because he did not have the gear on while waiting for a call. Mr. Kos testified that before he leaves the house for a pickup, he puts on "a duty belt with the holster, your gun, your handcuffs." Mr. Wright appears not to have testified as to his attire while monitoring the duty phone. Therefore, it appears from the testimony offered

by plaintiffs at trial that plaintiffs did have to remain in a state of readiness while monitoring the duty phone, and, thus, could satisfy the second identified factor to qualify for standby duty. Although plaintiffs are expected to stay in a state of readiness to receive phone calls, undertake research, and be available for pickups, they are able to do so without official direction as to where to remain to perform their assigned duty and without being required to be law enforcement attire while they waited for a phone call to come in.

Regarding the third factor, the "limitations on the employee's activities so substantial that the employee cannot use the time effectively for his or her own purposes," 5 C.F.R. § 551.431(a)(1), plaintiffs testified to restrictions they felt limited to certain activities while monitoring the duty phone, as well as to what they were able to do while monitoring the duty phone. Mr. Cheung testified that he had to hire a babysitter if his wife is not home in the event he had to perform a pickup, but that he also browsed the internet, watched television, slept, played with his children, and was able to "tidy up the house." Mr. Onewokae testified that while monitoring the duty phone, he does not drink, but that he can watch movies on Netflix, play with his kids "[t]o a certain extent," sleep, and do household chores. Mr. Miller testified that he cannot pickup takeout while monitoring the duty phone. Mr. Kos testified that he has "anxiety" while monitoring the duty phone: "Generally I don't fall asleep. Sometimes -- and then I figure if it's going to ring, it gets busy 2 to 3. If I can just stay up until then, and then, you know, if I fall asleep, I fall asleep, and hopefully the phone wakes you up." Mr. Kos, as stated above, however, that he had gone camping, to a restaurant, and to a colleague's home while monitoring the duty phone. Mr. Wright, whose duty station was transferred to his home for health reasons making the impact of his testimony different from the others, testified that he would otherwise be going to his children's sporting events, but that he cannot attend those while monitoring the duty phone. Mr. Wright testified that he was able do some household chores, such as washing the dishes while monitoring the duty phone. Although there appears to be a range of answers offered by plaintiffs, the testimony at trial reveals that the plaintiffs felt restricted in their movements, but while home, plaintiffs appear to have been able to participate in many normal at-home activities while monitoring the duty phone so long as the phone, computer, and gear is nearby. In sum, plaintiffs failed to demonstrate they should have been classified as in standby status under 5 C.F.R. § 551.431(a)(1).

Prior to the trial, with the exception of ERO 2.0, plaintiffs were on an on-call status, which defendant argues is, and was, the proper classification for plaintiffs' duties while monitoring the duty phone. On-call status is characterized in 5 C.F.R. § 551,431(b)(1)-(2), "[a]n employee will be considered off duty and time spent in an on-call status shall not be considered hours of work if," the plaintiffs are: (1) "allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius," or (2) "allowed to make arrangements such that any work which may arise during the on-call period will be performed by another person." See 5 C.F.R. § 551.431(b)(1)-(2). Turning first to whether plaintiffs were "allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius." See 5 C.F.R. § 551.431(b)(1). As stipulated to by both parties, each plaintiff had their own electronic device: "During night phone duty,

calls to the night phone ring to an assigned DO's Government-issued mobile phone." Additionally, it appears that, so long as plaintiffs had arranged with their partner to cover their shift, plaintiffs need not even be in the state of Minnesota. For instance, Mr. Miller testified that he once had a responsibility "to fill in a deportation officer's spot for 45 days, covering a detention facility in Folkston, Georgia." Although he did not perform night phone duty while on the "Folkston detail," Mr. Miller testified, "[i]f a swap could not be found or they couldn't find a replacement, we were still required to cover our night phone duties if we were on detail." Mr. Miller elaborated that "I would have at least had to do the phone calls" while he was in Georgia and his partner was in Minnesota while monitoring the duty phone. Additionally, as indicated above, Mr. Kos testified to having gone camping while monitoring the duty phone, a restaurant, and to a colleague's house, and Mr. Onewokae testified to having gone to his in-laws' home. Plaintiffs clearly satisfy the first on-call identification factor because they each have a telephone to which calls may be forwarded, and plaintiffs need not even be in a designated geographical area.

Turning next to the second indicia of being on-call, "[t]he employee is allowed to make arrangements such that any work which may arise during the on-call period will be performed by another person." See 5 C.F.R. § 551.431(b)(2). The parties have stipulated that "DOs may switch their assigned night phone duty days with other DOs if they can find another DO who is willing to switch with them." Each plaintiff testified that they may switch their shift with another DO. Mr. Cheung testified that "[i]f you come to an agreement with the officer and then once that agreement has been made, you would notify your supervisor that you had switched dates." Mr. Onewokae testified that he is able to switch with another DO and that he has, in fact, switched his shift with another DO before. Mr. Miller testified "depending if you have leave and stuff you have to, you know, talk to your supervisor and figure things out to switch stuff." Mr. Kos testified that he has switched his shift with another DO "[n]umerous times." Mr. Wright testified that he could find someone to switch with "[i]f you're lucky," suggesting that it was not guaranteed that a DO could find another DO to cover his shift.

Based on all of the above, plaintiffs have failed to demonstrate under 5 C.F.R. § 551.431(a)(1), that they are "restricted by official order to a designated post of duty," and that the "limitations on the employee's activities [are] so substantial that the employee cannot use the time effectively for his or her own purposes," while monitoring the duty phone. See 5 C.F.R. § 551.431(a)(1) (brackets added). Although plaintiffs had to remain "in a state of readiness to perform work," that alone is insufficient to support that plaintiffs were on standby status. See id. Additionally, plaintiffs had flexibility to choose where to monitor the duty phone when assigned; not one of the plaintiffs testified that they were forced to remain at their homes, although there was testimony that plaintiffs chose that location. Moreover, for most of the time spent on on-call waiting for a call to come in, plaintiffs had no other work-related duties to perform, other than the fifteen minutes of set up responsibilities. Based on the testimony of the five plaintiffs and the two supervisors, plaintiffs satisfy the described on-call factors, including because plaintiffs were (1) "allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius; or" (2) "allowed to make arrangements such that any work which may

arise during the on-call period will be performed by another person," further demonstrating they could be described as on on-call status. See 5 C.F.R. § 551.431(b)(1)-(2). Based on the foregoing, plaintiffs in the above-captioned case were on on-call status

Administratively Uncontrollable Overtime or FLSA One and One-Half Pay

Plaintiffs also challenge the type of overtime compensation they were paid for the time spent monitoring the duty phone. Plaintiffs argue that they are entitled to one and one-half pay under the FLSA overtime provisions, 29 U.S.C. § 207(a)(1), as opposed to AUO compensation under 5 U.S.C. § 5545(c)(2), independent of whether plaintiffs were found to be in on-call or standby status. The excerpts from the parties' June 26, 2020 joint statement of issues of law and fact which focus on AUO compensation or one and one-half times pay compensation are:

5. Whether classification of Plaintiffs' night phone duty work as administratively uncontrollable overtime hours is consistent with law.

a. Whether Plaintiffs' hours of work with respect to night phone duty are scheduled in advance of the administrative work week or irregular.

b. Does the entire duration of the night phone coverage period constitute hours of work, as Plaintiffs assert, or do only the periods when Plaintiffs are actively answering or responding to night phone calls constitute the hours of work during night phone duty, as Defendant asserts?

As determined above, the court found above that plaintiffs were in on-call status and, therefore, plaintiffs are actively working only for the time spent by plaintiffs during their scheduled shifts performing varying work-related tasks while on duty to monitor the duty phone, including setting up their laptops and other necessary items, although not putting on their gear which certain plaintiffs testified they dress into after receiving a call for a pickup, in preparation for calls, answering the duty phone, performing call-related research, and performing pickups.

Plaintiffs argue that "[d]efendant assigns Plaintiffs to work night duty phone shifts for particular dates months in advance of the administrative workweeks in which those shifts occur." Plaintiffs argue: "Plaintiffs are assigned to work night phone duty for particular shifts in advance of the administrative workweeks in which those shifts occur." Plaintiffs also state "such work time is scheduled in advance of the administrative workweek and is compensable with regularly scheduled overtime and not AUO." (internal citation omitted). According to plaintiffs: "Non-supervisory DOs such as the plaintiffs, who are covered under the FLSA and who receive AUO, are entitled to additional half-time pay for overtime hours for which they receive AUO pay." Plaintiffs, therefore, argue, "the DOs should be receiving time and one-half premium pay, not AUO, for all of the night

phone hours they work more than 85.5 hours in a 14-day work period." (citing 5 U.S.C. § 5545(c)(2)); see also 29 C.F.R. § 553.201(a); 29 C.F.R. § 553.230(c).

Defendant indicates that "the amount of AUO pay for a given pay period depends not on the number of AUO hours reported in that pay period, but rather on an average computed from several previous pay periods." Defendant argues in its post-trial brief that

> scheduling on-call assignments in advance does not mean that any work is scheduled in advance. Indeed, the very nature of an on-call system is such that it generally is not known if, when, or how much work will be needed during the on-call period. That is why employees are placed on-call.

Defendant argues: "The joint trial exhibits and the trial testimony demonstrate that the work plaintiffs sometimes perform while on-call is not scheduled in advance. An examination of the hours spent answering and responding to calls, as recorded by plaintiffs, demonstrates that the work is highly unpredictable." Defendant provides, "[m]any times plaintiffs recorded no hours of actual work at all during a night phone coverage period. When plaintiffs did record hours of work, the extent of the work varied widely and randomly." (internal citations omitted). Defendant also asserts that "[d]uring the trial, every witness agreed that there was no way to predict when calls would come in." Defendant argues:

> The trial evidence demonstrates that night phone work is not scheduled in advance, and cannot be scheduled in advance because it is unknowable whether, or how much, work will be required after hours. AUO is therefore the correct compensation under the law for work that arises while plaintiffs are covering the night phone.

(citing 5 C.F.R. § 550.163(b)).

Plaintiffs argue in their post-trial reply brief that defendant's argument, in which the assignment of the shift is in advance of the work week, but that the work performed on the shift is unpredictable because it is not known what, or how, much work must be performed "is much different than traditional AUO work." Plaintiffs argue:

> An example of typical, or traditional AUO is that if an ICE agent gets a call to pickup a detainee towards the end of a regular shift, the agent must continue with that assignment and related paperwork that runs over his normal shift. 5 C.F.R. § 550.153(a). Such a situation was administratively uncontrollable and fell outside his scheduled the [sic] shift. Id. The scheduled shift, of course, would not be AUO. The same is true here. The Plaintiffs here were assigned to a particular scheduled shift to have night phone and pickup duties and responsibilities. There is no way to predict when, what type, or how many calls and pickups will occur on a particular night phone duty shift; however, the fact is that the entire night phone duty shift is scheduled well in advance. Common sense dictates that AUO is not

appropriate for shifts scheduled in advance regardless of how much or what type of work must be performed during that shift.

(internal citation omitted).

Congress determined that regular overtime compensation is paid "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(k). An employer also may pay an employee a different rate for "administratively uncontrollable overtime," defined in the statute at 5 U.S.C. § 5545(c)(2) if the "head of an agency, with the approval of the Office of Personnel Management," approves AUO compensation. The parties agree plaintiffs were being paid AUO compensation at the time of the trial for their obligations to monitor the duty phone for all time spent actually performing work. As stated in the statute at 5 U.S.C. § 5545(c)(2):

> **(c)** The head of an agency, with the approval of the Office of Personnel Management, may provide that–
>
> . . .
>
> **(2)** an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty, shall receive premium pay for this duty on an annual basis instead of premium pay provided by other provisions of this subchapter, except for regularly scheduled overtime, night, and Sunday duty, and for holiday duty. Premium pay under this paragraph is an appropriate percentage, not less than 10 percent nor more than 25 percent, of the rate of basic pay for the position, as determined by taking into consideration the frequency and duration of irregular, unscheduled overtime duty required in the position.

5 U.S.C. § 5545(c)(2). The rates of payment permitted by regulation in the regulation at 5 C.F.R. § 550.154(a) for AUO are:

> (a) An agency may pay the premium pay on an annual basis referred to in § 550.151 to an employee who meets the requirements of that section [5 C.F.R. § 550.151], at one of the following percentages of the employee's rate of basic pay (as defined in § 550.103):
>
> > (1) A position which requires an average of at least 3 but not more than 5 hours a week of irregular or occasional overtime work—10 percent;
> >
> > (2) A position which requires an average of over five but not more than 7 hours a week of irregular or occasional overtime work—15 percent;

> (3) A position which requires an average of over seven but not more than 9 hours a week or irregular or occasional overtime work—20 percent;
>
> (4) A position which requires an average of over 9 hours a week of irregular or occasional overtime work—25 percent.

5 C.F.R. § 550.154(a) (2021) (brackets added). Regarding whether the statute at 5 U.S.C. § 5545(c)(2) is money-mandating, the United States Court of Appeals for the Federal Circuit stated:

> By using the word "may," the statute gives the "head of an agency" the discretion to allow AUO pay for employees in particular positions, although this discretion is somewhat limited because the agency may only award AUO pay to employees in positions that meet the requirements listed in section 5545(c)(2). Further, once the agency makes a determination that a particular position is entitled to AUO pay, the employee "shall" receive premium pay under the statute. Thus, the statute is money-mandating because once a condition is met, namely that the head of an agency states that a position meets the criteria listed in subsection (c)(2), the statute requires payment to employees with that position. *See Fisher*, 402 F.3d at 1175; *Samish*, 419 F.3d at 1364–65 (citing *Perri*, 340 F.3d at 1342–43). Therefore, the Court of Federal Claims erred to the extent that it dismissed the Doe plaintiffs' claim for AUO pay for lack of jurisdiction in *Doe I* [Doe v. United States, 46 Fed. Cl. 399 (2000)].

2006 Doe, 463 F.3d at 1325 (brackets added); see also Crawley v. United States, 149 Fed. Cl. 258, 268 (2020). The OPM has issued a regulation describing when the use of AUO compensation is acceptable:

> The requirement in § 550.151[22] that a position be one in which the hours of duty cannot be controlled administratively is inherent in the nature of such

---

[22] The regulation at 5 C.F.R. § 550.151 states:

> An agency may pay premium pay on an annual basis, instead of other premium pay prescribed in this subpart (except premium pay for regular overtime work, and work at night, on Sundays, and on holidays), to an employee in a position in which the hours of duty cannot be controlled administratively and which requires substantial amounts of irregular or occasional overtime work, with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty. Premium pay under this section is determined as an appropriate percentage, not less than 10 percent nor more than 25 percent, of the employee's rate of basic pay (as defined in § 550.103).

a position. A typical example of a position which meets this requirement is that of an investigator of criminal activities whose hours of duty are governed by what criminals do and when they do it. He [or she] is often required to perform such duties as shadowing suspects, working incognito among those under suspicion, searching for evidence, meeting informers, making arrests, and interviewing persons having knowledge of criminal or alleged criminal activities. His [or her] hours on duty and place of work depend on the behavior of the criminals or suspected criminals and cannot be controlled administratively. In such a situation, the hours of duty cannot be controlled by such administrative devices as hiring additional personnel; rescheduling the hours of duty (which can be done when, for example, a type of work occurs primarily at certain times of the day); or granting compensatory time off duty to offset overtime hours required.

5 C.F.R. § 550.153(a) (2021) (brackets added).

Definitions of regularly scheduled work can be found in a series of definitions contained in the OPM regulations:

For the purpose of determining hours of work in excess of 40 hours in a week or in excess of another applicable overtime work standard under section 7(k) of the Fair Labor Standards Act, agencies shall credit hours of work under § 410.402 of this chapter, part 532 of this chapter and 5 U.S.C. 5544, and part 550 of this chapter, as applicable, that will not be compensated as hours of work in excess of 8 hours in a day, as well as any additional hours of work under this part.

5 C.F.R. § 551.401(g). "*Overtime work* has the meaning given that term in [5 C.F.R.] § 550.111 and includes irregular or occasional overtime work and regular overtime work." 5 C.F.R. § 550.103 (2021) (emphasis in original) (brackets added). Overtime work is defined in 5 C.F.R. § 550.111 as:

work in excess of 8 hours in a day or in excess of 40 hours in an administrative workweek that is—

(1) Officially ordered or approved; and

(2) Performed by an employee. Hours of work in excess of 8 in a day are not included in computing hours of work in excess of 40 hours in an administrative workweek.

5 C.F.R. § 550.111(a).

The regularly scheduled workweek, for law enforcement officers, such as ICE DOs, is 42.75 hours per week, instead of the 40 hours for non-law enforcement, government employee's workweek hours. See 29 U.S.C. § 207(k); 29 C.F.R. § 553.201(a); 29 C.F.R.

§ 553.230(c); <u>see</u> <u>also</u> Dep't of Labor, Fire Protection and Law Enforcement Employees of Public Agencies; Study of Average Number of Hours Worked, 48 Fed. Reg. 40,518 (Sept. 8, 1983).

The regulation at 5 C.F.R. § 550.103, in addition to providing the definition for overtime work, noted above, also provides definitions for regularly scheduled administrative workweek, regularly scheduled work, regular overtime work, and irregular or occasional overtime work. The regulation provides that: "*Regularly scheduled administrative workweek*, for a full-time employee, means the period within an administrative workweek, established in accordance with § 610.111 of this chapter, within which the employee is regularly scheduled to work;" "*Regularly scheduled work* means work that is scheduled in advance of an administrative workweek under an agency's procedures for establishing workweeks in accordance with § 610.111;" "*Regular overtime work* means overtime work that is part of an employee's regularly scheduled administrative workweek;" and "*Irregular or occasional overtime work* means overtime work that is not part of an employee's regularly scheduled administrative workweek." 5 C.F.R. § 550.103 (emphases in original).

In <u>Burich v. United States</u>, the United States Court of Claims stated that overtime is not regularly scheduled if "overtime was not susceptible to administrative control beyond the point of recognizing that it might occur." <u>Burich v. United States</u>, 177 Ct. Cl. 139, 148 (1966) (holding that regularly given assignments that often-caused plaintiff to work overtime were not regularly scheduled because the time for completion could not be ascertained). In an appeal from a decision of the United States District Court for the Southern District of Florida, the United States Court of Appeals for the Federal Circuit described work as being administratively controllable when the work is "amenable to administrative control by devices such as hiring additional personnel or rescheduling the hours of duty." See <u>Slugocki v. United States</u>, 816 F.2d 1572, 1577 (Fed. Cir. 1987), <u>cert. denied</u>, 484 U.S. 976 (1987). In <u>Slugocki</u>, the Federal Circuit also agreed with the observation of the United States District Court for the Southern District of Florida, that "overtime generated by certain specific categories of appellees' duties" was

> "routinely required to be worked and was demanded of the plaintiffs on a constant and on-going basis. Such was therefore 'recurrent.'" The court [the United States District Court for the Southern District of Florida] concluded that these recurrent duties, which did not entail work where "the employee [is] generally responsible for recognizing, without supervision, circumstances which require him to remain on duty," were susceptible of scheduling. We agree with appellees that the Government has not shown the district court's findings on this issue to be clearly erroneous or its conclusions to be incorrect as a matter of law.

<u>Id.</u> at 1576-77 (second alteration in original) (quoting 5 U.S.C. § 5545(c)(2)). Discussing and distinguishing the plaintiff in <u>Burich</u>, the Federal Circuit in <u>Slugocki</u> stated:

Although his assignments were received on a daily basis, "neither the nature of the work nor the length of time required in its performance could be ascertained beforehand." Thus, in *Burich* it was not contended that these hours were amenable to administrative control by devices such as hiring additional personnel or rescheduling the hours of duty, which the district court held would be effective in the present case in eliminating overtime. 5 C.F.R. § 550.153(a).

Slugocki v. United States, 816 F.2d at 1577. In Alozie v. United States, a Judge of the United States Court of Federal Claims found that plaintiffs, who occasionally had to work through their thirty-minute lunch break, were entitled to AUO compensation and not entitled to one and one-half pay because

> [e]ven if Plaintiffs had made a case that they frequently worked through lunch, there is no evidence that any supervisor directed Plaintiffs not to take a meal break. The most to be said is that Plaintiffs occasionally chose to work through lunch, or on rare occasions, they had to work through lunch due to unexpected emergencies. Plaintiffs made no showing that their supervisors had any knowledge of these circumstances, or that they should have scheduled such work in advance.

Alozie v. United States, 106 Fed. Cl. 765, 776 (2012). In Leggitte v. United States, a Judge of the United States Court of Federal Claims noted: "Typically, AUO is appropriate for positions such as criminal investigators, who are responsible for recognizing, without supervision, circumstances that require them to remain on duty. 5 C.F.R. § 550.153(a)." Leggitte v. United States, 104 Fed. Cl. 315, 316 (2012). Moreover, in Buchan v. United States, another Judge of the Court of Federal Claims stated: "If the job position is administratively uncontrollable, then the question is whether the particular *function* of the job is administratively uncontrollable." Buchan v. United States, 31 Fed. Cl. 496, 498 (1994) (emphasis in original) (citing Slugocki v. United States, 816 F.2d at 1576). The court in Buchan continued, "[i]n other words, could the overtime necessary to perform this particular function of the job be eliminated through administrative procedures, or could the amount of overtime necessary for that function be regulated." Id. (citing Fox v. United States, 416 F. Supp. 593, 597, 598 (E.D. Va. 1976)).

A "Fact Sheet" issued by OPM and currently published on its website tries to simplify the regulations regarding AUO as follows, "for employees with a regularly scheduled administrative workweek, an overtime hour is either irregular or regularly scheduled based on whether the work was scheduled in advance of the employee's administrative workweek." Office of Personnel Management, *Pay & Leave: Policy, Data, Oversight: Fact Sheet: Guidance on Applying FLSA Overtime Provisions to Law Enforcement Employees Receiving Administratively Uncontrollable Overtime Pay* ¶16, OPM.GOV, https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/fact-sheets/guidance-on-applying-flsa-overtime-provisions-to-law-enforcement-employees-

receiving-administratively-uncontrollable-overtime-pay/#content (last visited Dec. 6, 2021).[23]

As stated above, the statute governing AUO compensation, 5 U.S.C. § 5545(c)(2), indicates that an employee may qualify for AUO compensation if the employee is "in a position in which the hours of duty cannot be controlled administratively," and "which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty." 5 U.S.C. § 5545(c)(2). According to the testimony at trial, the plaintiffs are scheduled at a minimum of one month or up to three months in advance to monitor the duty phone outside of their regular shifts. According to the testimony of Supervisor Halverson, the duty phone shifts are assigned "at least three months in advance." Mr. Cheung testified that the duty phone schedule used to be sent "a year out," but that now the schedule is sent out about "two or three months." Mr. Onewokae testified that "[s]omeone on management usually assigns or schedules us two months out" to monitor the duty phone. Mr. Miller testified that shifts to monitor the duty phone are scheduled "months" in advance. Mr. Kos testified that the duty phone schedule is set "three months in advance," but that "it used to almost be out six months to a year." Mr. Wright testified that the duty phone shifts were scheduled "[p]ossibly" more than one month in advance. Although the testimony of the witnesses was not entirely consistent, it appears that the schedules are released well in advance of the administrative workweek for the duty phone. The number of calls received, the timing of the calls, the amount of time expended by the DOs after the calls come in while assigned to monitor the duty phone, and the actions required, however, are unpredictable. Mr. Cheung testified that the nature of the calls is "very unpredictable." When Mr. Onewokae was asked by plaintiffs' counsel "[d]o you know in advance when you will not have -- be receiving phone calls?" Mr. Onewokae responded, "[n]o." When Mr. Miller was asked by defense counsel, "[y]ou agree that you can't predict when the phone will ring on night phone duty, correct?" Mr. Miller testified, "[t]hat is correct." When defense counsel asked Mr. Kos, "is there any way to know when in advance how many calls you're going to get on a shift?" Mr. Kos responded, "[n]o." Mr. Wright testified that whether a call comes in is "really completely random."

Plaintiffs' shifts to monitor the duty phone in the above-captioned case were controlled administratively by a schedule which was sent out at least one month in advance. Plaintiffs each knew, in advance, when they were responsible to monitor the duty phone. Additionally, plaintiffs' shifts as DOs were set by plaintiffs' supervisors, and plaintiffs were not to be on overtime duty to monitor the duty phone, except when they were scheduled to do so by their supervisors. Plaintiffs should not have received AUO compensation for monitoring the duty phone because they were neither "in a position in which the hours of duty cannot be controlled administratively," nor were the DOs in a situation "which requires substantial amounts of irregular, unscheduled overtime duty with

---

[23] Although the OPM "Fact Sheet" has no date of publication, this administrative website guidance was available to the parties as early as February 26, 2019 because defendant relied upon the resource in its motion for summary judgment.

the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty," as required by 5 U.S.C. § 5545(c)(2). The statute at 5 U.S.C. § 5545(c)(2) indicates that an employee may qualify for AUO compensation if the employee is "in a position in which the hours of duty cannot be controlled administratively," and "which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty." 5 U.S.C. § 5545(c)(2). The DOs knew well in advance the schedule that required them to monitor to duty phone. Under 5 U.S.C. § 5545(c)(2), AUO is a form of compensation that is appropriate when the "head of an agency, with the approval of the Office of Personnel Management," chooses to compensate an employee with AUO and when the employee qualifies for AUO compensation under the statute. 5 U.S.C. § 5545(c). Although plaintiffs were authorized by their employer to receive AUO compensation for time spent monitoring the duty phone, according to 5 U.S.C. § 5545(c)(2), AUO was not the appropriate form of compensation. Although the amount of time of work varied when the DOs were assigned to night phone duty, these hours were supervisor-assigned hours, and when a call came in during the assigned call hours, the DOs had to respond and perform the required established work, including preparation, research, and pick-up duties. Because plaintiffs are non-exempt employees under the FLSA, plaintiffs are entitled to FLSA overtime pay for the time spent on-call while monitoring the duty phone. See 29 U.S.C. § 207(a)(1). Based on the record before the court, these five plaintiffs, therefore, were being improperly paid for the time spent on-call monitoring the duty phone because they were receiving AUO pay instead of the correct type of compensation, one and one-half pay, for the overtime spent actively working while on-call. See 29 U.S.C. § 207(a)(1). Additionally, any time plaintiffs were responsible for monitoring the duty phone during the timeframe the court determined was during ERO 2.0, June 5, 2017 to July 15, 2017, will not be subject to this analysis because plaintiffs were already paid one and one-half pay for their time spent monitoring the duty phone during ERO 2.0.

FLSA Liquidated Damages

Plaintiffs also request an award of liquidated damages, which defendant opposes. An employer "who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The statue at 29 U.S.C. § 260 (2018) clarifies the limitations of § 216:

> [I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he [or she] had reasonable grounds for believing that his [or her] act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260. The United States Court of Appeals for the Federal Circuit has stated that the court has "'broad statutory discretion' over the liquidated damages award." Shea v. United States, 976 F.3d 1292, 1297 (2020) (quoting Bull v. United States, 479 F.3d 1365, 1380 (Fed. Cir. 2007)). The Federal Circuit in Shea stated that even when a plaintiff prevails on the merits, a plaintiff does not automatically recover liquidated damages. See id. at 1297-1301 (finding the trial court's detailed analysis of plaintiff's position description and the determination that it was reasonable that defendant would see plaintiff as exempt, despite being "ultimately incorrect" when determining that classification, meant plaintiff was not entitled to liquidated damages). Good faith is a "subjective inquiry" as to whether, "'an honest intention to ascertain what the Fair Labor and Standards Act requires and to act in accordance with it.'" Beebe v. United States, 226 Ct. Cl. 308, 328, 640 F.2d 1283, 1295 (1981) (quoting Addison v. Huron Stevedoring Corp., 204 F.2d 88, 93 (2d Cir.), cert. denied 346 U.S. 877 (1953)); see also Barfield v. N.Y. City Health & Hosps. Corp., 537 F.3d 132, 142 (2d Cir. 2008). "'To establish the requisite subjective "good faith," an employer must show that it took active steps to ascertain the dictates of the FLSA and then act[ed] to comply with them.'" Shea v. United States, 976 F.3d at 1300 (alterations in original) (internal quotation marks and citations omitted in original) (quoting Barfield v. New York City Health & Hosps. Corp., 537 F.3d at 150).

Reasonable grounds is an "objective standard" which, for example, may be due to, "[p]roof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act, even though his belief is erroneous." Havrilla v. United States, 125 Fed. Cl. at 467 (quoting Beebe v. United States, 226 Ct. Cl. at 328, 640 F.2d at 1295 (internal quotations omitted)). When a defendant offers "no evidence that it investigated the requirements of" its legal obligations and "no evidence that it had reasonable grounds for believing that it was in compliance with" its legal obligations, defendants are in violation of the "reasonable grounds" factor. Sinclair v. Auto. Club of Okla., Inc., 733 F.2d 726, 730 (10th Cir. 1984); see also Adams v. United States, 350 F.3d 1216 (Fed. Cir. 2003); Abbey v. United States, 106 Fed. Cl. 254, 279 (2012) (finding that setting up a new management system without legal analysis and with informality "could not have been based on reasonable grounds and made in good faith," and was in violation of 29 U.S.C. § 216(b)); Adams v. United States, 46 Fed. Cl. 616, 621 (2000) (finding the government's burden to be a "continuing obligation to monitor" the OPM regulations and to look at them more than 20 years apart in order to avoid liquidated damages). The government is treated the same as a private party because "[n]o exception is set out in the code for a government defendant." Adams v. United States, 46 Fed. Cl. at 620 (regarding the establishment of a defense for the government).

Plaintiffs argue that "defendant cannot meet its heavy burden of showing both subjective good faith and objective reasonableness" which are the two prongs of determining whether a plaintiff is entitled to liquidated damages under 29 U.S.C. § 216(b) "because the Government failed to present *any evidence* of its compliance, or efforts to comply, with the FLSA in ensuring that DOs were compensated for all hours they work while covering the night phone." (emphasis in original). Plaintiffs argue that "the Agency

has failed to present any evidence that Agency officials *attempted* to discern its obligations pursuant to the FLSA." (emphasis in original). Plaintiffs assert:

> Since 2015, the St. Paul Field Office has utilized an internal ICE policy called the "Premium Pay Guide" to determine FLSA compliance. *See* JX 5. Defendant has done nothing else to determine its FLSA compliance other than consult the Premium Pay Guide. Indeed, when first level supervisor Skwira contacted Agency attorney Braunstein regarding the compensability of night phone duty, the attorney specifically stated that whether it is stand by or on call "depends on the level of restriction." JX 20, TP 240. Yet, at trial, SDDO Skwira admitted that she never followed up with the attorney or explained the level of restriction during night phone shifts. SOF ¶ 73. Defendant was aware that, depending on the level of restriction on the employees, the time could be compensable, yet did nothing to determine whether the plaintiff DOs should be compensated for the shifts. Defendant never sought or received a formal legal opinion to determine whether its practices regarding compensating DOs for time spent monitoring the duty phone outside regular hours complies with the FLSA. SOF ¶ 74.

Plaintiffs also note that Supervisors Halverson and Skwira indicated they had not received meaningful training, if at all, on the FLSA.

The ICE Premium Pay Guide was introduced at trial as Joint Exhibit 5. The ICE Premium Pay Guide introduction states:

> This U.S. Immigration and Customs Enforcement (ICE) Premium Pay Guide (Guide) includes a summary of the statutory and regulatory requirements governing premium pay, as well as several examples and scenarios to provide context to the statutes and regulations. While the Guide covers most subjects applicable to ICE employees, it currently is limited to general schedule employees and excludes variations specific to wage-grade employees.

> This Guide does not include or establish any new requirements, responsibilities, or procedures; rather, it is limited to a summary of federal statutes and regulations along with relevant examples. Although several examples are provided, it may not include all scenarios encountered by supervisors, law enforcement officers, or other ICE personnel.

> This Guide will be continuously reviewed, revised, and updated to ensure consistency with law, regulation, and ICE policy, and on that basis, it is subject to change without notice. Nothing in this Guide is intended to and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Therefore, should there be any questions, concerns or issues that are addressed, or not addressed in this Guide, please contact your servicing Office of Human Capital Human Resources Specialist.

**DISCLAIMER:**

**Any ICE employee, including those in Headquarters and field offices, having any reason to believe that an ICE organizational entity is not in compliance with the guidance provided in this Guide should report such issue up his or her chain of command. Office management <u>must immediately</u> <u>contact</u> ICE Employee and Labor Relations (ELR) and the ICE Office of the Principal Legal Advisor (OPLA) to discuss how to move into compliance, consistent with any potential labor obligations. While statutes and regulations must be complied with immediately, compliance with the ICE policies or best practices referenced in this Guide may in some circumstances require that certain steps be taken prior to moving the office into compliance.**

(emphasis and capitalization in original). The ICE Premium Pay Guide is a summary of information and is not regulatory or statutory in nature. The ICE Premium Pay Guide discusses "Overtime under the FEPA/Title 5 ('45 Act')," "Administratively Uncontrollable Overtime," and "On-Call Status and Standby Status," as well as other types of premium pay and examples of ICE's interpretation of proper use of the premium pay. The Premium Pay Guide compiles a selection of premium pay statues and regulations that ICE policy makers have deemed relevant and includes definitions which are generally lifted from those statutes and regulations.

Defendant argues "prevailing on the merits does not mean a plaintiff necessarily should recover liquidated damages." Defendant argues that "[t]he first prong—good faith—'requires a subjective showing.'" (quoting Shea v. United States, 976 F.3d at 1298). Defendant further argues, "'[t]o establish the requisite subjective "good faith," an employer must show that it took active steps to ascertain the dictates of the FLSA and then act[ed] to comply with them.'" (quoting id. at 1300). Defendant also argues "The second prong— reasonable grounds—involves an objective standard. Thus, in combination, the two prongs require a defendant to demonstrate that it subjectively believed it was complying with the FLSA and that its reasons for that belief were objectively reasonable." (citing id. at 1298). Defendant argues with regards to the government's attention to its responsibilities "both prongs are easily satisfied by the joint exhibits and trial testimony. As a starting point, it is clear that the United States has a robust system in place to comply with the FLSA." Defendant points to the OPM Guidance and states, "OPM has prepared relevant guidance and made it available on its website." Defendant also states, "At the agency level, ICE has developed a comprehensive Premium Pay Guide, JX 5, and the trial testimony in the record makes clear that supervisors are familiar with it." The defendant points first to the trial testimony of Supervisor Halverson, who was being questioned by defendant's counsel:

> Q. As a supervisor, if a question comes up about overtime or holiday pay or something like that and you don't know the answer, what do you do?
>
> A. I reference the Premium Pay Guide. I would reach out to my supervisor. We may reach out to labor relations, attorneys.

Defendant also identifies the trial testimony Supervisor Skwira, who was questioned by defendant's counsel:

> Q. As a supervisor, if a question comes up about overtime or holiday pay or something like that, and you don't know the answer, how do you deal with that?
>
> A. Well, one, I would reference the Premium Pay Guide. I would look to see if I can, you know, see it or figure it out. A lot of times I'll still have that discussion with my boss, Jason Sieving, and some -- usually -- sometimes it always leads to, well, let's talk to Mike Havrilesko [Senior Labor Relations Specialist at ICE] so we're all on the same page. But we reference the Premium Pay Guide first.

(brackets added). Defendant also points to the March 14, 2016 letter from Field Office Director Scott Baniecke to Vice President of the AFGE Local 3928 Peter Fehlen. The March 14, 2016 letter is a "*Letter of Intent – St. Paul Area of Responsibility After-hours Duty Rotation*," which, according to defendant, "memorialize[s] the fact that the local parties have reached an understanding regarding the updated St. Paul Area of Responsibility After-hours Duty Rotation, which is set out in a memorandum attached to this letter." (capitalization and emphasis in original). Within the memorandum referenced in the March 14, 2016 Letter of Intent, there is a portion on compensation, which states:

> Generally, time spent in on-call status does not constitute hours of work. An AUO eligible employee will be compensated by AUO for the actual time spent performing after-hours work, if it is irregular or occasional. The Union and Management agree to re-evaluate this agreement if the agency makes changes to Premium Pay compensation.

In plaintiffs' post-trial briefs, plaintiffs argue:

> Simply because OPM or the Agency issues general guidance regarding the FLSA does not mean the Defendant actually acted in good faith or reasonableness. To prove good faith, the agency employer at issue must prove that it undertook a review of the very issue of FLSA compliance with respect to the facts at issue in the case.

Regarding the ICE Premium Pay Guide and the ability of supervisors to contact attorneys, plaintiffs point out to the court that Supervisor Skwira testified that she did not respond to the attorney she contacted. Plaintiffs argue: "Defendant was informed by an attorney and was aware that, depending on the level of restriction on the employees, the time would be compensable, *yet did nothing to determine whether the plaintiff DOs should be compensated for the shifts*." (emphasis in original). Plaintiffs also argue that

> the Plaintiffs agree with the March 2016 statement that AUO can be used to compensate actual time spent working that is irregular or occasional, but

the night phone shifts at issue are not irregular or occasional. The Plaintiffs here are scheduled in advance to work a night duty phone shift in which they are responsible for any and all calls that come in.

In the record and trial testimony before the court, both supervisors testified that they did not recall ever having reviewed or been trained on the FLSA, as indicated above. When asked by plaintiffs' counsel whether Supervisor Halverson had "ever had training in the Fair Labor Standards Act," Supervisor Halverson testified, "[n]ot that I recall." Supervisor Skwira also testified, regarding whether she had received any training in the FLSA, "I don't recall." While examining a "statement of earnings and leave," plaintiffs' counsel and Supervisor Halverson had the following exchange:

Q: FLSA, can you explain what that is?

A: It's the Fair Labor Standards Act. Honestly, I mean, it's difficult. I'm not able to explain how that works.

Q: It's confusing, right?

A: It is, yes.

Regarding what document Supervisor Halverson referenced for determining whether officers should be paid on-call or standby pay, Supervisor Halverson testified, "I recall referencing this page ['On-call status and standby duty status,' page 7 of the ICE Premium Pay Guide] quite a bit during the time of ERO 2.0, and I believe a lot of -- our field office director at the time heavily looked at all of this during that time." (brackets added). Plaintiffs' counsel questioned Supervisor Halverson regarding his resources for determining overtime pay:

Q. Okay. You said that -- on your cross examination that you could -- I think it was in the context of how you used the Premium Pay Guide, and then you also said that if you needed to, you could reach out to an attorney or labor relations or something like that. Do you recall that?

A: Yes, I do.

Q: Have you ever done that?

A: I know I've spoken with our labor relations. I don't recall specifically what I reached out to labor relations for.

Regarding speaking with "labor relations" and "how to compensate employees," Supervisor Halverson testified, "I don't recall ever having that direct conversation with them about that." Supervisor Skwira testified,

I was tasked with looking into on-call and standby, and so I reached out to our labor relations expert, Mike Havrilesko [Senior Labor Relations Specialist at ICE], for guidance, because it's a very complex issue. And we referenced the AUO Premium Pay Guide, but they're the ones that are experts in that field, but -- and then so we tried to get our answer there. I tried for -- I was tasked by upper management to look into it.

71

(brackets added). Supervisor Skwira testified that Mr. Havrilesko is her designated point of contact for labor relations, and that she was "trying to look at different types of shifts, and so I inquired with the shifts, with Mr. Havrilesko" via email. Additionally, when Supervisor Skwira asked an ICE Employee and Labor Relations Specialist attorney Meir Braunstein by email on July 10, 2017 to "make any sense out of" the "Call-back/AUO inquiry," whether he has "had similar cases," and whether it was "all AUO," Mr. Braunstein answered[24] "it depends on the level of restriction" and "[i]f it is on-call time, then it's all AUO when it is actually triggered," which the court has already determined to be incorrect. In that same email chain, also on July 10, 2017, Mr. Braunstein indicated to Mr. Havrilesko, "when you are AUO certified, all irregular and occasional overtime (which this is, the specific days and hours of actual overtime work were not scheduled in advance of the administrative workweek and not reasonably predictable) are paid by, and credited towards, AUO." The rest of the email chain appears to discuss an upcoming conversation between Mr. Braunstein, senior management at the ERO St. Paul Field Office, and the Union, in which to provide information, Mr. Braunstein pulls information from the Premium Pay Guide. In sum, the supervisors who testified appear to have read the ICE Premium Pay Guide and, on occasion as individual issues came up, reached out to Mr. Braunstein. Neither supervisor, however, testified as to recalling being trained on the FLSA and Supervisor Halverson testified that he was unable to explain how the FLSA works.

Because this court finds ICE was correct in labeling plaintiffs as on-call, but incorrect in paying plaintiffs AUO payment as opposed to one and one-half pay for the time spent on-call actively working while monitoring the duty phone, the court addresses whether liquidated damages are appropriate for defendant's failure to properly pay plaintiffs one and one-half for the time spent on-call only. As noted above, the two required factors for a plaintiff to recover FLSA liquidated damages are "if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he [or she] had reasonable grounds for believing that his [or her] act or omission was not a violation of the Fair Labor Standards Act of 1938." See 29 U.S.C. § 260 (brackets added); see also Shea v. United States, 976 F.3d at 1297. The supervisors appear to have found the FLSA "confusing" or "difficult." One of the supervisors at the St. Paul Office did make minimal efforts to go through the proper channels to "'ascertain the dictates of the FLSA and then act to comply with them.'" Id. Despite plaintiffs' assertion, defendant did "nothing" to determine whether plaintiffs were being properly compensated for the time spent on-call is not entirely true, however, the question was what defendant did enough. The supervisors also sought guidance from the ICE-provided Premium Pay Guide for questions, but apparently remained uncertain about what was required. The supervisors apparently periodically sought out Mr. Braunstein,

---

[24] Although the question in this email was initially asked by Supervisor Skwira, it appears that Mr. Braunstein became somewhat unresponsive to Supervisor Skwira. Mr. Havrilesko, who is Supervisor Skwira's supervisor, contacted Mr. Braunstein on Supervisor Skwira's behalf. Mr. Braunstein then became more responsive and Mr. Havrilesko then forwarded the emails from Mr. Braunstein to Supervisor Skwira. Neither Mr. Havrilesko nor Supervisor Skwira asked a follow-up question to Mr. Braunstein's answer about the "level of restriction" necessary for standby or on-call status.

who was incorrect in his analysis that plaintiffs should be paid AUO for time spent actively working while on-call monitoring the duty phone, as determined by the court. Mr. Braunstein's analysis does not appear to rely on caselaw or statutes, however. Supervisor Skwira testified that she did contact Mr. Braunstein, and Joint Exhibit 20 reveals that so as did her Supervisor, Mr. Havrilesko, but Mr. Braunstein apparently became somewhat unresponsive. Both Supervisor Skwira and her supervisor took Mr. Braunstein's word without question and did not ask for follow-up information on the "level of restriction." Plaintiffs' supervisors were reasonable to try to rely on the "Employee and Labor Relations Specialist" hired by ICE for this specific purpose, however it was done without follow-up and without a lot of effort. The record before the court reflects minimal efforts to distinguish between AUO and one and one-half compensation. If the supervisors had looked to the FLSA, and specifically 5 U.S.C. § 5545(c)(2), the supervisors would have noted that plaintiffs' duty to monitor the duty phone, regulated by shifts scheduled in advance, were not subject to AUO compensation because plaintiffs' shifts were scheduled one month, or more, in advance according to the testimony at trial and plaintiffs are not required to be on duty without supervision. Defendant in the Minneapolis St. Paul ICE Office should have done more to determine the appropriate compensation for plaintiffs when monitoring the duty phone and, therefore, failed to act in good faith.

The second factor of the inquiry is whether defendant had "reasonable grounds for believing that his [or her] act or omission was not a violation of the Fair Labor Standards Act of 1938." See 29 U.S.C. § 260 (brackets added); see also Shea v. United States, 976 F.3d at 1297. As noted above, the court found that the language of the relevant regulation that plaintiffs were reasonably found to be on-call based on the plain language of the regulation at 5 C.F.R. § 551.431:

> (b) An employee will be considered off duty and time spent in an on-call status shall not be considered hours of work if:
>
> (1) The employee is allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius; or
>
> (2) The employee is allowed to make arrangements such that any work which may arise during the on-call period will be performed by another person.

5 C.F.R. § 551.431(b)(1)-(2). The court also found that the language of the statute determining whether an employee is entitled to AUO indicates that AUO compensation is for "an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty." 5 U.S.C. § 5545(c)(2). Additionally, the regulations elaborate on the statute, defining what is regular and what is irregular overtime: "*Regular overtime work* means overtime work that is part of an employee's regularly scheduled administrative workweek;" and "*Irregular or*

*occasional overtime work* means overtime work that is not part of an employee's regularly scheduled administrative workweek." 5 C.F.R. § 550.103 (emphases in original). The court has found this language to be clear that plaintiffs' obligation to monitor the duty phone in shifts scheduled at least one month in advance is regular overtime work, not subject to AUO compensation. If the defendant-supervisors had received training on, or regularly consulted, the relevant provisions of the statutes and regulations, rather than relying mostly on a summary Guide and a single email chain in the record, and more diligently pursued getting to the correct answer, defendant would have realized that plaintiffs should have been classified in on-call status and should have been receiving one and one-half pay for the time they spent monitoring the duty phone. Defendant's efforts to determine whether plaintiffs were subject to AUO compensation or regular overtime compensation were insufficient. Plaintiffs have proven that ICE did not demonstrate to the satisfaction of the court that the act or omission which gave rise to the decisions would meet the good faith test and that there were reasonable grounds for believing that the omission was not a violation of the Fair Labor Standards Act of 1938. See 29 U.S.C. § 260 (brackets added). Liquidated damages in the amount of double the actual damages are appropriate for the named plaintiffs for the period at issue in this case.


Attorneys' Fees

In their complaint, plaintiffs also request attorneys' fees and costs. In their post-trial submissions, defendant did not address plaintiffs' request for attorneys' fees. The statute governing attorneys' fees, which also governs the liquidated damages, addressed above, states in relevant part: "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). "Courts have held where an employee prevails on a FLSA claim, the award of attorneys' fees under § 216(b) is mandatory." Slugocki v. United States 816 F.2d at 1579 (citing Beebe v. United States, 226 Ct. Cl. 308, 640 F.2d 1283 (1981)); see also Shea v. United States, 154 Fed. Cl. 1, 4 (2021). "[P]laintiffs are only entitled to recover attorneys' fees to the extent of plaintiffs' success at trial." Bull v. United States, 68 Fed. Cl. 212, 229 (2005). Although the United States Supreme Court was examining attorney fees in the context of the Civil Rights Attorney's Fees Awards Act, the Supreme Court stated that if

> a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

Hensley v. Eckerhart, 461 U.S. 424, 436, 103 S. Ct. 1933, 1941 (1983); see also Beebe v. United States, 226 Ct. Cl. at 329 (citing Rau v. Darling's Drug Store, Inc., 388 F. Supp. 877 (W.D. Pa. 1975)) ("The amount to be allowed as attorneys' fees shall be determined by the trial division on remand, taking into account various pertinent factors."). "'Factors to be considered in arriving at a fair award for attorney's fees are: the amount of the overtime compensation award, the nature and complexity of the issues involved, and the efforts of the [p]laintiff's counsel in obtaining the award.'" Shea v. United States, 154 Fed. Cl. at 4 (alterations in original) (quoting Rau v. Darling's Drug Store, Inc., 388 F. Supp. at 887). The court determined that plaintiffs were entitled to be paid with one and one-half compensation while actively working on-call monitoring the duty phone, as opposed to the AUO compensation plaintiffs were paid. An award of attorneys' fees is premature in this phase of the case.

## C O N C L U S I O N

In conclusion, in this portion of the case, based on the trial testimony, the admitted exhibits, and the joint stipulations, the court finds that the plaintiffs, who when actively working, albeit engaged in demanding and challenging law enforcement responsibilities, were in on-call status while monitoring the duty phone after-hours. The court also finds that the plaintiffs were entitled to one and one-half pay for the compensable time spent actively working under the FLSA. Liquidated damages in the amount of double the actual damages are appropriate for the named plaintiffs for the period at issue in this case. The final spreadsheets which reflect the court's determinations of the "the days and hours— by date and time" that were not paid correctly are attached as part of this Opinion. The issues regarding attorneys' fees are deferred for further briefing and review of fee requests when submitted as part of the damages portion of the case.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

**<u>Cheung, et al. v. United States</u>, No. 18-48C**

Spreadsheets of Dates and Times Worked by Plaintiffs Cheung, Onewokae, Miller, Kos, and Wright

**KEY**:

Actively Working: The time spent by plaintiffs during their scheduled shifts performing work-related tasks while monitoring the duty phone, including answering the duty phone, performing pickups, and setting up laptop and other gear in preparation for calls.

Date: The date on which the relevant plaintiff was scheduled to work and/or performed work according to the schedule, plaintiff's administratively uncontrollable overtime (AUO) Report, and/or call log.

Hours Worked: The amount of time plaintiffs spent actively working while monitoring the duty phone based upon the AUO Report and/or call logs. The hours worked column is based on the court's examination of the AUO Report and call logs presented by parties.

Issue: Identified issues or inconsistencies resolved by the court which are numbered and listed below the respective plaintiff's spreadsheet.

JX: Acronym for joint exhibit.

Relevant AUO Report Exhibit: The citation to the location in the record which identifies the relevant plaintiff's AUO Report, which generally reflects a two-week log of work of time deemed eligible for AUO pay and provides an amount of time plaintiffs spent actively working while monitoring the duty phone. An AUO Report is signed by plaintiff and plaintiff's supervisor.

Relevant Call Log Exhibit: The citation to the location in the record which identifies the relevant plaintiff's call log. The call log is a worksheet which include boxes for the date, time worked, name of agent, caller name, alien name, alien "DOB," reason arrested, and more. The call logs are filled out by the plaintiffs while monitoring the duty phone and also provide an amount of time plaintiffs spent actively working while monitoring the duty phone.

Relevant Schedule Exhibit: The citation to the location in the record which identifies the date plaintiff was scheduled to work.

Scheduled Shift Hours: The number of hours for which the relevant plaintiff was scheduled to monitor the duty phone.

TP: Acronym for trial page.

Trial Transcript: The citation to the location in the trial transcript of testimony which identifies the particular plaintiff's testimony regarding a particular date.

In the above-captioned case, the court heard testimony from multiple witnesses, including each of the plaintiffs, as well as from two of plaintiffs' supervisors. Prior to the taking of testimony during the first phase of the case, the parties had submitted a joint motion for partial bifurcation of the issues. The motion stated that the upcoming presentation of witnesses

> should include a resolution of exactly which days and hours—by date and time—were allegedly not paid correctly. If the Government prevails at trial, the payroll computations at issue will be unnecessary. If the plaintiffs prevail, the parties believe that it may prove more efficient in this case to attempt to agree on the appropriate payroll adjustments after the court has made the factual findings on which such payroll adjustments would be based, rather than attempting to address the exact computations at this stage through the expert discovery process.

At the urging of the parties, the court granted the parties' motion, stating: "Payroll computation shall be deferred until after the upcoming trial, however, the parties shall present evidence identifying the dates and hours in dispute."

The court developed a set of spreadsheets, one for each plaintiff, based on the testimony and exhibits at trial and the submitted joint stipulation of facts. After the court's thorough review of the evidence based in the record before the court, however, inconsistencies and missing information became apparent. The court shared draft spreadsheets with the parties and requested the parties' comments. Subsequently, plaintiffs and defendant provided their input to the court on the topic of each issue identified by the court and specifically what to do for missing documents. Regarding missing documentation, defendant states simply: "We introduced into evidence as complete a set of these documents as we could locate, and we assume plaintiffs had the same objective." Plaintiffs argue,

> Defendant is required by federal law to maintain accurate records of the Plaintiffs' work hours and it cannot, as it appears to have done here, shift that burden to the employees. When, as here, the Defendant failed to accurately keep complete records, the Court should rely upon the Plaintiff employees' testimony regarding their hours of work.

Plaintiffs argue, "[t]o the extent that the records maintained by Defendant contain holes or do not address every shift, Plaintiffs' testimony should be used to fill in any gaps in the records."

Regarding the collection and maintenance of data of employees, the Fair Labor Standards Act (FLSA) provides:

Every employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order

as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder. The employer of an employee who performs substitute work described in section 207(p)(3) of this title may not be required under this subsection to keep a record of the hours of the substitute work.

29 U.S.C. § 211(c) (2018). The regulation at 29 C.F.R. § 516.1(a), promulgated under 29 U.S.C. § 211, states:

Form of records. No particular order or form of records is prescribed by the regulations in this part. However, every employer subject to any provisions of the Fair Labor Standards Act of 1938, as amended (hereinafter referred to as the "Act"), is required to maintain records containing the information and data required by the specific sections of this part. The records may be maintained and preserved on microfilm or other basic source document of an automatic word or data processing memory provided that adequate projection or viewing equipment is available, that the reproductions are clear and identifiable by date or pay period and that extensions or transcriptions of the information required by this part are made available upon request.

29 C.F.R. § 516.1(a) (2021). Additionally, the United States Office of Personnel Management (OPM) regulation at 5 C.F.R. § 551.401 implementing the FLSA for federal employees states: "An agency shall keep complete and accurate records of all hours worked by its employees." 5 C.F.R. § 551.402(b) (2021). When an employer fails to keep proper records of time worked, the United States Supreme Court has stated:

where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate. See Note, 43 Col.L.Rev. 355.

Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946); see also Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 456 (2016); Leatherbury v. Dep't of the Army, 524 F.3d 1293, 1302 (Fed. Cir. 2008); Abbey v. United States, 106 Fed. Cl. 254, 274 (2012); Bull v. United States, 68 Fed. Cl. 212, 220, decision clarified, 68 Fed. Cl. 276 (2005), aff'd, 479 F.3d 1365 (Fed. Cir. 2007). "For work to be compensable, the quantum of time claimed by plaintiffs must not be de minimis and

must be reasonable in relation to the principal activity." <u>Bull v. United States</u>, 68 Fed. Cl. at 220 (citing <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. at 688, 693; <u>Bobo v. United States</u> 136 F.3d 1465, 1468 (Fed. Cir. 1998); <u>Adams v. United States</u>, 65 Fed. Cl. 217, 222 (2005); <u>Amos v. United States</u>, 13 Cl. Ct. 442, 449 (1987)).

Although inconsistences or missing information still appear to exist in the record before the court even after plaintiffs' and defendant's responses to the court's draft spreadsheets, the court makes its findings as follows. There are three main sources, in addition to the transcript, from which the court was able to derive information regarding how much time plaintiffs worked: the overtime schedule, the AUO Reports, and the call logs. The overtime schedule was set up and sent out by supervisors in the ICE St. Paul Field Office. The AUO Reports were created and signed by each plaintiff and also signed by supervisors.[I] The call logs were created by plaintiffs while monitoring the duty phone. If a plaintiff has his schedule, an AUO Report, and a call log all indicating the same information, plaintiff will be found to have worked for that day and for the determined amount of time. If the call log and AUO Report indicate the same information, plaintiff will be found to have worked for that day and for the determined amount of time, even if the schedule does not indicate plaintiff was scheduled to work. If the AUO Report indicates an amount of time worked differently than the call log associated with the same date, the AUO Report will be controlling.[II] If the call log does not list an amount of time worked, the plaintiff will receive only the time listed in his AUO Report. If no AUO Report exists, but a call log exists, plaintiff will be determined to have worked for the amount of time listed in the call log. If no time is listed in a call log and a call log is the only source for the court to determine if plaintiff actively worked while monitoring the duty phone, plaintiff will be awarded fifteen minutes of time per

---

[I] Supervisor Halverson testified at the trial that he signed off on AUO Reports after "I'd cross-reference it with their electronic time card to make sure that the AUO hours that they put on this AUO sheet matches what they put into their electronic records and that the totals are the same, and, of course, looking at dates and things, making sure everything is accurate."

[II] Defendant states that when the call log and AUO Report are inconsistent that the court should rely upon the AUO Report because "although the call logs provide more detail about individual calls, the AUO reports provide a more reliable measure of the total time a plaintiff spent working. Accordingly, we would ordinarily resolve any discrepancies between the call logs and the AUO reports by relying on the AUO report, if available." Defendant also asserts:

It has long been our understanding that plaintiffs' AUO reports provide the most accurate record of the total time they spent actively working during each night phone assignment. This is because plaintiffs understood that the number of hours they reported in their AUO reports were used in their payroll computations, and therefore they needed to take care to ensure that their total hours of night phone work were accurately reported it their AUO reports.

entry on the log because plaintiffs submit their timesheet to their employer in fifteen-minute increments of work. If neither a call log nor an AUO Report exist, the court relies upon the timesheets as a record of last resort to determine if a plaintiff spent any time actively working.[III]

Additionally, one of the issues the court raised was whether time marked on plaintiffs' AUO Reports as setting up their computers to monitor the duty phone should count towards plaintiffs' hours worked. On their AUO Reports, plaintiffs submit their time in fifteen-minute increments, although the court recognizes that turning on a laptop and setting up for monitoring the duty phone may not take a full fifteen minutes. Plaintiffs argue that

[i]f the Plaintiffs did not take the time to set up their workstations at the beginning of their night phone shifts, they would be unable to perform their principal activity of responding to calls to the night phone during that shift. Accordingly, such time is plainly compensable and must be included in the "Actively Working" column.

Defendant appears to concede that 0.25 hours should be included in plaintiffs' hours worked for set up of a DO's computer and paperwork. For example, defendant states in response to fifteen minutes claimed by Mr. Cheung on December 1, 2019, "if the Court defines its 'Hours Worked' column to include preparatory activities not in response to a night phone call, it may be appropriate to consider including the 0.25 hours that Mr. Cheung reported." Therefore, for each evening plaintiffs were found to be on-call monitoring the duty phone, plaintiffs are entitled to fifteen minutes compensation for set up for time including computer and necessary measures.

---

[III] Plaintiffs' timesheets indicate whether time was AUO overtime but provide no additional details regarding what occurred. Both plaintiffs and defendant have agreed to the use of timesheets as a measure of last resort.

**Jim Cheung**

| Date | Scheduled Shift Hours | Relevant Schedule Exhibit | Hours Worked | Relevant AUO Report Exhibit | Relevant Call Log Exhibit | Transcript | Issue |
|---|---|---|---|---|---|---|---|
| October 21 to 22, 2017 | 24 | JX 35, TP 313 | 18 | JX 41, TP 558 | JX 54, TP 1894-98 | | |
| November 4, 2017 | 7 | JX 36, TP 314 | 5.25 | JX 41, TP 560 | | | |
| November 15, 2017 | 7 | JX 36, TP 314 | 0.25 | JX 41, TP 561 | | | |
| December 3 to 4, 2017 | 24 | JX 36, TP 314 | 0.25 | JX 41, TP 562 | JX 54, TP 1906-08 | | |
| December 29, 2017 | 7 | JX 36, TP 315 | 0.25 | JX 41, TP 565 | | | |
| January 30, 2018 | 7 | JX 36, TP 316 | 1.25 | JX 41, TP 568 | JX 54, TP 1918 | | |
| February 17, 2018 | 7 | JX 36, TP 316 | 3.75 | JX 41, TP 569 | JX 54, TP 1920-22 | | |
| March 14, 2018 | 7 | JX 36, TP 317 | 2.50 | JX 41, TP 572 | JX 54, TP 1923 | August 10, 2020 at 130 | [1] |
| April 14 to 15, 2018 | 24 | JX 36, TP 318 | 4.50 | JX 41, TP 574 | JX 54, TP 1934-35 | | |
| May 3, 2018 | 7 | JX 36, TP 318 | 0.25 | JX 41, TP 577 | | | |
| May 23, 2018 | 7 | JX 36, TP 319 | 0.25 | JX 41, TP 578 | | | |
| May 27 to 28, 2018 | 24 | JX 36, TP 319 | 1.25 | JX 41, TP 579 | JX 54, TP 1943 | | |
| June 22, 2018 | 7 | JX 37, TP 320 | 1.25 | JX 41, TP 581 | JX 54, TP 1950 | | |
| July 12, 2018 | 7 | JX 37, TP 321 | 0.25 | JX 41, TP 581 | | | |
| July 17, 2018 | 7 | JX 37, TP 321 | 0.25 | JX 41, TP 581 | | | |
| July 19, 2018 | 7 | JX 37, TP 321 | 1.25 | JX 41, TP 583 | JX 54, TP 1952 | | [2] |
| August 11, 2018 | 7 | JX 37, TP 322 | 3.75 | JX 41, TP 585 | JX 54, TP 1959-60 | | |
| September 29 to 30, 2018 | 24 | JX 37, TP 323 | 1.25 | JX 41, TP 589 | JX 54, TP 1964 | | |
| October 24, 2018 | 7 | JX 37, TP 324 | 3 | JX 41, TP 593 | JX 54, TP 1968-69 | | |
| November 9, 2018 | 7 | JX 38, TP 325 | 0.25 | JX 41, TP 594 | | | |
| December 2 to 3, 2018 | 24 | JX 38, TP 325 | 5.25 | JX 41, TP 596A | JX 54, TP 1975-76 | | |
| January 1 to 2, 2019 | 24 | JX 38, TP 326 | 3.5 | JX 41, TP 597 | JX 54, TP 1986-87 | | |
| January 26, 2019 | 7 | JX 38, TP 326 | 0.25 | JX 41, TP 600 | | August 10, 2020 at 110-11 | [3] |
| February 17 to 18, 2019 | 24 | JX 38, TP 327 | 3 | JX 41, TP 602 | JX 54, TP 1996-97 | | |

| Date | Scheduled Shift Hours | Relevant Schedule Exhibit | Hours Worked | Relevant AUO Report Exhibit | Relevant Call Log Exhibit | Transcript | Issue |
|---|---|---|---|---|---|---|---|
| March 14, 2019 | 7 | JX 38, TP 327 | 3 | | | | [4] |
| April 2, 2019 | 7 | JX 38, TP 328 | 0.25 | JX 41, TP 605 | | | |
| April 30, 2019 | 7 | JX 38, TP 328 | 2.75 | JX 41, TP 607 | JX 54, TP 2001-02 | | |
| May 23, 2019 | 7 | JX 38, TP 329 | 0.25 | JX 41, TP 608 | | | |
| June 15 to 16, 2019 | 24 | JX 38, TP 329 | 0.25 | JX 41, TP 611 | JX 54, TP 2007 | | |
| July 9, 2019 | 7 | JX 38, TP 330 | 0.25 | JX 41, TP 613 | | | |
| August 3, 2019 | 7 | JX 38, TP 330 | 0.25 | | | | [5] |
| August 28, 2019 | 7 | JX 38, TP 331 | 0.25 | JX 41, TP 615 | | | |
| September 21, 2019 | 7 | JX 38, TP 331 | 1.5 | JX 41, TP 617 | | | |
| October 14 to 15, 2019 | 24 | JX 38, TP 332 | 2.5 | JX 41, TP 620 | JX 54, TP 2009 | | |
| November 8, 2019 | 7 | JX 38, TP 332 | 0.25 | JX 41, TP 621 | JX 54, TP 2013 | | |
| December 1 to 2, 2019 | 24 | JX 38, TP 333 | 0.25 | JX 41, TP 624 | JX 54, TP 2014 | | |
| December 27, 2019 | 7 | JX 38, TP 334 | 4.25 | | JX 54, TP 2015 | August 10, 2020 at 163 | [6] |

## Issues Regarding Mr. Cheung

1. Mr. Cheung's call logs for March 14, 2018 indicate that he actively worked 1.5 hours of his shift while monitoring the duty phone, but his AUO Report for the same day indicate he worked 2.25 hours. In the defendant's response to the court's draft spreadsheets, defendant contends that "[a]t trial, Mr. Cheung acknowledged that the 2.25 hours recorded on his AUO report for March 14, 2018 may be attributable to both night phone work and responding to electronic monitoring alerts." (internal citations omitted). The testimony of Mr. Cheung at trial, however, does not necessarily support defendant's argument. Mr. Cheung and defense counsel had the following exchange:

Q. So in other words, just to clarify that, you wouldn't ordinarily -- I understand from our discussion before about how the AUO report was more exact, but you wouldn't expect that much of a difference between the call log total and the AUO report as we see here?

A. So, for example, like this call came in at 5:27, what I would do is run the records checks, and try to see if he's detainable. There's occasions where also my computer didn't work, I don't know if this specific occasion

that happened, but I would have to go into my office to complete the call, to respond properly. And then I would just stay in my office and finish or continue to work until the beginning of my regular shift would start.

Q. So if that were to happen, then there could be more time in that situation, if I understand you right, there could be more time in that situation that then goes onto the AUO report versus what's in the call logs?

A. That is correct.

Plaintiffs argue that Mr. Cheung

explained that he sometimes has to go into the office to finish work and that that time is not always reflected in the call log. He explained that that may have been what occurred on March 14, 2018. The 2.25 hours on the AUO report represent Plaintiff Cheung's contemporaneous representation of his night phone AUO hours worked on March 14, 2018, and a supervisor signed his AUO report indicating as much.

(internal citations omitted). Because Mr. Cheung's AUO Report indicated he worked for 2.25 hours, and Mr. Cheung testified that he had no recollection for the discrepancy, the court finds that Mr. Cheung worked for 2.25 hours on March 14, 2018 as well as 0.25 hours to set up.

2. According to the schedule, Mr. Cheung was scheduled to monitor the duty phone on July 18, 2018. There is, however, a call log and an AUO Report which indicates Mr. Cheung worked not on July 18, 2018, but on July 19, 2018. In plaintiffs' response to the court's draft spreadsheets, plaintiff argues that Mr. Cheung worked on July 19, 2018, not on July 18, 2018. Defendant states, "we do not believe it is likely that he covered the night phone on July 18, 2018, *and* July 19, 2018, but rather one day or the other." (emphasis in original). The court finds Mr. Cheung worked on July 19, 2018 because the call log and AUO Report indicate he performed work on July 19, 2018.

3. Despite the schedule indicating Mr. Cheung was scheduled to work on January 25, 2019, when Mr. Cheung was asked by defense counsel at trial whether he monitored the night phone duty on January 25, 2019, Mr. Cheung testified, "I believe there was an error" and "I'm not sure if I worked on the 25th or 26th. I'm assuming I worked one of those two days." Plaintiffs argue:

The schedule for January 25, 2019 shows a duplicate entry for that date, whereby two pairs of officers were on the schedule for night phone duty on January 25, 2019. JX 38, TP 326 (showing both officers Holien and Cheung, and officers Campbell and Holien were scheduled for January 25, 2019). The best indicator that this was an error is that Officer Holien, of course, could not have been scheduled twice for the same date with

different partners. *Id.* Further, the fact that Plaintiff Cheung was scheduled to work night phone duty on January 26, 2019 makes it unlikely (although not impossible) that he was also scheduled to work night phone duty the previous day. However, unlike January 25, 2019, the Agency did not double schedule January 26, 2019. Therefore, the most probable course of events is that officers Campbell and Holien worked night phone duty on January 25, 2019, and officers Cheung and Byrd worked night phone duty on January 26, 2019. JX 38, TP 326.

Defendant states: "We agree with the resolution reflected in the Court's draft chart, which includes only one of those two dates, but not both." The court finds that Mr. Cheung most likely only worked one day, and that day was January 26, 2019, because the agency did not double-schedule January 26, 2019. Mr. Cheung will be given credit for 0.25 hours worked to set up on January 26, 2019 because no calls were indicated to have been received on that duty phone shift.

4. The AUO Report and call log containing March 14, 2019 for Mr. Cheung appear to be missing from the record before the court. Defendant refers to its general statement to address this discrepancy, which is "[w]e introduced into evidence as complete a set of these documents as we could locate, and we assume plaintiffs had the same objective." Plaintiffs, however, contend that for March 14, 2019, there is a timesheet in the record before the court. The court notes, as indicated in the court's introductory remarks, that the timesheets in the record simply state the amount of AUO claimed for a day, but do not indicate what actually occurred for AUO to be claimed, unlike the AUO reports which list in detail for what and for how many hours AUO is claimed. Plaintiffs state:

> Plaintiffs note that Plaintiff Cheung's timesheet from the pay period covering March 14, 2019 indicates that he worked 2.75 hours of AUO. On March 14, 2019. JX 39, TP 422. Given that Plaintiff Cheung was scheduled to work night phone duty on this date, that is evidence that Plaintiff Cheung performed active work during his night phone shift that day. Considering that it is the Agency's responsibility to maintain accurate time records for its employees, any ambiguity must be resolved in favor of Plaintiff Cheung.

The court finds that Mr. Cheung performed work for 2.75 hours on March 14, 2019 while monitoring the duty phone, in addition to the 0.25 hours Mr. Cheung took to set up.

5. The AUO Report and call log for August 3, 2019 for Mr. Cheung appear to be missing from the record before the court. Defendant refers to its general statement to address this discrepancy, which is "We introduced into evidence as complete a set of these documents as we could locate, and we assume plaintiffs had the same objective." Plaintiffs argue: "Plaintiff

Cheung's timesheet covering August 3, 2019 does not include any additional information regarding work performed on that day. JX 39, TP 442." The court finds Mr. Cheung actively worked only for 0.25 hours to set up.

6. Mr. Cheung appears to have testified at the trial that the AUO Report in the record for December 27, 2020 is typographical error and should state December 27, 2019. Mr. Cheung and defense counsel had the following exchange:

Q. For December 27th, 2019, and it does say 2020, but I take it that's just a typo, it should be December 27, 2019, right?

A. Yes, there's a -- yes. A bunch of dates are incorrect on here it looks like.

Q. With the year you mean?

A. With the year, correct.

Q. Okay, but the day of the month you think is right for 2019, right?

A. I believe so.

Q. Okay, and then there's four hours for the night phone on December 27th, 2019, right?

A. That is correct.

Both Mr. Cheung and the supervisor signed the document on "1-6-20." Additionally, both plaintiffs and defendant agree that the AUO Report for "December 27, 2020" should state the year 2019 and that the AUO Report lists four hours of work of actively working while monitoring the duty phone.

**Jacob Onewokae**

| Date | Scheduled Shift Hours | Relevant Schedule Exhibit | Hours Worked | Relevant AUO Report Exhibit | Relevant Call Log Exhibit | Transcript | Issue |
|---|---|---|---|---|---|---|---|
| October 25, 2017 | 7 | JX 35, TP 313 | 1.5 | JX 50, TP 1439 | JX 54, TP 1899 | August 11, 2020 at 260-61 | [1] |
| November 2, 2017 | 7 | JX 36, TP 314 | 0.25 | JX 50, TP 1441 | | | |
| November 4, 2017 | 7 | JX 36, TP 314 | 4.75 | JX 50, TP 1441 | | | |
| December 9, 2017 | 7 | JX 36, TP 315 | 6.50 | JX 50, TP 1443 | JX 54, TP 1909-10 | | |
| January 24, 2018 | 7 | JX 36, TP 316 | 0.25 | JX 50, TP 1449 | | | |
| March 7, 2018 | 7 | JX 36, TP 317 | 0.25 | JX 50, TP 1453 | | | |
| March 14 to 15, 2018 | | | 1.75 | JX 50, TP 1453 | JX 54, TP 1924 | | |
| March 31 to April 1, 2018 | 24 | JX 36, TP 317 | 10 | JX 50, TP 1454-55 | JX 54, TP 1927-29 | August 11, 2020 at 279 | [2] |
| April 8 to 9, 2018 | 24 | JX 36, TP 317 | 6 | JX 50, TP 1455 | JX 54, TP 1931-32 | | [3] |
| May 4, 2018 | 7 | JX 36, TP 318 | 1.5 | JX 50, TP 1457 | | | |
| May 28 to 29, 2018 | 24 | JX 36, TP 319 | 1.75 | JX 50, TP 1459 | | | |
| June 13, 2018 | 7 | JX 37, TP 320 | 2.25 | JX 50, TP 1461 | | | |
| June 23, 2018 | 7 | JX 37, TP 320 | 0.25 | JX 50, TP 1461 | | | |
| September 7, 2018 | 7 | JX 37, TP 323 | 0.25 | JX 50, TP 1468 | | | |
| September 11, 2018 | 7 | JX 37, TP 323 | 0.25 | JX 50, TP 1468 | | | |
| September 30 to October 1, 2018 | 24 | JX 37, TP 323 | 7.25 | JX 50, TP 1472 | | | |
| October 20, 2018 | 7 | JX 37, TP 324 | 3.25 | JX 50, TP 1476 | | | |
| December 10 to 11, 2018 | 7 | JX 38, TP 325 | 2.75 | JX 50, TP 1483 | JX 54, TP 1980-81 | | [4] |
| January 2 to 3, 2019 | 7 | JX 38, TP 326 | 4.5 | JX 50, TP 1484 | JX 54, TP 1988-89 | | [5] |
| February 9 to 10, 2019 | 24 | JX 38, TP 327 | 7 | JX 50, TP 1488 | JX 54, TP 1994-95 | | |
| February 18 to 19, 2019 | 24 | JX 38, TP 327 | 2 | JX 50, TP 1491 | | | [6] |
| March 14 to 15, 2019 | 7 | JX 38, TP 327 | 1.5 | JX 50, TP 1492 | | | [7] |
| April 6 to 7, 2019 | 24 | JX 38, TP 328 | 9.25 | JX 50, TP 1494 | | | |
| May 9 to 10, 2019 | 7 | JX 38, TP 329 | 3.75 | JX 50, TP 1498 | | | [8] |
| May 15, 2019 | | | 0.5 | JX 50, TP 1499 | | | [9] |

| Date | Scheduled Shift Hours | Relevant Schedule Exhibit | Hours Worked | Relevant AUO Report Exhibit | Relevant Call Log Exhibit | Transcript | Issue |
|------|------|------|------|------|------|------|------|
| May 24, 2019 | 7 | JX 38, TP 329 | 1.25 | JX 50, TP 1499 | | | [10] |
| June 1 to 2, 2019 | 24 | JX 38, TP 329 | 6.75 | JX 50, TP 1500 | | | |
| July 10, 2019 | 7 | JX 38, TP 330 | 0.25 | JX 50, TP 1504 | | | |
| August 3 to 4, 2019 | 24 | JX 38, TP 330 | 3.25 | JX 50, TP 1505 | | | |
| August 22, 2019 | 7 | JX 38, TP 331 | 0.25 | JX 50, TP 1508 | | | |
| October 16, 2019 | 7 | JX 38, TP 332 | 0.25 | JX 50, TP 1513 | | | |
| November 9, 2019 | 7 | JX 38, TP 332 | 0.25 | JX 50, TP 1515 | | | |
| December 28, 2019 | 7 | JX 38, TP 334 | 3 | JX 50, TP 1521 | | | [11] |

## Issues Regarding Mr. Onewokae

1. Mr. Onewokae was scheduled to monitor the duty phone on October 24, 2017. Mr. Onewokae testified, and his AUO Report for October 24 and October 25, 2017 indicate, however, that he recorded 1.25 hours for "CAP phone" on his AUO Report on October 25, 2017, not on October 24, 2017 as scheduled. Plaintiffs state in their response to the court's draft spreadsheets: "This record evidence demonstrates that Plaintiff Onewokae actively worked 1.25 hours of night phone duty on October 25, 2017, regardless of what the schedule for October 24-25, 2017 may indicate." Plaintiffs request that the court simply put October 24 to October 25, 2017 as the days worked. Defendant, however, appears to concede that Mr. Onewokae was scheduled for October 25, 2017 despite the schedule indicating October 24, 2017, stating: "the rotation listed for Mr. Onewokae on October 24, 2017 did not actually begin until 12:00 A.M., Midnight, on October 25, 2017, and it concluded at 7:00 A.M. that morning." The court finds, although there is no indication that Mr. Cheung was scheduled to work on October 25, 2017, that Mr. Cheung worked on October 25, 2017, not October 24, 2017.

2. Instead of having the AUO Report for April 1 to April 14, 2018, the AUO Report included is from April 1 to April 14, 2017. To add to the discrepancies, the signatures of Mr. Onewokae and his supervisor at the bottom of the April 1 to April 14, 2017 AUO Report were both signed on April 18, 2018. Both plaintiffs and defendant agree that the AUO Report is misdated and in fact represent the time period from April 1 to April 14, 2018. Additionally, Mr. Onewokae testified at trial in response to the question by defense counsel:

Q. April 1st, 2018 -- or 2017. Excuse me, I think the dates are actually wrong on this. The report reads April 1st, 2017, but you signed it on April 18th, 2018, which leads me to conclude that the date listed is incorrect and it should be April 1st, 2018. Do you agree with that?

A. Yeah. I would assume it goes with the signature, so yeah, 2018.

The court finds that the April 1 to April 14, 2017 AUO Report, which was signed on April 18, 2018, to be indicative of the time period from April 1 to April 14, 2018.

3. The same issue addressed immediately above exists for April 8 to April 9, 2018 as well, and the court finds the AUO Report of April 1 to 14, 2017 to be representative of the time period of April 1 to 14, 2018.

4. Mr. Onewokae was scheduled to monitor the duty phone only on December 11, 2018. On December 10, 2018, however, from "2215" until "2230" Mr. Onewokae entered in his AUO Report "Prepare Night Phone workstation." (capitalization in original). Because the supervisor signed Mr. Onewokae's AUO Report, indicating approval for the time spent the day before he was scheduled to work setting up, the court finds that Mr. Onewokae is entitled to have this time counted.

5. It appears Mr. Onewokae monitored the duty phone during the 11:00 P.M. hour on January 2, 2019, although he was not scheduled to work until January 3, 2019. Because the supervisor signed Mr. Onewokae's AUO Report, indicating approval for the time spent the day before he was scheduled to work setting up, this court finds that Mr. Onewokae is entitled to have this time counted.

6. Mr. Onewokae's AUO Report for his shift on February 18 to February 19, 2019 indicates that he performed one hour of AUO for "Afterhours Duty Phone" on February 18, 2019. Mr. Onewokae also lists that on February 19, 2019, he performed 0.75 hours of AUO work for "Duty phone wrap up and prep IHP case A20550679." Plaintiffs argue that,

> [c]onsidering that the Agency bears the responsibility for ensuring that employee time is tracked and recorded accurately, Plaintiffs ask the Court to construe this ambiguity in favor of the Plaintiffs and allocate all .75 hours of that entry on February 19, 2019 to Plaintiff Onewokae as night phone hours actively worked.

Defendant does not address this issue. The court, therefore, finds that Mr. Onewokae is entitled to the 0.75 hours listed on February 19, 2019 for "Duty phone wrap up and prep IHP case A20550679."

7. Mr. Onewokae appears to have listed 0.25 hours of work on his AUO Report on March 14, 2019 as "prep night work station at my house for duty phone." Because the supervisor signed Mr. Onewokae's AUO Report, indicating approval for

the time spent the day before he was scheduled to work setting up, the court finds that Mr. Onewokae is entitled to have this time counted.

8. Mr. Onewokae appears to have listed 0.25 hours of work on his AUO Report on May 9, 2019 for "prep work station for on-call duties." Because the supervisor signed Mr. Onewokae's AUO Report, indicating approval for the time spent the day before he was scheduled to work setting up, the court finds that Mr. Onewokae is entitled to have this time counted.

9. Mr. Onewokae was not scheduled to work on May 15, 2019, but using the hours worked reported in his AUO Report, he may have monitored the duty phone on May 15, 2019. Additionally, Mr. Onewokae appears to have listed 0.25 hours of work on his AUO Report on May 14, 2019 for "night phone preparation." Because the supervisor signed Mr. Onewokae's AUO Report, indicating approval for the time spent the day before he was scheduled to work setting up, the court finds that Mr. Onewokae is entitled to have this time counted, coming to a total of 0.5 hours actively worked.

10. Mr. Onewokae appears to have listed 0.25 of hours of work on his AUO Report for May 23, 2019, the day before his scheduled shift for May 24, 2019. Because the supervisor signed Mr. Onewokae's AUO Report, indicating approval for the time spent the day before he was scheduled to work setting up, the court finds that Mr. Onewokae is entitled to have this time counted, coming to a total of 1.25 hours worked.

11. Mr. Onewokae appears to have listed 0.5 of hours of work to set up to monitor the duty phone on his AUO Report for December 27, 2019, the day before his scheduled shift for December 28, 2019. Because the supervisor signed Mr. Onewokae's AUO Report, indicating approval for the time spent the day before he was scheduled to work setting up, the court finds that Mr. Onewokae is entitled to have this time counted, coming to a total of 3 hours worked.

**Craig Miller**

| Date | Scheduled Shift Hours | Relevant Schedule Exhibit | Hours Worked | Relevant AUO Report Exhibit | Relevant Call Log Exhibit | Transcript | Issue |
|---|---|---|---|---|---|---|---|
| May 27 to 28, 2017 | 24 | JX 35, TP 308 | 0.25 | | JX 54, TP 1870-74 | | [1] |
| November 11 to 12, 2017 | 24 | JX 36, TP 314 | 13.25 | JX 47, TP 1143-44 | JX 54, TP 1902-04 | | |
| January 11, 2018 | 7 | JX 36, TP 315 | 4.25 | JX 47, TP 1147 | JX 54, TP 1914-15 | | |
| February 21, 2018 | 7 | JX 36, TP 316 | 0.25 | JX 47, TP 1151 | | | |
| March 27, 2018 | 7 | JX 36, TP 317 | 0.25 | JX 47, TP 1158 | | | |
| April 3, 2018 | 7 | JX 36, TP 317 | 0.75 | JX 47, TP 1159-60 | JX 54, TP 1930 | August 11, 2020 at 392-93 | [2] |
| April 21, 2018 | 7 | JX 36, TP 318 | 1.75 | | JX 54, TP 1936-37 | | [3] |
| June 9 to 10, 2018 | 24 | JX 37, TP 320 | 8.25 | JX 47, TP 1165 | JX 54, TP 1944-45 | | |
| July 4 to 5, 2018 | 24 | JX 37, TP 321 | 0.25 | JX 47, TP 1168 | JX 54, TP 1951 | | [4] |
| July 29 to 30, 2018 | 24 | JX 37, TP 321 | 3.5 | JX 47, TP 1171 | JX 54, TP 1956-57 | | |
| August 24, 2018 | 7 | JX 37, TP 322 | 0.25 | JX 47, TP 1173 | | | |
| September 12, 2018 | 7 | JX 37, TP 323 | 5 | | JX 54, TP 1963 | | [5] |
| October 12, 2018 | 7 | JX 37, TP 324 | 2.25 | JX 47, TP 1175 | JX 54, TP 1966-67 | | |
| November 4 to 5, 2018 | 24 | JX 38, TP 325 | 2.75 | JX 47, TP 1177 | JX 54, TP 1973-74 | | |
| November 28, 2018 | 7 | JX 38, TP 325 | 0.25 | JX 47, TP 1180 | | | |
| December 22, 2018 | 7 | JX 38, TP 326 | 0.25 | | | | |
| February 7, 2019 | 7 | JX 38, TP 327 | 1.75 | JX 47, TP 1187 | JX 54, TP 1993 | | |
| February 8 to 9, 2019 | 7 | JX 38, TP 327 | 2.5 | JX 47, TP 1187 | JX 54, TP 1991-92 | | |
| March 1 to 2, 2019 | 7 | JX 38, TP 327 | 4.75 | JX 47, TP 1188 | | | [6] |
| March 26, 2019 | 7 | JX 38, TP 328 | 0.25 | JX 47, TP 1191 | | | |
| April 18, 2019 | 7 | JX 38, TP 328 | 0.25 | JX 47, TP 1194 | | | |
| June 4, 2019 | 7 | JX 38, TP 329 | 1.25 | JX 47, TP 1197 | JX 54, TP 2005 | | |
| June 16 to 17, 2019 | 24 | JX 38, TP 329 | 0.25 | JX 47, TP 1199 | | | |
| September 7 to 9, 2019 | 55 | JX 38, TP 331 | 11.25 | JX 47, TP 1206 | | | |
| October 3, 2019 | 7 | JX 38, TP 332 | 2.75 | JX 47, TP 1209 | JX 54, TP 2008 | | |
| October 26 to 27, 2019 | 24 | JX 38, TP 332 | 3.75 | JX 47, TP 1211, 1213 | JX 54, TP 2010-11 | | |
| November 20, 2019 | 7 | JX 38, TP 333 | 0.25 | JX 47, TP 1212 | | | |
| December 12, 2019 | 7 | JX 38, TP 333 | 0.25 | JX 47, TP 1219 | | | |

<u>Issues Regarding Mr. Miller</u>

1. Mr. Miller was scheduled only for May 27, 2017; however, the call logs indicate that Mr. Miller monitored the duty phone on both May 27 and May 28, 2017. Additionally, the AUO Report which contains May 27 and May 28, 2017 has two blank lines for these two days. Defendant contends "[t]his was a weekend rotation, running from 7:00 A.M. Saturday, May 27, 2017 to 7:00 A.M. on Sunday, May 28, 2017. Thus, we propose inserting 24 for the scheduled shift hours for this entry, which is otherwise consistent with our chart." Plaintiffs propose "[t]he call logs provide such a detailed record of the time Plaintiff Miller worked on these dates, that it appears most likely that these two dates were simply inadvertently omitted from the two consecutive AUO Reports." The court finds that although Mr. Miller may have been scheduled for 24 hours, that, because the AUO Report reviewed by a supervisor does not indicate any time spent working, the court finds Mr. Miller did not actively work while monitoring the duty phone, other than setting up for 0.25 hours, when he was scheduled for May 27 and May 28, 2017.

2. Mr. Miller appears to have entered a call log for monitoring the duty phone, and was scheduled to work on April 3, 2018, but he did not list any time worked on his AUO Report for April 3, 2018. Plaintiffs contend that "there is a call log for April 3, 2018 in the record in which Plaintiff Miller indicates he spent 30 minutes handling a call. JX 54, TP 1930. This call log provides the best evidence of the night phone work that Plaintiff Miller performed on April 3, 2018. *Id.*" Defendant appears to agree with plaintiff: "Mr. Miller received a night phone call that morning, but it was while he was already working on early morning surveillance, which is what he recorded on his AUO report. On our chart, we included the 30 minutes reflected in the call log." Additionally, for the pay period from April 1 to April 14, 2018, Mr. Miller has two different signed AUO Reports: one signed on April 16, 2018 by both Mr. Miller and his supervisor, and one signed on April 27, 2018 by Mr. Miller and on April 30, 2018 by his supervisor. Based on Mr. Miller's testimony at trial, the AUO Report signed on April 16, 2018 is the relevant AUO Report for the week of April 1 to April 14, 2018. The court finds Mr. Miller worked for 0.5 hours on April 3, 2018 while monitoring the duty phone, as well as 0.25 hours to set up.

3. The detailed AUO Report for April 21, 2018 appears to be missing from the record before the court. Mr. Miller at the trial testified that he inadvertently did not update the dates from the previous AUO Report, and that April 7, 2018 should actually read April 21, 2018, with 1.5 hours of AUO for actively working while monitoring the duty phone. Both plaintiffs and defendant agree with this interpretation of the AUO Report.

4. Mr. Miller's AUO Report does not indicate any time logged for monitoring the duty phone for Mr. Miller's scheduled shift on July 4, 2018. The call logs from July 4, 2018 indicate he worked 0.75 hours. Because the AUO Report reviewed by a supervisor does not indicate any time spent working while monitoring the duty phone, the court finds Mr. Miller did not actively work while monitoring the duty phone, other than setting up for 0.25 hours.

5. The hours worked is estimated solely on the call logs provided in the record because the AUO Report detailing whether Mr. Miller performed work while monitoring the duty phone on September 12, 2018 is missing from the record before the court. Defendant states "[w]e agree." Plaintiff argues: "Based on the evidence contained in the call logs, and the Agency's responsibility for tracking employee work time and maintaining accurate records of such time, Plaintiffs ask that the Court construe any ambiguity in the record in favor of Plaintiffs and allocate 4.75 hours actively worked to Plaintiff Miller." The court finds plaintiffs actively worked for 4.75 hours, in addition to 0.25 hours to set up, while monitoring the duty phone on September 12, 2018.

6. Although Mr. Miller was scheduled only for March 2, 2019, Mr. Miller performed a pickup on the evening of March 1, 2019 prior to the start of his scheduled shift. Plaintiffs argue that Mr. Miller "does not recall exactly why the phone was being forwarded to him the evening of March 1, 2019, although he explained that sometimes the phone is switched over early." Plaintiffs also assert: "In any case, it is consistent with Plaintiff Miller's performance of a pickup from Dakota County on March 2, 2019 that he received a call from Dakota County the previous evening." Defendant similarly states:

> Our understanding of Mr. Miller's AUO report, JX 47 at 1188, is that he performed a pick up on March 2, 2019, and he was notified of the need for that pick-up on the evening of March 1, 2019. We do not believe Mr. Miller was responsible for the night phone during the March 1, 2019 rotation, which would have been from Midnight to 7:00 A.M. on March 1, 2019.

Because a supervisor signed off that Mr. Miller should receive AUO compensation for his time spent monitoring the duty phone on March 1, 2019, despite not being scheduled, the court includes that time worked in his hours worked.

**Christopher Kos**

| Date | Scheduled Shift Hours | Relevant Schedule Exhibit | Hours Worked | Relevant AUO Report Exhibit | Relevant Call Log Exhibit | Transcript | Issue |
|---|---|---|---|---|---|---|---|
| August 26, 2017 | 7 | JX 35, TP 311 | 0.25 | JX 44, TP 844 | | | |
| September 17 to 23, 2017 | | | 28.5 | JX 44, TP 847 | JX 54, TP 1878-92 | | |
| October 11, 2017 | | | 1.75 | JX 44, TP 848 | JX 54, TP 1893 | | |
| October 18, 2017 | 7 | JX 35, TP 313 | 0.25 | JX 44, TP 849 | | | |
| November 7, 2017 | 7 | JX 36, TP 314 | 2.25 | JX 44, TP 851 | JX 54, TP 1900-01 | | |
| December 2, 2017 | 7 | JX 36, TP 314 | 0.25 | JX 44, TP 854 | | | |
| December 6, 2017 | 7 | JX 36, TP 314 | 0.25 | JX 44, TP 854 | | | |
| December 30 to 31, 2017 | 24 | JX 36, TP 315 | 6 | JX 44, TP 857 | JX 54, TP 1911-13 | | |
| February 15, 2018 | 7 | JX 36, TP 316 | 0.75 | JX 44, TP 861 | JX 54, TP 1919 | | |
| March 11 to 12, 2018 | 24 | JX 36, TP 317 | 1.75 | | | | [1] |
| April 12, 2018 | 7 | JX 36, TP 318 | 1.75 | JX 44, TP 866 | JX 54, TP 1933 | | |
| May 1, 2018 | 7 | JX 36, TP 318 | 2.5 | JX 44, TP 869 | JX 54, TP 1938-39 | | |
| May 26, 2018 | 7 | JX 36, TP 319 | 3.75 | JX 44, TP 871 | JX 54, TP 1940-42 | | [2] |
| June 16 to 17, 2018 | 24 | JX 37, TP 320 | 12.75 | JX 44, TP 874 | JX 54, TP 1946-49 | | |
| June 20, 2018 | 7 | JX 37, TP 320 | 0.25 | JX 44, TP 874 | | | |
| July 21 to 22, 2018 | 24 | JX 37, TP 321 | 6 | JX 44, TP 876 | JX 54, TP 1953-54 | | |
| August 9, 2018 | 7 | JX 37, TP 322 | 2 | JX 44, TP 880 | JX 54, TP 1958 | | |
| September 9 to 10, 2018 | 24 | JX 37, TP 323 | 1.5 | JX 44, TP 882 | JX 54, TP 1961-62 | | |
| October 21 to 22, 2018 | 24 | JX 37, TP 324 | 0.25 | JX 44, TP 892 | | August 12, 2020 at 556 | [3] |
| October 27 to 28, 2018 | 24 | | 2 | JX 44, TP 892 | JX 54, TP 1970-71 | | |
| November 14, 2018 | 7 | JX 38, TP 325 | 0.25 | JX 44, TP 895 | | | |
| December 8, 2018 | 7 | JX 38, TP 325 | 2.25 | JX 44, TP 896 | JX 54, TP 1977-79 | | |
| December 30 to 31, 2018 | 24 | JX 38, TP 326 | 0.75 | JX 44, TP 898 | JX 54, TP 1984-85 | | |
| January 24, 2019 | 7 | JX 38, TP 326 | 0.25 | JX 44, TP 900 | | | |
| February 16, 2019 | 7 | JX 38, TP 327 | 0.25 | JX 44, TP 901 | | | |

| Date | Scheduled Shift Hours | Relevant Schedule Exhibit | Hours Worked | Relevant AUO Report Exhibit | Relevant Call Log Exhibit | Transcript | Issue |
|---|---|---|---|---|---|---|---|
| March 12, 2019 | 7 | JX 38, TP 327 | 2.5 | JX 44, TP 906 | | | |
| May 21, 2019 | 7 | JX 38, TP 329 | 1.75 | JX 44, TP 911 | JX 54, TP 2003-04 | | |
| June 14, 2019 | 7 | JX 38, TP 329 | 1.25 | JX 44, TP 913 | JX 54, TP 2006 | | |
| August 1, 2019 | 7 | JX 38, TP 330 | 1.75 | JX 44, TP 916 | | | |
| August 25 to 26, 2019 | 24 | JX 38, TP 331 | 2.75 | JX 44, TP 918 | | | |
| September 19, 2019 | 7 | JX 38, TP 331 | 0.25 | JX 44, TP 920 | | | |
| October 12 to 13, 2019 | 24 | JX 38, TP 332 | 0.25 | JX 44, TP 921-22 | | | |
| November 6, 2019 | 7 | JX 38, TP 332 | 0.25 | JX 44, TP 923 | JX 54, TP 2012 | | |
| November 8, 2019 | 7 | JX 38, TP 332 | 0.25 | JX 44, TP 923 | | | |
| December 25, 2019 | 7 | JX 38, TP 333 | 0.25 | JX 44, TP 930 | | | |

<u>Issues Regarding Mr. Kos</u>

1. The AUO Report and call logs for Mr. Kos for March 11 to March 12, 2018 appear to be absent from the record before the court. Plaintiffs argue: "Plaintiff Kos's timesheet for March 12, 2018 indicates 1.5 hours of AUO. Plaintiffs ask that the Court resolve this ambiguity in favor of Plaintiff Kos, and conclude that these 1.5 hours were hours actively worked during night phone duty." Defendant states: "Neither party was able to locate or identify an AUO report for Mr. Kos for those dates." The court finds Mr. Wright actively worked for 1.5 hours, in addition to the 0.25 hours it took to set up.

2. Mr. Kos' AUO Report for May 26, 2018 indicates he worked for 4.25 hours while monitoring the duty phone, but his call logs indicate he performed work for only 3.5 hours. Unlike the other instances in which the AUO Report would be controlling, Mr. Kos' AUO Report states the 4.25 hours worked is for "Non-Detained Duties / Night CAP Phone," meaning the 4.25 hours claimed on his AUO Report were for two different types of overtime he was claiming. Both parties, however, agree that the proper hours of active work are 3.5 hours, in addition to the 0.25 it took to set up.

3. Mr. Kos was not scheduled to work on October 27, 2018, however, according to Mr. Kos' AUO Reports and call logs, he performed work while monitoring the duty phone on October 27, 2018. Plaintiffs and defendant both agree that Mr. Kos worked either October 21 to October 22, 2018 or October 27, 2018, but not both. Plaintiffs state that

Although Plaintiff was scheduled to work night phone duty on October 21 to 22, 2018 and not on October 27, 2018, what appears to have happened is that he switched his night phone duty day from October 21-22, 2018 to October 27, 2018. *See* Tr. Vol. III. 556; JX 37, TP 324. Plaintiff Kos's AUO Report entries for October 21-22, 2018 shows no night phone duty hours worked. JX 44, TP 892. However, this same AUO Report shows 1.75 night phone hours worked on October 27, 2018. *Id.* The call logs from October 27, 2018 support that Plaintiff performed 1.75 hours of night phone activities on October 27, 2018. JX 54, TP 1970-1971. The record contains no call logs for October 21-22, 2018. *See* JX 54, TP 1967-1968 (moving directly from October 12, 2018 to October 24, 2018).

Defendant states: "We believe that he covered the night phone for one 24-hour period beginning on either October 21, 2018, or on October 27, 2018, but not both." What Mr. Kos testified at the trial when examined by defense counsel was as follows:

Q. Let's look at [Trial Page] 892, and on 892, do you have any -- you don't have any night phone duty work recorded for October 21st, 2018, correct?

A. Correct.

Q. But you do have 1.75 hours recorded for October 27th, 2018. Is that right?

A. Correct.

Q. Okay. And by looking at that entry there on October 27th, 2018, does that look like that would have been one of the 24-hour periods?

A. Yes.

Q. Okay. And I take it at this point, no particular recollection as to whether you either did or didn't work night phone duty on October 21st, 2018.

A. Correct. I'm assuming not because there's nothing on there.

(brackets added). The court does not find this interaction to be definitive as to whether Mr. Kos only worked one shift. The court finds Mr. Kos was scheduled to monitor the duty phone and did monitor the duty phone on October 21 to October 22, 2018. The court finds Mr. Kos is entitled to 0.25 hours to set up to monitor the duty phone for his scheduled shift from October 21 to October 22, 2018. The court also finds that  Mr. Kos actively worked on October 27, 2018, the first day of his

96

24-hour shift from October 27 to October 28, 2018, and is entitled to 1.75 hours of work, in addition to the 0.25 hours to set up for his shift.

<u>Additional Note Regarding Mr. Kos</u>: Mr. Kos was scheduled to monitor the duty phone on September 28, 2018, but Mr. Kos' AUO Report reflects that he was out for "Sick Leave" that day. Similarly, Mr. Kos was scheduled to monitor the duty phone on April 4, 2019, but Mr. Kos's AUO Report reflects that he was out for "Annual Leave" that day. The court has excluded September 28, 2018 and April 4, 2019 from the spreadsheet for Mr. Kos.

**Sean Wright**

| Date | Scheduled Shift Hours | Relevant Schedule Exhibit | Hours Worked | Relevant AUO Report Exhibit | Relevant Call Log Exhibit | Transcript | Issue |
|---|---|---|---|---|---|---|---|
| May 2 to 3, 2017 | 15 | JX 35, TP 308 | 9.25 | JX 53, TP 1740 | JX 54, TP 1868-69 | | |
| July 1, 2017 | 7 | | 4.25 | JX 53, TP 1774 | | | |
| September 20, 2017 | 7 | JX 35, TP 312 | 0.25 | JX 53, TP 1787 | | | |
| November 16, 2017 | 7 | JX 36, TP 314 | 0.25 | JX 53, TP 1791 | JX 54, TP 1905 | | |
| December 10 to 11, 2017 | 24 | JX 36, TP 315 | 7.75 | JX 53, TP 1797 | | | |
| January 5, 2018 | 7 | JX 36, TP 315 | 0.25 | JX 53, TP 1800 | | | |
| January 22 to 23, 2018 | 15.5 | JX 36, TP 316 | 6.25 | JX 53, TP 1805 | JX 54, TP 1916-17 | August 12, 2020 at 636 | |
| February 22, 2018 | 7 | JX 36, TP 316 | 0.25 | JX 53, TP 1809 | | | |
| February 24, 2018 | 7 | JX 36, TP 316 | 0.25 | JX 53, TP 1809 | | | |
| March 21, 2018 | 7 | JX 36, TP 317 | 4.25 | JX 53, TP 1811 | JX 54, TP 1925-26 | | |
| April 7 to 8, 2018 | 24 | JX 36, TP 316 | 1.25 | JX 53, TP 1813 | | | |
| May 10, 2018 | 7 | JX 36, TP 318 | 0.25 | JX 53, TP 1818 | | | |
| June 3 to 4, 2018 | 24 | JX 37, TP 320 | 4.75 | | | | [1] |
| June 29, 2018 | 7 | JX 37, TP 320 | 0.25 | JX 53, TP 1821 | | | |
| July 24, 2018 | 7 | JX 37, TP 321 | 0.25 | JX 53, TP 1823 | JX 54, TP 1955 | | |
| August 18, 2018 | 7 | JX 37, TP 322 | 0.25 | JX 53, TP 1825 | | | |
| September 18, 2018 | 7 | JX 37, TP 323 | 0.25 | JX 53, TP 1828 | | | |
| October 6 to 7, 2018 | 24 | JX 37, TP 324 | 2.5 | JX 53, TP 1831 | JX 54, TP 1965 | | |
| October 30, 2018 | 7 | JX 37, TP 324 | 1.25 | JX 53, TP 1835 | JX 54, TP 1972 | | |
| November 22 to 23, 2018 | 24 | JX 38, TP 325 | 2.75 | | | | [2] |
| December 15 to 16, 2018 | 24 | JX 38, TP 325 | 4.25 | JX 53, TP 1838 | JX 54, TP 1982-83 | | |
| January 9, 2019 | | JX 38, TP 326 | 0.75 | | JX 54, TP 1990 | | [3] |
| February 1, 2019 | 7 | JX 38, TP 327 | 0.25 | | | | |
| February 24 to 25, 2019 | 24 | JX 38, TP 327 | 0.25 | | JX 54, TP 1998 | | |
| March 20, 2019 | 7 | JX 38, TP 328 | 2.25 | JX 53, TP 1841 | JX 54, TP 1999 | | |

| Date | Scheduled Shift Hours | Relevant Schedule Exhibit | Hours Worked | Relevant AUO Report Exhibit | Relevant Call Log Exhibit | Transcript | Issue |
|---|---|---|---|---|---|---|---|
| April 13, 2019 | 7 | JX 38, TP 328 | 0.25 | JX 53, TP 1843 | JX 54, TP 2000 | | |
| May 11 to 12, 2019 | 24 | JX 38, TP 329 | 0.25 | JX 53, TP 1845, 1847 | | | |
| May 30, 2019 | 7 | JX 38, TP 329 | 0.25 | JX 53, TP 1848 | | | |
| June 22, 2019 | 7 | JX 38, TP 330 | 0.25 | JX 53, TP 1849 | | | |
| July 16, 2019 | 7 | JX 38, TP 330 | 2.25 | | | | [4] |
| August 9, 2019 | 7 | JX 38, TP 331 | 1.25 | | | | [5] |
| September 2 to 3, 2019 | 24 | JX 38, TP 331 | 0.25 | JX 53, TP 1853 | | | |
| September 28, 2019 | 7 | JX 38, TP 332 | 0.25 | | | | |
| October 22, 2019 | 7 | JX 38, TP 332 | 2.25 | | | | [6] |
| November 15, 2019 | 7 | JX 38, TP 333 | 0.25 | JX 53, TP 1858 | | | |
| December 8 to 9, 2019 | 24 | JX 38, TP 333 | 0.25 | JX 53, TP 1860 | | | |

<u>Issues Regarding Mr. Wright</u>

1. The AUO Report and call logs containing June 3 to 4, 2018 for Mr. Wright appear to be missing from the record before the court. Plaintiffs argue:

> The absence of these records is not something that the Plaintiffs can cure at this stage, both because the record is closed and because the AUO Reports and call logs are not in the custody or control of the Plaintiffs. However, Plaintiff Wright's timesheet for the period covering June 3-4, 2018 shows 4.5 hours of AUO on June 3, 2018. JX 51, TP 1572. Given that the Agency bears the responsibility for ensuring that employee work time is accurately tracked and recorded, Plaintiffs ask the Court to resolve any ambiguity as to what those hours of AUO represent in favor of Plaintiff Wright and to count them as hours worked in the Court's chart. *See* Section II(A) *supra*. Plaintiff notes that it is highly likely that all 4.5 hours represent night phone activities given that the June 3-4, 2018 night phone shift began at 7 a.m. on June 3, 2018. Therefore, it is much more likely that Plaintiff Wright accrued 4.5 hours of AUO performing night phone duties between 7 a.m. and midnight on June 3, 2018, than it is that he performed non-night phone duties between the previous midnight and 7 a.m. on June 3, 2018.

Defendant simply states, "[n]either party was able to locate or identify an AUO report for Mr. Wright for those dates." The court determines Mr. Wright actively worked for 4.5 hours, in addition to 0.25 hours to set up.

2. The AUO Report and call logs containing November 22 to November 23, 2018 for Mr. Wright appear to be missing from the record before the court. Plaintiffs argue:

> Plaintiff Wright's timesheet covering November 22-23, 2018 shows 2.5 hours of AUO on November 23, 2018. Given that the Agency bears the responsibility for ensuring that employee work time is accurately tracked and recorded, Plaintiffs ask the Court to resolve any ambiguity as to what those hours of AUO represent in favor of Plaintiff Wright and to count them as hours worked in the Court's chart because the Agency failed to produce the relevant AUO Report and call logs.

Defendant states, "[n]either party was able to locate or identify an AUO report for Mr. Wright for that date." The court determines Mr. Wright actively worked for 2.5 hours, in addition to 0.25 hours to set up.

3. It appears that Mr. Wright received a call at 11:57 P.M. on January 8, 2019 using his call log entries. Mr. Wright was only scheduled for January 9, 2019 from 12:00 A.M. until 7:00 A.M. Mr. Wright's AUO Report for January 8, 2019 is absent from the record before the court. Mr. Wright does have two call log entries for January 8, 2019, however, the "TIME WORKED" section simply states the time of day, not an amount of time worked, so the court cannot determine the length of those calls. (capitalization in original). Plaintiffs argue that the court should attribute 0.25 hours to Mr. Wright for each call, in addition to the 0.25 hours to set up, for a total of 0.75 hours of work. Defendant, however, looks to the timesheet for January 8 and 9, 2019 and states: "Although no AUO report has been located for Mr. Wright for this period, his timesheet reflects that he claimed two hours of AUO for January 9, 2019. JX 51 at 1597. Given the call logs, in this instance, we included two hours of active work in our chart. ECF No. 75-1 at 6/6 & n.2." As the court stated above, if no time is listed in a call log and a call log is the only source for the court to determine if plaintiff actively worked while monitoring the duty phone, plaintiff will be awarded fifteen minutes of time per entry on the log because plaintiffs submit their timesheet to their employer in fifteen-minute increments of work. The court also notes that timesheets would be used as a last resort. The court finds that Mr. Wright would be entitled to 0.75 hours for January 9, 2019.

4. The AUO Report and call logs for July 16, 2019 are missing from the record before the court. Plaintiffs contend that Mr. Wright's timesheet indicates that he worked two hours of AUO. Defendant states "[n]either party was able to locate or identify AUO reports for Mr. Wright for those dates." The court finds Mr. Wright actively worked for 2 hours, in addition to the 0.25 hours it took to set up.

5. The AUO Report and call logs for August 9, 2019 are missing from the record before the court. Plaintiffs contend that Mr. Wright's timesheet indicates that he worked one hour of AUO. Defendant states "[n]either party was able to locate or identify AUO reports for Mr. Wright for those dates." The court finds Mr. Wright actively worked for 1 hour, in addition to the 0.25 hours it took to set up.

6. The AUO Report and call logs for October 22, 2019 are missing from the record before the court. Plaintiffs contend that Mr. Wright's timesheet indicates that he worked two hours of AUO. Defendant states "[n]either party was able to locate or identify AUO reports for Mr. Wright for those dates." The court finds Mr. Wright actively worked for 2 hours, in addition to the 0.25 hours it took to set up.