# In the United States Court of Federal Claims

**No. 18-48C**
**Filed: February 27, 2024**
**Reissued for Publication: March 22, 2024[1]**

```
* * * * * * * * * * * * * * * *      *
                                     *
JIM W. CHEUNG,                       *
                                     *
CHRISTOPHER D. KOS,                  *
                                     *
CRAIG P. MILLER,                     *
                                     *
JACOB O. ONEWOKAE, and               *
                                     *
SEAN E. WRIGHT,                      *
                                     *
                Plaintiffs,          *
                                     *
        v.                           *
                                     *
UNITED STATES,                       *
                                     *
                Defendant.           *
                                     *
* * * * * * * * * * * * * * * *      *
```

    **David Ricksecker**, McGillivary Steele Elkin LLP, Washington, D.C., for plaintiffs. With him were **Gregory K. McGillivary**, **T. Reid Coploff**, and **Matthew D. Purushotham**, McGillivary Steele Elkin LLP, Washington, D.C.

    **Daniel B. Volk**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Reginald T. Blades, Jr.**, Assistant Director, Commercial Litigation Branch, **Martin F. Hockey, Jr.**, Acting Director, Commercial Litigation Branch, and **Brian Boynton**, Principal Deputy Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C.

---

[1] This Opinion was issued under seal on February 27, 2024. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued without redactions since the parties proposed no redactions in response to the court's request.

**O P I N I O N**

**HORN, J.**

**FINDINGS OF FACT**

Plaintiffs Jim W. Cheung, Christopher D. Kos, Craig P. Miller, Jacob O. Onewokae, and Sean E. Wright, at all times relevant to their claims in the above captioned case, were employees of the United States Department of Homeland Security, Immigration and Customs Enforcement (ICE). See Cheung v. United States, 157 Fed. Cl. 508, 508 (2021). Attached to the court's earlier detailed trial Opinion on liability, see id., was a detailed chart regarding the hours worked by each of the five named plaintiffs, which is discussed more fully below.[2]

The plaintiffs challenged having been placed by ICE in on-call status and that they were paid Administratively Uncontrollable Overtime (AUO) under 5 U.S.C. § 5545(c)(2), and not paid as scheduled overtime under the overtime provisions of the Fair Labor Standards Act (FLSA) in 29 U.S.C. § 207(a)(1). See Cheung v. United States, 157 Fed. Cl. at 511, 551. In their complaint, plaintiffs alleged that they were owed overtime under 29 U.S.C. § 207(k) of the FLSA, and that ICE had failed to comply with the provisions of the Back Pay Act, 5 U.S.C. § 5596, regarding scheduled overtime. Plaintiffs further alleged in their complaint in the following paragraphs

> 55. Pursuant to 29 U.S.C. § 216(b), plaintiffs are entitled to recover liquidated damages in an amount equal to their back pay damages for the defendant's failure to pay overtime compensation.

> 56. Pursuant to the Back Pay Act, 5 U.S.C. § 5596, plaintiffs are entitled to recover interest on their back pay damages for the defendant's failure to pay them overtime compensation.

> 57. Plaintiffs are entitled to recover attorneys' fees and costs under 29 U.S.C. § 216(b), the Back Pay Act, 5 U.S.C. § 5596, as well as other applicable laws and regulations.

Pursuant to the FLSA, AUO pay is "extra compensation" at a "premium rate." See 29 U.S.C. §§ 207(h)(2), (e)(5)–(7). Because AUO pay was paid to plaintiffs in lieu of FLSA overtime, the parties raised and briefed issues regarding how to calculate FLSA damages to account for the AUO that was incorrectly paid to plaintiffs during the damages period.

---

[2] The findings of fact in the court's earlier trial Opinion on liability are incorporated into this Opinion, although certain of the facts most relevant to this Opinion are repeated below. After the Opinion on liability was issued, the parties entered into lengthy settlement negotiations, but failed to reach agreement. Therefore, this Opinion is issued after the unsuccessful efforts by the parties to settle the calculation of damages and attorneys' fees, followed by briefing on related legal and factual calculation issues subsequently raised by the parties.

The parties also briefed the issues of liquidated damages, as well as the plaintiffs' request for attorneys' fees and costs.

The plaintiffs each worked as Deportation Officers (DOs) in ICE's Enforcement and Removal Operations (ERO), at least since May 1, 2017, at the St. Paul Field Office, in Fort Snelling, Minnesota, which covers a five-state area of responsibility, including Minnesota, North Dakota, South Dakota, Nebraska, and Iowa. According to the DO Position Description, the major duties and responsibilities of a DO at the time were

> to perform law enforcement duties to investigate, identify, locate, arrest, detain, prosecute, and remove foreign nationals who pose a threat to national security and public safety, as well as those that enter the United States illegally with the intent to undermine the integrity of the nation's immigration laws and border control efforts.

Id. at 513. In addition, plaintiffs were sometimes responsible for "monitoring the duty phone after hours." Id. At trial, one of the plaintiffs' supervisors testified that DOs who were monitoring the duty phone were responsible for

> monitoring any incoming calls from our law enforcement partners via the after-hours duty phone. They're responsible for responding to those telephone calls appropriately, and at times that could mean if they received a call from a law enforcement agency that required – regarding a release, they would be required to respond to that call and pick up the individual from the local jail. They would be – they're responsible also for documenting any calls that they receive via the after-hours duty phone in our call logs.

Id. at 515.

In the court's detailed post-trial Opinion on liability, the court determined

> If the supervisors had looked to the FLSA, and specifically 5 U.S.C. § 5545(c)(2), the supervisors would have noted that plaintiffs' duty to monitor the duty phone, regulated by shifts scheduled in advance, was not subject to AUO compensation because plaintiffs' shifts were scheduled one month, or more, in advance according to the testimony at trial and plaintiffs are not required to be on duty without supervision. Defendant in the Minneapolis St. Paul ICE Office should have done more to determine the appropriate compensation for plaintiffs when monitoring the duty phone and, therefore, failed to act in good faith.

Cheung v. United States, 157 Fed. Cl. at 557. The Opinion on liability continued:

> The court has found this language to be clear that plaintiffs' obligation to monitor the duty phone in shifts scheduled at least one month in advance is regular overtime work, not subject to AUO compensation. If the defendant-supervisors had received training on, or regularly consulted, the relevant provisions of the statutes and regulations, rather than relying mostly on a summary Guide and a single email chain in the record, and more diligently pursued getting to the correct answer, defendant would have

3

realized that plaintiffs should have been classified in on-call status and should have been receiving one and one-half pay for the time they spent monitoring the duty phone. Defendant's efforts to determine whether plaintiffs were subject to AUO compensation or regular overtime compensation were insufficient. Plaintiffs have proven that ICE did not demonstrate to the satisfaction of the court that the act or omission which gave rise to the decisions would meet the good faith test and that there were reasonable grounds for believing that the omission was not a violation of the Fair Labor Standards Act of 1938. See 29 U.S.C. § 260 (brackets added).

Cheung v. United States, 157 Fed. Cl. at 562-63.

In its earlier trial Opinion on liability, the court concluded that while monitoring the duty phone, "plaintiffs were on an on-call status," as defined by the FLSA implementing regulations and, therefore, plaintiffs should be compensated for overtime pursuant to the FLSA, rather than be paid AUO compensation, see Cheung v. United States, 157 Fed. Cl. at 557. The earlier trial Opinion on liability stated:

[T]he plaintiffs, who when actively working, albeit engaged in demanding and challenging law enforcement responsibilities, were in on-call status while monitoring the duty phone after-hours. The court also finds that the plaintiffs were entitled to one and one-half pay for the compensable time spent actively working under the FLSA [Fair Labor Standards Act]. Liquidated damages in the amount of double the actual damages are appropriate for the named plaintiffs for the period at issue in this case.

Cheung v. United States, 157 Fed. Cl. at 563–64 (alterations added).

At the liability trial, the parties referenced a period of time called ERO 2.0, and the parties stipulated that during the ERO 2.0 timeframe "the office tested and evaluated various initiatives with the goal of improving its operations" in 2017. Id. at 512 n.2. "During ERO 2.0, plaintiffs were 'paid as scheduled overtime (not as administratively uncontrollable overtime (AUO))' for the entirety of the shift while monitoring the duty phone." Id. at 527. There was some dispute between the parties at the liability trial as to the duration of the ERO 2.0. See id. at 527–30. This court stated, in the earlier trial Opinion on liability, that "[b]ased on the strong evidence in the record before the court, the court concludes that ERO 2.0 lasted from June 5, 2017 until July 15, 2017." Id. at 530 (alteration added).

The court, in its earlier trial Opinion on liability, further determined:

Plaintiffs' shifts to monitor the duty phone in the above-captioned case were controlled administratively by a schedule which was sent out at least one month in advance. Plaintiffs each knew, in advance, when they were responsible to monitor the duty phone. Additionally, plaintiffs' shifts as DOs were set by plaintiffs' supervisors, and plaintiffs were not to be on overtime duty to monitor the duty phone, except when they were scheduled to do so

4

by their supervisors. Plaintiffs should not have received AUO compensation for monitoring the duty phone because they were neither "in a position in which the hours of duty cannot be controlled administratively," nor were the DOs in a situation "which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty," as required by 5 U.S.C. § 5545(c)(2). The statute at 5 U.S.C. § 5545(c)(2) indicates that an employee may qualify for AUO compensation if the employee is "in a position in which the hours of duty cannot be controlled administratively," and "which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty." 5 U.S.C. § 5545(c)(2). The DOs knew well in advance the schedule that required them to monitor to duty phone. Under 5 U.S.C. § 5545(c)(2), AUO is a form of compensation that is appropriate when the "head of an agency, with the approval of the Office of Personnel Management," chooses to compensate an employee with AUO and when the employee qualifies for AUO compensation under the statute. 5 U.S.C. § 5545(c). Although plaintiffs were authorized by their employer to receive AUO compensation for time spent monitoring the duty phone, according to 5 U.S.C. § 5545(c)(2), AUO was not the appropriate form of compensation. Although the amount of time of work varied when the DOs were assigned to night phone duty, these hours were supervisor-assigned hours, and when a call came in during the assigned call hours, the DOs had to respond and perform the required established work, including preparation, research, and pick-up duties. Because plaintiffs are non-exempt employees under the FLSA, plaintiffs are entitled to FLSA overtime pay for the time spent on-call while monitoring the duty phone. See 29 U.S.C. § 207(a)(1).

Cheung v. United States, 157 Fed. Cl. at 556-57. The earlier trial Opinion on liability continued:

Based on the record before the court, these five plaintiffs, therefore, were being improperly paid for the time spent on-call monitoring the duty phone because they were receiving AUO pay instead of the correct type of compensation, one and one-half pay, for the overtime spent actively working while on-call. See 29 U.S.C. § 207(a)(1). Additionally, any time plaintiffs were responsible for monitoring the duty phone during the timeframe the court determined was during ERO 2.0, June 5, 2017 to July 15, 2017, will not be subject to this analysis because plaintiffs were already paid one and one-half pay for their time spent monitoring the duty phone during ERO 2.0.

Cheung v. United States, 157 Fed. Cl. at 557.

As noted above, attached to the court's earlier trial Opinion on liability was a detailed chart and narrative explanation that indicated for each plaintiff the number of scheduled shift hours, the number of hours actually worked, and any AUO hours performed by each plaintiff. See id. at 567–83. In sum, the damages period for each of the plaintiffs was determined to be as follows: Mr. Cheung, October 21, 2017 through December 27, 2019, see id. at 568; Mr. Onewokae, October 25, 2017 through December 28, 2019, see id. at 572–73; Mr. Miller, May 27, 2017 through December 12, 2019, see id. at 575; Mr. Kos, August 26, 2017 through December 25, 2019, see id. at 578–79; Mr. Wright, May 2, 2017 through December 9, 2019, see id. at 581–82.

For purposes of the current Opinion, and to move towards judgment in the case, the parties do not dispute the number of hours that each plaintiff worked while monitoring the duty phone, and the parties further do not dispute that each plaintiff is entitled to FLSA overtime pay at a rate of time-and-one-half for the hours that each plaintiff worked while monitoring the duty phone. Rather, the parties now disagree as to how to "offset" the AUO that the plaintiffs were paid during the damages period for the hours they spent monitoring the duty phone. Additionally, plaintiffs and defendant disagree as to which statute, the Back Pay Act, 5 U.S.C. § 5596, or the FLSA, 29 U.S.C. § 201 et seq., governs the method by which the AUO that was incorrectly paid to plaintiffs should be offset against the damages owed.

As discussed below, plaintiffs argue that "[t]he damages in this case are FLSA damages and, accordingly, the methodology for damages under the FLSA applies here." (alteration added). Defendant asserts that the Back Pay Act and its implementing regulations should control the damages calculations, which would allow for the AUO payments plaintiffs received during the entire damages period to be offset against the time and one-half owed to plaintiffs under the FLSA.

As indicated above, after the trial Opinion on liability was issued, the court instructed the parties to file joint status reports regarding the progress of the parties' settlement negotiations regarding any issues remaining in the case including, any the attorneys' fees and costs. After multiple attempts, settlement discussions were unsuccessful. Subsequently, plaintiffs' attorneys submitted briefs on the remaining legal questions regarding calculations of damages and on their request for attorneys' fees and costs. Defendant does not challenge that plaintiffs' counsel are entitled to attorneys' fees and costs, but argues that the court award attorneys' fees under the Back Pay Act and also should disallow the vast majority of plaintiffs' claimed fees and expenses.

## DISCUSSION

Calculation of Damages

Defendant argues "Plaintiffs seek to avoid the Back Pay Act and its implementing regulations by asserting that they are entitled to relief under the Fair Labor Standards Act of 1938 (FLSA), codified as amended at 29 U.S.C. §§ 201-219, as opposed to Title 5. That position is both contrary to plaintiffs' complaint and incorrect." According to defendant, the Back Pay Act applies to

> [a]n employee of an agency who, on the basis of a timely appeal or an administrative determination (including a decision relating to an unfair labor practice or a grievance) is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances, or differentials of the employee.

5 U.S.C. § 5596(b)(1) (alteration added). As an "employee of an agency" who was found to be improperly compensated AUO, rather than FLSA time and one-half, defendant argues that the Back Pay Act applies to each of the plaintiffs. Defendant's expert, Mr. Rodney J. Bosco, calculated the damages

> by replicating the computations of the actual compensation plaintiffs received during the pay periods covered by the Court's August 27, 2021 opinion. He then calculated the total compensation that each plaintiff would have received if he had been paid in accordance with the Court's opinion— *i.e.*, with the hours identified by the Court recorded as scheduled overtime hours, rather than administratively uncontrollable overtime (AUO) hours. Figure 1 in Mr. Bosco's report summarizes the difference between that "but-for compensation"—the compensation that plaintiffs would have received if they had been paid in accordance with the Court's opinion—and the actual compensation that each plaintiff received.

(internal reference omitted).

> As indicated above, in its earlier Opinion on liability, the court found

> the plaintiffs, who when actively working, albeit engaged in demanding and challenging law enforcement responsibilities, were in on-call status while monitoring the duty phone after-hours. The court also finds that the plaintiffs were entitled to one and one-half pay for the compensable time spent actively working under the FLSA. Liquidated damages in the amount of double the actual damages are appropriate for the named plaintiffs for the period at issue in this case.

Cheung v. United States, 157 Fed. Cl. at 563–64.

Defendant asserts that, even though the court found liability solely under the FLSA, see Cheung v. United States, 157 Fed. Cl. at 563–64, because plaintiffs claimed relief under the Back Pay Act in their complaint, the court must use the Back Pay Act and its implementing regulations to calculate damages. Defendant asserts:

> Plaintiffs seek to avoid the Back Pay Act and its implementing regulations by asserting that they are entitled to relief under the Fair Labor Standards Act of 1938 (FLSA), codified as amended at 29 U.S.C. §§ 201-219, as opposed to Title 5. That position is both contrary to plaintiffs' complaint and incorrect.

7

Defendant states that "Plaintiffs fail to offer the Court any compelling reason not to treat the issue of AUO versus scheduled overtime payments as they pled it—as a Title 5 claim." Defendant asserts that "Plaintiffs fail to identify any reason why the judgment they receive should not be in accordance with their complaint."

Plaintiffs respond that "the Government's bizarre protestations that the damages in this case are not owed pursuant to the FLSA are contrary to this Court's order and false. The damages in this case are FLSA damages and, accordingly, the methodology for damages under the FLSA applies here." Plaintiffs assert:

> Plaintiffs here sued alleging that the Government failed to compensate them for all time that they spent responsible for the duty phone. In addition, the Plaintiffs contended in the complaint that the Government had failed to compensate them with time-and-a-half overtime for the duty phone hours for which they had been compensated by improperly considering those hours unscheduled, instead of scheduled, overtime hours. Under the FLSA, the Government must pay the Plaintiffs for all hours worked above the appliable [sic] overtime threshold at a rate of one and one-half times their regular rate of pay. When the Government failed to pay the Plaintiffs one and one-half times their regular rate for the duty phone hours, it violated the FLSA. That is exactly what this Court found.

(alteration added; internal references omitted).

Plaintiffs argue that

> [t]he Government's calculations, however, would look at the entire time period covered by this case, not only the FLSA work periods where the Court has found that there were violations. Adopting the Government's argument is directly contrary to FLSA precedent and would lead to the Plaintiffs being paid less than the amount required by the FLSA.

(alteration added). Plaintiffs further argue that "[w]hen determining the manner to offset excess premium payments against liability under the FLSA, it is well-established that the offset is conducted on an FLSA-work-period basis." (alteration added). Accordingly, plaintiffs state they "revised the Government's damages and limited the offsets due to the AUO miscalculation to only the work periods when there were damages under the FLSA. For work periods when the offsets were larger than the damages, Plaintiffs zeroed out the damages for that period."

Plaintiffs alleged in their complaint in the following paragraphs:

> 41. Employees covered by the FLSA must be paid at a rate of not less than one and one-half times their regular rate of pay for each hour worked in excess of 40 hours in a workweek. Agencies who adopt a work period of at least 7 days and not more than 28 days, are permitted to pay overtime compensation to federal agency employees pursuant to the hourly standards under section 7(k) of the Act [the FLSA], 29 U.S.C. § 207(k), provided that the employees are engaged in law enforcement activities, and

that the employees also receive administratively uncontrollable overtime pursuant to 5 U.S.C. § 5545(c)(2). See 5 C.F.R. § 551.541.

42. Under section 7(k) of the FLSA, in a 14-day work period, law enforcement employees who also receive AUO are entitled to FLSA overtime compensation at the rate of one and one-half their regular rate of pay for all hours that they are suffered or permitted to work in excess of 85.5 hours. Id.

43. The FLSA additionally contains protections enabling employees to assert these rights. Retaliation against employees seeking to be paid overtime is illegal under 29 U.S.C. § 215(a).

44. The administration of the FLSA in the federal sector must be done in a manner that is consistent with the Department of Labor's implementation of the FLSA in other sectors of the economy.

45. Defendant is required under the FLSA to pay plaintiffs, and those similarly situated, for all work time that is suffered or permitted. 5 C.F.R. § 551.402(a)(2); 29 C.F.R. § 553.221(b).

46. Defendant is required, under the FLSA, to pay plaintiffs, and those similarly situated, for all time spent in a standby status. 5 C.F.R, [sic] § 551.431(a); 29 C.F.R. § 553.221(d).

47. Defendant has violated, and continues to violate the FLSA by failing and refusing to compensate plaintiffs and other similarly situated employees for hours of work when plaintiffs, and those similarly situated, spend monitoring, but not actively responding to, the night phone, as they are so restricted that their time cannot be effectively used for their own purposes.

48. All of the time that plaintiffs spend monitoring the night phone during the scheduled night phone shifts constitutes compensable hours of work.

49. Plaintiffs, and those similarly situated, are officially ordered to spend 7- or 24-hour shifts monitoring and responding to the night phone.

50. Plaintiffs, and those similarly situated, are restricted to their home, where they maintain their government-issued laptops, and must remain in a state of readiness to respond to calls on the night phone during the entirety of their assigned shifts monitoring the phone.

51. Plaintiffs, and those similarly situated, are so restricted when monitoring the night phone, that they cannot use the time effectively for their own purposes.

52. The defendant, however, violates the FLSA by failing to compensate plaintiffs, and those similarly situated, for the entire shifts where they monitor the night phone.

53. The defendant has violated, and is continuing to violate in a willful and intentional manner, the provisions of the FLSA. As a consequence, at all times material herein, the plaintiffs have been unlawfully deprived of overtime compensation and other relief for the maximum statutory period allowed under federal law.

54. As a result of the defendant's willful and purposeful violations of the FLSA, there have become due and owing to each of the plaintiffs [sic] various amounts that have not yet been precisely determined. The employment and work records for each plaintiff are in the exclusive possession, custody and control of defendant and its public agencies and the plaintiffs are unable to state at this time the exact amounts owing to each of them. Defendant and its public agencies are under a duty imposed by the Government Accounting Office retention schedule, the FLSA (29 U.S.C. §211(c)) and various statutory and regulatory provisions to maintain and preserve payroll and other employment records with respect to plaintiffs and other employees similarly situated from which the amounts of defendant's liability can be ascertained.

55. Pursuant to 29 U.S.C. § 216(b) [Fair Labor Standards Act], plaintiffs are entitled to recover liquidated damages in an amount equal to their back pay damages for the defendant's failure to pay overtime compensation.

56. Pursuant to the Back Pay Act, 5 U.S.C. § 5596, plaintiffs are entitled to recover interest on their back pay damages for the defendant's failure to pay them overtime compensation.

57. Plaintiffs are entitled to recover attorneys' fees and costs under 29 U.S.C. § 216(b), the Back Pay Act, 5 U.S.C. § 5596, as well as other applicable laws and regulations.

(alterations added).

In its earlier trial Opinion on liability, the court found that

[b]ased on the record before the court, these five plaintiffs, therefore, were being improperly paid for the time spent on-call monitoring the duty phone because they were receiving AUO pay instead of the correct type of compensation, one and one-half pay, for the overtime spent actively working while on-call. See 29 U.S.C. § 207(a)(1).

Cheung v. United States, 157 Fed. Cl. at 557 (alteration added). In addition, the court awarded liquidated damages to plaintiffs under the FLSA. See Cheung v. United States, 157 Fed. Cl. at 561. In the earlier trial Opinion on liability, the court found that

[p]laintiffs have proven that ICE did not demonstrate to the satisfaction of the court that the act or omission which gave rise to the decisions [to compensate plaintiffs with AUO instead of FLSA overtime] would meet the good faith test and that there were reasonable grounds for believing that the omission was not a violation of the Fair Labor Standards Act of 1938.

Cheung v. United States, 157 Fed. Cl. at 563 (alterations added). This court found "that the plaintiffs were entitled to one and one-half pay for the compensable time spent actively working under the FLSA." Cheung v. United States, 157 Fed. Cl. at 563 As reflected in the court's earlier trial Opinion on liability, the court also found that the plaintiffs were entitled to liquidated damages as a result of violation of the FLSA. Therefore, the court has found and reiterates that plaintiffs' complaint pled that the agency had violated the FSLA and that the plaintiffs sought damages based on violation of the FLSA.

Defendant also argues, citing Adams v. United States, 350 F.3d 1216 (Fed. Cir. 2003), that plaintiffs "do not offer any meaningful explanation as to how they can properly recover a judgment that is not consistent with their complaint. The Federal Circuit has made clear that what is pled—or not pled—in a complaint is no trivial matter." In Adams, the Federal Circuit recognized plaintiffs sought prejudgment interest on overtime back pay. See Adams v. United States, 350 F.3d at 1229. The Federal Circuit in Adams determined:

Plaintiffs assert that prejudgment interest on overtime back pay is nevertheless available, but under the Back Pay Act ("BPA"), 5 U.S.C. § 5596. The BPA provides remedies—including interest—for violations of pay-entitling statutes. See id. The Court of Federal Claims engaged in a lengthy analysis of the potential interaction of the BPA and the FLSA, and concluded that the plaintiffs could not rely on the BPA for prejudgment interest because "the plaintiffs ha[d] already invoked an integrated remedy, in the form of the FLSA." Adams IV, 48 Fed. Cl. [602,] 610 [(2001)]. The Court of Federal Claims observed that courts have held that "liquidated damages under the FLSA serve the purpose of interest, and, thus, the recovery of both is not allowed." Id. The Court of Federal Claims concluded that if the BPA's interest provision were applicable to a damages award under the FLSA, "liquidated damages would be read out of the FLSA . . . [a] result [that] is so at odds with the FLSA remedy Congress created that we could not adopt it unless the waiver were plain." Id. at 611.

Whether liquidated damages under the FLSA and interest under the BPA are mutually exclusive is an issue that would require close analysis, if we had to decide it here—but we do not. Plaintiffs conceded at oral argument that their complaint did not include a claim under the BPA. In light of this concession, plaintiffs necessarily argue that FLSA plaintiffs can always invoke BPA remedies, whether the BPA is pleaded or not. We do not agree: If plaintiffs desired BPA remedies, they should have included a BPA claim. In fact, their complaint rested solely on the FLSA, which "authorize[s] payment of liquidated damages, not interest." Doyle [v. United States], 931 F.2d [1546,] 1550 [(Fed. Cir. 1991)]; see also Arneson v. Callahan, 128 F.3d

11

> 1243, 1245–47 (8th Cir. 1997) (holding plaintiffs could not rely on the BPA to obtain interest on a back pay award under the Rehabilitation Act of 1973 where the suit was brought under the Rehabilitation Act, not the BPA). We therefore need not and do not reach the issue of whether a plaintiff can prevail on both a well-pleaded BPA claim for interest and an FLSA claim for liquidated damages arising out of the same facts.

Adams v. United States, 350 F.3d at 1229–30 (first, third, fourth and fifth alterations and omission in original). In Adams, the plaintiffs had filed suit under the FLSA and not the Back Pay Act, and therefore, the Federal Circuit concluded recovery was limited to the FLSA. As determined in the court's trial Opinion on liability, plaintiffs in the above captioned case filed suit with reference to both the FLSA and the Back Pay Act, and the court found liability under the FLSA. See Cheung v. United States, 157 Fed. Cl. at 563–64. Therefore, thee Adams case does not provide support for defendant's position in this case.

In the above captioned case before this court, application of the FLSA has been found to be the proper method to determine damages. As quoted above in the earlier trial Opinion on liability, the court determined:

> Because plaintiffs are non-exempt employees under the FLSA, plaintiffs are entitled to FLSA overtime pay for the time spent on-call while monitoring the duty phone. See 29 U.S.C. § 207(a)(1). Based on the record before the court, these five plaintiffs, therefore, were being improperly paid for the time spent on-call monitoring the duty phone because they were receiving AUO pay instead of the correct type of compensation, one and one-half pay, for the overtime spent actively working while on-call. See 29 U.S.C. § 207(a)(1).

Cheung v. United States, 157 Fed. Cl. at 556-57. Additionally, this court concluded that

> Plaintiffs have proven that ICE did not demonstrate to the satisfaction of the court that the act or omission which gave rise to the decisions would meet the good faith test and that there were reasonable grounds for believing that the omission was not a violation of the Fair Labor Standards Act of 1938. See 29 U.S.C. § 260 (brackets added). Liquidated damages in the amount of double the actual damages are appropriate for the named plaintiffs for the period at issue in this case.

Cheung v. United States, 157 Fed. Cl. at 563. Further, although the plaintiffs cite the Back Pay Act four times in their complaint, the Back Pay Act did not come up as an issue in the parties' earlier filed motions for summary judgment or in the parties' post-trial briefs. Additionally, except for a single reference during plaintiffs' opening statement at trial, in which plaintiffs' counsel stated, "as will be briefed as necessary, the Plaintiffs are seeking reasonable attorneys' fees and costs which are allowed under both the Fair Labor

Standards Act and the Back Pay Act," the trial had no other references to the Back Pay Act.[3]

Separate from Adams v. United States, defendant also cites to Erickson v. United States Postal Service, 759 F.3d 1341 (Fed. Cir. 2014), to argue

> even if it were reasonable to characterize their back pay claims as being based on the FLSA as opposed to Title 5, the Back Pay Act and its implementing regulations would still apply. See Erickson v. U.S. Postal Serv., 759 F.3d 1341, 1348 n.2 (Fed. Cir. 2014) ("The Back Pay Act is found in title 5 . . . . [but] [i]t does not matter what the source of the employee's violated right is").

(alterations in original). The court notes that the issue in Erickson v. United States Postal Service was limited to the availability of attorneys' fees. See generally Erickson v. U.S. Postal Serv., 759 F.3d 1341. The Federal Circuit's decision in Erickson begins:

> The petitioner in this case, Richard Erickson, has filed an application for attorney fees in connection with his two appeals to this court. In his application, he sets forth four grounds for the recovery of attorney fees and expenses. We hold that none of the four grounds provides a legal basis for Mr. Erickson to receive attorney fees in this case, and we therefore deny the application.

Id. at 1342. In Erickson, the United States Postal Service had removed Mr. Erickson for excessive use of military leave. Mr. Erickson appealed that decision to the Merit Systems Protection Board and claimed that the Postal Service had violated his rights under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA). See Erickson v. U.S. Postal Serv., 759 F.3d at 1342-43. After the Merit Systems Protection Board denied his appeal, Mr. Erickson appealed to the Federal Circuit, which reversed the Merit Systems Protection Board's decision with regard to Mr. Erickson's discrimination claim under the USERRA and remanded the case back to the Merit Systems Protection Board. See id. at 1343. The Federal Circuit explained:

> On remand, the Board found that Mr. Erickson had waived his USERRA rights by abandoning his civilian career. Mr. Erickson again appealed to this court, arguing that the Board's findings in that regard were not supported by substantial evidence. This court agreed with Mr. Erickson that the Board's findings were not supported by substantial evidence. Accordingly, the court remanded the case to the Board for further proceedings on Mr. Erickson's claim. Erickson v. U.S. Postal Serv. (Erickson II), 636 F.3d 1353 (Fed. Cir. 2011). In the second remand proceeding, the Board ruled in favor of Mr. Erickson on his discrimination claim. It granted him reinstatement with back wages and benefits as of the date of his removal. Mr. Erickson has now filed

---

[3] By contrast, plaintiffs cite the FLSA 19 times in their complaint, and at the trial, including closing arguments, there were over 90 references to the FLSA.

an application here seeking fees for his attorneys' work in the two appeals he took to this court.

Erickson v. U.S. Postal Serv., 759 F.3d at 1343. One of the four grounds for the recovery of attorneys' fees and expenses sought by Mr. Erickson was the Back Pay Act. The Federal Circuit determined that the Back Pay Act did not provide employees of the Postal Service with the ability to recover attorneys' fees:

> In general, the Back Pay Act has been interpreted as authorizing the courts of appeals to award attorney fees incurred on appeal. Gallo v. Dep't of Transp., 725 F.3d 1306, 1309–10 (Fed. Cir. 2013); Olsen v. Dep't of Commerce, 735 F.2d 558, 563 (Fed. Cir. 1984); Hoska v. U.S. Dep't of the Army, 694 F.2d 270, 273–74 (D.C. Cir. 1982). The government argues, however, that the Back Pay Act does not apply to the Postal Service, and that the provisions of the Back Pay Act (including the attorney fee provision) do not apply to Postal Service employees. Mr. Erickson argues that the Back Pay Act in general, and the attorney fee provision in particular, apply to preference eligible employees in the Postal Service (i.e., certain veterans, also referred to as "preference eligibles"), even though those provisions do not apply to Postal Service employees generally.
>
> The Federal Circuit has not resolved the question whether, or to what extent, the Back Pay Act applies to preference eligible employees in the Postal Service. See Romero v. United States, 38 F.3d 1204, 1212 (Fed. Cir. 1994) (not deciding the issue whether the Back Pay Act applies to postal workers due to sparse record and minimal argument); United States v. Connolly, 716 F.2d 882, 887 (Fed. Cir. 1983) (declining to decide whether the Back Pay Act applies to Postal Service employees); see also White v. Bloomberg, 501 F.2d 1379, 1381 n. 2 (4th Cir. 1974) ("[T]he Back Pay Act is no longer statutorily applicable to the Postal Service."); Kellus v. United States, 13 Cl. Ct. 538, 542 n. 4 (1987) (stating that the Fourth Circuit has held that the Back Pay Act does not apply to the Postal Service and that even though the "Federal Circuit pretermitted deciding the question as to whether the Back Pay Act is applicable to Postal Service employees . . . . it seems clear that the Back Pay Act" does not authorize suit in the Claims Court).
>
> After careful consideration, we conclude that, even if the back pay provision of the Back Pay Act applies to preference eligible employees in the Postal Service—an issue we need not reach to decide this case—the attorney fee provision of that Act does not. The analysis of this issue begins with 39 U.S.C. § 410. That statute provides that "no Federal law dealing with public or Federal . . . employees . . . shall apply to the exercise of the powers of the Postal Service" unless the law is enumerated in subsection (b) of that code provision. The Back Pay Act is not enumerated in 39 U.S.C. § 410(b). That Act therefore does not apply generally to the Postal Service.

In addition, the Back Pay Act by its own terms does not apply to the Postal Service because the Postal Service is not an "executive agency," the term that is used to define the scope of the Act's coverage. <u>See</u> 5 U.S.C. § 5596(a). Instead, the Postal Service is defined by statute as an "independent establishment of the executive branch." 39 U.S.C. § 201. Although "executive agency" is defined as "an Executive department, a Government corporation, and an independent establishment," 5 U.S.C. § 105, the term "independent establishment" is further defined to mean "an establishment in the executive branch (other than the United States Postal Service. . . )," 5 U.S.C. § 104. The Postal Service is therefore not an "executive agency" within the meaning of title 5 in general and the Back Pay Act in particular. <u>See</u> <u>also</u> <u>White v. Bloomberg,</u> 501 F.2d 1379, 1381 n. 2 (4th Cir. 1974).

The inapplicability of the Back Pay Act to Postal Service employees in general does not, however, answer the question whether the Back Pay Act applies to preference eligible employees in the Postal Service. The answer to that question turns on the interpretation of 39 U.S.C. § 1005(a)(2), a provision of the Postal Reorganization Act, Pub. L. No. 91–375, 84 Stat. 719, 731 (1970). Section 1005(a)(2) of that Act states that "[t]he provisions of title 5 relating to a preference eligible" apply to postal workers. The question then becomes whether the Back Pay Act and its fee provision are provisions of title 5 that "relat[e] to a preference eligible." If so, then the Back Pay Act provides a basis for a preference eligible employee such as Mr. Erickson to obtain an award of attorney fees for a successful termination appeal, even though a Postal Service employee who is not a preference eligible employee would not be entitled to such an award.

<u>Erickson v. U.S. Postal Serv.</u>, 759 F.3d at 1347–48 (footnote omitted; alterations in original). The <u>Erickson v. United States Postal Service</u> footnote cited by the defendant provides in full:

The government argues that section 1005(a)(2) does not help Mr. Erickson in this case because that section refers to the provisions of title 5 relating to preference eligible employees, but does not refer to the provisions of title 38, where USERRA is codified. That argument misses the point. The Back Pay Act is found in title 5, and it provides rights to any agency employee who is found "to have been affected by an unjustified or unwarranted personnel action" resulting in monetary loss to the employee. 5 U.S.C. § 5596(b)(1). It does not matter what the source of the employee's violated right is that makes the adverse personnel action unjustified or unwarranted (e.g., USERRA); what *does* matter is whether the Back Pay Act is a statute "relating to a preference eligible" so that the Act, including its attorney fee provision, applies to such employees.

15

Erickson v. United States Postal Serv., 759 F.3d at 1348 n.2 (emphasis and capitalization in original).

The above footnote and the Erickson decision which generally focused on a plaintiff's ability to recovery attorneys' fees does not suggest a change to the calculation of damages in the above captioned case as the issue of whether the Back Pay Act applies to "preference eligible" federal employees is not at issue. As repeatedly noted above, regarding plaintiffs' claims in this court, this court's earlier trial Opinion on liability determined that the agency had violated the FLSA when plaintiffs were not paid FLSA overtime for the hours spent monitoring the duty phone, and found that ICE had violated the FLSA and awarded actual and liquidated damages thereunder. See Cheung v. United States, 157 Fed. Cl. at 557, 563. Notwithstanding defendant's arguments, the FLSA governs the damage calculations for the five plaintiffs in the above captioned case, and the court looks to the FLSA for direction on how to account for the AUO compensation that plaintiffs received when they should have received FLSA overtime.

Regarding the calculation of damages in the above captioned case, defendant alleges:

> For some pay periods, some plaintiffs were paid more than they should have been paid, according to the Court's opinion. In determining the difference between what plaintiffs were paid and what they are owed, [defendant's expert] Mr. Bosco counted all pay periods within the damages period. Plaintiffs wish to sum only the pay periods in which there were underpayments, taking the position that overpayments should be zeroed and disregarded. We maintain that only the net difference between compensation owed and compensation received is recoverable.

(alteration added). Defendant continues:

> Because AUO payments are based on hours recorded in prior pay periods, any decrease in AUO compensation resulting from moving AUO hours to scheduled overtime will not be felt in the pay period when those hours were worked. Rather, a decrease in AUO hours during a given pay period will be considered the next time the computation is performed to determine the employee's AUO compensation percentage, and if there is any resulting decrease in AUO percentage, it is implemented thereafter when the new AUO rate takes effect. Thus, if one shifts AUO hours to scheduled overtime in a pay period, the AUO payment for that pay period does not change as a result. Rather, any effect on the AUO payment comes later. Consistent with 5 C.F.R. § 550.805, Mr. Bosco correctly calculated the net difference between the compensation that the plaintiffs would have received under the Court's opinion and what they were actually paid over the entirety of the damages period.

Notably, with respect to defendant's citation to 5 C.F.R. § 550.805, in the quote immediately above, 5 C.F.R. § 550.805 is a Back Pay Act regulation, titled: "Back pay computations." See 5 C.F.R. § 550.805. Defendant argues that

> [t]he plain language of 5 C.F.R. § 550.805(e)(2) requires a deduction for "[a]ny erroneous payments received from the Government *as a result of* the unjustified or unwarranted personnel action." Id. (emphasis added). Thus, under the plain language of the regulation, any payment—at any time—that would not have been made but for the challenged action must be deducted.

(emphasis in original; alteration added). The Back Pay Act implementing regulation at 5 C.F.R. § 550.805(b) provides, in its entirety that, "[n]o employee shall be granted more pay, allowances, and differentials under section 5596 of title 5, United States Code, and this subpart than he or she would have been entitled to receive if the unjustified or unwarranted personnel action had not occurred." Id. (alteration added).[4]

> Defendant also argues that:

> Plaintiffs cannot choose to have the Court's opinion applied only to the pay periods for which the result is favorable to them. The Court has decided that certain hours paid as AUO should have been paid as scheduled overtime. To a large extent, plaintiffs are attempting to recover the increases in scheduled overtime pay without having to return overpayments of AUO attributable to the same hours. That approach would produce an unjustified windfall and violate the regulations implementing the Back Pay Act. Id.; see also 5 C.F.R. § 550.805(b) ("No employee shall be granted more pay . . . than he or she would have been entitled to receive if the unjustified or unwarranted personnel action had not occurred.").

> Plaintiffs respond:

> First, the Government contends that, because treating the time as scheduled overtime instead of unscheduled overtime would impact the Plaintiffs' administratively uncontrollable overtime ("AUO") rates, the Government is entitled to a cumulative offset against its overtime liability. This means that, according to the Government, it is permitted to apply payments made to Plaintiffs in periods when there was no FLSA violation in order to offset, and potentially extinguish, the Government's liability to Plaintiffs in *other pay periods*. It is well-established, however, that, under the FLSA, damages are computed on a work-period basis. That means that, when there is an adjustment to the AUO rate, it can be used to offset the Government's liability in that work period, but not others. The Government's argument ignores this concept in an effort to diminish Plaintiffs' damages.

(emphasis in original). Plaintiffs continue:

---

[4] Plaintiffs note that 5 C.F.R. § 550.805(a) provides, in part: "The agency shall compute for the period covered by the corrective action the pay, allowances, and differentials the employee would have received if the unjustified or unwarranted personnel action had not occurred." 5 C.F.R. § 550.805(a) (2023).

> Second, the Government attempts to depart from FLSA caselaw even further. With no support whatsoever, the Government argues that it should be able to offset damages **across plaintiffs**. This means that, according to the Government, if one Plaintiff has been overpaid, the Government can then deduct that overpayment from the damages of **a different Plaintiff**. Damages under the FLSA, though, are calculated on an individual basis. Even assuming *arguendo* that one Plaintiff were owed a negative amount in damages, the Government does not get to lower its liability to a different Plaintiff.
>
> Finally, the Government oddly contends that it should only be required to pay liquidated damages on a fragment of the back pay damages that it agrees are owed pursuant to the Court's order. The Government, somehow, believes that because its payroll system lists only some overtime payments on the FLSA line in a leave and earnings statement, that means that only a portion of its liability is grounded in the FLSA. The Government is wrong. As this Court found, the Government failed to properly pay time-and-a-half overtime for the hours at issue in this case. The Government's behavior violates the FLSA. Simply because the Government may list the overtime amounts paid to Plaintiffs on multiple lines of a payroll system in order to reach the requisite time-and-one-half, that does not somehow change the fact that the damages at issue are FLSA damages and that the Government is liable for liquidated damages on the entire amount owed.

(emphasis in original). Instead plaintiffs suggest that

> the FLSA requires that employees be paid one and one-half times their regular rate of pay for hours above the applicable overtime threshold in each FLSA work period. See 29 U.S.C. § 207(k). Each FLSA work period must be considered individually. The Government's calculations, however, would look at the entire time period covered by this case, not only the FLSA work periods where the Court has found that there were violations. Adopting the Government's argument is directly contrary to FLSA precedent and would lead to the Plaintiffs being paid less than the amount required by the FLSA.

Plaintiffs state:

> Here, where the Plaintiffs are paid pursuant to Section 207(k) of the FLSA, the FLSA work period is two weeks, concurrent with a pay period. Plaintiffs revised the Government's damages and limited the offsets due to the AUO miscalculation to only the work periods when there were damages under the FLSA. For work periods when the offsets were larger than the damages, Plaintiffs zeroed out the damages for that period.

(internal references omitted). Plaintiffs argue

> when calculating damages under the FLSA, the damages must be calculated on the basis of each applicable pay period because that is what

the statute requires. Any other result would permit an employer to use payments from other time periods - time periods months or years removed from the obligation to pay overtime wages – to meet its FLSA obligations. The FLSA must be administered in the federal sector in a manner that is consistent with the Department of Labor's implementation of the FLSA in the private sector. See AFGE v. OPM, 821 F.2d 761, 769–70 (D.C. Cir. 1987). It is clear that if the Plaintiffs here were covered by the Department of Labor's regulations, the Government would only be able to offset the excess AUO payments against overtime liability on a work period basis. Accordingly, the Government cannot avoid or lower its liability under the FLSA by relying on payments made outside of the work periods when the Government violated the FLSA.

Plaintiffs also assert that "[f]or Plaintiffs, the FLSA work period is two weeks, concurrent with each pay period." (alteration added). Plaintiffs conclude that "in order to properly calculate the FLSA damages in this case, the amounts owed in each FLSA work period must be calculated individually with any offsets applying only within that work period. Any other result would violate the mandates of the FLSA."

The FLSA at 29 U.S.C. § 207(a)(1) provides:

Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

Id. With respect to public law enforcement personnel, such as plaintiffs, the FLSA at 29 U.S.C. § 207(k) provides:

**Employment by public agency engaged in fire protection or law enforcement activities**

No public agency shall be deemed to have violated subsection (a) with respect to the employment of any employee in fire protection activities or any employee in law enforcement activities (including security personnel in correctional institutions) if—

**(1)** in a work period of 28 consecutive days the employee receives for tours of duty which in the aggregate exceed the lesser of (A) 216 hours, or (B) the average number of hours (as determined by the Secretary pursuant to section 6(c)(3) of the Fair Labor Standards Amendments of 1974) in tours of duty of employees engaged in such activities in work periods of 28 consecutive days in calendar year 1975; or

**(2)** in the case of such an employee to whom a work period of at least 7 but less than 28 days applies, in his work period the employee receives for tours of duty which in the aggregate exceed a number of hours which bears the

19

same ratio to the number of consecutive days in his work period as 216 hours (or if lower, the number of hours referred to in clause (B) of paragraph (1)) bears to 28 days, compensation at a rate not less than one and one-half times the regular rate at which he is employed.

Id. (emphasis in original). The FLSA implementing regulation at 5 C.F.R. § 551.541 (2023) similarly provides:

(a) An employee engaged in fire protection activities or law enforcement activities (as described in §§ 551.215 and 551.216, respectively) who receives compensation for those activities under 5 U.S.C. 5545(c)(1) or (2) or 5545b, or does not meet the definition of "employee" in 5 U.S.C. 5541(2) for the purposes of 5 U.S.C. 5542, 5543, and 5544, is subject to section 7(k) of the Act and this section. (See § 551.501(a)(1) and (5)). Such an employee shall be paid at a rate equal to one and one-half times the employee's hourly regular rate of pay for those hours in a tour of duty which exceed the overtime standard for a work period specified in section 7(k) of the Act.

5 C.F.R. § 551.541.

Additionally, the FLSA at 29 U.S.C. § 207(h) provides guidance on how to calculate "Credit toward minimum wage or overtime compensation of amounts excluded from regular rate," and states:

(1) Except as provided in paragraph (2), sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 206 of this title or overtime compensation required under this section.

(2) Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) shall be creditable toward overtime compensation payable pursuant to this section.

Id. (capitalization in original). The "Extra compensation" referred to in 29 U.S.C. § 207(h)(2) is defined in 29 U.S.C. § 207(e)(5)–(7), which provides:

(5) extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day or in excess of the maximum workweek applicable to such employee under subsection (a) or in excess of the employee's normal working hours or regular working hours, as the case may be;

(6) extra compensation provided by a premium rate paid for work by the employee on Saturdays, Sundays, holidays, or regular days of rest, or on the sixth or seventh day of the workweek, where such premium rate is not less than one and one-half times the rate established in good faith for like work performed in nonovertime hours on other days;

(7) extra compensation provided by a premium rate paid to the employee, in pursuance of an applicable employment contract or collective-bargaining agreement, for work outside of the hours established in good faith by the contract or agreement as the basic, normal, or regular workday (not exceeding eight hours) or workweek (not exceeding the maximum workweek applicable to such employee under subsection (a), where such premium rate is not less than one and one-half times the rate established in good faith by the contract or agreement for like work performed during such workday or workweek[.]

29 U.S.C. § 207(e)(5)–(7) (alteration added).

Further, the FLSA implementing regulation at 29 C.F.R. § 778.104 states that the FLSA

takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks. Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the 2 weeks is 40.

29 C.F.R. § 778.104 (2023). In addition, the FLSA implementing regulation at 29 C.F.R. § 778.202(c) provides greater detail on how to "offset" erroneously paid premium pay against damages owed to prevailing plaintiffs. The regulation at 29 C.F.R. § 778.202(c) provides in full:

***Premiums for excessive daily hours.*** If an employee whose maximum hours standard is 40 hours is hired at the rate of $12 an hour and receives, as overtime compensation under his contract, $12.50 per hour for each hour actually worked in excess of 8 per day (or in excess of his normal or regular daily working hours), his employer may exclude the premium portion of the overtime rate from the employee's regular rate and credit the total of the extra 50-cent payments thus made for daily overtime hours against the overtime compensation which is due under the statute for hours in excess of 40 in that workweek. If the same contract further provided for the payment of $13 for hours in excess of 12 per day, the extra $1 payments could likewise be credited toward overtime compensation due under the Act. To qualify as overtime premiums under section 7(e)(5) of the Act, the daily overtime premium payments must be made for hours in excess of 8 hours per day or the employee's normal or regular working hours. If the normal workday is artificially divided into a "straight time" period to which one rate is assigned, followed by a so-called "overtime" period for which a higher "rate" is specified, the arrangement will be regarded as a device to contravene the statutory purposes and the premiums will be considered part of the regular rate. For a fuller discussion of this problem, see § 778.501.

29 C.F.R. § 778.202(c) (2023) (emphasis in original).

Consistent with the foregoing, the FLSA and its implementing regulations provide that damages should be calculated on the basis of each plaintiffs' workweek. See 29 U.S.C. §§ 207(e)(5)–(7), 207 (k); see also 29 C.F.R. §§ 778.202(c), 778.104. Therefore, in the above captioned case, the calculation of damages is derived from each plaintiff's "workweek" to determine how many hours a particular plaintiff worked in excess of the specified number of hours for a particular "workweek" while monitoring the duty phone. Consistent with the court's earlier trial Opinion on liability, any hours the plaintiffs worked in excess of the "workweek" are entitled to FLSA overtime.

The defendant's argument under the Back Pay Act that the AUO that plaintiffs received during the entire damages period, not just the pay periods in which there was a violation of the FLSA, must be offset against the damages owed to plaintiffs regardless of the pay period in which it was accrued, is not supported by the terms of the FLSA and its implementing regulations. On this point, the United States Court of Appeals for the Seventh Circuit's decision in Howard v. City of Springfield, Illinois, 274 F.3d 1141 (7th Cir. 2001) is instructive. The Seventh Circuit decision, with the reference to the FLSA, stated:

> As set forth above, the statute provides in relevant part that premium payments described in §§ 207(e)(5),(6), & (7) "shall be creditable towards overtime compensation payable pursuant to this section." The City maintains that it can use all premium payments made during the years in issue to offset all overtime liability, regardless of when the payments were made and when the overtime was owed. The officers seek a more narrow construction of the statute that would allow such overpayments made during a given work period to be credited against amounts due during that same work period. The courts that have addressed this issue have taken divergent views, with no consensus at this point. Compare, e.g., Abbey v. City of Jackson, 883 F. Supp. 181 (E.D. Mich. 1995) with Roland Electrical Co. v. Black, 163 F.2d 417 (4th Cir. 1947) and Nolan [v. City of Chicago], 125 F. Supp. 2d [324,] 331–33 [N.D. Ill. 2000)].[5] The district court here

---

[5] The court notes that the United States District Court for the Eastern District of Michigan's analysis in Abbey v. City of Jackson, 883 F. Supp. 181 (E.D. Mich. 1995), was not as extensive as the analysis discussed below by the United States Court of Appeals for the Seventh Circuit in Howard v. City of Springfield, Illinois, 274 F.3d 1141 and the United States Court of Appeals for the Sixth Circuit in Herman v. Fabri-Centers of America, Inc., 308 F.3d 580. Furthermore, the Sixth Circuit in Herman v. Fabri-Centers of America, Inc., discussed below, declined to follow the approach of the Abbey, and found damages must be calculated on a workweek by workweek basis. The Abbey court, did note, however, with regards to Roland Electrical Co. v. Black, 163 F.2d 417 (4th Cir. 1947),

> [i]n Roland the court said that an employer must pay overtime "promptly and when due" in order to comport with the FLSA policy of not allowing employers to compromise or settle sums due employees. Id. at 421. The import of this case is reduced significantly by the fact that § 207(e)(5) was

adopted the City's position, holding that all such premium payments could be used to offset the total liability. Because that amount exceeded the overtime owed, the court granted summary judgment for the City.

The [district] court's decision was based in part on its conclusion that if the City was restricted to using premium pay offsets only in the pay period in which they were earned, the officers would receive an undeserved windfall. We disagree. In fact, if the City were able to use premium payments in the manner contemplated by the district court, the City would be the recipient of the windfall, and in fact would be placed in a substantially better position than if it had complied with the overtime requirements of the FLSA all along. An example may help illustrate this point. If the City complied with the FLSA all along, it would have paid the overtime each pay period as it accrued. Subsequent premiums payments could not be used to reduce those overtime payments, because they would have already have been calculated and paid. For instance, a premium payment made for the Thanksgiving holiday would not be used by a conforming employer to offset overtime paid back in March. But that is precisely what the City seeks to do here. It is contrary to the language and the purpose of the statute.

The credit provision must be read in the context of the statute as a whole, which is designed to protect workers from the twin evils of excessive work hours and substandard wages. Barrentine[ v. Arkansas-Best Freight Sys., Inc.], 450 U.S. [728,] 739, 101 S. Ct. 1437 [(1981)]; Monahan v. County of Chesterfield, Virg., 95 F.3d 1263, 1267 (4th Cir. 1996). Toward that end, the statute requires the payment of time and a half for overtime work. Courts have long interpreted the FLSA as requiring that those payments be timely made. Brooklyn Savings Bank v. O'Neil, 324 U.S. 697, 703–07, 65 S. Ct. 895, 89 L. Ed. 1296 (1945); Calderon v. Witvoet, 999 F.2d 1101, 1107 (7th Cir. 1993); Rogers v. City of Troy, New York, 148 F.3d 52, 55 (2d Cir. 1998). Thus, the statute is violated even if the employer eventually pays the overtime amount that was due. See id. In fact, that requirement may not be waived, and "even the workers' enthusiastic assent to deferred payment— a form of employer—held savings account—is ineffectual." Calderon, 999 F.2d at 1107. That principle is also found at 29 C.F.R. § 778.106, which provides in relevant part:

> The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends. When the correct amount of the overtime compensation cannot be determined

_____

not added to FLSA until July, 1949, two years after Roland was handed down.

Abbey v. City of Jackson, 883 F. Supp. at 186 (alteration added).

until some time after the regular pay period, however, the requirements of the FLSA will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made.

Although that regulation is not entitled to deference, Shaw[ v. Prentice Hall Computer Pub., Inc.], 151 F.3d [640,] 642 [(7th Cir. 1998)[6]], it is nonetheless persuasive as it is consistent with the interpretation of the FLSA that the courts have reached. Therefore, under the statute, overtime generally must be calculated and paid on a pay period by pay period basis. The City, however, advocates a method of payment that would allow it to pay its

---

[6] As explained by the United States Court of Appeals for the Seventh Circuit in Shaw:

The FLSA requires a covered employer to pay time-and-a-half to employees who work more than 40 hours per week. 29 U.S.C. § 207(a)(1). But it need not do so for "bona fide executive, administrative, or professional" employees. 29 U.S.C. § 213(a)(1). The FLSA does not define these terms, but directs the Secretary of Labor to promulgate regulations doing so, and these regulations have the binding effect of law. Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S. Ct. 2399, 53 L.Ed.2d 448 (1977); Haywood v. North American Van Lines, Inc., 121 F.3d 1066, 1069 (7th Cir. 1997) (citing Batterton). The Secretary has also promulgated interpretive regulations, which serve as guides to the Secretary's view of the Act's application to various fact settings. These interpretive regulations do not have the force of binding law. Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 89 L. Ed. 124 (1944); Batterton, 432 U.S. at 425 n. 9, 97 S. Ct. 2399. The Fifth Circuit has succinctly stated how the interpretive regulations are to be used:

To the extent that a district court finds in the interpretations an analogy useful in deciding the case before it, it may rely on the interpretations as persuasive evidence both of Congress's legislative and the Secretary's regulatory intent. At the same time, should a district court find the concepts expressed inapposite to the facts before it, the court is free to engage in its own application of [the exemption] and the pertinent regulations.

Shaw v. Prentice Hall Computer Pub., Inc., 151 F.3d 640, 642 (7th Cir. 1998) (quoting Dalheim v. KDFW–TV, 918 F.2d 1220, 1228 (5th Cir. 1990) (alteration added in Shaw).

overtime obligations at a time far removed from when that overtime amount was due. That is inconsistent with the statutory requirement that overtime payments must be timely made.

The City's argument would eviscerate the protection intended by the overtime payment requirement. Consider an extreme example of the potential effects of this interpretation. An employer could require an employee to work long overtime hours without the FLSA-mandated overtime payments in one year in which the economy was depressed, thus depriving the employee of both the quality of life sought by the FLSA and the ability to supplement her income with a second job. Then, in the next year in which economic conditions are improved, the employer could pay premiums to the employee, and then use those premiums to offset the overtime liability. Or an employer engaged in the filing of tax returns could require substantial overtime in the tax season without incurring the costs of that overtime at that time, and could "pay" for that overtime with the double or triple time holiday pay in its contract for the rest of the year. In essence, the employer could manipulate the payments to suit its economic concerns. That interpretation is completely divorced from the purpose of the FLSA. Accord Nolan, 125 F. Supp. 2d at 331–33. The language of the statute provides that those premium payments are creditable "towards overtime compensation payable pursuant to this section." Because the statute contemplates that overtime will be paid and calculated on a pay period basis, it is consistent with that language to calculate and apply credits in the same manner. See also 29 C.F.R. § 778.202(c) (credits may be given for daily compensation "against the overtime compensation which is due under the statute for hours in excess of 40 *in that workweek*" [emphasis added]).

Howard v. City of Springfield, Illinois, 274 F.3d 1141, 1147–49 (7th Cir. 2001) (emphasis and last alteration in original; footnotes added).

This court observes that the United States Court of Appeals for the Federal Circuit does not appear to have defined an approach for how to offset types of premium payments such as AUO against damages for plaintiffs who prevail under the FLSA when accounting for the AUO payments, instead of the FLSA overtime payments, that a plaintiff incorrectly received. Additionally, there is a split among the United States Federal Circuit Courts which have addressed the issue of whether the FLSA allows for a cumulative offset or whether damages must be calculated on a workweek by workweek basis. See Haro v. City of Los Angeles, 745 F.3d 1249, 1255 (9th Cir. 2014) ("While the Sixth and Seventh Circuits have ruled that a week-by-week offset must be used [to offset other types of premium pay against damages owed under the FLSA], the Fifth and Eleventh Circuits have held that offsets may be applied cumulatively over longer periods of time." (alteration added)). The United States Court of Appeals for the Sixth Circuit, the United States Court of Appeals for the Seventh Circuit, and the United States Court of Appeals for the Ninth Circuit have held that when computing the offsets against FLSA damages, such offsets and damages must be calculated on a workweek by workweek basis, i.e.,

that "extra compensation provided by a premium rate" as defined in 29 U.S.C. § 207(e)(5), for overtime hours worked can only be offset against FLSA overtime incurred in the hours for the "same work period." See, e.g., Haro v. City of Los Angeles, 745 F.3d at 1260 ("[P]reviously-paid overtime should be offset using a week-by-week calculation." (alteration added)); Herman v. Fabri-Centers of Am., 308 F.3d 580, 590 (6th Cir. 2002) ("Given the silence in the statute as to when overtime compensation may be credited and the lack of an implementing regulation on this precise issue, it is perhaps not surprising that divergent case law has arisen."); Howard v. City of Springfield, Ill., 274 F.3d at 1149 ("Because the statute contemplates that overtime will be paid and calculated on a pay period basis, it is consistent with that language to calculate and apply credits in the same manner.").

In Herman v. Fabri-Centers of America, Inc., the United States Court of Appeals for the Sixth Circuit stated that the FLSA as a whole and its implementing regulations "should be interpreted to include a workweek or work period restriction." Herman v. Fabri-Ctrs. of Am., Inc., 308 F.3d at 589–90. The Sixth Circuit in Herman offered the following explanation:

> First, various provisions of the FLSA explicitly note the primacy of the workweek. See 29 U.S.C. § 207(a)(1) ("Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce . . . for a *workweek* longer than forty hours . . .") (emphasis added); 29 U.S.C. § 207(l) ("No employer shall employ any employee in domestic service . . . for a *workweek* longer than forty hours . . . .") (emphasis added); 29 U.S.C. § 207(m) ("For a period or periods of not more than fourteen *workweeks* in the aggregate in any calendar year, any employer may employ any employee [in the tobacco industry]") (emphasis added).

> In addition, the Department of Labor ("DOL") regulations implementing the Act support prompt payment of overtime, suggesting that the premiums should be credited within the same workweek in which they were paid. Specifically, 29 C.F.R. § 778.106 provides in pertinent part:

>> The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends. When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made.

> 29 C.F.R. § 778.106. See Reich v. Interstate Brands Corp., 57 F.3d 574, 576 (7th Cir. 1995) (noting the "general rule is that overtime compensation

earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends") (quoting 29 C.F.R. § 778.106); see also 29 C.F.R. § 778.103 (directing employers to pay overtime due on a weekly basis); 29 C.F.R. § 778.104 (stating that an employer cannot average the number of hours worked over two weeks in order to avoid paying overtime); 29 C.F.R. § 778.202(c) (finding that credits may be given for daily compensation "against the overtime compensation which is due under the statute for hours in excess of 40 in that workweek").

Herman v. Fabri-Ctrs. of Am., Inc., 308 F.3d at 589–90 (emphasis and alterations in original). The Sixth Circuit concluded that "the FLSA and its implementing regulations lend support to the Secretary's position that premium credits allowed by § 207(h)(2) should be limited to the same workweek or work period in which these premiums were paid." Herman v. Fabri-Ctrs. of Am., Inc., 308 F.3d at 590. As described above, in Howard v. City of Springfield, Illinois, the Seventh Circuit stated that "extra compensation provided by a premium rate paid," see 29 U.S.C. § 207(e)(5)–(7), may be offset "against the overtime compensation which is due under the statute for hours in excess of 40 hours in that workweek." Howard v. City of Springfield, Ill., 274 F.3d at 1149. The United States Court of Appeals for the Seventh Circuit in Howard concluded that under the FLSA overtime "generally must be calculated and paid on a pay period by pay period basis." See id. at 1148.

The United States Court of Appeals for the Ninth Circuit in Haro v. City of Los Angeles cited with the approval Herman v. Fabri–Centers of America, Inc., 308 F.3d 580 and Howard v. City of Springfield, 274 F.3d 1141, but noted, "[t]here is still, however, a split of authority over how to calculate offsets, and the Ninth Circuit has not yet decided the matter. The reasoning from circuits supporting a week-by-week offset is persuasive." Haro v. City of Los Angeles, 745 F.3d at 1260 (alteration added) (citing Herman v. Fabri–Centers of Am., Inc., 308 F.3d 580 and Howard v. City of Springfield, 274 F.3d 1141). Specific to the facts in Haro v. City of Los Angeles, the Ninth Circuit stated:

In their cross-motions for summary judgment, the parties presented four different calculation methods. Plaintiffs advanced one method: credits and offsets must be applied on a workweek-by-workweek basis. The City argued that credits and offsets should be viewed as a whole and applied cumulatively over the entire period for which Plaintiffs claimed the City was liable. Alternatively, the City contended that credits and offsets should be applied within the twenty-seven-day period the City had been using to calculate overtime. As a final option, the City proposed that offsets be paid on a two-week-pay-period basis. The district court agreed with Plaintiffs that credits and offsets must be applied on a workweek-by-workweek basis.

The district court correctly applied a week-by-week approach. Section 207(a) sets forth the basic overtime standard, set at forty hours in a seven-day workweek and time and one-half for overtime. To determine the overtime owed for each workweek, the total hours worked over forty is multiplied by one and one-half the regular rate. Then, under § 207(h), the overtime already paid by the employer is determined and credited against

the overtime owed. While § 207(h) does not state whether credits must be determined on a workweek basis, it must still be read within the context of the overtime due under § 207(a), which is calculated on a workweek basis. Under this reading, compensation already paid for work done within one workweek should not be transferrable and offset against overtime due in another workweek. This makes sense because Plaintiffs are owed what they should have been paid had the City obeyed the law.

Haro v. City of Los Angeles, 745 F.3d 1249, 1259–60 (9th Cir. 2014). The Ninth Circuit concluded "because the statutory language of [29 U.S.C. §] 207(h), as well as persuasive authorities, supports a workweek-by-workweek offset, we affirm the district court's holding that this method of calculation must be used." Haro v. City of Los Angeles, 745 F.3d at 1261 (alteration added).

As referenced above, other United States Courts of Appeals, specifically, the United States Court of Appeals for the Fifth Circuit and the United States Court of Appeals for the Eleventh Circuit, have determined that a cumulative offset approach should be allowed under the FLSA, which would support the defendant's approach. See Singer v. City of Waco, 324 F.3d 813, 828 (5th Cir. 2003); Kohlheim v. Glynn County, Ga., 915 F.2d 1473, 1481 (11th Cir. 1990). In Singer v. City of Waco, Texas, 324 F.3d 813, the United States Court of Appeals for the Fifth Circuit held "that the district court did not err in offsetting the overpayments paid to the fire fighters in some work periods against the shortfalls in other work periods," indicating that the FLSA, 29 U.S.C. § 207(h), allows employers to offset certain "extra compensation" that plaintiffs received during the damages period against overtime compensation due under the FLSA, but did not apply to the plaintiffs in that case. See Singer v. City of Waco, Tex., 324 F.3d at 827–28. The Fifth Circuit decision stated:

As the fire fighters themselves point out, however, [29 U.S.C.] § 207(h) does not apply in this case. Section 207(h) refers to the overtime premiums listed in § 207(e) of the FLSA. That provision refers to payments that are *not included* in determining the regular rate of pay. See 29 U.S.C. § 207(e). These overtime premiums are extra payments made by employers. These sums are excluded from the total salary (from which the regular hourly rate is calculated) so that they do not improperly inflate the hourly rate. See Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 464, 68 S. Ct. 1186, 92 L. Ed. 1502 (1948) ("If [an] overtime premium is included in the weekly pay check that must be deducted before the division . . . . To permit [the] overtime premium to enter into the computation of the regular rate would be to allow overtime premium on overtime premium—a pyramiding that Congress could not have intended."). In this case, the district court included the overpayments made to the firefighters in determining the fire fighters' regular rate of pay. The court did not treat the overpayments as "overtime premiums." Therefore, § 207(h), and the cases interpreting it, are inapplicable.

Singer v. City of Waco, Tex., 324 F.3d at 827–28 (first alteration added; footnotes and internal references omitted; emphasis in original).

In Kohlheim v. Glynn County, the United States Court of Appeals for the Eleventh Circuit stated that "[t]he FLSA mandates that 'extra' compensation paid by an employer be credited toward overtime compensation due." Kohlheim v. Glynn County, Ga., 915 F.2d at 1481 (alteration added). The Eleventh Circuit held "that the county should be allowed to set-off all previously paid overtime premiums," (emphasis in original), "against overtime compensation found to be due and owing." Id. The Eleventh Circuit in Kohlheim v. Glynn County did not reference supporting citations, either to the statutory language or to caselaw, to support its decision to allow a cumulative offset of "extra compensation" that plaintiffs received during the damages period rather than calculating the damages on a work period by work period basis. See id.; see also Haro v. City of Los Angeles, 745 F.3d at 1260 ("[T]he Eleventh Circuit held that previously-paid overtime can be cumulatively offset against the damages calculated. Yet the court summarily decided the issue, citing no supporting authority." (alteration added)).

In the case currently before the court, with respect to the split in authority regarding the offset of premium payments against FLSA damages, the court finds that the approach taken by the United States Court of Appeals for the Sixth Circuit, the United States Court of Appeals for the Seventh Circuit, and the United States Court of Appeals for the Ninth Circuit, calculating damages owed to plaintiffs on a workweek by workweek basis, is consistent with the language of the FLSA and its implementing regulations. See 29 U.S.C. § 207; 29 C.F.R. § 778.104; 29 C.F.R. § 778.202(c). As noted above by the Sixth Circuit in Herman v. Fabri-Centers of America, Inc., the FLSA includes multiple indications of the "primacy of the workweek." Herman v. Fabri-Ctrs. of Am., Inc., 308 F.3d at 589 (citing 29 U.S.C. § 207(a)(1); 29 U.S.C. § 207(l); 29 U.S.C. § 207(m)); see also Haro v. City of Los Angeles, 745 F.3d at 1261 ("because the statutory language of [29 U.S.C. §] 207(h), as well as persuasive authorities, supports a workweek-by-workweek offset, we affirm the district court's holding that this method of calculation must be used" (alteration added)); Howard v. City of Springfield, Illinois, 274 F.3d at 1149 ("The language of the statute provides that those premium payments are creditable 'towards overtime compensation payable pursuant to this section.' Because the statute contemplates that overtime will be paid and calculated on a pay period basis, it is consistent with that language to calculate and apply credits in the same manner. See also 29 C.F.R. § 778.202(c) (credits may be given for daily compensation 'against the overtime compensation which is due under the statute for hours in excess of 40 in that workweek' [emphasis added]).") (emphasis added in Howard v. City of Springfield, Illinois).

This court does not find the approach taken by the Eleventh Circuit in Kohlheim v. Glynn County, 915 F.2d 1473, to be persuasive because, as noted by the Ninth Circuit in Haro v. City of Los Angeles, "the Eleventh Circuit's held that previously-paid overtime can be cumulatively offset against the damages calculated. Yet the court summarily decided the issue, citing no supporting authority." Haro v. City of Los Angeles, 745 F.3d at 1260. The Fifth Circuit decision in Singer v. City of Waco, Texas, 324 F.3d 813, noted that "Section 207(h) refers to the overtime premiums listed in § 207(e) of the FLSA," and

specifically found "§ 207(h), and the cases interpreting it, are inapplicable," and, therefore, does not provide guidance to the above captioned case.

Although there were subtle distinctions between the decisions in Herman v. Fabri-Centers of America, Inc., Howard v. City of Springfield, Illinois, and Haro v. City of Los Angeles, all three of these United States Federal Circuit Courts' decisions concluded that in the context of the FLSA, damages should be calculated on a workweek basis. The court finds, therefore, that given the language of the FLSA and its implementing regulations, that when evaluating the damages in the case of an FLSA violation, the "workweek" is the appropriate unit of measure for calculating compensation owed to employees and, therefore, to the applicable calculation of damages owed to plaintiffs in the case currently before the court. Therefore, when calculating the offset of the excess premium payments, as defined at 29 U.S.C. §§ 207(h)(2), (e)(5)–(7), the offset is calculated on a workweek to workweek basis. A cumulative offset of all AUO within the damages period as suggested by defendant "that only the net difference between compensation owed and compensation received is recoverable," is not the appropriate approach in the above captioned case. Consistent with the FLSA, the court adopts the approach proposed by plaintiffs, who suggested in their brief that "in order to properly calculate the FLSA damages in this case, the amounts owed in each FLSA work period must be calculated individually with any offsets applying only within that work period. Any other result would violate the mandates of the FLSA."[7]

Liquidated Damages

As indicated in the court's earlier trial Opinion on liability,

[a]n employer "who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."

Cheung v. United States, 157 Fed. Cl. at 557 (alteration added) (quoting 29 U.S.C. § 207(a)(1)). The court continued:

The statute at 29 U.S.C. § 260 (2018) clarifies the limitations of [29 U.S.C.] § 216:

[I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he [or she] had reasonable grounds for believing that his [or her] act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award

---

[7] The court notes that in the parties' most recent joint status report before briefing the damages issues, the plaintiffs indicated: "Once this legal issue is determined, Plaintiffs believe that the parties will be able to stipulate to damages, as Plaintiffs had no other objections to Defendant's calculation methodology."

any amount thereof not to exceed the amount specified in section 216 of this title.

Cheung v. United States, 157 Fed. Cl. at 557 (first alteration added) (quoting 29 U.S.C. § 260).

With respect to the first factor, of whether the agency's "action was in good faith," 29 U.S.C. § 260, in the earlier trial Opinion on liability, this court determined:

One of the supervisors at the St. Paul Office did make minimal efforts to go through the proper channels to "'ascertain the dictates of the FLSA and then act to comply with them.'" Id. [Shea v. United States, 976 F.3d at 1297] Despite plaintiffs' assertion, defendant did "nothing" to determine whether plaintiffs were being properly compensated for the time spent on-call is not entirely true, however, the question was what defendant did enough. The supervisors also sought guidance from the ICE-provided Premium Pay Guide for questions, but apparently remained uncertain about what was required. The supervisors apparently periodically sought out [Agency attorney] Mr. Braunstein, who was incorrect in his analysis that plaintiffs should be paid AUO for time spent actively working while on-call monitoring the duty phone, as determined by the court. Mr. Braunstein's analysis does not appear to rely on caselaw or statutes, however. Supervisor Skwira testified that she did contact Mr. Braunstein, and Joint Exhibit 20 reveals that so as did her Supervisor, Mr. Havrilesko, but Mr. Braunstein apparently became somewhat unresponsive. Both Supervisor Skwira and her supervisor took Mr. Braunstein's word without question and did not ask for follow-up information on the "level of restriction." Plaintiffs' supervisors were reasonable to try to rely on the "Employee and Labor Relations Specialist" hired by ICE for this specific purpose, however it was done without follow-up and without a lot of effort. The record before the court reflects minimal efforts to distinguish between AUO and one and one-half compensation. If the supervisors had looked to the FLSA, and specifically 5 U.S.C. § 5545(c)(2), the supervisors would have noted that plaintiffs' duty to monitor the duty phone, regulated by shifts scheduled in advance, were not subject to AUO compensation because plaintiffs' shifts were scheduled one month, or more, in advance according to the testimony at trial and plaintiffs are not required to be on duty without supervision. Defendant in the Minneapolis St. Paul ICE Office should have done more to determine the appropriate compensation for plaintiffs when monitoring the duty phone and, therefore, failed to act in good faith.

Cheung v. United States, 157 Fed. Cl. at 562 (alterations added). The court continued:

The second factor of the inquiry is whether defendant had "reasonable grounds for believing that his [or her] act or omission was not a violation of the Fair Labor Standards Act of 1938." See 29 U.S.C. § 260 (brackets added); see also Shea v. United States, 976 F.3d at 1297. As noted above, the court found that the language of the relevant regulation that plaintiffs

were reasonably found to be on-call based on the plain language of the regulation at 5 C.F.R. § 551.431:

> (b) An employee will be considered off duty and time spent in an on-call status shall not be considered hours of work if:
> (1) The employee is allowed to leave a telephone number or to carry an electronic device for the purpose of being contacted, even though the employee is required to remain within a reasonable call-back radius; or
> (2) The employee is allowed to make arrangements such that any work which may arise during the on-call period will be performed by another person.

5 C.F.R. § 551.431(b)(1)-(2). The court also found that the language of the statute determining whether an employee is entitled to AUO indicates that AUO compensation is for "an employee in a position in which the hours of duty cannot be controlled administratively, and which requires substantial amounts of irregular, unscheduled overtime duty with the employee generally being responsible for recognizing, without supervision, circumstances which require the employee to remain on duty." 5 U.S.C. § 5545(c)(2). Additionally, the regulations elaborate on the statute, defining what is regular and what is irregular overtime: "*Regular overtime work* means overtime work that is part of an employee's regularly scheduled administrative workweek;" and "*Irregular or occasional overtime work* means overtime work that is not part of an employee's regularly scheduled administrative workweek." 5 C.F.R. § 550.103 (emphases in original). The court has found this language to be clear that plaintiffs' obligation to monitor the duty phone in shifts scheduled at least one month in advance is regular overtime work, not subject to AUO compensation. If the defendant-supervisors had received training on, or regularly consulted, the relevant provisions of the statutes and regulations, rather than relying mostly on a summary Guide and a single email chain in the record, and more diligently pursued getting to the correct answer, defendant would have realized that plaintiffs should have been classified in on-call status and should have been receiving one and one-half pay for the time they spent monitoring the duty phone. Defendant's efforts to determine whether plaintiffs were subject to AUO compensation or regular overtime compensation were insufficient. Plaintiffs have proven that ICE did not demonstrate to the satisfaction of the court that the act or omission which gave rise to the decisions would meet the good faith test and that there were reasonable grounds for believing that the omission was not a violation of the Fair Labor Standards Act of 1938. See 29 U.S.C. § 260 (brackets added). Liquidated damages in the amount of double the actual damages are appropriate for the named plaintiffs for the period at issue in this case.

Cheung v. United States, 157 Fed. Cl. 508, 562–63.

Regarding the payment of liquidated damages, defendant now asserts that

plaintiffs' effort to now re-characterize their Title 5 scheduled overtime claim as a FLSA claim appears to create an issue regarding how to apply the Court's liquidated damages award. As reflected by Figures 2 through 6 in Mr. Bosco's [defendant's expert] report, the portion of the net underpayment that is attributable to the FLSA—*i.e.*, the portion that would appear on the FLSA line of plaintiffs' earnings statements and would not have been paid to them had they been classified as exempt from the FLSA's overtime requirements—totals only $1,281.55 (net for all five plaintiffs).

Plaintiffs respond:

The Government bizarrely contends that it owes liquidated damages only on the portion of damages that the Government's payroll system lists on the "FLSA line of plaintiffs' earnings statement." The Government's argument is directly contrary to the FLSA. The FLSA requires that Plaintiffs be paid one and one-half times their regular rate of pay for all hours worked above the applicable threshold. 29 U.S.C. § 207(a).

(emphasis in original; internal reference omitted). Plaintiffs continue:

The Government attempts to use the fact that Plaintiffs' overtime payments are found in multiple lines of their payroll to somehow avoid liquidated damages on the full amount of damages. The Government, though, has identified damages, even using its flawed methodology of nearly $7,500. The Government, though, claims that only $1,281.55 is available as liquidated damages. The Government is wrong.

(internal references omitted). Plaintiffs further indicate that

[t]he Court here found that the Government violated the FLSA by failing to pay one and one-half times the employees' regular rate for regularly scheduled overtime spent responding to duty phone calls. The entirety of the difference between the overtime paid for those hours and the amount that should have been paid for those hours are FLSA damages.

(alteration added; internal reference omitted).

Regarding liquidated damages, defendant's reply brief only repeats "with respect to liquidated damages, we explained in our opening brief that Count II of the complaint— the count plaintiffs partially succeeded on—plainly asserts a violation of Title 5, not the FLSA."

As repeatedly held in the court's Opinion on liability and in this Opinion, the FLSA, and not the Back Pay Act is the correct framework for plaintiffs' damages. Pursuant to the FLSA at 29 U.S.C. § 207(a),

> no employer shall employ any of his employees who in any workweek is
> engaged in commerce or in the production of goods for commerce, or is
> employed in an enterprise engaged in commerce or in the production of
> goods for commerce, for a workweek longer than forty hours unless such
> employee receives compensation for his employment in excess of the hours
> above specified at a rate not less than one and one-half times the regular
> rate at which he is employed.

29 U.S.C. § 207(a). As indicated repeatedly above, the court found in its earlier trial
Opinion on liability, these five plaintiffs "were being improperly paid for the time spent on-
call monitoring the duty phone because they were receiving AUO pay instead of the
correct type of compensation, one and one-half pay, for the overtime spent actively
working while on-call. See 29 U.S.C. § 207(a)(1)." Cheung v. United States, 157 Fed. Cl.
at 557.

There is no provision for defendant's approach of allowing only "the portion of the
net underpayment that is attributable to the FLSA—*i.e.*, the portion that would appear on
the FLSA line of plaintiffs' earnings statements and would not have been paid to them
had they been classified as exempt from the FLSA's overtime requirements." Further,
defendant cites no case, statute, or regulation for its "net underpayment" approach.
Finally, there is no provision in the Back Pay Act for liquidated damages, so the only
approach to calculate liquidated damages is from the framework of the FLSA.

As explained above, in the court's earlier trial Opinion on liability, the court
concluded that the named plaintiffs established that "ICE did not demonstrate to the
satisfaction of the court that the act or omission which gave rise to the decisions would
meet the good faith test and that there were reasonable grounds for believing that the
omission was not a violation of the Fair Labor Standards Act of 1938." Therefore, the
court determined: "Liquidated damages in the amount of double the actual damages are
appropriate for the named plaintiffs for the period at issue in this case." See Cheung v.
United States, 157 Fed. Cl. at 563. Consistent with the framework in the FLSA, and the
court's earlier determinations, the court adopts plaintiffs' approach to liquidated damages,
i.e., that the "entirety of the difference between the overtime paid for those hours and the
amount that should have been paid for those hours are FLSA damages."

Plaintiffs' Attorneys' Fees Request

Plaintiffs argue, citing Almanza v. United States, 135 Fed. Cl. 645, 648 (2018), that
they are entitled to reasonable attorneys' fees because "where an employee prevails on
a [sic] FLSA claim, the award of attorneys' fees under [29 U.S.C.] § 216(b) is mandatory."
(alterations added). See also Slugocki v. United States, 816 F.2d 1572, 1579 (Fed. Cir.)
(citing Beebe v. United States, 226 Ct. Cl. 308, 328, 640 F.2d 1283, 1295 (1981)), cert.
denied, 484 U.S. 976 (1987). Plaintiffs state that "[t]he total attorney's fees and costs
incurred by McGillivary Steele Elkin LLP (f/n/a [formerly known as] Woodley & McGillivary

LLP) in furtherance of the claims asserted in this case, using the <u>Laffey</u> matrix[8] rates, are $706,899.60." (alterations and footnote added). Plaintiffs continue:

> In this case, plaintiffs are unquestionably the prevailing party with respect to the FLSA claims. Indeed, the Court found the defendant violated the FLSA when it failed to compensate plaintiffs at time-and-one-half by compensating the plaintiffs with AUO instead of time-and-one-half overtime. While the Court did not find that the entire duty phone shift was standby entitling the plaintiffs to FLSA overtime for the entire shift, the Court did find significant FLSA violations in the way the plaintiffs were compensated during the duty phone shift. In addition, the plaintiffs are the prevailing party with respect to the Court's finding that the plaintiffs are entitled to liquidated damages as the government could not demonstrate that it acted reasonably or in good faith.

(internal references omitted).

Defendant has not objected to an award of attorneys' fees, but, as discussed above, argues that the attorneys' fees should be governed by the Back Pay Act. Under which attorneys' fees are awarded at the discretion of the court, rather than the FLSA, which makes the award of attorneys' fees mandatory for the prevailing party. Defendant states, therefore, that "the first determination should be whether the proper basis for plaintiffs' forthcoming fee request is the FLSA, the Back Pay Act, or some combination of the two." Defendant also argues that "[u]nder either statute [the FLSA or the Back Pay Act], only reasonable attorney fees are recoverable." (alterations added). Regarding the statutory framework that governs attorneys' fees, in the earlier trial Opinion on liability, the court stated:

> In their complaint, plaintiffs also request attorneys' fees and costs. In their post-trial submissions, defendant did not address plaintiffs' request for attorneys' fees.[9] The statute governing attorneys' fees, which also governs the liquidated damages, addressed above, states in relevant part: "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). "Courts have held where an employee prevails on a FLSA claim, the award of attorneys' fees under § 216(b) is mandatory." <u>Slugocki v. United States</u>, 816 F.2d at 1579 (citing <u>Beebe v. United States</u>, 226 Ct. Cl. 308, 640 F.2d 1283 (1981)); <u>see also</u> <u>Shea v. United States</u>, 154 Fed. Cl. 1, 4 (2021). "[P]laintiffs are only entitled to recover attorneys' fees to the extent of plaintiffs' success at trial." <u>Bull v. United States</u>, 68 Fed. Cl. 212, 229 (2005). Although the United States Supreme Court was examining attorney fees in the context of the Civil Rights Attorney's Fees Awards Act, the Supreme Court stated that if

---

[8] The court defines and addresses the "<u>Laffey</u> Matrix" below.

[9] Following the court's earlier trial Opinion on liability, the parties now have submitted supplemental briefs in which they further addressed the specific calculation issues regarding damages and attorneys' fees.

a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, the most critical factor is the degree of success obtained.

Hensley v. Eckerhart, 461 U.S. 424, 436, 103 S. Ct. 1933, 1941 (1983); see also Beebe v. United States, 226 Ct. Cl. at 329, 640 F.2d 1283 (citing Rau v. Darling's Drug Store, Inc., 388 F. Supp. 877 (W.D. Pa. 1975)) ("The amount to be allowed as attorneys' fees shall be determined by the trial division on remand, taking into account various pertinent factors."). "'Factors to be considered in arriving at a fair award for attorney's fees are: the amount of the overtime compensation award, the nature and complexity of the issues involved, and the efforts of the [p]laintiff's counsel in obtaining the award.'" Shea v. United States, 154 Fed. Cl. at 4 (alterations in original) (quoting Rau v. Darling's Drug Store, Inc., 388 F. Supp. at 887).

Cheung v. United States, 157 Fed. Cl. at 563 (alterations in original; footnote added). While defendant argues that the Back Pay Act should control attorneys' fees because it was included in plaintiffs' complaint and because plaintiffs were federal employees at the time that the damages were accrued, the court explicitly stated in its earlier trial Opinion on liability that the FLSA is "[t]he statute governing attorneys' fees, which also governs the liquidated damages." Cheung v. United States, 157 Fed. Cl. at 563 (citing the FLSA at 29 U.S.C. § 216(b)). Therefore, the award of attorneys' fees in connection with plaintiffs' award of damages under the FLSA in the above captioned case is governed by the FLSA. See id.; see also 29 U.S.C. § 216(b).

As indicated above, the court concludes that any award of attorneys' fees should be made pursuant to the FLSA, and rejects award pursuant to the Back Pay Act. Although the analysis below is focused on the award of attorneys' fees under the FLSA, given the trial testimony, exhibits, and considering the parties' arguments, the court notes that, in the absence of an award of attorneys' fees under the FLSA, the court also would have awarded plaintiffs attorneys' fees and costs under the Back Pay Act, as applicable.[10]

---

[10] As explained by another Judge of the United States Court of Federal Claims

There are two possible statutory bases for an award of attorneys' fees in this case. The first is contained in the Back Pay Act. That Act provides, in pertinent part, that:

An employee of an agency who, on the basis of a timely appeal or an administrative determination . . . is found by appropriate

Regarding attorneys' fees and costs, the United States Supreme Court has stated:

This Court's "'basic point of reference' when considering the award of attorney's fees is the bedrock principle known as the '"American Rule"': Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." Hardt v. Reliance Standard Life Ins. Co., 560 U.S. 242, 252–53, 130 S. Ct. 2149, 176 L. Ed. 2d 998 (2010) (quoting Ruckelshaus v. Sierra Club, 463 U.S. 680, 683, 103 S. Ct. 3274, 77 L. Ed. 2d 938 (1983)). The American Rule has "roots in our common law reaching back to at least the 18th century." Baker Botts, 576 U.S., [121, 126], 135 S. Ct., at 2164 (citing Arcambel v. Wiseman, 3 Dall. 306, 1 L. Ed. 613 (1796)); see also Summit Valley Industries, Inc. v. Carpenters, 456 U.S. 717, 721, 102 S. Ct. 2112, 72 L. Ed. 2d 511 (1982) (observing that the American Rule "has been consistently followed for almost 200 years"); Alyeska Pipeline, 421 U.S. [247,] 257 [(1975)], 95 S. Ct. 1612 (referring to the presumption against shifting attorney's fees as a "general" rule).

---

authority under applicable law . . . to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay . . . of the employee . . . is entitled, on correction of the personnel action, to receive for the period for which the personnel action was in effect . . . reasonable attorney fees related to the personnel action.

5 U.S.C. § 5596(b)(1) (2012).

Although the Back Pay Act "does not explicitly include a requirement that the party claiming attorney's fees be a prevailing party," it "incorporate[s] by reference the 'standards established under [5 U.S.C. §] 7701(g),' and section 7701(g) includes a prevailing party requirement." Sacco v. United States, 452 F.3d 1305, 1309 (Fed. Cir. 2006) (quoting 5 U.S.C. § 5596(b)(1)(A)(ii)).

The second statutory basis for an award of fees in this case is § 216(b) of the FLSA. It provides that "[t]he court . . . shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant." 29 U.S.C. § 216(b). The Federal Circuit has held that "where an employee prevails on a FLSA claim, the award of attorneys' fees under § 216(b) is mandatory." See Slugocki v. United States, 816 F.2d 1572, 1579 (Fed. Cir. 1987) (citing Beebe v. United States, 226 Ct. Cl. 308, 640 F.2d 1283 (1981)).

Almanza v. United States, 135 Fed. Cl. at 648 (alteration and omissions in original).

Peter v. Nantkwest, Inc., 140 S. Ct. 365, 370–71 (2019) (alteration added); see also Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Res., 532 U.S. 598, 602 (2001) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. at 247 ("In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser."); Dellew Corp. v. United States, 855 F.3d 1375, 1379 (Fed. Cir. 2017) (citing Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Res., 532 U.S. at 602) ("Described as the 'American Rule,' that practice proscribes an award of attorney fees unless otherwise provided by statute. Absent a waiver of sovereign immunity, a party may not recover attorney fees in suits against the Government.") (citation omitted); Nilssen v. Osfam Sylvania, Inc., 528 F.3d 1352, 1357 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Arcambel v. Wiseman, 3 U.S. (Dall.) 306 (1796). "Absent statute or enforceable contract, litigants pay their own attorney's fees." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. at 257 (citations omitted). This has come to be known as the "American Rule," and the only exceptions to this rule are those created by Congress and a small group of common law equitable exceptions which federal courts lack the power to enlarge. See id. at 269; Parker v. United States, 137 Fed. Cl. 604, 608 (2018) ("Our legal system largely adheres to the 'American Rule,' whereby each party to a lawsuit bears its own attorneys' fees regardless of the outcome"). The Supreme Court in Alyeska noted the equitable exceptions of (1) willful disobedience of a court order, (2) bad faith on the part of a losing party, and (3) the common fund or common benefit exception allowing recovery of costs when the prevailing party is a trustee of property or is a party preserving or recovering a fund for the benefit of others in addition to himself. See id. at 257–59.

In addition, litigants seeking to recoup litigation expenses from the United States also face the barrier of overcoming sovereign immunity. See Nilssen v. Osfam Sylvania, Inc., 528 F.3d at 1357; see also Chiu v. United States, 948 F.2d 711, 714 (Fed. Cir. 1991); Gavette v. Office of Pers. Mgmt., 808 F.2d 1456, 1460 (Fed. Cir. 1986); Griffin & Dickson v. United States, 21 Cl. Ct. 1, 4 (1990). "[T]he traditional principle that the Government's consent to be sued 'must be "construed strictly in favor of the sovereign . . . .""' United States v. Nordic Vill., 503 U.S. 30, 34 (1992) (alterations in original) (quoting Ruckelshaus v. Sierra Club, 463 U.S. at 685 (quoting McMahon v. United States, 342 U.S. 25, 27 (1951))); see also Ardestani v. I.N.S., 502 U.S. 129, 137 (1991). Only a statutory directive waiving immunity can make the United States potentially liable in suit. See Lane v. Pena, 518 U.S. 187, 192 (1996); United States v. Testan, 424 U.S. 392, 399 (1976); Soriano v. United States, 352 U.S. 270, 276 (1957).

With respect to statutory authorization which waives sovereign immunity for attorneys' fees, the FLSA provides:

> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) or 218d of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) or 218d of this title, including without limitation employment, reinstatement, promotion, and

the payment of wages lost and an additional equal amount as liquidated damages. Any employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages. An action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.

29 U.S.C. § 216(b). "Under the FLSA, courts can award actual and liquidated damages, reasonable attorney's fees, and costs." Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 745 (1981). The United States Court of Appeals for the Federal Circuit has stated

[t]he FLSA provides such authorization in 29 U.S.C. § 216(b), which states 'the court . . . shall, in addition to any judgment awarded to plaintiff or plaintiffs, allow reasonable attorneys' fees to be paid by the defendant . . . .'[11] Courts have held that where an employee prevails on a FLSA claim, the award of attorneys' fees under § 216(b) is mandatory.

Slugocki v. United States, 816 F.2d at 1579 (omissions in original; footnote added) (citing Beebe v. United States, 226 Ct. Cl. at 328, 640 F.2d at 1295); see also Shea v. United States, 154 Fed. Cl. 1, 4 (2021) ("'[W]here an employee prevails on a FLSA claim, the award of attorneys' fees under § 216(b) is mandatory.'" (alteration in original) (quoting Slugocki v. United States, 816 F.2d at 1579 (citing Beebe v. United States, 226 Ct. Cl. 308, 640 F.2d 1283))); Parker v. United States, 137 Fed. Cl. at 608 ("[U]nder 29 U.S.C. § 216(b) of FLSA, which establishes overtime pay and other standards affecting government employees, a court may award reasonable attorneys' fees and costs to the prevailing party" (alteration added) (citing Barrentine v. Arkansas-Best Freight Sys., 450 U.S. at 745)).

Addressing the role of the trial court to determine the amount of attorneys' fees to be awarded in an appropriate case by Judges of the United States Court of Federal Claims, guidance can be gleaned from the United States Supreme Court, the United States Court of Appeals for the Federal Circuit, other United States Federal Circuit Courts, the United States Court of Claims, trial judges in the United States District Courts and

---

[11] As noted above, 29 U.S.C. § 216(b) states: "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b).

fellow judges in the United States Court of Federal Claims. The United States Supreme Court provided the guidance, in the context of the Equal Access to Justice Act:

> There is no precise rule or formula for making these determinations [for fee awards]. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment.

Hensley v. Eckerhart, 461 U.S. 424, 436–37 (1983) (alteration added); see also Smith v. McDonough, 995 F.3d 1338, 1345 (Fed. Cir. 2021); Hubbard v. United States, 480 F.3d 1327, 1332–33 (Fed. Cir. 2007) (quoting Hensley v. Eckerhart, 461 U.S. at 436–37); Shea v. United States, 154 Fed. Cl. at 7 (quoting Hensley v. Eckerhart, 461 U.S. at 436–37). "The amount to be allowed as attorneys' fees shall be determined by the trial division on remand, taking into account various pertinent factors." Beebe v. United States, 226 Ct. Cl. at 329, 640 F.2d 1283 (alteration in original) (citing Rau v. Darling's Drug Store, Inc., 388 F. Supp. 877 (W.D. Pa. 1975)).

"Generally, in determining the amount of reasonable attorneys' fees to award under federal fee-shifting statutes, the district court is afforded considerable discretion. This deference results from 'the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.'" Bywaters v. United States, 670 F.3d 1221, 1228 (Fed. Cir.), reh'g denied, 684 F.3d 1295 (Fed. Cir. 2012) (internal citation omitted) (citing Hensley v. Eckerhart, 461 U.S. at 437); see also Comm'r, I.N.S. v. Jean, 496 U.S. at 161 (quoting Hensley v. Eckerhart, 461 U.S. at 437) ("In Hensley, we emphasized that it is appropriate to allow the district court discretion to determine the amount of a fee award, given its 'superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.'"). This guidance is applicable to decisions by the Judges of the United States Court of Federal Claims as well. See Bradley v. United States, 164 Fed. Cl. 236, 247 (2023), appeal dismissed, No. 2023-1707, 2023 WL 4930847 (Fed. Cir. Aug. 2, 2023).

With respect specifically to an award of attorneys' fees under the FLSA: "While reasonable attorneys' fees are permitted under the FLSA, Congress does not actually define reasonableness in the statute. The United States Court of Appeals for the Federal Circuit, however, often considers factors outlined in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974),[12] to determine the reasonableness of

---

[12] The court notes that the United States Court of Appeals for the Fifth Circuit's decision in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 was abrogated by the United States Supreme Court in Blanchard v. Bergeron, 489 U.S. 87 (1989). The United States Supreme Court in Blanchard explained:

> Petitioner Arthur J. Blanchard brought suit in the United States District Court for the Western District of Louisiana alleging violations of his civil rights under 42 U.S.C. § 1983. Blanchard asserted that he was beaten by Sheriff's Deputy James Bergeron while he was in Oudrey's Odyssey Lounge.

_____

Blanchard brought his claim against the deputy, the sheriff, and the St. Martin Parish Sheriff's Department. He also joined with his civil rights claim a state-law negligence claim against the above defendants and against the owners and a manager of the lounge and the lounge itself. The case was tried and a jury awarded Blanchard compensatory damages in the amount of $5,000 and punitive damages in the amount of $5,000 on his § 1983 claim. Under the provisions of 42 U.S.C. § 1988, which permit the award of attorney's fees to a prevailing party in certain federal civil rights actions, Blanchard sought attorney's fees and costs totaling more than $40,000. The District Court, after reviewing the billing and cost records furnished by counsel, awarded $7,500 in attorney's fees and $886.92 for costs and expenses.

Petitioner appealed this award to the Court of Appeals for the Fifth Circuit, seeking to increase the award. The Court of Appeals, however, reduced the award because petitioner had entered into a contingent-fee arrangement with his lawyer, under which the attorney was to receive 40% of any damages awarded should petitioner prevail in his suit. While recognizing that other Circuits had different views, the court held that it was bound by its prior decision in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 718 (1974), to rule that the contingency-fee agreement "serves as a cap on the amount of attorney's fee to be awarded." 831 F.2d 563, 564 (CA5 1987). The court further found that hours billed for the time of law clerks and paralegals were not compensable since they would be included within the contingency fee. Ibid. Accordingly, the court limited the fee award to 40% of the $10,000 damages award-$4,000.

Because other Courts of Appeals have concluded that a § 1988 fee award should not be limited by a contingent-fee agreement between the attorney and his client we granted certiorari to resolve the conflict, 487 U.S. 1217, 108 S. Ct. 2869, 101 L. Ed. 2d 904 (1988). We now reverse.

Blanchard v. Bergeron, 489 U.S. at 88–90 (footnotes omitted). The Supreme Court noted that

[i]n many past cases considering the award of attorney's fees under § 1988, we have turned our attention to Johnson v. Georgia Highway Express, Inc., supra, a case decided before the enactment of the Civil Rights Attorney's Fee Award Act of 1976. As we stated in Hensley v. Eckerhart, 461 U.S. 424, 429-431, 103 S. Ct. 1933, 1938, 76 L.Ed.2d 40 (1983), Johnson provides guidance to Congress' intent because both the House and Senate Reports refer to the 12 factors set forth in Johnson for assessing the reasonableness of an attorney's fee award. The Senate Report, in particular, refers to three District Court decisions that "correctly applied" the 12 factors laid out in Johnson.

attorneys' fees." <u>Parker v. United States</u>, 137 Fed. Cl. at 608 (citing <u>Electro-Mechanical Indus. v. Universal Support Sys.</u>, 359 F. App'x 160, 166 (Fed. Cir. 2009); <u>Cook v. United States</u>, 855 F.2d 848, 851–52 (Fed. Cir. 1988)) <u>see</u> <u>also</u> <u>Bywaters v. United States</u>, 670 F.3d 1221, 1229 (Fed. Cir. 2012); <u>Shea v. United States</u>, 154 Fed. Cl. at 4. With respect to claims brought pursuant to the FLSA, a Judge of this court has stated that "'[f]actors to

<u>Blanchard v. Bergeron</u>, 489 U.S. at 91–92 (footnotes omitted; alteration added). The Supreme Court held

> The <u>Johnson</u> contingency-fee factor is simply that, a factor. The presence of a pre-existing fee agreement may aid in determining reasonableness. "'The fee quoted to the client or the percentage of the recovery agreed to is helpful in demonstrating attorney's fee expectations when he accepted the case.'" <u>Pennsylvania v. Delaware Valley Citizens' Council for Clean Air</u>, 483 U.S. 711, 723, 107 S. Ct. 3078, 3085, 97 L. Ed. 2d 585 (1987) quoting <u>Johnson</u>, 488 F.2d, at 718. But as we see it, a contingent-fee contract does not impose an automatic ceiling on an award of attorney's fees, and to hold otherwise would be inconsistent with the statute and its policy and purpose.

<u>Blanchard v. Bergeron</u>, 489 U.S. at 93. The Supreme Court continued

> <u>Hensley v. Eckerhart,</u> 461 U.S. 424, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983), directed lower courts to make an initial estimate of reasonable attorney's fees by applying prevailing billing rates to the hours reasonably expended on successful claims. And we have said repeatedly that "[t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." <u>Blum v. Stenson</u>, 465 U.S. 886, 888, 104 S. Ct. 1541, 1544, 79 L. Ed. 2d 891 (1984). The courts may then adjust this lodestar calculation by other factors. We have never suggested that a different approach is to be followed in cases where the prevailing party and his (or her) attorney have executed a contingent-fee agreement. To the contrary, in <u>Hensley</u> and in subsequent cases, we have adopted the lodestar approach as the centerpiece of attorney's fee awards. The <u>Johnson</u> factors may be relevant in adjusting the lodestar amount, but no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of the number of hours expended on the litigation. In <u>Blum</u>, we rejected, as contrary to congressional intent, the notion that fees are to be calculated on a cost-based standard. Further, as we said in <u>Blum</u>, "Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization." 465 U.S., at 894, 104 S. Ct., at 1547. That a nonprofit legal services organization may contractually have agreed not to charge <i>any</i> fee of a civil rights plaintiff does not preclude the award of a reasonable fee to a prevailing party in a § 1983 action, calculated in the usual way.

<u>Blanchard v. Bergeron</u>, 489 U.S. 87, 94–95 (emphasis and alteration in original).

be considered in arriving at a fair award for attorney's fees are: the amount of the overtime compensation award, the nature and complexity of the issues involved, and the efforts of the [p]laintiff's counsel in obtaining the award.'" Shea v. United States, 154 Fed. Cl. at 4 (second alteration in original) (quoting Rau v. Darling's Drug Store, 388 F. Supp. at 887); see also Parker v. United States, 137 Fed. Cl. at 608 ("The factors include, but are not limited to, the time and labor required; the novelty and difficulty of the questions; the skill requisite to adequately perform the legal service; the customary fee; and the amount involved in the results obtained").

A Judge of the United States Court of Federal Claims has stated that

[t]he party seeking attorneys' fees bears the burden of showing that the requested amount is reasonable; counsel is also expected to exercise "billing judgment" when maintaining records. Hensley, 461 U.S. at 437, 103 S. Ct. 1933. An attorney's billing records should be kept in a manner that will allow a reviewing court to understand and identify distinct claims within reason. Id. Courts do not require excessive detail in record keeping, but counsel should adequately identify the subject matter of each billing entry, which provides a basis for recovery. See id. at n.12.

Parker v. United States, 137 Fed. Cl. at 608–09 (alteration added); see also Stimson Lumber Co. v. United States, 154 Fed. Cl. at 701 ("The plaintiff bears the burden of documenting the hours expended and establishing the reasonableness of the requested hours and the attorneys' hourly rates.").

*Prevailing Party*

The United States Supreme Court has stated that "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Hensley v. Eckerhart, 461 U.S. at 433 (quoting Nadeau v. Helgemoe, 581 F.2d 275, 278–79 (1st Cir. 1978)); see also Brewer v. Am. Battle Monuments Comm'n, 814 F.2d 1564, 1567–69 (Fed. Cir. 1987). According to the Supreme Court, "the term 'prevailing party' in fee statutes is a 'term of art' that refers to the prevailing litigant." Astrue v. Ratliff, 560 U.S. 586, 591 (2010); see also Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Human Res., 532 U.S. at 603. "[T]he 'touchstone of the prevailing party inquiry must be the material alteration of the relationship of the parties.'" CRST Van Expedited, Inc. v. E.E.O.C., 578 U.S. 419, 422 (2016) (alteration added); see also Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 792–93 (1989) ("The touchstone of the prevailing party inquiry must be the material alteration of the legal relationships of the parties in a manner which Congress sought to promote in the fee statute. Where such a change has occurred, the degree of the plaintiff's overall success goes to the reasonableness of the award under Hensley, not to the availability of a fee vel non."[13] (emphasis in original)); O.F. Mossberg & Sons, Inc. v. Timney Triggers, LLC, 955 F.3d 990, 992 (Fed. Cir. 2020) (quoting CRST Van Expedited, Inc. v. E.E.O.C., 578 U.S. at 422 ("The Supreme Court has said that 'the touchstone of the prevailing party inquiry

---

[13] Vel non translates to "or not." https://www.merriam-webster.com/legal/vel%20non (last visited March 22, 2024).

must be the material alteration of the legal relationship of the parties.'") (internal quotation omitted in O.F. Mossberg & Sons, Inc. v. Timney Triggers, LLC). A Judge of this court has observed

> at least nine circuits have ruled that—although the FLSA does not include the phrase "prevailing party"—that standard applies to [FLSA provision at 29 U.S.C.] § 216(b). See Rother v. Lupenko, 691 Fed. Appx. 350, 351–52 (9th Cir. 2017); Olivo v. Crawford Chevrolet Inc., 526 Fed. Appx. 852, 854 (10th Cir. 2013); Jackson v. Estelle's Place, LLC, 391 Fed. Appx. 239, 242 (4th Cir. 2010) (per curiam); Saizan v. Delta Concrete Prods. Co., 448 F.3d 795, 799 (5th Cir. 2006); Reimer v. Champion Healthcare Corp., 258 F.3d 720, 725 (8th Cir. 2001); Loughner v. Univ. of Pittsburgh, 260 F.3d 173, 177 (3d Cir. 2001); Nance v. Maxwell Fed. Credit Union, 186 F.3d 1338, 1343 (11th Cir. 1999); Calderon v. Witvoet, 112 F.3d 275, 275 (7th Cir. 1997); United Slate, Tile & Composition Roofers v. G & M Roofing & Sheet Metal Co., 732 F.2d 495, 502 (6th Cir. 1984); see also Rozelle v. United States, No. 04-1712C, 2005 WL 6112659, at *5 (Fed. Cl. July 29, 2005).

Almanza v. United States, 135 Fed. Cl. at 648.

In Cheung v. United States, 157 Fed. Cl. 508, this court found that the plaintiffs "were being improperly paid for the time spent on-call monitoring the duty phone because they were receiving AUO pay instead of the correct type of compensation, one and one-half pay, for the overtime spent actively working while on-call," id. at 557, and awarded liquidated damages and attorneys' fees to plaintiffs. See id. at 563. As indicated above, the FLSA, 29 U.S.C. § 216(b), provides that when an employer violates the FLSA, "[t]he court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 2016(b) (alteration added); see also Slugocki v. United States, 816 F.2d at 1579. The court explained in its earlier trial Opinion on liability that plaintiffs were being improperly compensated "for time spent monitoring the duty phone," and that plaintiffs were "entitled to FLSA overtime pay for the time spent on-call while monitoring the duty phone." See Cheung v. United States, 157 Fed. Cl. at 557. Because, as indicated above, the agency violated the FLSA by improperly compensating plaintiffs, the award of attorneys' fees under the FLSA is mandatory. See 29 U.S.C. § 216(b).

*Lodestar Amount*

As explained by the United States Court of Appeals for the Federal Circuit in Bywaters v. United States:

> We first consider the district court's adjustment to the lodestar figure. In determining the amount of reasonable attorneys' fees under federal fee-shifting statutes, the Supreme Court has consistently upheld the lodestar calculation as the "guiding light of [its] fee-shifting jurisprudence." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 130 S. Ct. 1662, 1672, 176 L. Ed. 2d 494 (2010) (quoting Gisbrecht v. Barnhart, 535 U.S. 789, 801, 122 S. Ct. 1817, 152 L. Ed. 2d 996 (2002)). Although there is a "strong presumption"

that the lodestar figure represents a "reasonable" attorney fee, [City of Burlington v.] Dague, 505 U.S. [557,] 562, 112 S. Ct. 2638 [(1992)], the Supreme Court has recognized a district court's discretion to adjust the lodestar figure "upward or downward" based upon other considerations, [Penn v.] Del. Valley [Citizens' Council for Clean Air], 478 U.S. [546,] 564, 106 S. Ct. 3088 [(1986)] (quoting Hensley [v. Eckerhart], 461 U.S. [424,] 434, 103 S. Ct. 1933 [(1983)]). However, adjustments to the lodestar figure "are proper only in certain 'rare' and 'exceptional' cases, supported by both 'specific evidence' on the record and detailed findings by the lower courts." Id. at 565, 106 S. Ct. 3088; see also Perdue, 130 S. Ct. at 1673 (reaffirming that enhancements to the lodestar figure may be awarded in only "rare" and "exceptional" circumstances). Adjustments are warranted only where the lodestar figure fails to take into account a relevant consideration. As the Supreme Court recently stated, "an enhancement may not be awarded based on a factor that is subsumed in the lodestar calculation." Perdue, 130 S. Ct. at 1673 (citations omitted). The question is whether the "amount involved and results obtained" in this case warranted an adjustment.

Bywaters v. United States, 670 F.3d at 1228–29 (alterations added); see also Blum v. Stenson, 465 U.S. 886, 888 (1984); Stimson Lumber Co. v. United States, 154 Fed. Cl. 694, 701 (2021) ("The lodestar method requires determining both the reasonable hourly rate for each attorney and the reasonable number of hours they expended on the litigation.").

The Federal Circuit in Bywaters continued:

We note initially that the Supreme Court has not always been clear about what is encompassed within the category of "amount involved and results obtained"—that is, whether it refers to the absolute level of success or the proportionate level of success (percentage of recovery on the initial claim). In truth, even though this case involves an adjustment for the absolute level of success, it seems to make little difference in the mandated approach. As the Supreme Court standards have evolved, neither an adjustment for the absolute or proportionate level of success is appropriate absent unusual circumstances. The "amount involved and results obtained" factor was first identified as relevant to the attorney fee inquiry as one of twelve factors— the so-called "Johnson factors"—considered by the Fifth Circuit in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). In 1983, citing Johnson, the Court initially opined in Hensley that the district court could, in its discretion, adjust the lodestar figure "upward or downward" to account for the "crucial" factor of the "results obtained." 461 U.S. at 434, 103 S. Ct. 1933. Specifically, the Court noted that in considering this factor, the district court should "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation," but that there was "no precise rule or formula" for taking this factor into consideration. Id. at 435–36, 103 S. Ct. 1933.

In the years since Hensley, the Supreme Court's view on the degree of discretion afforded district courts in adjusting the lodestar figure has undergone change, thus cabining the district court's ability to adjust the lodestar figure to only "rare" and "exceptional" cases. See Perdue, 130 S. Ct. at 1673. Later cases have made clear that while the "amount involved and results obtained" remains a factor to be considered in determining a reasonable attorney fee, it cannot be a basis for reducing the lodestar figure where it could have been taken into account in calculating the lodestar figure in the first instance. In Blum v. Stenson, 465 U.S. 886, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984), decided just one year after Hensley, the Court clarified that while "there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high," the lodestar figure is "presumed" to be reasonable. Id. at 897, 104 S. Ct. 1541. The Court also cautioned against "double counting" factors such as the "amount involved and results obtained" by adjusting the lodestar figure where those factors are fully reflected in the reasonable hourly rate of the attorneys and the reasonable number of hours expended. Id. at 899–900, 104 S. Ct. 1541; see also Dague, 505 U.S. at 562–63, 112 S. Ct. 2638. In particular, the Court noted that "[b]ecause acknowledgment of the 'results obtained' generally will be subsumed within other factors used to calculate a reasonable fee, it normally should not provide an independent basis for increasing the fee award." Blum, 465 U.S. at 900, 104 S. Ct. 1541; see also City of Riverside v. Rivera, 477 U.S. 561, 568–69, 106 S. Ct. 2686, 91 L. Ed. 2d 466 (1986) (plurality opinion) (recognizing that while the "amount involved and results obtained" may be considered in determining a reasonable attorney fee, a district court is not free to mechanically adjust the lodestar figure downward based on this factor).

Most recently, the Court considered the principles governing the district court's authority to adjust the lodestar figure in Perdue, 130 S. Ct. 1662. In Perdue, the Court once again endorsed the lodestar method, noting that it is "readily administrable; and unlike the Johnson approach, the lodestar calculation is 'objective,' and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results." Id. at 1672 (internal citations omitted). Quoting Blum with approval, the Court also held that as a rule, the lodestar figure should only be adjusted in "rare" and "exceptional" cases and may not be adjusted "based on a factor that is subsumed in the lodestar calculation." Id. at 1673. A district court seeking to adjust the lodestar figure must justify its deviation with "specific evidence" demonstrating that the factors considered are not adequately subsumed within the lodestar calculation. See Blum, 465 U.S. at 898–900, 104 S. Ct. 1541; see also Perdue, 130 S. Ct. at 1676 ("It is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination, including any award of an enhancement."); Del. Valley, 478 U.S. at 565, 106 S. Ct. 3088 (noting that modifications of

the lodestar figure should be supported by "detailed findings" by the lower court). In <u>Perdue</u>, the Court held that the upward adjustment for "results obtained" was not permissible. 130 S. Ct. at 1676. We see no basis for distinguishing between an upward adjustment and a downward adjustment for "results obtained." Neither is permissible absent unusual circumstances.

<u>Bywaters v. United States</u>, 670 F.3d at 1229–30 (alteration in original; footnote omitted). In the example in <u>Bywaters</u>, the Federal Circuit noted:

> The district court, applying Federal Circuit law, determined the amount of attorneys' fees to be awarded under the "lodestar" approach, i.e., by multiplying the number of hours reasonably expended by a reasonable hourly rate. In determining the lodestar figure, the district court first considered the hours requested by appellants and the government's objections and determined that only 18.2 hours spent drafting and filing an amicus brief were unreasonable. Accordingly, the court reduced the amount of hours requested by appellants by 18.2 hours. The court next determined that the relevant market for determining the reasonable hourly rate was the District of Columbia and applied the Updated <u>Laffey</u> Matrix to determine the reasonable hourly rates for complex litigation. Accordingly, the district court determined that "multiplying the number of hours reasonably expended by the reasonable hourly rate using the Updated Laffey Matrix" yielded a lodestar figure of $826,044.19. <u>Bywaters v. United States</u>, No. 6:99–CV–451, 2010 WL 3212124, at *4 (E.D. Tex. Aug. 12, 2010)

<u>Bywaters v. United States</u>, 670 F.3d at 1225–26 (footnote omitted).

The Supreme Court has indicated that the fee may also include the work of paralegals billed at an hourly rate. <u>See</u> <u>Missouri v. Jenkins by Agyei</u>, 491 U.S. 274, 287 (1989) ("By encouraging the use of lower cost paralegals rather than attorneys wherever possible, permitting market-rate billing of paralegal hours 'encourages cost-effective delivery of legal services and, by reducing the spiraling cost of civil rights litigation, furthers the policies underlying civil rights statutes.'"); <u>see also</u> <u>Stimson Lumber Co. v. United States</u>, 154 Fed. Cl. at 705–06 (finding certain administrative tasks compensable at "paralegal" rates); <u>McCarty v. United States</u>, 142 Fed. Cl. 616, 627 (2019) (finding compensable certain hours "devoted solely to administrative work" including "'[t]asks such as proofreading, assembling, photocopying, and mailing,'" which are to "be reimbursed at paralegal rates" (alteration in original) (quoting <u>Hopi Tribe v. United States</u>, 55 Fed. Cl. 81, 99 (2002))); <u>Almanza v. United States</u>, 137 Fed. Cl. 611, 616 (2018) (in a FLSA case "$115 per hour was a reasonable hourly rate for paralegal services"); <u>Town of Grantwood Village v. United States</u>, 55 Fed. Cl. 481, 486 (2003) (recognizing that "[b]illing [purely administrative and clerical] tasks at paralegal rates is reasonable" (alterations added)).

*Reasonable Hours*

As indicated above, "[t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied

by a reasonable hourly rate." <u>Hensley v. Eckerhart</u>, 461 U.S. at 433 (alteration added). Because not all hours are "reasonably expended," before submitting their fee request, "[c]ounsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." <u>Id.</u> at 433-34 (alteration added). Additionally, "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." Id. at 440; <u>see also</u> <u>Shea v. United States</u>, 154 Fed. Cl. at 7. "If plaintiffs do not prevail on the claim for liquidated damages, they will not be entitled to recover any attorneys' fees or costs which are incurred in connection with or are attributable to the trial and resolution of that issue." <u>Beebe v. United States</u>, 226 Ct. Cl. at 329, 649 F.2d 1283.

Therefore, when a plaintiff is successful in some, but not all of its claims, the court considers whether the claims on which the plaintiff is successful are related to the claims on which they are unsuccessful. <u>See</u> <u>Hensley v. Eckerhart</u>, 461 U.S. at 434–35. If the claims "involve a common core of facts" or are "based on related legal theories," the time should not be divided on a claim-by-claim basis. <u>See id.</u> at 448. In such cases, "the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." <u>Id.</u> at 435. If, however, the claims are "distinctly different claims for relief that are based on different facts and legal theories," the work on the unsuccessful claim is not considered to be in pursuit of the successful result. <u>See id.</u> at 434-35. A Judge of this court explained, however, that

> [w]hen multiple claims are brought that involve overlapping questions of law, "it may be difficult, if not impossible, to separate out the hours expended on each claim. However, . . . a court 'may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.'" <u>Biery [v. United States]</u>, 818 F.3d [704,] 712 [(Fed. Cir. 2016)]. The court should not, however, reduce hours in a "rigid, mechanical way." <u>Id.</u> (citing <u>Hubbard v. United States</u>, 480 F.3d 1327, 1333–34 (Fed. Cir. 2007)).

<u>Stimson Lumber Co. v. United States</u>, 154 Fed. Cl. at 706 (alterations added; omission in original).

Counsel, however, should keep billing records in a way that allows the court to identify distinct claims. <u>See</u> <u>Hensley v. Eckerhart</u>, 461 U.S. at 437. In a case in which a plaintiff obtains excellent results, the plaintiff may recover the full fee even if they do not prevail on every issue raised in the case. <u>See id.</u> at 435. The court may reduce the fee "if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." <u>Id.</u> at 440. The United States Court of Appeals for the Federal Circuit has noted, however, "[t]he mere fact that the recovery is small in amount is not a circumstance justifying a reduced fee award." <u>Bywaters v. United States</u>, 670 F.3d at 1231 (citing <u>Millea v. Metro–North R.R. Co.</u>, 658 F.3d 154, 168 (2d Cir. 2011)) (alteration added). Courts must consider the reasonableness of the time in the circumstances of the totality of the litigation and the result obtained and may not mechanically adjust the rates downward or upward. <u>See id.</u> at 1230 ("[W]hile the 'amount involved and results obtained' may be considered in determining a reasonable attorney fee, a district court is not free to

48

mechanically adjust the lodestar figure downward based on this factor." (alteration added) (quoting City of Riverside v. Rivera, 477 U.S. 561, 568–69 (1986)). In addition, the Supreme Court has indicated that "[t]he government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by plaintiff in response." City of Riverside v. Rivera, 477 U.S. at 580 n.11 (alteration added).

As indicated above, following the issuance of the earlier trial Opinion on liability and after undertaking time to attempt to settle the above captioned case, the parties concluded they would be unsuccessful in settling the actual dollar amount to be awarded in attorneys' fees and costs to the plaintiffs' attorneys. During the damages phase of the case, however defendant also has attempted to re-litigate many of the issues previously decided in the court's earlier trial Opinion on liability.

As applied to the case currently under review, although defendant has not objected to an award of attorneys' fees, defendant did propose "at least a one-third reduction" of plaintiffs' hours, as well as specific objections to certain of the hours claimed by plaintiffs' counsel. Defendant argues:

> Many of the hours expended by these four attorneys are unquestionably redundant. Initially, Mr. McGillivary was plaintiffs' counsel of record. Approximately, two months before trial, Mr. Ricksecker substituted for Mr. McGillivary as counsel of record. Mr. McGillivary did not leave his firm; he continued to work on the case. We are not aware of the reasons underlying plaintiffs' decision to replace Mr. McGillivary with Mr. Ricksecker. Whatever the reason may have been, there is undoubtedly redundancy between the time expended by Mr. McGillivary and the time recorded by Mr. Ricksecker, who had little involvement in the case before his appearance as counsel of record.

> Similarly, Messrs. McGillivary and Ricksecker were assisted by both Mr. Coploff and Mr. Purushotham. Together they reported more than $410,000 in effort through November 3, 2021, with a relatively even split of time reported between the two of them. It is not clear why plaintiffs needed the work of both Messrs. Coploff and Purushotham on a case of this nature. Whatever the reason, there is undoubtedly substantial redundancy within the time expended by the two of them.

(internal references omitted). Due to defendant's assertion that these hours are redundant, defendant suggests,

> [a]s an initial step, we propose at least a one-third reduction in the hours summarized on page 5 of the Appendix. That one-third reduction reduces the total for these four attorneys through November 3, 2021, from $640,079.80 to $426,719.87. We have intentionally not added the supplemental $23,670.50 plaintiffs' counsel have reported for work on this case since November 3, 2021. Those hours are virtually all the result of plaintiffs' rejection of the calculations set forth in the expert report of Rodney Bosco. Plaintiffs' efforts to have overpayments disregarded in violation of 5 C.F.R. § 550.805(e)(2) are unreasonable and should not be compensated.

Thus, we propose that the Court exclude plaintiffs' supplemental hours altogether.

(footnote omitted; alteration added).

Additionally, defendant argues, citing Hensley v. Eckerhart, 461 U.S. at 440, Hubbard v. United States, 480 F.3d at 1332–33, and Bull v. United States, 68 Fed. Cl. at 229, that plaintiffs' counsel should only recover the percentage of attorneys' fees that is equal to the percentage of success at trial. Defendant asserts:

Plaintiffs were mostly unsuccessful in this case. Nearly all of plaintiffs' counsel's efforts were aimed at convincing the Court that plaintiffs' idle time while on call should be treated as hours of work. Even when making their alternative Title 5 argument, regarding scheduled overtime versus administratively uncontrollable overtime (AUO), plaintiffs' counsel was still mostly focused on trying to convince the Court that plaintiffs' idle hours should have been paid as hours of work. The Court rejected these arguments.

Examples of plaintiffs' counsel arguing specifically about the classification of plaintiffs' hours of active work, as distinguished from their idle hours or total "shift" hours, are scarce. Ultimately, the Court's limited ruling in plaintiffs' favor relied on facts that were undisputed and stipulated to at an early stage in the case. Without the arguments on which plaintiffs were unsuccessful, it is difficult to see how a trial, or anywhere near the amount of time and effort expended in this litigation, would have been needed.

(internal references omitted).

Defendant continues:

Plaintiffs' counsel should have maintained time records that would enable the Court to identify the amount of effort expended on distinct claims. See Hensley, 461 U.S. at 437 ("The applicant . . . should maintain billing time records in a manner that will enable a reviewing court to identify distinct claims."). In this case, plaintiffs' counsel's time records are not sufficiently detailed to distinguish time spent on the issue on which plaintiffs prevailed from the issues on which they were unsuccessful.

(footnote omitted; alteration in defendant's brief). Defendant indicates:

Under these circumstances, from the starting point proposed above ($426,719.87), the Court should make an adjustment to account for plaintiffs' degree of success by comparing the amounts plaintiffs claimed to what they recovered. As discussed in our brief regarding back pay calculations, filed today, plaintiffs should recover, before liquidated damages, $7,489.04. In plaintiffs' fourth amended Rule 26(a)(1)(A)(iii) disclosures, served February 28, 2020, plaintiffs asserted entitlement to $112,340.01, plus an equal amount in liquidated damages. Dividing

> $7,489.04 by $112,340.01 yields a ratio of 6.67 percent, providing a general sense of plaintiffs' degree of success. Applying that 6.67 percent success ratio to the $426,719.87 starting point discussed above, we propose that the Court limit any attorney fees awarded to no more than $28,462.22. This amount, though nearly four times the net back pay due, is more in line with the amount of damages recoverable under the Court's opinion. Any amount significantly in excess of the success achieved as reflected by the damages recovered is neither reasonable nor in the interest of justice.

(internal references omitted). Moreover, defendant states that, in calculating reasonable hours expended by plaintiffs' counsel, "[w]e have intentionally not added the supplemental $23,670.50 plaintiffs' counsel have reported for work on this case since November 3, 2021." (alteration added). Defendant asserts that

> [t]hose hours are virtually all the result of plaintiffs' rejection of the calculations set forth in the expert report of Rodney Bosco. Plaintiffs' efforts to have overpayments disregarded in violation of 5 C.F.R. § 550.805(e)(2) are unreasonable and should not be compensated. Thus, we propose that the Court exclude plaintiffs' supplemental hours altogether.

(alteration added; footnote omitted). In addition, defendant suggests that the court exclude "the hours that appear to be for secretarial staff, as those expenses are recovered through the hourly rates of the attorney." (citing Bennett v. Dep't of Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983).

Defendant concludes:

> Under these circumstances, from the starting point proposed above ($426,719.87), the Court should make an adjustment to account for plaintiffs' degree of success by comparing the amounts plaintiffs claimed to what they recovered. As discussed in our brief regarding back pay calculations, filed today, plaintiffs should recover, before liquidated damages, $7,489.04. In plaintiffs' fourth amended Rule 26(a)(1)(A)(iii) disclosures, served February 28, 2020, plaintiffs asserted entitlement to $112,340.01, plus an equal amount in liquidated damages. Dividing $7,489.04 by $112,340.01 yields a ratio of 6.67 percent, providing a general sense of plaintiffs' degree of success. Applying that 6.67 percent success ratio to the $426,719.87 starting point discussed above, we propose that the Court limit any attorney fees awarded to no more than $28,462.22. This amount, though nearly four times the net back pay due, is more in line with the amount of damages recoverable under the Court's opinion. Any amount significantly in excess of the success achieved as reflected by the damages recovered is neither reasonable nor in the interest of justice.

Defendant quotes a 2005 decision by another Judge of the United States Court of Federal Claims, "'[P]laintiffs are only entitled to recover attorneys' fees to the extent of plaintiffs' success at trial.' Bull v. United States, 68 Fed. Cl. 212, 229 (2005)." (alteration in defendant's brief). In Bull v. United States, a Judge of this court evaluated an overtime

claim brought against the United States Department of Homeland Security, Customs and Border Protection by canine enforcement officers, and stated that

> plaintiffs are only entitled to recover attorneys' fees to the extent of plaintiffs' success at trial. For example, "[i]f plaintiffs do not prevail on the claim for liquidated damages, they will not be entitled to recover any attorneys' fees or costs which are incurred in connection with or are attributable to the trial and resolution of that issue." Beebe, 640 F.2d at 1295. "The amount to be allowed as attorneys' fees shall be determined by the trial [court] . . . taking into account various pertinent factors." Id. (citing Rau v. Darling's Drug Store, Inc., 388 F. Supp. 877, 887 (W.D. Pa. 1975) ("Factors to be considered in arriving at a fair award for attorney's fees are: the amount of the overtime compensation award, the nature and complexity of the issues involved, and the efforts of the Plaintiff's counsel in obtaining the award.")).

Id. (alterations and omissions in original). The Judge in Bull v. United States found that the government was liable for unpaid overtime compensation for certain activities as well as liquidated damages. See id. While the decision in Bull v. United States indicated that, in general, a court may reduce a claim for attorneys' fees under the FLSA, the Bull decision primarily addressed liability and did not reach the issue of calculated damages or attorneys' fees. See id. at 276. The case of Bull v. United States, therefore, does not support defendant's argument that the plaintiffs' attorneys' fees in the above captioned case should be reduced by the magnitude suggested by defendant.[14]

---

[14] Similarly, in Shea v. United States, 154 Fed. Cl. 1, which quotes the Bull decision for the proposition, "'[P]laintiffs are only entitled to recover attorneys' fees to the extent of plaintiffs' success at trial,'" Shea v. United States, 154 Fed. Cl. at 4, (quoting Bull v. United States, 68 Fed. Cl. at 229 (alteration in Shea v. United States), the Judge in Shea determined:

> Plaintiff's status as the prevailing party is not determinative of 'whether the expenditure of counsel's time was reasonable in relation to the success achieved.' While Mr. Shea recovered $42,750.84 in back pay, he had sought $73,139.41 in back pay at trial. Furthermore, plaintiff was unsuccessful in proving willfulness, as well as entitlement to liquidated damages. Thus, "the ultimate damages award reflects lack of success and the fee award should be reduced accordingly."

Shea v. United States, 154 Fed. Cl. at 7 (quoting Radtke v. Cashetta, 254 F. Supp. 3d at 174) (footnote and internal citations omitted). By contrast, the plaintiffs in the above captioned case not only had significant successes regarding establishing liability under the FLSA, leading to damages in the liability phase of the case, but also, as discussed above, plaintiff s were found to be entitled to liquidated damages under the FLSA.

In response, Mr. Ricksecker, counsel of record for plaintiffs, indicated in a declaration that the attorneys' fees request is reasonable and included work on the plaintiffs' case such as:

> (1) investigating the claims in the case, (2) drafting the complaint; (3) interviewing plaintiffs; (4) reviewing and analyzing thousands of pages of documents produced by defendant; (5) preparing for and taking five depositions of defendant's witnesses, including an RCFC [Rule] 30(b)(6) [of the Rules of the United States Court of Federal Claims] deposition; (6) preparing for and defending the depositions of all 5 plaintiffs; (7) responding to defendant's discovery requests; (8) preparing discovery requests; (9) preparing summary judgment briefs; (10) preparing for and participating in summary judgment oral arguments; (11) analyzing the Court's summary judgment decision; (12) preparing for and conducting a week-long trial; (13) preparing post-trial briefs; (14) preparing for and participating in post-trial oral arguments; (15) preparing supplemental briefs; (16) analyzing the Court's decision on liability; (17) conducting damages calculations and analyzing defendant's damage calculations; (18) preparing the damages brief, and (19) drafting the instant brief for attorneys' fees and costs.

(alterations added). Mr. Ricksecker also indicated in his declaration:

> The hourly fees charged by the attorneys and paralegals working on this case are reasonable hourly fees. The fees charged are based on the Laffey Matrix rates. The original Laffey Matrix was developed well over 30 years ago based on a survey that was conducted in 1988-89 using a methodology advocated by the economist Dr. Michael Kavanaugh. Bywaters v. United States, 670 F.3d 1221, 1226, n.4 (Fed. Cir. 2012). It provides for different rates for attorneys and paralegals based on their experience. Over time, however, courts have found that those rates must be adjusted for inflation. See Save Our Cumberland Mountains, Inc. v. Hodel, 857 F.2d 1516, 1525 (D.C. Cir. 1988).

Mr. Ricksecker's declaration continues:

> Between the case's inception and June 2020, Gregory K. McGillivary was counsel of record for plaintiffs in this matter. Because Mr. McGillivary was not available on the dates of the trial on liability in this matter, I filed a motion to substitute myself as counsel of record. Mr. Coploff, who had also been involved in the case since its inception, was also unavailable during the trial dates because his wife, who was pregnant with their second child, was scheduled to be, and ultimately was, induced during the week of the trial.

Mr. Ricksecker's declaration concludes: "The total attorneys' fees and costs incurred by McGillivary Steele Elkin LLP (f/n/a [formerly known as] Woodley & McGillivary LLP) in

furtherance of the claims asserted in this case, using the <u>Laffey</u> matrix rates, are $706,899.60." (alteration added).

With respect to defendant's suggestion of an "at least a one-third reduction" of plaintiffs' hours, due to "substantial redundancy," plaintiffs state:

> There is no evidence that plaintiffs' counsel engaged in unnecessary litigation, delay, or questionable tactics. The staffing changes and the fees incurred here simply resulted from a long, heavily litigated lawsuit which resulted in the defendant being found to have violated the backpay, and owed the plaintiffs backpay and liquidated damages for that violation. All four attorneys are skilled and experienced with the FLSA and wage and hour law, particularly as it applies to federal employees. In any case that is vigorously litigated over the period of more than four years, there will likely be staffing adjustments made due to other work or life commitments. The manner in which this case was staffed is simply not unusual. The "getting up to speed" incidents in the case were minor, and largely consisted of typical tasks and preparations that take place before and during a trial, and post-trial briefings, arguments, and damage calculations and would have needed to occur not [sic] matter which attorneys tried the case. Further, defendant's argument ignores that the government has had multiple attorneys participate in this case. Mr. Volk has had co-counsel and Agency counsel assisting him throughout the litigation, including Vito S. Solitro, Charles Barksdale, Vidhya B. Amirthalingam, and Matthew J. Carhart. There is simply no basis to carve off a third of the fees incurred.

(alteration added). With respect to defendant's argument that plaintiffs are not entitled to fees after November 3, 2021,[15] plaintiffs assert:

> The government disingenuously argues that the plaintiffs are not entitled to any attorneys' fees after November 2, 2021. There is no basis for the government's argument. The time spent litigating an award of fees and expenses is recoverable. <u>See</u> <u>Northcross v. Board of Educ.</u>, 611 F.2d 624, 637 (6th Cir. 1979) ("the plaintiffs should recover attorneys' fees for the time spent litigating the fees issue itself.") Furthermore, as the parties are also actively briefing a dispute between them regarding the application of premium pay offsets when calculating FLSA backpay damages, the plaintiffs' position is supported by caselaw and commonsense.[16] There is no justification to simply not count any additional hours incurred since

---

[15] Defendant asserts that plaintiffs' counsel are not entitled to the "supplemental hours" after November 3, 2021, not November 2, 2021, which is the date that the plaintiffs have included in their brief.

[16] As described above, the court has resolved the issue of calculation of damages under the FLSA in favor of plaintiffs.

November when the plaintiffs' counsel first provided the attorneys' fees and costs breakdown. This request must be rejected outright.

(footnote added). Plaintiffs argue that "[t]he entire amount of damages is recovered [sic] as a result of plaintiffs' success." (alterations added). Plaintiffs assert:

> While the Court did not find that the entire duty phone shift was standby entitling the plaintiffs to FLSA overtime for the entire shift, the Court did find significant FLSA violations in the way the plaintiffs were compensated during the duty phone shift. In addition, the plaintiffs are the prevailing party with respect to the Court's finding that the plaintiffs are entitled to liquidated damages as the government could not demonstrate that it acted reasonably or in good faith.

(footnote omitted).

With respect to the plaintiffs' level of success and whether their attorneys' fee request can be divided among successful and unsuccessful claims, plaintiffs indicate:

> Indeed, the claims here as to whether the defendant violated the FLSA when compensating the plaintiffs (the Court found it did), whether the duty phone shift was standby or on-call (the Court found it was on-call), whether the Defendant wrongly compensated the Plaintiffs with AUO (the Court found it did) and whether the Defendant acted reasonably and in good faith to avoid an award of liquidated damages (the Court found that it did not) are all sufficiently entwined that the case would have been almost impossible to segregate. See Hensley [v. Eckerhart], 461 U.S. at 437 n.12 (recognizing that there is "no certain method of determining when claims are 'related' or 'unrelated'"). Simply because the Court agreed with the defendant that the duty phone shift was on call and not standby, and thus only the actual work performed was compensable as FLSA overtime would not have reduced, by any significant amount, the number of depositions taken, the length of the trial, the summary judgment and post-hearing briefs, or, as we have seen since the decision was issued, facilitated settlement. Because these claims were related and entwined, the fees should not be reduced for the failure to win on one argument.

(alteration added).

Plaintiffs also take issue with defendant's argument "that the plaintiffs are merely entitled to recover 6.67 percent of 2/3 of the total fees incurred at the Laffey Matrix rates." (footnote omitted). Plaintiffs continue:

> The defendant argues, without any support, that because the plaintiffs' estimated backpay damages had the duty phone shift been considered standby rather than on-call at $112,30.01, [sic] this somehow justifies a further 93.4% reduction of the remaining 2/3 of fees incurred. Accepting defendant's argument would eviscerate the protections of the FLSA. Courts

have rejected adjustments to the fees incurred despite plaintiffs' partial success in proving damages.

In support of their argument, plaintiffs cite to cases, albeit not decided by the United States Court of Appeals for the Federal Circuit, and mostly unreported.[17] Plaintiffs also take issue with defendant's assertion that plaintiffs wasted time and resources by arguing "that the duty phone shift was misclassified as on-call and should be considered standby." Plaintiffs argue that

> the defendant argues that had the plaintiffs not argued that the duty phone shift was misclassified as on-call and should be considered standby, it is "difficult to see how a trial, or anywhere near the amount of time and effort expended in this litigation, would have been needed." This belies the facts and reality. As noted previously, the claims were intertwined and not readily or easily segregable.

Plaintiffs contend that "[t]he time spent by plaintiffs' counsel was reasonable and indeed necessary throughout the entire litigation, even though not every single argument was ultimately unsuccessful." (alteration added).

Plaintiffs also assert that defendant's argument regarding claimed paralegal time incorrectly classifies a paralegal as "secretarial staff." Plaintiffs argue that "Paralegal time is compensable under 29 U.S.C. § 216(b) because the proper allocation of tasks between partners, associates, law clerks and paralegals is an important consideration in achieving economy of resources."

Plaintiffs conclude that

> Plaintiffs here are clearly the prevailing party and, accordingly, an award of plaintiffs' fees and costs under the FLSA is mandatory. There is no justification to reduce the plaintiffs' fees – certainly not by the defendant's proposed more than 95 percent reduction, as the fees were necessary to prosecute the case, reasonably incurred in its efforts, and resulted in the defendant being found liable for violating the FLSA and owing liquidated damages.

With respect to defendant's argument that the court should reduce plaintiffs' hours "at least one third" because of defendant's summary allegation of a redundancy of hours,

---

[17] Plaintiffs cite to <u>Bankston v. Illinois</u>, 60 F.3d 1249, 1256 (7th Cir. 1995) ("[F]ailing to obtain every dollar sought on behalf of his clients does not automatically mean a lawyer's fees should be reduced." (alteration added)); <u>Gonzalez v. Scalinatella Ristorante</u>, 112 F. Supp. 3d 5, 10 (S.D.N.Y. 2015); <u>Reyes v. Clime</u>, 2015 WL 3644639, at *4 (D. Md. June 8, 2015); <u>Almendarez v. J.T.T. Enters. Corp.</u>, 2010 WL 3385362, at *3 (D. Md. Aug. 25, 2010); <u>Singer v. City of Waco</u>, 324 F.3d 813; <u>Gurule v. Land Guardian, Inc.</u>, 912 F.3d 252, 258 (5th Cir. 2018); <u>Galdames v. N & D Inv. Corp.</u>, 432 F. App'x 801, 807–08 (11th Cir. 2011).

the court finds that this mechanical reduction is not supported by the facts in the above captioned case. Defendant offers no support for its "one-third reduction" other than a conclusory allegation that "[m]any of the hours expended by these four attorneys [Gregory McGillivary, David Ricksecker, Theodore Coploff, and Matthew Purushotham] are unquestionably redundant." Defendant notes "[t]hat one-third reduction reduces the total for these four attorneys through November 3, 2021, from $640,079.80 to $426,719.87," without specific discussion of the hours expended by each of the individual attorneys. (alterations added). Regarding defendant's argument about the redundancy of hours due to the substitution of counsel of record, the court finds that it was not unreasonable, due to the circumstances, for Mr. Ricksecker to take over for Mr. McGillivary as attorney of record approximately two months prior to trial, given scheduling conflicts, although such substitutions late in a case are never ideal. As indicated above, Mr. McGillivary became unavailable for the dates of the trial on liability, and the attorney who conducts a trial should also be the attorney of record who has brough the case up to the trial. Similarly, it was not unreasonable for Mr. Purushotham to replace Mr. Coploff, who initially staffed and assisted Mr. McGillivary, because Mr. Coploff's wife was pregnant and was induced the week of the trial. At the time that the case commenced, in 2018, it was not foreseeable that Mr. McGillivary and Mr. Coploff would be unavailable for the trial on liability, which was held in 2020 after discovery, briefings on the motions for summary judgment, and the pre-trial filings.

Accordingly, while there may have been some overlap in the hours between Mr. McGillivary and Mr. Ricksecker as the latter took over as attorney of record, and some overlap in the hours between Mr. Coploff and Mr. Purushotham, those hours are reasonable in light of the circumstances and the length of the litigation. Moreover, it is not unreasonable or duplicative to have multiple attorneys work on the same briefing or preparation for trial. See Stimson Lumber Co. v. United States, 154 Fed. Cl. 694, 704 (2021) (rejecting the government's argument that two partners billed "duplicative" hours to conduct "site visits, conferences between partners, editing pleadings, and reviewing deeds, emails, and court orders" and concluding "that the number of hours spent by more than one partner on this work is not unreasonable"); Bratcher v. United States, 136 Fed. Cl. 786, 795 (2018) (finding unpersuasive the government's argument that the court should disallow 18.9 hours of an attorney's time which the government claimed was "duplicative" because "[i]t was not unreasonable for the firm to assign two attorneys to attend the meetings because there were multiple prospective plaintiffs," and because the "other time entries involve brief periods of time to perform a review of pleadings and orders, to discuss discrete legal issues and other matters, to conduct specific research tasks, and to attend meetings with the litigation team to discuss strategy," which the court found reasonable (alteration added)); Almanza v. United States, 137 Fed. Cl. at 620 (stating that it was not unreasonable to have two attorneys prepare for and attend oral argument). Notably, defendant had at trial, defendant's counsel of record, another attorney with the Department of Justice, a paralegal with the Department of Justice, as well as agency counsel. The issues in the above captioned were not simple or straightforward and the court finds it reasonable that the plaintiffs employed multiple attorneys during the course of the litigation.

In addition, during the course of the case, plaintiffs' counsel represented all five named plaintiffs as claimants, and deposed plaintiffs and witnesses, prepared briefs on the issue of summary judgment, prepared for and delivered oral argument on the motions for summary judgment, prepared the pre-trial filings for trial, conducted a week-long trial on liability, prepared supplemental briefs, and attempted to negotiate and calculate plaintiffs' damages and attorneys' fees, as well as file briefs regarding attorneys' fees and costs, and it is reasonable that, during complex and lengthy litigation, there might be some turnover or rearrangement of staff. The court, therefore, rejects the defendant's proposed reduction of plaintiffs' counsel's claimed hours by "at least one third" through November 3, 2021. The court also rejects the defendant's argument that the supplemental hours claimed by plaintiffs for $23,670.50 should be disallowed because they represent, as defendant characterized it, plaintiffs' "efforts to have overpayments disregarded in violation of 5 C.F.R. § 550.805(e)(2)." Counsel for plaintiffs also spent hours responding to defendant's arguments regarding application of the Back Pay Act to the damages calculation, on which the court ultimately found in favor of plaintiffs. Plaintiffs' briefs were helpful to the court in this regard and, therefore, the hours the plaintiffs' counsel spent on research and drafting are not unreasonable.

Regarding defendant's argument that plaintiffs should recover only the percentage of attorneys' fees equal to their percentage of success at trial, as measured by the dollar amount recovered compared against the actual dollar amount claimed, such a reduction in the fees requested is often suggested by an opposing party when addressing fee-shifting statutes. After close review in the case currently before the court, it does not properly encompass the number of hours that were required to adequately represent the multiple plaintiffs or the complexity and duration of the case before this court, including the preparation for trial, conducting the trial, and submitting post-trial briefing on multiple issues, including attorneys' fees. Furthermore, the court notes that it also is not uncommon for not every claim or argument raised by a plaintiff, either in a complaint or during the course of a litigation, to be successful, given that a plaintiff can and does often raise alternative and related arguments.

Although in some cases it may be appropriate to limit the attorneys' fees when the relief obtained "is limited in comparison to the scope of the litigation as a whole," Hensley v. Eckerhart, 461 U.S. at 440, this is not the situation regarding all the issues presented by this case and the numerous issued raised in defendant's opposition to plaintiffs' arguments. The court finds that such a drastic reduction in hours proposed by defendant is not appropriate in the above captioned case. As described above, in plaintiffs' case, discovery occurred, including multiple depositions, the parties submitted motions for summary judgment, the court held oral argument on the motions for summary judgment, the court held a week-long trial, and ordered post-trial briefing. When considering the reasonableness of the time plaintiffs' attorneys spent on the case, within the broader circumstances of the case and the results obtained, the hours that plaintiffs have claimed are found to be reasonable. During the extended litigation, counsel for plaintiffs also had an obligation to vigorously represent their clients, especially given defendant's vigorous responses to the legal and factual issues raised by plaintiffs, including the issues regarding attorneys' fees. The court finds that reducing the attorneys' fees mechanically

by more than 95.5% is not reasonable given the facts and legal issues raised in the above captioned case.[18]

In addition, reducing the attorneys' fees to match the percentage of the dollar amount received by plaintiffs does not account for the successes achieved by plaintiffs on the legal entitlement and now attorneys' fees issues raised in this case. In Cheung v. United States, 157 Fed. Cl. 508, the claims and issues addressed by the court in its earlier trial Opinion on liability included whether the defendant had violated the FLSA, how the duty phone shift should be categorized, whether the government wrongly compensated plaintiffs with AUO, and whether the government had acted reasonably and in good faith, which would determine if plaintiffs were entitled to a possible award of liquidated damages, all of which arose from the same set of facts and intertwined legal theories. See generally id. In its Opinion on liability, this court held that the government had violated the FLSA, that the duty phone shift was correctly categorized, that the government incorrectly compensated plaintiffs with AUO, rather than one and one-half time their regular rate of pay for the hours spent actually working. See Cheung v. United States, 157 Fed. Cl. at 557. Further, the court found that the government did not act in good faith, which made the award of liquidated damages appropriate. See id. at 563. The court finds, therefore, that due to the interrelated nature of the detailed factual and complex legal issues involved in the above captioned case, that it was not necessary to segregate the award to plaintiffs' counsel issue by issue or reduce the award accordingly.

The court does not find persuasive defendant's arguments that the hours for plaintiffs' paralegals, which defendant characterizes as "secretarial staff," should be disallowed. Plaintiffs' counsel billed time for their paralegals, who generally provide forms of legal assistance, other than generally recognized secretarial support, which has been treated by courts as billable time not covered by an attorneys' hourly rate. Moreover, it can be much more efficient and less costly for plaintiffs to use paralegals for certain tasks. See, e.g., Missouri v. Jenkins by Agyei, 491 U.S. 274, 287–88 (1989) ("By encouraging the use of lower cost paralegals rather than attorneys wherever possible, permitting market-rate billing of paralegal hours 'encourages cost-effective delivery of legal services and, by reducing the spiraling cost of civil rights litigation, furthers the policies underlying civil rights statutes.'"); Almanza v. United States, 137 Fed. Cl. at 616 (concluding "that $115 per hour was a reasonable hourly rate for paralegal services"). Defendant has provided no factual support for suggesting that the paralegal billings included here were not for work generally recognized as paralegal work, for which paralegals receive specific training and coursework, actually the opposite. Further, there is no support that the paralegals working for plaintiffs' attorneys, and for which plaintiffs' attorneys billed, did not perform duties that would otherwise have been performed by attorneys and which, if

---

[18] As noted above, defendant begins by demanding and applying "at least a one-third reduction," to what defendant calculates should be plaintiffs' attorneys' fees, and states, "[t]hat one-third reduction reduces the total for these four attorneys through November 3, 2021, from $640,079.80 to $426,719.87." (alteration added). Defendant then suggests, "[a]pplying that 6.67 percent success ratio to the $426,719.87 starting point discussed above, we propose that the Court limit any attorney fees awarded to no more than $28,462.22." (alteration added).

performed by plaintiffs' attorneys , would have increased the overall cost of the litigation. For example, one of the plaintiffs' paralegals, Mr. Nickerson, has time entries included in the record with a variety of tasks, including "Review data and discuss damages calculations methodology with Coploff," or "Review and edit brief." This court, therefore, finds the paralegal hours claimed in the case currently before the court are allowable as separate, billable entries. For purposes of the lodestar calculation, the court finds that plaintiffs' claimed hours are reasonable and will be used to calculate the attorneys' fees owed to plaintiffs.

*Reasonable Hourly Rate*

To calculate the lodestar amount, courts must determine the reasonable hourly rates for the plaintiff's attorneys. See Hensley v. Eckerhart, 461 U.S. at 433. Courts require prevailing attorneys to "submit evidence supporting the hours worked and rates claimed," see id., and provide additional evidence that the rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. at 896 n.11; see also Stimson Lumber Co. v. United States, 154 Fed. Cl. at 701 ("'Reasonable hourly rates under the lodestar method are "calculated according to the prevailing market rates in the relevant community."'" (quoting Haggart v. United States, 149 Fed. Cl. 651, 665 (2020) (quoting Blum v. Stenson, 465 U.S. at 895))). In the case currently before the court, defendant alleges that "[p]laintiffs have not articulated to us how they selected the rates they have used in their submissions, although it does appear that there was some selecting involved. See Appendix at 101 (time entry narrative for Mr. McGillivary: "Emails about which rates to use in fee submission to Judge.")."

In response, plaintiffs argue:

Plaintiffs' counsel took this case on a contingency fee basis, meaning that they did not charge the plaintiffs for any of the work performed. In this fee request, the plaintiffs seek to recover fees based upon the hourly rate set forth in the Laffey Matrix. The original Laffey Matrix was developed well over 30 years ago based on a survey that was conducted in 1988-89 using a methodology advocated by the economist Dr. Michael Kavanaugh. Bywaters[ v. United States], 670 F.3d at 1226, n.4 It provided for different rates for attorneys and paralegals based on their experience. Over time, however, courts have found that those rates must be adjusted for inflation. See Save Our Cumberland Mountains, 857 F.2d at 1525. The Laffey Matrix rates are an eminently reasonable hourly rate for the attorneys in this case, considering their experience, expertise and location and results in a total $706,899.60.[19] Tellingly, in its brief, the Government raised no specific objection to the rates used by plaintiffs' counsel. Indeed, Courts frequently

---

[19] After plaintiffs' attorneys submitted their original fee request, they submitted a request for the additional hours regarding work on their fee request.

utilize the "Updated LSI[20] <u>Laffey</u> Matrix," which are sometimes also referred to as *Salazar* rates. This is in reference to the court's decision in <u>Salazar v. District of Columbia</u>, 809 F.3d 58 (D.C. Cir. 2015), adopting these hourly rates for attorney work by attorneys who are based in the Washington, D.C. area, such as the plaintiffs' attorneys in this case.

(internal citation omitted; footnotes and alteration added). Plaintiffs assert that the <u>Laffey</u> Matrix is reasonable as compared to the <u>Salazar</u> rates, taken from the decision in <u>Salazar v. District of Columbia</u>, 809 F.3d 58 (D.C. Cir. 2015), which is frequently used "for attorney work by attorneys who are based in the Washington, D.C. area," and, if applied in the case currently before the court, would raise the plaintiffs' fee request to $1,018,103.10. Plaintiffs indicate that

the work in this case has been performed in the District of Columbia – including a week-long trial - by plaintiffs' counsel whose offices are located in the District of Columbia. Accordingly, the market rates for the attorneys in the District of Columbia are appropriate. See <u>Bywaters</u>, 670 F.3d at 1233–34. Furthermore, the government cannot argue that the work was not complex, as it involved a unique intersection between the FSLA and Title 5 AUO regulations, and required the parties to conduct extensive discovery, participate in a week-long trial, and prepare several briefs on a [sic] several legal issues. Given the complexity of the work, plaintiffs' counsel's skill, experience and reputation all would justify application of the Updated LSI <u>Laffey</u> Matrix, or the <u>Salazar</u> rates. The rates included in plaintiffs' fee request, though, are the lower <u>Laffey</u> Matrix rates.

(alteration added).

With respect to the <u>Laffey</u> Matrix rates, in the 2016 decision in <u>Biery v. United States</u>, the United States Court of Appeals for the Federal Circuit stated:

In <u>Laffey v. Northwest Airlines, Inc.</u>, the District Court for the District of Columbia set out a matrix of reasonable rates for attorneys in the Washington, D.C. metropolitan area who were engaged in complex federal litigation at that time. See 572 F. Supp. 354, 371–72 (D.D.C. 1983), <u>aff'd in part</u>, <u>rev'd in part</u>, 746 F.2d 4 (D.C. Cir. 1984), <u>overruled by</u> <u>Save Our Cumberland Mountains, Inc. v. Hodel</u>, 857 F.2d 1516 (D.C. Cir. 1988) (en banc). This matrix of fees has become known as the "<u>Laffey</u> Matrix" and its use has been expressly endorsed by the Court of Appeals for the D.C. Circuit as a "useful starting point" for computing attorney fees. See <u>Covington v. District of Columbia</u>, 57 F.3d 1101, 1109 (D.C. Cir. 1995). We have not had occasion to determine whether the <u>Laffey</u> Matrix is an appropriate starting point for fee awards, but have acknowledged its use by the Court of Federal Claims. See <u>Bywaters</u>, 670 F.3d at 1226 & n. 4 (Fed. Cir .2012); <u>see also</u> <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 632 F.3d

_____

[20] "LSI" refers to Legal Service Index.

1381, 1384–85 (Fed. Cir. 2011) (distinguishing Vaccine Act cases from "complex litigation" described in Laffey).

Because the matrix proposed by Laffey was based on prevailing market rates for a single point in time, courts have found it necessary to determine similar matrices for other years using the Laffey rates as a starting point. See Save Our Cumberland Mountains, Inc., 857 F.2d at 1525. To this end, two competing approaches have been applied by district courts and the Court of Federal Claims.

The first approach is for courts to use the Adjusted Laffey Matrix which is maintained by the United States Attorney's Office. See, e.g., Rooths v. District of Columbia, 802 F. Supp. 2d 56, 62 (D.D.C. 2011); First Fed. Sav. & Loan Assoc. of Rochester v. United States, 88 Fed. Cl. 572, 586 (Fed. Cl. [sic] 2009). Adjustments to this version of the matrix are based on changes to the cost of living in the Washington D.C. metropolitan area as measured by the Consumer Price Index for All Urban Consumers ("CPI–U"). United States Attorney's Office, District of Columbia, Laffey Matrix—2014–2015, at 1, http://www.justice.gov/usao/dc/divisions/Laffey% 20Matrix—2014–2015.pdf. The CPI–U measures the average change in price of a market basket of goods and services including food, shelter, and medical and legal services. See Bureau of Labor and Statistics, CPI Detailed Report: Data for December 2015, at 14, 203, http://www.bls.gov/cpi/cpid1512.pdf.

Biery v. United States, 818 F.3d 704, 712–13 (Fed. Cir. 2016) (alteration added). In Biery, the Federal Circuit also discussed the Kavanaugh Matrix, which is another method by which attorneys in the Washington, D.C. area compute reasonable rates for attorneys' fees. See id. at 713. The Federal Circuit continued that "[t]he Kavanaugh Matrix has been criticized for its use of the national CPI, and may thus not be an accurate measure of the relevant community, here the Washington, D.C. metropolitan area." Id. at 713–14 (alteration added) (citing Eley v. District of Columbia, 999 F. Supp. 2d 137, 152 (D.D.C. 2013)). Given the criticisms as well as compelling arguments in favor of each approach, the Federal Circuit "decline[d] to exclusively endorse either for use in a lodestar calculation. The decision to use either matrix as a starting point to determine a lodestar is within the discretion of a trial court." Id. (alteration added).

The Federal Circuit in Biery also indicated that "though a court has broad discretion in computing a lodestar, the court must 'provide a concise but clear explanation of its reasons for the fee award.'" Id. (quoting Hensley v. Eckerhart, 461 U.S. at 437). In Shea v. United States, 154 Fed. Cl. 1, a Judge of this court indicated that both the Laffey Matrix, as well as the updated version of the Laffey Matrix, which is known as the USAO [United States Attorney's Office] Matrix, "have been deemed acceptable starting points for calculating the applicable lodestar." Id. at 6 n.2 (citing Biery v. United States, 818 F.3d at 714) (alteration added); see also McCarty v. United States, 142 Fed. Cl. 616, 624 (2019) ("Upon considering the Kavanaugh Matrix and the USAO Matrix, this Court is persuaded that the USAO Matrix is more appropriate here, as that matrix is based on changes in prices for goods and services, including legal services in Washington, D.C. and the Court

is applying that forum rate."). As explained by the Judge of the United States Court of Federal Claims in McCarty,

> [b]oth the USAO Matrix and the Kavanaugh Matrix are used to determine billing rates in the Washington, D.C. legal market. Each matrix adjusts rates to account for the passage of time by applying a price index that measures the change in billing rates. Because the Kavanaugh Matrix is based on the Legal Services Index of the Consumer Price Index ("CPI"), it captures only the market for legal services, not other consumer markets such as food, housing, and clothing. Biery[ v. United States], 818 F.3d at 713. The USAO Matrix, on the other hand, is based on "changes to the cost of living in the Washington D.C. metropolitan area as measured by the Consumer Price Index for All Urban Consumers ("CPI-U")," which "measures the average change in price of a market basket of goods and services including food, shelter, and medical and legal services." Id.

McCarty v. United States, 142 Fed. Cl. at 623–24 (alterations added; internal references omitted).

In the case currently before the court, in addition to the Laffey Matrix rates for the years 2015 to 2021, which was when the bulk of the work was performed by plaintiffs' attorneys, plaintiffs include the hourly rates of comparable law firms in the Washington, D.C. area to support the rates charged by plaintiffs' counsel. In addition, plaintiffs include multiple declarations by fee experts, which indicate that "the Updated LSI Laffey Matrix rates are reasonable and consistent with the prevailing market rates in the DC metropolitan area for complex federal litigation." Further, defendant does not take a position on the plaintiffs' use of the Laffey Matrix rates. The court finds that the plaintiffs' use of the Laffey Matrix is appropriate in the above captioned case because the Laffey Matrix "is based on changes in prices for goods and services, including legal services in Washington, D.C. and the Court is applying that forum rate." McCarty v. United States, 142 Fed. Cl. 616, 624 (2019); see also Biery v. United States, 818 F.3d at 713–14 (stating that one of the criticisms of the Kavanaugh Matrix is that it does not provide "an accurate measure of the relevant community, here the Washington, D.C. metropolitan area"). Because plaintiffs' counsel is based in Washington, D.C. because the Laffey Matrix rates accurately capture local rates for Washington, D.C., and because the plaintiffs did not request to use what the plaintiffs refer to as the updated LSI Laffey Matrix,[21] the court concludes that the Laffey Matrix rates provided by plaintiffs are reasonable and should be used in the Lodestar calculation in the above captioned case.[22] See Biery v. United

---

[21] As referred above, the updated LSI Laffey Matrix is also referred to as the United States Attorney's Office Matrix or the Salazar rates.

[22] As noted above, plaintiffs' brief stated: "Given the complexity of the work, plaintiffs' counsel's skill, experience and reputation all would justify application of the Updated LSI Laffey Matrix, or the Salazar rates. The rates included in plaintiffs' fee request, though, are the lower Laffey Matrix rates."

States, 818 F.3d at 712–13; Shea v. United States, 154 Fed. Cl. at 6–7; McCarty v. United States, 142 Fed. Cl. at 624.

The court notes, however, that there are a few years in which certain of the attorneys' Laffey Matrix rate changed midyear, but the plaintiffs' records do not offer consistent information as to when the increased rate should apply. For instance, according to the hours and rate summary on page 5 of "Plaintiffs' Fee and Cost Submission, Nov. 8, 2021," Mr. McGillivary charges a total of 35.6 hours in 2018: 9.20 hours at a rate of $602.00 per hour and 26.4 hours at a rate of $613.00 per hour. According to the detailed hourly reports provided by plaintiffs as documentation of these hours, however, in 2018, Mr. McGillivary reported a total of 38.4 hours in 2018. When the court adds early time entries in 2018 for Mr. McGillivary, the hours do not come to 9.20 hours and the court is unsure how plaintiffs' attorneys came to the results in their summary chart in their "Plaintiffs' Fee and Cost Submission, Nov. 8, 2021." Given that a detailed, contemporaneous log is more likely to be accurate, the court uses the hourly log to determine how many hours were worked by plaintiffs' counsel. When an hourly rate increased during the year, but there is no documentation of when that rate increase occurred, the court uses the lower rate.

The court notes that there are other discrepancies between the summaries provided by plaintiffs and the hourly logs included as documentation, albeit ones not identified by defendant in the parties' briefing on attorneys' fees. For instance, the hourly logs submitted with plaintiffs' fee request, which were included with "Plaintiffs' Fee and Cost Submission, Nov. 8, 2021," indicate that Mr. Ricksecker performed 0.6 hours and 0.4 hours of work on December 20, 2019 and December 23, 2019, respectively. There is, however, no rate and no hour provided for Mr. Ricksecker in the summary sheet for 2019. Mr. Ricksecker was billed at a rate of $566.00 for 2020 and, according to the Fees Matrix provided by plaintiffs, an attorney of comparable skill and experience should be billed at between $544.00 and $566.00 for 2019. Because it is unclear where Mr. Ricksecker's rate would fall on that rate spectrum, and because plaintiffs failed to include a rate in their request, the court awards the one hour that Mr. Ricksecker worked in 2019 at $544.00 per hour. Plaintiffs also omitted from their summary of hours the 0.6 hours that Mr. Purushotham worked on January 5, 2022. The court again looks to information provided by plaintiffs, which only provides rate information through 2021. Accordingly, the court defaults to the rate that he billed in 2021, which was $380.00 per hour for the 0.6 hours that he billed in 2022.

Additionally, there are several inconsistencies between the summary of hours worked and the actual hourly logs, which were included in the same document, and which demonstrate that the summary sheets are not necessarily accurate. For instance, the summary sheet indicates that Mr. Nickerson performed 0.4 hours of work in 2022, but the detailed hourly log indicates that he performed only 0.2 hours of work in 2022. The summary sheet also indicates that for the calendar year 2020, Mr. Nickerson conducted 1.8 hours of work, but the hourly log, when added, comes to 2 hours. Similarly, the summary sheet indicates that Mr. Nickerson performed only 0.6 hours of work in 2019, but there is a second entry of 0.2 hours on December 6, 2019, which appears to have been omitted from the plaintiffs' summary sheet. For Ms. Patel, the summary sheet indicates that she billed 7 hours in 2018, but the hourly logs indicate that she only worked

6.8 hours in 2018. For 2020, the summary sheet indicates that she worked 5.8 hours, but the hourly logs indicate that she actually worked 6 hours. For Ms. O'Brien, the summary sheet indicates that she performed 8.3 hours of work in 2020, but the hourly log in the same document only provides for 8 hours of work. For Charisma Hunter, the summary sheet indicates that she performed 0.4 hours of work in 2020, but the detailed hourly log states that she performed 0.5 hours of work in 2020. Because of the presence of inconsistencies in plaintiffs' fee request, the court uses the detailed hourly logs to compute the fees owed to plaintiffs' attorneys, as detailed below:

| Attorney Name | Year | Hours | Rate | Total |
|---|---|---|---|---|
| Gregory McGillivary | 2017 | 25.4 | $602.00 | $15,290.80 |
| Gregory McGillivary | 2018 | 38.4 | $602.00 | $23,116.80 |
| Gregory McGillivary | 2019 | 37.1 | $613.00 | $22,742.30 |
| Gregory McGillivary | 2020 | 14.6 | $637.00 | $9,300.20 |
| Gregory McGillivary | 2021 | 10.9 | $665.00 | $7,248.50 |
| Gregory McGillivary | 2022 | 0.4 | $665.00 | $266.00 |
| | | | **Total:** | **$77,964.60** |

| Attorney Name | Year | Hours | Rate | Total |
|---|---|---|---|---|
| David Ricksecker | 2019 | 1 | $544.00 | $544.00 |
| David Ricksecker | 2020 | 233.6 | $566.00 | $132,217.60 |
| David Ricksecker | 2021 | 59.6 | $566.00 | $33,733.60 |
| David Ricksecker | 2022 | 14 | $591.00 | $8,274.00 |
| | | | **Total:** | **$174,769.20** |

| Attorney Name | Year | Hours | Rate | Total |
|---|---|---|---|---|
| Theodore Coploff | 2017 | 39 | $ 410.00 | $15,990.00 |
| Theodore Coploff | 2018 | 189.7 | $ 410.00 | $77,777.00 |
| Theodore Coploff | 2019 | 62.2 | $ 417.00 | $25,937.40 |
| Theodore Coploff | 2020 | 191.4 | $ 510.00 | $97,614.00 |
| Theodore Coploff | 2021 | 42.7 | $ 532.00 | $22,716.40 |
| Theodore Coploff | 2022 | 50.4 | $ 532.00 | $26,812.80 |
| | | | **Total:** | **$266,847.60** |

| Attorney Name | Year | Hours | Rate | Total |
|---|---|---|---|---|
| Matthew Purushotham | 2018 | 60.7 | $302.00 | $18,331.40 |
| Matthew Purushotham | 2019 | 91.1 | $340.00 | $30,974.00 |
| Matthew Purushotham | 2020 | 288.8 | $365.00 | $105,412.00 |
| Matthew Purushotham | 2021 | 69.1 | $380.00 | $26,258.00 |
| Matthew Purushotham | 2022 | 0.6 | $380.00 | $228.00 |
| | | | **Total:** | **$181,203.40** |

| Name | Year | Hours | Rate | Total |
|---|---|---|---|---|
| Keith Nickerson | 2018 | 20.2 | $166.00 | $3,353.20 |
| Keith Nickerson | 2019 | 0.8 | $166.00 | $132.80 |
| Keith Nickerson | 2020 | 2 | $173.00 | $346.00 |
| Keith Nickerson | 2021 | 22.8 | $180.00 | $4,104.00 |
| Keith Nickerson | 2022 | 0.2 | $180.00 | $36.00 |
| | | | **Total:** | **$7,972.00** |

| Name | Year | Hours | Rate | Total |
|---|---|---|---|---|
| Richard DeBoard | 2021 | 7.10 | $180.00 | $1,278.00 |
| | | | **Total:** | **$1,278.00** |

| Name | Year | Hours | Rate | Total |
|---|---|---|---|---|
| Sandy Patel | 2018 | 6.8 | $166.00 | $1,128.80 |
| Sandy Patel | 2020 | 6 | $173.00 | $1,038.00 |
| | | | **Total:** | **$2,166.80** |

| Name | Year | Hours | Rate | Total |
|---|---|---|---|---|
| Kathleen Dacruz | 2018 | 11.8 | $166.00 | $1,958.80 |
| Kathleen Dacruz | 2019 | 1.5 | $166.00 | $249.00 |
| Kathleen Dacruz | 2020 | 17.1 | $180.00 | $3,078.00 |
| Kathleen Dacruz | 2021 | 1.6 | $180.00 | $288.00 |
| | | | **Total:** | **$5,573.80** |

| Name | Year | Hours | Rate | Total |
|---|---|---|---|---|
| Ethan Trucker | 2018 | 9 | $166.00 | $1,494.00 |
| | | | **Total:** | **$1,494.00** |

| Name | Year | Hours | Rate | Total |
|------|------|-------|------|-------|
| Shannon Dhillon | 2018 | 5.6 | $166.00 | $929.60 |
| Shannon Dhillon | 2019 | 1 | $166.00 | $166.00 |
| | | | **Total:** | **$1,095.60** |

| Name | Year | Hours | Rate | Total |
|------|------|-------|------|-------|
| Mary O'Brien | 2018 | 2.5 | $166.00 | $415.00 |
| Mary O'Brien | 2020 | 8 | $173.00 | $1,384.00 |
| | | | **Total:** | **$1,799.00** |

| Name | Year | Hours | Rate | Total |
|------|------|-------|------|-------|
| Charisma Hunter | 2020 | 0.5 | $173.00 | $86.50 |
| | | | **Total:** | **$86.50** |

The total sum owed to plaintiffs for attorneys' fees applying the Laffey Matrix, as requested by plaintiffs, consistent with the adjustments described above, at this time, is $722,250.50.

Plaintiffs' Requests for Costs

In addition, plaintiffs' attorneys have requested out-of-pocket costs related to litigating the above captioned case. Defendant states that plaintiffs "can recover out-of-pocket expenses only to the extent that they are not already covered by the attorney's hourly rates."

The FLSA provides an express statutory authorization for payment of attorneys' fees and costs in an FLSA lawsuit:

> Any employer who violates the provisions of section 206 or 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

29 U.S.C.§ 216(b). The FLSA, at 29 U.S.C.§ 216(b), also provides: "The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." Id. "Under the FLSA, costs include reasonable out-of-pocket expenses." Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 969 (10th Cir. 2002) (citing Shorter v. Valley Bank & Trust Co., 678 F. Supp. 714, 726 (N.D. Ill. 1988) ("Costs under fee-shifting statutes such as the FLSA include all reasonable out-of-pocket expenditures."). Such costs "can include costs beyond those normally allowed under Fed. R. Civ. P. [Federal Rules of Civil Procedure] 54(d) and 28 U.S.C. § 1920." Smith v. Diffee Fort-Lincoln-Mercury, Inc., 298 F.3d at 969 (alteration added) (citing Herold v. Hajoca Corp., 864 F.2d 317, 323 (4th Cir. 1988)); Calderon v. Witvoet, 112 F.3d 275, 276 (7th Cir. 1997) (finding that "outlays for

67

travel and related expenses by attorneys and paralegals" were "nonetheless reimbursable-but as part of the award for attorneys' fees, because travel and meal expenses are the sort of things that a lawyer includes with a bill for professional services" (citing Missouri v. Jenkins, 491 U.S. at 285–89; Herold v. Hajoca Corp., 864 F.2d at 323)).

In the case currently before the court, defendant asserts that "[m]any of these claimed costs are not of a nature that would customarily be billed to a client and are instead already covered by the attorney's hourly rates. Some of the costs also appear unnecessary or unreasonable." (alteration added). Defendant argues:

> The first expense plaintiffs list is $1,162.93 for "Bloomberg Research." Plaintiffs have not demonstrated that this type of expense would ordinarily be billed to clients in addition to an attorney's hourly rates. In any case, plaintiffs provided documentation showing that Mr. Purushotham conducted 11 law searches using a Bloomberg service on September 28, 2020. However, Mr. Purushotham's time records do not indicate that he conducted any legal research on that day. Rather, his records indicate that final edits to plaintiffs' post-trial brief had been made the previous day. It is not clear why there was a need to incur $1,162.93 in research costs on September 28, 2020. Absent a satisfactory explanation, the Court should exclude that expense entirely from any award.

(internal references omitted). The next line item that defendant contests is $105.14 for "misc.," which defendant argues should be excluded in its entirety for want of greater explanation. Defendant also asserts:

> Plaintiffs seek $726.38 for "Phone Charges." The costs of telephone plans are not direct expenses of this case or any other individual case. As discussed above, overhead expenses of that nature are not recoverable as costs because they are covered by the attorney's hourly rates. Bennett, 699 F.2d at 1145 n.5 ("Examples of expenses that would be covered by the hourly rate include fixed overhead such as utilities, rent, and secretarial expense."). Plaintiffs' telephone charges should be excluded in their entirety.

Defendant further argues that the expense labeled as "Production of Documents" for $1,725.30 should be disallowed because "[t]his does not appear to be an expense producing documents during discovery (plaintiffs barely produced any documents during discovery)." (alteration added). Defendant asserts that

> this charge appears to relate to plaintiffs' decision to print approximately 15,000 pages shortly before trial. It is not clear that this expense would customarily be charged to a client, and, even if it would be, this expense does not seem necessary or reasonable. The Government printed—and paid for—all of the trial exhibit binders in this case. The trial was held remotely, such that all counsel had ready access to a computer. Absent a reasonable explanation for plaintiffs' need to print these roughly 15,000 pages, this charge should be excluded in its entirety.

Finally, defendant argues that plaintiffs' travel expenses of $7,777.30 should not be allowed because "they do not itemize or clearly explain how this amount is calculated." Defendant also states:

> Some of the amounts claimed seem questionable. For example, to the extent reimbursement for meals is appropriate at all, the $141.89 for Mr. McGillivary at the "Firelake Grill" and $153.89 the next day at "Newsroom" seem exorbitant in amount. And there was no travel required for the trial, so it is unclear what the basis is for the Government to reimburse plaintiffs for Mr. Ricksecker's trial lunch burritos.

(internal references and footnote omitted). Defendant concludes that "[f]or all expenses not excluded in their entirety, the Court should apply the same 6.67 percent success rate discussed above." (alteration added). Defendant provides no additional support for its summary argument.

Plaintiffs respond that "[n]one of the Government's arguments are valid. All of the costs to which the Government objects are plainly the type of costs that are typically charged to clients." (alteration added). Plaintiffs state:

> All of the costs that defendant raises fall within the scope of the typical costs charged to clients. For instance, the Government objects to online legal research conducted by Mr. Purushotham on the day that the plaintiffs' post-trial brief was filed. It's hard to fathom how a party could claim that completing legal research while finalizing the post-trial brief is not a legitimate cost. Similarly, the Government objects to copying costs that plaintiffs incurred just before trial. According to the Government, because it prepared some binders prior to trial, the plaintiffs should have had no copying costs. The Government is incorrect. It prepared seven total binders (three for the court, one for the court reporter, one for witnesses in St. Paul, and one each for the plaintiffs and defendant). This, of course, does not cover any copying costs for, for instance, plaintiffs' additional counsel or documents related to preparation or trial. Additionally, it does not cover any trial preparation documents that were not copies of the exhibits as required by the Court's orders. As the Court is aware, the instant case was document intensive. Plaintiffs had to prepare documents both to prepare for and to participate in the trial. Further, any contention by the Government that plaintiffs did not need hard copies of the documents because the trial was remote and plaintiffs had "ready access to a computer" is a red herring at best because, of course, plaintiffs' counsel was not consistently able to reference documents on the computer while using the same computer to access the trial.

With respect to the travel expenses and meals with which defendant took issue, plaintiffs, citing <u>Calderon v. Witvoet</u>, 112 F.3d 275, state that "[t]hese meal costs,

however, are of the sort that have consistently been found to be recoverable in FLSA actions." (alteration added). Plaintiffs also state that the travel expenses which were incurred while Mr. McGillivary and Mr. Coploff traveled to Minneapolis "to depose the Government's RCFC 30(b)(6) witness and four of plaintiffs' supervisors," are reasonable and should be allowed.

In the above captioned case, the court does not find defendant's summary and unsupported assertion that the court should reduce the expenses claimed by plaintiffs' counsel to only 6.67 percent of the requested total to be persuasive. It may be appropriate to reduce an award of costs when a plaintiff has succeeded on some, but not all, claims. See Shea v. United States, 154 Fed. Cl. at 7. For example, in Shea v. United States, the Judge reduced the plaintiffs' requested hours by 30 percent because the plaintiff succeeded on liability but did not prove "willfulness or entitlement to liquidated damages." Id. (quoting Hensley v. Eckerhart, 461 U.S. at 440). Nevertheless, despite the 30 percent reduction in the fee, the court in Shea v. United States awarded all of the plaintiffs' requests for expenses because of the interrelated nature of the legal issues and the impracticability of separating the expenses by claim. See id. ("In light of the related nature of these issues, the court awards $16,696.68 in costs, the full amount requested."

In the case currently before the court, while the plaintiffs did not prevail on every one of their claims, in its earlier trial Opinion on liability the court found:

> Based on the record before the court, these five plaintiffs, therefore, were being improperly paid for the time spent on-call monitoring the duty phone because they were receiving AUO pay instead of the correct type of compensation, one and one-half pay, for the overtime spent actively working while on-call. See 29 U.S.C. § 207(a)(1). Additionally, any time plaintiffs were responsible for monitoring the duty phone during the timeframe the court determined was during ERO 2.0, June 5, 2017 to July 15, 2017, will not be subject to this analysis because plaintiffs were already paid one and one-half pay for their time spent monitoring the duty phone during ERO 2.0.

Cheung v. United States, 157 Fed. Cl. at 557. In addition, unlike in Shea v. United States, 154 Fed. Cl. 1, plaintiffs in the above captioned case, prevailed on the issue of willfulness on the part of the agency and were, therefore, awarded liquidated damages. See id. at 563. As discussed above, in the court's earlier trial Opinion on liability the court found:

> Defendant's efforts to determine whether plaintiffs were subject to AUO compensation or regular overtime compensation were insufficient. Plaintiffs have proven that ICE did not demonstrate to the satisfaction of the court that the act or omission which gave rise to the decisions would meet the good faith test and that there were reasonable grounds for believing that the omission was not a violation of the Fair Labor Standards Act of 1938.

Cheung v. United States, 157 Fed. Cl. at 563. "The court concluded: "Liquidated damages in the amount of double the actual damages are appropriate for the named plaintiffs for the period at issue in this case." Id. Given the interrelated nature of the issues in the above captioned case, and the unreasonableness of defendant's proposal to only award

plaintiffs 6.67 percent of their requested total, the court declines to adopt defendant's approach to awarding costs. Moreover, the court finds that all of the plaintiffs' claimed costs, with a few exceptions discussed below, are reasonable.

With respect to specific objections by defendant, as noted above, defendant argues that the "first expense plaintiffs list is $1,162.93 for 'Bloomberg Research.' Plaintiffs have not demonstrated that this type of expense would ordinarily be billed to clients in addition to an attorney's hourly rates." The court does not agree with defendant's argument that Bloomberg research, conducted the day that a brief was filed, should be rejected. On September 28, 2020, Mr. Purushotham's work log indicates 1.7 hours for the following: "Compose and send e-mails re finalizing and filing post-trial brief; make final revisions to table of contents and table of authorities in same; finalize and file same; serve same on opposing counsel." It is reasonable for attorneys to conduct legal research while finalizing briefing to be submitted to the court to ensure, for instance, that the case citations contained therein are up to date and represent the current state of the law. Accordingly, the court finds the Bloomberg legal research to be reasonable and allowable.

In addition, the line item for "Production of Documents," for plaintiffs' counsel to use at trial is reasonable and allowable. The fact that the trial was remote, and the fact that plaintiffs' counsel "had ready access to a computer," does not necessarily reduce plaintiffs' counsel's need to have backup, hard copies of documents for use during trial. Not only can technology fail, it is reasonable, and prudent, for attorneys to have redundant, and, if preferred, hard copy versions of necessary documents for the possible use at trial, including copies which are perhaps highlighted or flagged. The court finds, therefore, that the expenses attributed to "Production of Documents" as part of trial preparation are reasonable and allowable.

Finally, the court finds that the expenses that plaintiffs' counsel incurred while traveling to Minneapolis to depose witnesses, to include meals at "Firelake Grill" and "Newsroom," typically are costs that attorneys would bill to the client and are allowable, if reasonable. See Calderon v. Witvoet, 112 F.3d at 276 (finding that "outlays for travel and related expenses by attorneys and paralegals" were "nonetheless reimbursable-but as part of the award for attorneys' fees, because travel and meal expenses are the sort of things that a lawyer includes with a bill for professional services" (citing Missouri v. Jenkins, 491 U.S. at 285–89; Herold v. Hajoca Corp., 864 F.2d at 323)). Plaintiffs' counsel traveled to Minneapolis "to depose the Government's RCFC 30(b)(6) witness and four of plaintiffs' supervisors," which was necessary for trial preparation and were reasonable and allowable expenses. See Shea v. United States, 154 Fed. Cl. at 7. In addition, the court finds that the "Phone charges," are allowable costs that were reasonably incurred during the litigation as the plaintiffs have provided records sufficient to separate the charges for this case from the phone charges pertaining to other matters. Plaintiffs' claimed phone charges are, therefore, reasonable and allowable.

The court finds, however, certain of the plaintiffs' claimed expenses should not be shifted to the government, despite plaintiffs having sufficiently prevailed in the litigation to be eligible for the attorneys' fees, costs, and expenses that the court has found reasonable and allowable. Plaintiffs' attorneys are located in the Washington, D.C. area and plaintiffs' attorneys have not provided a compelling reason as to why the government

should reimburse Mr. Ricksecker for his lunch time burritos for a trial that he participated while he was located in Washington, D.C. The court also finds that plaintiffs' line item for "misc.," without greater explanation as to how it is connected to this case, is not allowable because plaintiffs fail to demonstrate that these costs are reasonable and "are the sort of things that a lawyer includes with a bill for professional services." Calderon v. Witvoet, 112 F.3d at 276. The allowed costs are as follows:

| Costs | Amount Allowed |
|---|---|
| Bloomberg Research | $1,162.93 |
| Court Records Accessed | $4.70 |
| Federal Express | $655.89 |
| Filing Fee | $400.00 |
| LexisNexis Research | $524.18 |
| Phone Charges | $726.38 |
| Postage | $289.20 |
| Production of Documents | $1,725.30 |
| Transcript | $8,815.90 |
| Travel Expense | $7,777.30 |
| | |
| Supplemental Costs | Amount Allowed |
| Court Records Electronically Accessed | $1.90 |
| LexisNexis Research | $108.53 |
| | |
| | Total: $22,192.21 |

The total allowable and reasonable costs owed to plaintiffs, at this time, are $22,192.21.

## CONCLUSION

As determined above, the FLSA, not the Back Pay Act, is the correct framework by which to analyze the plaintiffs' damages, including liquated damages in the case brought by plaintiffs Cheung, Kos, Miller, Onewokae, and Wright. Further, under the FLSA, the "workweek" time period is the appropriate unit of measure for calculating compensation owed plaintiffs. Final proceedings regarding the exact calculation of damages by the parties in accordance with the Opinions issued by the court will be scheduled in a Separate Order.

**IT IS SO ORDERED**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**